UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

───────────────────────────────────────────────

UNITED STATES OF AMERICA,          )
                                   ) CASE NO. 18-00315-RAJ
                 Plaintiff,        )
                                   ) SEATTLE, WASHINGTON
v.                                 )
                                   ) January 17, 2020
GIZACHEW WONDIE,                   ) 10:00 a.m.
                                   )
                 Defendant.        ) MOTION HEARING
                                   )

───────────────────────────────────────────────

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE L. PETERSON
UNITED STATES MAGISTRATE JUDGE

───────────────────────────────────────────────


APPEARANCES:

 For the Plaintiff:      TOBIAS D. TOBLER
                         ERIN BECKER
                         United States Attorney's Office
                         700 Stewart Street, Suite 5220
                         Seattle, WA 98101


 For the Defendant:      MOHAMMAD ALI HAMOUDI
                         SARA BRIN
                         Federal Public Defender's Office
                         1601 Fifth Avenue, Suite 700
                         Seattle, WA 98101


 Reported by:            NANCY L. BAUER, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov

```
1                         PROCEEDINGS

2    ─────────────────────────────────────────────

3            THE COURT:  Good morning.  Please be seated.

4       We are here on U.S. v. Gizachew Wondie, Case No. CR18-315.

5       Counsel, please make your appearances for the record.

6            MR. TOBLER:  Good morning, Your Honor.  Tobias Tobler

7    and Erin Becker for the United States.

8            MR. HAMOUDI:  And good morning, Your Honor.  Mohammad

9    Hamoudi, Ms. Sara Brin.  We're here on behalf of Mr. Wondie.

10   He's out of custody, and he's sitting in the middle of us.

11           THE COURT:  Good morning, Mr. Wondie.

12           THE DEFENDANT:  Good morning.

13           THE COURT:  All right, Mr. Hamoudi.  This is your

14   motion.  I'll hear from you first.

15           MR. HAMOUDI:  Yes, Your Honor.  I filed with the

16   court...

17           THE COURT:  Well, I have reviewed your motion at

18   Docket No. 75.  I've reviewed the government's response at

19   Docket No. 89, and the exhibits attached thereto.  I've

20   reviewed the reply that you filed at Docket No. 92; the

21   exhibits that you attached.  I reviewed Docket No. 101, which

22   was a status update filed by the government.  I reviewed

23   Docket No. 102, which, I think, is what you were referring

24   to, which is your supplemental submission.  I've also

25   reviewed the protective order and briefly reviewed your
```

1    *Franks* motion.

2            MR. HAMOUDI:  Thank you, Your Honor.

3        What we've laid out in the supplemental submission is that

4    we request that the court review Category 1 of the materials

5    in camera, and we've laid out a proposal on how best to

6    accomplish that.

7        At this point, we don't have confidence that we are

8    getting everything, and the reason why I don't -- and I'm

9    putting on the court's camera -- this is a document that

10   Mr. Tobler sent and caused to be sent to the King County

11   Sheriff's Office and the King County Prosecutor's Office back

12   on December 13, 2018.

13       And what this document represents is that Mr. Tobler,

14   understanding the importance of the government's discovery

15   obligations, is saying all electronic communications

16   pertaining to the investigation must be preserved regardless

17   whether the communications are substantive.

18       The case agent, the affiant in this case, disregarded this

19   order, went ahead and allowed to be destroyed her text

20   messages, and her state of mind is at issue.

21       And it's clear that the King County's Sheriff's Office and

22   the King County Prosecutor's Office is disregarding orders by

23   the United States Attorney's Office.

24       We do not have confidence that they're going to continue

25   to respond to requests for material.

1        In order to ensure that my client's rights are protected,

2   a court order -- a federal court order is necessary for this

3   material to be disclosed to this court.

4        I will outline and direct the court's guidance on how to

5   review this material, in detail, by closing of business

6   either today, or by Monday close of business, Your Honor.

7             THE COURT:  And are you just talking about the hard

8   copy of the homicide file?

9             MR. HAMOUDI:  Respectfully, Your Honor, I would like

10  the court -- I would like the court to review the entire

11  file, because I just don't have any confidence, at this

12  point, that my client's rights, under *Brady*, and my client's

13  rights, under Rule 16, are being respected.

14            THE COURT:  I guess my question is, there's also

15  electronic evidence.  Are you suggesting that I go through

16  the email as well or text messages that are available?

17            MR. HAMOUDI:  Yes, Your Honor.  And the reason why is

18  this:  The court is concerned about the monumental task that

19  may be ahead of it, or if this is like -- like -- if the

20  court is not -- yes, I expect the court to go through the

21  correspondence and the entire file, and review it for *Brady*

22  material and Rule 16 material.  And then the court can issue

23  a report and let us know what falls under what category, and

24  make that report and recommendation to Judge Jones.

25            THE COURT:  What is the status of the trial date?

1        MR. HAMOUDI:  The trial date -- Mr. Wondie executed a

2   speedy trial waiver through June of this year, and that's

3   filed in the court's docket, but we didn't file a motion

4   accompanying that, because Judge Jones's clerk directed us

5   that it was unnecessary.

6     He has not yet set an actual trial date.  A preliminary

7   trial date has been discussed, around March 23rd.  But given

8   what I have attached to Docket 102, the supplemental reply

9   and what I learned of yesterday, I think this situation may

10  be -- I need to think about the situation a little bit more

11  critically, and give some advice to my client about maybe

12  kicking out the trial date maybe even longer, to make sure

13  this is done right.

14     So that is our position at this point.

15        THE COURT:  And with respect to the other two

16  discovery matters, you are withdrawing your motion?

17        MR. HAMOUDI:  I'm not withdrawing my motion.  What

18  I'm going to do, Your Honor, is that I'm going to meet and

19  confer with the government.  And what I would like to do --

20        THE COURT:  Which you should have done in the first

21  place, Mr. Hamoudi.

22        MR. HAMOUDI:  Your Honor --

23        THE COURT:  A meet-and-confer is face to face or on

24  the telephone.  It's not an email that says, you know, "I

25  consider this the meet-and-confer."  Because when you meet

```
 1   and confer, you're able to have a dialogue about what you
 2   actually need to move to compel.  So that's why it's in the
 3   rule.  Granted, it's in the rule as of January 1, so maybe
 4   you didn't realize that.
 5            MR. HAMOUDI:  I just want to make clear, Your Honor,
 6   that I have met and conferred orally and in writing over the
 7   past year with the government, repeatedly, about the issues
 8   in this case.
 9            THE COURT:  Not the issues.  You meet and confer.
10   You tell Mr. Tobler or Ms. Becker, "Here are the items that I
11   am going to be moving to compel.  What is your response?"
12   That's the dialogue that we want to have happen before you
13   file your motion to compel.  It's the rule.  I don't want to
14   hear -- I don't need to hear anything more about it.  But
15   let's talk about the other two issues.
16            MR. HAMOUDI:  The other two issues we will start to
17   address with the government, and meet and confer with them.
18   We've narrowed the third request.  We will address the second
19   request as well with them, and report back to the court if
20   there are disputes.
21            THE COURT:  So can I -- is this without prejudice?
22   Do you want to just keep your motion to compel open?  Do you
23   want the court to rule on the motion to compel or recommend
24   that Judge Jones rule on the motion to compel without
25   prejudice as to the second and third issue?
```

1           MR. HAMOUDI:  I would ask that the court rule without

2   prejudice as to the second and third category.

3           THE COURT:  Okay.

4       And do you have any information on the email that you

5   provided this morning, 102-3, which is from the unspecified

6   sender to John Free?

7           MR. HAMOUDI:  Yes.

8           THE COURT:  It appears that there's something that's

9   cut off, or it's been cut off.  Have you been given any

10  information about that?

11          MR. HAMOUDI:  That's why I said "either redacted or

12  didn't spell it out."

13          THE COURT:  Okay.  Thank you.  Thank you,

14  Mr. Hamoudi.

15          MR. HAMOUDI:  Thank you.

16          THE COURT:  Mr. Tobler?

17          MR. TOBLER:  Thank you, Your Honor.  Just a couple of

18  quick clarifications.

19      We're not aware of and we have no reason to believe that

20  the retention letter that was placed on the screen went to

21  the King County Prosecutor's Office.  I thought I heard

22  Mr. Hamoudi say that, so I just wanted to make that clear for

23  the record, that the retention request, as far as I know, was

24  never shared with the King County Prosecuting Attorney's

25  Office.

1        THE COURT:  Who was it shared with?  Can you put it

2   back up?

3        MR. TOBLER:  Yes.

4        THE COURT:  This isn't an issue that's before the

5   court, but to be clear.

6        MR. TOBLER:  Sure.

7     This was sent directly to Special Agent Tammy Spencer, who

8   is the federal case agent on the federal case.  It's our --

9   this is our retention request that we send out in all cases.

10  We ask that the case agent share that information contained

11  in the retention request, and share that memo with all

12  members of the investigative team.

13       THE COURT:  And are you aware of whether or not that

14  was shared with Detective Decker?

15       MR. TOBLER:  Yes.  As far as this form that appears

16  on the screen right now, I can't say for certain.  But what I

17  can say for certain, and the defense is aware of this, is

18  that Detective Decker did get an email from Special Agent

19  Marco Dkane, from Homeland Security, making her aware of the

20  requirement that, in a federal case, that she retain her

21  email, and text messages as well.

22     So as far as the email that you mentioned, Your Honor,

23  just now, it's marked as Document 102, Exhibit 3.  Just to be

24  clear, this -- there's no redaction at the end of the word

25  beginning C-R-E-A.  That's where the word cut off.  So

1   there's been no redaction that the government's made.

2      I believe that the reason it appears the way it does is

3   because it was never actually sent, but it's a draft and we

4   collected it, and so we turned it over to the defense.

5   That's my understanding, Your Honor.

6             THE COURT:  Okay.

7             MR. TOBLER:  In terms of actual request, I think

8   we're here to talk about the first request that the defense

9   made in the motion to compel, and that relates to the entire

10  murder file --

11            THE COURT:  Right.

12            MR. TOBLER:  -- from the underlying investigation

13  into the murder of Amarah Riley.  We certainly oppose the

14  request for unfettered access to the communications of every

15  investigator or attorney who has touched this case over the

16  course of the last one and a half years.

17            THE COURT:  Are you opposing the in camera review of

18  it, or just defense counsel's review of it?

19            MR. TOBLER:  Well, we don't think it's necessary to

20  review in camera.  We oppose, for, I think, obvious

21  law-enforcement-sensitive reasons, sharing it with the

22  defense, but as a practical matter, it's not even -- these

23  aren't emails that are in our possession currently, as I'm

24  sure you're aware.  Going out and collecting -- attempting to

25  fashion search terms that would allow us to capture all of

1   the communications from anybody who's had any involvement

2   with the investigation into the death of Amarah Riley, which

3   began in September of 2018.  The search warrants in this case

4   that are the subject of the *Franks* motion were filed -- were

5   signed and executed in early December 2018.  So this

6   investigation into the murder has been going on for a full

7   year-plus since that time.

8           THE COURT:  It would be helpful to me if you could

9   walk me through what you have done to review the file for

10  potential exculpatory information.  And it's my understanding

11  that you did run some search terms, so there's that

12  capability.  So I'd like to know, did you have access to the

13  system yourself, or did you have another King County

14  prosecutor that did it?

15          MR. TOBLER:  No, Your Honor.  Thanks.

16      In terms of what we've reviewed -- and I know there's a

17  lot of information in the filings.  We tried to lay this out

18  as cleanly as possible.

19      In terms of what we've reviewed most recently, I think the

20  items that are the subject of the motion to compel, first,

21  there's this bucket, which is email.  In December of 2019, we

22  collected the email of six potential witnesses, in accordance

23  with our *Jencks* obligations, from the time frame of September

24  15th, I believe, 2018, around the time of the murder, through

25  the end of 2018, December 2018.  By that point, it had been a

1    month since the defendant had been arrested and the search

2    warrant had been executed.

3         The search term that we asked the King County Public

4    Records Department to use was the name "Wondie," and that

5    turned back approximately 700 emails.

6         And just to be clear for the court, the way this process

7    has worked is, I contact the King County Public Disclosure

8    Public Records Department, and they run the searches, and

9    they provide me with the results.

10              THE COURT:  And the six potential witnesses, who are

11   those?

12              MR. TOBLER:  They're deputies and detectives from

13   King County.  I think probably we would agree that most

14   pertinent is Detective Decker, who is the affiant in the

15   search warrant that's been challenged in the *Franks* motion.

16   So that's the first, sort of, set of information.

17        The second set of information is, in January -- early

18   January, we went back to King County Public Records to check

19   for more email in the same time frame.  We wanted to cast a

20   wider net, just to be certain that we captured things that we

21   thought the defendant would consider relevant for purpose of

22   his motion.

23              THE COURT:  And that was 2020?

24              MR. TOBLER:  Yes, January 2020.

25              THE COURT:  Same six witnesses?

1          MR. TOBLER:  No.  We focused on Detective Decker and

2    Detective Free.  Detective Free is Detective Decker's

3    partner.  And for that, we used, I believe, four search

4    terms.

5          THE COURT:  Same time period?

6          MR. TOBLER:  Yes, Your Honor, same time period.

7          THE COURT:  Okay.  And the four search terms are in

8    your pleadings, so we don't have to go over that.

9          MR. TOBLER:  Yes, Your Honor.

10        In addition to the emails, we also have a paper file --

11   what I'll refer to as a "paper file" -- that resides at the

12   King County Sheriff's Office.  And what, essentially, that

13   consists of is two large binders full of paper, notes,

14   reports, that sort of information.

15        We reviewed that at the King County Sheriff's Office.  We

16   made copies of the pages out of those two paper files that we

17   considered responsive to the defendant's requests.  We

18   overproduced, in an abundance of caution, things that were

19   not covered by any discovery obligation.

20        But to be clear -- and we've notified the defendant of

21   this as well -- there are a handful of thumb drives that are

22   sitting in the paper file that include things like video

23   surveillance of -- well, some videos that we don't think

24   could possibly be relevant to Mr. Wondie.

25             THE COURT:  And when you say "the two paper files,"

1    are we talking a box?

2          MR. TOBLER:  They are these large, three-ring

3    binders.  I would estimate a couple of hundred pages each, at

4    least.  At least.

5       And in addition, we asked King County Sheriff's Office --

6    this isn't public records at this point -- but we asked the

7    sheriff's office to provide us with a -- they informed us

8    that they have an electronic file where some information

9    resides, and so we requested that they give us all that

10   information on a thumb drive.

11         THE COURT:  When did you request that?

12         MR. TOBLER:  At the same time.  I believe we obtained

13   it on January 6th, 2020.  They gave us that electronic file,

14   I believe, the same day that we went over to physically

15   review the file at the King County Sheriff's Office.

16         THE COURT:  And did the electronic file contain

17   emails and text messages, or what was that?

18         MR. TOBLER:  No, not primarily.  I'm sorry.  I don't

19   have all of it in front of me right now.  But it included, I

20   think, more electronic evidence, reports, I believe, as well,

21   that type of thing.

22         THE COURT:  There's a lot that falls under electronic

23   evidence.

24      Did you provide a discovery log to Mr. Hamoudi?

25         MR. TOBLER:  With respect to the information that --

1            THE COURT:  The thumb drive.

2            MR. TOBLER:  -- we turned over to him -- sorry, Your

3    Honor.

4            THE COURT:  Did you turn anything over from the thumb

5    drive that you received with the electronic evidence?

6            MR. TOBLER:  Yes, we did, as well as the paper, as

7    well as the emails, and, yes, we've -- for everything that's

8    gone out the door for production, as opposed to in-office

9    review subject to the protective order, those appear on the

10   most recent discovery order with Bates numbers.

11           THE COURT:  And I'm sorry if you answered this, but

12   the electronic file does not contain the text messages or

13   emails between the witnesses or the detectives?

14           MR. TOBLER:  No.  Your Honor, there may be some, but,

15   generally speaking, no, that's not the contents.  I

16   apologize.  If I could remember -- I don't want to totally

17   discount and say, no, there are no text messages whatsoever

18   in there, but the vast majority of those materials are not

19   text messages, and certainly not text messages that we

20   perceive as being relevant to the case.

21           THE COURT:  And how big is the material that's on the

22   thumb drive?

23           MR. TOBLER:  The thumb drive is approximately -- I

24   think they said 60 gigs of data, but it includes, again, a

25   good deal of electronic evidence.  I will say, from what I

1    recall from my review of the information on the thumb drive,

2    a lot of it has been captured elsewhere and made available to

3    the defendant, either because it also appeared in the paper

4    file or it appeared as an attachment to an email that's been

5    produced or disclosed to the defendant.

6             THE COURT:  Okay.  And you ran search terms on the

7    electronic file, or you reviewed it page by page?

8             MR. TOBLER:  We went through the electronic file and

9    clicked and opened the folders and sub folders and the

10   contents contained in it.

11            THE COURT:  And have we covered all of the potential

12   material that's out there relating to the homicide

13   investigation, or is there other material?

14            MR. TOBLER:  Your Honor, the court's indulgence?

15        Your Honor, one more thing.  Co-counsel has reminded me --

16   and this is also in the papers that the government has filed.

17        In addition to the emails that were collected in January,

18   running those search terms, we also collected the files, the

19   contents of the sub files of email, where Detectives Free and

20   Decker saved information.

21        So my understanding is that if they had pulled something

22   over to a file, an email to specifically save it, we've

23   captured all those as well, regardless of the actual, kind

24   of, contents of the email.  They weren't captured in the

25   search by terms, in other words.

1        THE COURT:  So you didn't pull the sub files out

2    independently, but they were captured by the search terms, or

3    whatever was in there?

4        MR. TOBLER:  I was unclear.  I'm sorry, Your Honor.

5      No, we did.

6        THE COURT:  Okay.

7        MR. TOBLER:  In addition to running the search for

8    the search terms, we also asked King County Public Records to

9    produce to us the sub folders that Detectives Free -- sub

10   folders of emails that Detective Free and Detective Decker

11   had created to saved email related to the Amarah Riley murder

12   investigation.

13       THE COURT:  And how did you know -- I mean, what were

14   the sub files?

15       MR. TOBLER:  I spoke to Detective Free and I spoke to

16   Detective Decker, and I asked them, "What are the names of

17   these files so that we can obtain the contents?"

18       THE COURT:  And then they provided you with a PST

19   file, and you ran your own searches -- or excuse me -- King

20   County public disclosure --

21       MR. TOBLER:  They provided us with those sub files,

22   that's correct.

23       THE COURT:  And the exhibit at Docket 102-3, where

24   was that recovered from?

25       MR. TOBLER:  This was recovered in one of the email

```
 1   searches.  I'm sorry, I don't -- let's see.
 2       It has the -- the subject line, Your Honor, of the email I
 3   see is "Wondie."  So this would have been an email, I
 4   believe, that was captured in the first set of emails that we
 5   collected.
 6            THE COURT:  Category 1 set of emails where you ran
 7   the searches?
 8            MR. TOBLER:  I believe that's correct.  I couldn't
 9   tell you for sure, but that would -- it would stand to
10   reason.
11            THE COURT:  Can you remind me of when you ran those
12   searches?
13            MR. TOBLER:  I believe I obtained the contents -- the
14   thumb drive December 11th or December 12th.
15            THE COURT:  2019, I'm assuming?
16            MR. TOBLER:  Correct, Your Honor.
17            THE COURT:  And up until that time, had you received
18   any of this material from Detective Decker, or it was just in
19   December of 2019 is the first time you realized that these
20   emails and these text messages may be relevant?
21            MR. TOBLER:  When you say "any of this material," are
22   you referring to --
23            THE COURT:  I'm referring to the categories that you
24   just outlined, what we were just talking about.
25            MR. TOBLER:  Oh, I'm sorry.
```

1    No, I did not search King County's paper file or their

2    electronic file prior to January of 2020, and I did not go to

3    the King County Sheriff's Office and make these requests to

4    collect all email until December 2019, and that was

5    undertaken with an order to comply with our *Jencks*

6    obligations in this case.

7        THE COURT:  And can you walk me through the standard

8    that you applied when you were reviewing the electronic file

9    and paper files and the emails in determining whether or not

10   you were going to produce something?

11       MR. TOBLER:  Yes, Your Honor.

12   Certainly anything that we considered to be exculpatory

13   would be something that would be captured in that search.

14   I think we wanted to err on the side of giving the

15   defendant everything we thought would be responsive to their

16   requests regarding this defendant and the firearm at issue,

17   the firearm that was used to kill Omar Riley, which the King

18   County Sheriff's Office's believed was returned to this

19   defendant after being test-fired in July of 2017.

20       THE COURT:  Just telling me that it's exculpatory --

21   you looked for exculpatory doesn't give me a firm

22   understanding of what you were --

23       MR. TOBLER:  I apologize, Your Honor.  I --

24       THE COURT:  There's a debate as to whether or not

25   you're applying a materiality standard when you go through

1    and you're reviewing for Brady or *Giglio*, and that's what I'm

2    trying to get at.

3        It sounds to me like what you're saying is that by erring

4    on the side of overproducing, you didn't apply a materiality

5    standard.

6            MR. TOBLER:  No.  Our standard wasn't "is this

7    something that would change the outcome of the proceeding,"

8    no, Your Honor.

9            THE COURT:  All right.  Do you have anything further?

10           MR. TOBLER:  Unless there are any further questions

11   from the court.

12           THE COURT:  No, no questions.

13           MR. TOBLER:  Thank you.

14           THE COURT:  Mr. Hamoudi, my understanding that what

15   you would like to do -- so we've walked through, I think,

16   what the buckets of information or evidence, potential --

17   where potential evidence could be, is it your -- because you

18   haven't proposed anything.  Is it your -- you're requesting

19   the court order the in camera review, and then you propose

20   protocols for conducting that review?

21           MR. HAMOUDI:  Yes, Your Honor, that is my proposal.

22   There was categories of information that may not have been

23   covered that I think is important.

24       The categories of information involve the deputy

25   prosecuting attorney -- former Deputy Prosecuting Attorney

1   McDonald's files, former Deputy Prosecuting Attorney Scott --

2   no, he's still a deputy prosecuting attorney -- O'Toole's

3   files.  These two individuals were working with the agents to

4   prepare the affidavits, and drafts were being exchanged

5   between the agents and the prosecuting attorneys.  And so the

6   court needs to look at those files, and we will make clear

7   that, to the extent there is work product at issue in those

8   files.  However, the work products contain *Brady* material;

9   they're discoverable.  And so I wanted to flag that issue

10  because I don't think that that was covered.

11      The other issue I wanted to just briefly flag is that we

12  will definitely set out -- I will lay out, as I've laid out

13  over the past year, what is happening and what we're looking

14  for and what we intend to do with respect to Mr. Wondie's

15  case, and why this material -- so that it focuses the court's

16  attention so it's not just looking through discovery without

17  any guidance.

18      And I will direct the court -- I will file something with

19  the court to do that, independent of the *Franks* motion that I

20  filed, because additional material that's been in piecemeal

21  coming to me has further informed that that inquiry is

22  expanded.

23          THE COURT:  So it's not just the issue of whether or

24  not there was a match, as stated in the search warrant?

25  You're broadening it?

1          MR. HAMOUDI:  Well, I think my analysis is going to

2    be broadened in part because of the issues that the

3    government has now put into stake in their response and the

4    defensive positions that they've taken.

5          THE COURT:  Can you identify the issues that the

6    government has raised --

7          MR. HAMOUDI:  Well, for example, state of mind is

8    going to be very relevant here, and we're going to have to

9    inquire fairly expansively as to this detective's state of

10   mind.

11      And so there were multiple homicide detectives involved in

12   this case.  It wasn't just Detective Free and Detective

13   Decker.  These detectives consult with the King County

14   homicide unit.  There is a Detective Olmstead, who received

15   the -- NIBIN presumptive lead with the qualification email

16   written by Intelligence Analyst Gonzales.

17      So I just have to think through these things.  These

18   materials were disclosed to us, a significant amount,

19   yesterday.  I've not had the time, and my colleague has not

20   had the time, nor my investigator, to thoroughly go through

21   them, so that's why I need a little time to further lay out

22   where my thinking is.

23      Another issue that's now come up is that -- is the fact

24   that there's been potentially useful evidence destroyed.

25   Now, what is that?  Potentially useful evidence destroyed

1    implicates the due-process clause.  That means I can't say

2    whether it was helpful to me or not, but it may have been

3    potentially useful.

4        With respect to Detective Decker, who is the affiant, who

5    knew that her affidavit was at stake, and at which point in

6    time she took steps, despite receiving a preservation

7    request, to destroy evidence, and it is my -- I believe there

8    is law I have to look at, and so it's going to direct the

9    court's inquiry with respect to another motion that will be

10   forthcoming in front of Judge Jones, and that motion entitles

11   us to potential dismissal, suppression of the evidence, or an

12   adverse credibility finding made by Judge Jones at the *Franks*

13   hearing, which would be helpful to Mr. Wondie's *Franks*

14   motion, in saying that the detective exercised -- was either

15   intentional or with reckless disregard with the facts that

16   she filed with the --

17              THE COURT:  Have you been given any information on

18   the reasons for the spoliation?

19              MR. HAMOUDI:  Your Honor, it was a letter I attached

20   as an exhibit.  I believe there was a verbal conversation

21   that the government had with Detective Decker.  I don't know.

22   But this is a thing I think that the detective should be

23   under oath testifying to.  I don't think it's proper for us

24   to be talking to her off record or anything like that.

25   That's a hearing I think it's only proper to put her under

1  oath directly and get a timeline.

2      In order to get the timeline as to what went down when, I

3  need to have the proper information.  "So when did you

4  receive the preservation request and when were you made aware

5  that, as of January 2019, as of April of 2019, that

6  Mr. Wondie was making specific requests for not even related

7  materials to seek to attack your affidavit, and when did you

8  decide to destroy your text messages on an active homicide

9  case that is yet to be charged -- that is yet to be charged

10  in King County Superior Court?"

11          THE COURT:  Is it a personal phone or personal device

12  or --

13          MR. HAMOUDI:  I have no idea, Your Honor, and this is

14  why it's necessary to put her under oath.

15          THE COURT:  Right, and I understand that's not before

16  me.  Okay.

17          MR. HAMOUDI:  Thank you, Your Honor.

18          THE COURT:  Well, I do think that there is enough

19  here that the court -- well, I'm going to reserve ruling on

20  the issue number one, with respect to the homicide file,

21  until I see what Mr. Hamoudi proposes that the court review

22  in camera.  But I do think there's enough here that

23  additional discovery, additional review, whether that's by

24  the court or by the U.S. Attorney's Office, needs to be done

25  and provided to Mr. Hamoudi.

1      So at this point, I'm going to reserve ruling on issue

2   number one.  I will deny, without prejudice, the motion to

3   compel on issues number two and three.

4      Mr. Hamoudi, Monday is a holiday, so when do you hope to

5   get your proposal to the court?

6           MR. HAMOUDI:  Your Honor, I would just like to add

7   one thing for the record.

8      When I asked the United States Attorney's Office to

9   conduct a *Brady* review of the investigation files, it is left

10  unclear to me who that responsibility was delegated to at the

11  King County Sheriff's Office.

12     To the extent the detectives in the homicide unit are

13  conducting these reviews, you have to understand, Your Honor,

14  they are the subject of the motion.  So I just want to make

15  that clear.

16          THE COURT:  Mr. Tobler, do you want to respond to

17  that?  I'm assuming you know who is conducting the reviews.

18          MR. TOBLER:  Your Honor, we conducted the review at

19  the defendant's request, the two attorneys that are in court

20  here today.

21          THE COURT:  What review are you referring to?

22          MR. HAMOUDI:  When did that occur?  That's my

23  concern.

24          MR. TOBLER:  That was January 6, 2020.

25          THE COURT:  It sounds like there was -- of the

1   categories of documents that we've been discussing, it sounds

2   like the first review or the first request started in

3   December of 2019 and went through January of 2020; is that

4   correct?

5           MR. TOBLER:  Yes, Your Honor.

6           THE COURT:  As to the issues that we've just been

7   discussing here.

8           MR. TOBLER:  Yes, I think that's correct.

9           THE COURT:  So, Mr. Hamoudi, what is your concern?

10          MR. HAMOUDI:  My concern is I made a request, in

11  April 2019, to review these materials -- that the government

12  review these materials.  That request was delegated to the

13  King County Sheriff's Office.

14      Then the United States Attorney's Office, this year, in

15  January 2020, has gone over and started to conduct this

16  review.

17      What that tells me is that, between my requests in 2019

18  and 2020, the King County Sheriff's Office homicide unit has

19  had free rein over these investigative files, and as of now,

20  we know one of the King County homicide detectives, the

21  affiant, has destroyed evidence.  That is a concern for me.

22      And so if they're going over there and saying, "Give us

23  your files," how is Mr. Wondie to feel confident that they

24  are complying?  What authority does the U.S. Attorney's

25  Office have to compel them to do what they're asking them to

1    do?

2              THE COURT:  Unless there is a reason not to trust the

3    U.S. Attorney's Office and the King County Sheriff's Office,

4    I'm confident that these attorneys are reviewing the file and

5    are ensuring that the King County Sheriff's Office is

6    responding to their requests appropriately.

7        I understand that we have the spoliation issue, whether it

8    was intentional or unintentional, but until there is some

9    reason to believe that the King County Sheriff's Office is

10   withholding information from the U.S. Attorney's Office, I'm

11   not going to go down that road.

12             MR. HAMOUDI:  And if they are, I hope the U.S.

13   Attorney's Office will make the court clear -- and I'm not

14   impugning the U.S. Attorney's Office.  What I'm saying is, I

15   don't trust the King County Sheriff's Office, Your Honor.

16   That's what I'm making very clear.

17             THE COURT:  Mr. Tobler, could you briefly respond to

18   the request for the McDonald file and the O'Toole file?

19             MR. TOBLER:  Yes, Your Honor.  For the reasons that

20   are set out in the filings, and as I've said here today, we

21   think that is an overbroad case.

22       We made available, from our review of the emails that were

23   sent between Detective Decker, who is the affiant in this

24   case, and the attorneys, including former Senior Prosecuting

25   Attorney McDonald and Senior Prosecuting Attorney O'Toole,

1    the drafts of the affidavits that are in question, as they

2    went back and forth, and so they have access to that

3    information.

4       I think the request that we dig into the attorney files of

5    an investigation again, that has been going on for a year,

6    past the date of the execution of the search warrant, is

7    overbroad and without justification under the circumstances.

8            THE COURT:  Well, isn't it relevant that one of the

9    senior deputy prosecutors is the one that inserted the

10   language that's at issue in the *Franks* motion?

11           MR. TOBLER:  We think -- I apologize, Your Honor.  I

12   didn't mean to cut you off.

13           THE COURT:  Well, you've looked at email; is that

14   correct?

15           MR. TOBLER:  Yes.

16           THE COURT:  And so have you picked up the email

17   between McDonald and O'Toole, like, leaving Detective Decker

18   off the chain?  Would your search have picked that up?

19           MR. TOBLER:  No.

20           THE COURT:  I'm not ruling on anything right now, but

21   that seems like a logical next step.  And then also, what it

22   sounds like you've done is that you have draft search

23   warrants going back and forth via email to Detective Decker,

24   but what you haven't done, as far as I can tell, is gone to

25   these attorneys or, if one is gone, gone to the file to see

 1   if there were draft search warrants contained in their

 2   electronic files or hard-copy files that was not sent back

 3   and forth.  I mean, it seems you could go that step, and

 4   you're still well within the realm of what's relevant

 5   information to the *Franks* hearing.

 6           MR. TOBLER:  If I understand correctly, Your Honor, a

 7   search of the electronic files of the deputy prosecuting

 8   attorneys to see, irrespective of whether they shared this

 9   information with Detective Decker, they had something that

10   they had saved that she wasn't privy to?

11           THE COURT:  I still -- I get where you're going,

12   because you're saying it doesn't go to her state of mind, but

13   it still seems like it's relevant, or do you just completely

14   believe that it's irrelevant if these attorneys are going

15   back and forth and changing the search warrant?

16           MR. TOBLER:  If it's information -- the reason that

17   we included a draft warrant in an email from McDonald to

18   Decker was to demonstrate that Detective Decker was not

19   trying to hide the ball when it came to the NIBIN evidence,

20   and that she was actually circulating drafts with the deputy

21   prosecuting attorneys.

22       We do believe that goes to her state of mind, and I

23   believe defense counsel here today has said the relevant

24   issue is her state of mind.

25       So, no, I don't think we would agree that something that

1   was not shared with her that resides as work product in the

2   file of a deputy prosecuting attorney is relevant or

3   discoverable with respect to the argument that the defendant

4   is advancing in his *Franks* motion.

5            THE COURT:  Okay.  I'm not prepared to rule on the

6   issue of relevancy right now.  I was just exploring whether

7   or not that made sense for you to go to their files and, at

8   least, look to see if there was any information in there that

9   could be *Brady* information or *Giglio* or some other relevant

10  information.

11      Yes, Mr. Hamoudi?

12           MR. HAMOUDI:  Your Honor, just to make sure the court

13  has a full record.  Ms. Brin has been helping me with this,

14  and she would like to say something, if the court would

15  indulge her.

16           MS. BRIN:  Your Honor, just briefly.

17      Just so that we know, I think, when we're proposing what

18  we would like the court to review and how to do that, we do

19  think this is relevant, and rather than, sort of, having them

20  go back and do this search, and I think the court actually

21  addressed a number of reasons why it would be relevant, but I

22  do just want to highlight a few other things.

23      Any emails between the two prosecutors about any

24  conversations that they had with Detective Decker over the

25  phone, what she told them about either the lead or the other

1   issues we've raised in our *Franks* motion, I think the court

2   has noted the email that we take great concern over, whether

3   she sent that email or not, in terms of what her mindset was

4   in preparing that affidavit.

5       I think we all pretty regularly talk to our investigators,

6   our paralegals, and then shoot an email to a colleague,

7   talking about what went on during that conversation.

8       So we think that, at least, as to those two deputy

9   prosecuting attorneys, or former now, that that is relevant,

10  and we do want to include that in what we would eventually

11  propose to the court for the court's review as well.

12      In terms of, sort of, proposed search terms, and I heard

13  the court talking about that as well.  I know the email is

14  voluminous, I know that there's different ways that all of

15  these vendors do it, that, sort of, people do this in-house,

16  and so I would suggest that we have the opportunity, before

17  filing anything with the court, to discuss any potential

18  search terms with the U.S. attorney, and that might be

19  something that we could also provide when we give our

20  submission to the court in our proposal.

21          THE COURT:  Thank you, Ms. Brin.  You articulated the

22  reasons why I was thinking that was relevant better than I

23  did.

24          MR. HAMOUDI:  One last thing, Your Honor.  I just

25  spoke to my investigator, who is trying to go through the

1    documents.  I have been too liberal in committing our

2    timeline, because, apparently, it's a lot of material.  So

3    we're going to need at least a week to prepare something for

4    the court, to do so in an informed fashion, to prepare a

5    document for the court outlining what we believe the legal

6    standards are and what we believe the relevant inquiry is.

7              THE COURT:  What I am trying to figure out,

8    Mr. Hamoudi, is a way of narrowing these categories of

9    documents that we've been talking about so that -- I mean, I

10   don't have infinite amount of resources to review thousands

11   of pages of documents.

12       And so as you're preparing your proposal, if you could

13   come up with some solutions or some narrowing that makes

14   sense.  And I do think your proposal should have some sort of

15   protocol.  And you can use the ESI protocol that we do in

16   civil cases, where the government will propose some search

17   terms, you'll look at the search terms, you get to propose

18   some search terms in return, and then the government runs the

19   search terms and provides -- allows you access to the results

20   of those search terms or provides those to the court for in

21   camera review.

22       I'd like to see some of that happen within the next week

23   so that there's this narrowing of what the court needs to

24   review.

25             MR. HAMOUDI:  We will do that, Your Honor.

1          THE COURT:  All right.  So the court is going to

2     reserve -- Mr. Tobler, did you want --

3          MR. TOBLER:  I don't mean to jump the gun.  We --

4     just to state for the record, we'd like the opportunity to

5     respond to whatever they file.  Assuming we can't resolve all

6     of our issues about what the appropriate search terms and

7     timelines are, we would ask for a week to respond because we,

8     like the defendant, agree that it's an important thing to get

9     right.

10          THE COURT:  I agree.

11      So we will order that your proposal is going to be filed

12     by next Friday, the 24th, and then seven days from the 24th,

13     the government will file its response.

14      It is the court's expectation that you are meeting and

15     conferring.  I would prefer it be in person.  I know that

16     requires you to travel farther, probably, Mr. Hamoudi.  But

17     it would help a lot if you guys were communicating better

18     about what's available and how quickly you can get

19     information and you articulate why you need the information.

20      So I would like to see the certification in both filings,

21     both the proposal and the response, that the parties met and

22     conferred, and the dates that they met and conferred.  Okay?

23      Anything further?

24          MR. HAMOUDI:  Nothing else from Mr. Wondie, Your

25     Honor.

1          MR. TOBLER:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you.  We'll be in recess.

3

4          (The proceedings concluded at 10:48 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


                I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present
in court during the foregoing matter and reported said
proceedings stenographically.

                I further certify that thereafter, I have
caused said stenographic notes to be transcribed under my
direction and that the foregoing pages are a true and
accurate transcription to the best of my ability.



                Dated this 20th day of January 2020.



                            /S/   Nancy L. Bauer

                            Nancy L. Bauer, CCR, RPR
                            Official Court Reporter