UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

―――――――――――――――――――――――――――――――――――――――――――――

UNITED STATES OF AMERICA,              )
                                       ) CASE NO. CR18-315-RAJ
                    Plaintiff,         )
                                       ) Seattle, Washington
v.                                     )
                                       ) June 21, 2021
GIZACHEW WONDIE,                       ) 9:00 a.m.
                                       )
                    Defendant.         ) *FRANKS* HEARING
                                       ) Part 1 of 2
                                       )
                                       )

―――――――――――――――――――――――――――――――――――――――――――――

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD A. JONES
UNITED STATES DISTRICT JUDGE

―――――――――――――――――――――――――――――――――――――――――――――

APPEARANCES:


  For the Plaintiff:        ERIN BECKER
                            JAMES OESTERLE
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


  For the Defendant:        MOHAMMAD HAMOUDI
                            SARA BRIN
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 98101


  Reported by:              NANCY L. BAUER, CCR, RPR
                            Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov

EXAMINATION INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| KATHLEEN DECKER | DIRECT EXAMINATION<br>BY MR. HAMOUDI | 7 |
| | CROSS-EXAMINATION<br>BY MR. OESTERLE | 110 |
| | REDIRECT EXAMINATION<br>BY MR. HAMOUDI | 154 |
| MICHAEL STORTINI | DIRECT EXAMINATION<br>BY MS. BRIN | 170 |
| MATTHEW NOEDEL | (SWORN) | |

EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| 17 | 125 |
| 51 | 121 |
| 55 | 157 |
| 56 | 138 |
| 58 | 61 |
| 62 | 32 |
| 68 | 63 |
| 70 | 114 |
| 71 | 116 |
| 72 | 117 |
| 74 | 118 |
| 74 | 119 |
| 113 | 107 |
| 122 | 37 |
| 123 | 38 |
| 124 | 39 |
| 125 | 45 |
| 127 | 47 |
| 130 | 48 |
| 131 | 50 |
| 132 | 51 |
| 133 | 52 |
| 134 | 11 |
| 135 | 14 |
| 136-1 | 20 |
| 136-11 TO 136-16 | 166 |
| 136-17 | 25 |
| 136-17 TO 136-21 | 166 |
| 136-2 | 20 |
| 136-23 | 25 |
| 136-24 | 26 |
| 136-25 TO 136-27 | 167 |
| 136-3 TO 136-4 | 165 |
| 136-5 | 21 |
| 136-8 | 22 |
| 136-9 | 17 |
| 136-9 | 22 |
| 137 | 30 |
| 138 | 31 |
| 139 | 34 |
| 140 | 56 |
| 141 | 55 |
| 142 | 65 |
| 143 | 66 |
| 145 | 67 |
| 146 | 68 |
| 147 | 69 |

EXHIBIT INDEX (CONTINUED)                PAGE
ADMITTED

149                                              75
150                                              76
151                                              86
152                                              98
153                                              87
155-1 TO 155-6                                   81
160                                             175
161                                             176
164                                             183
167                                             185
168                                             185

```
1                         PROCEEDINGS
2    _____

3          THE CLERK:  We are here in the matter of United States

4    versus Gizachew Wondie, Cause No. CR18-315, assigned to this

5    court.

6       Counsel, please make your appearances for the record.

7          MS. BECKER:  Good morning, Your Honor.  Erin Becker

8    alongside Jim Oesterle on behalf of the United States.  Also at

9    counsel table is our assistant, Jordan Clark.

10         THE COURT:  Good morning, all of you.

11         MS. BRIN:  Good morning, Your Honor.  Sara Brin and

12   Mohammad Hamoudi for Mr. Wondie, who is present with us at

13   counsel table, along with our paralegal, Patricia Stroeder.

14         THE COURT:  Good morning, all of you.

15      Are we ready to proceed, counsel?

16         MS. BRIN:  Your Honor, if I could just briefly be

17   heard on a few logistical matters?

18         THE COURT:  Please proceed.

19         MS. BRIN:  Your Honor, given these protected and

20   sensitive nature of most of the exhibits that we'll be showing

21   to the witness today, we have discussed with the government

22   having Mr. Wondie sit with his parents, who are here, and our

23   investigator, and turning screens away so that there would not

24   be any publishing of any of those exhibits.

25      We have also provided the witnesses and the court with
```

 1   acronyms that we intend to use in an effort to protect any

 2   sensitive information contained within those exhibits.

 3        And with the court's permission, we would have Mr. Wondie

 4   sit with his parents in the pews.

 5             THE COURT:  That's fine.

 6             MS. BRIN:  Thank you, Your Honor.

 7             THE COURT:  You're welcome.

 8             MR. OESTERLE:  Your Honor, one other thing.  As we're

 9   all aware, this is the defendant's motion, and there is a

10   question about the order of witnesses and who would conduct the

11   first examination.

12        It's up to the court, under Rule 611, to determine that.

13   Mr. Hamoudi has indicated he would like to take Detective Decker

14   first as his witness.  Frankly, the government is neutral on

15   that and would defer to the court as to what procedure you'd

16   like to follow.

17             THE COURT:  Why don't we have Mr. Hamoudi proceed with

18   Detective Decker.  He knows the precise and specific areas where

19   he wants to examine.  I think that may expedite things as

20   opposed to the government trying to anticipate where the defense

21   wants to go.  I think you have a pretty good idea, but I think

22   it might be easier for you to allow Mr. Hamoudi to go first.

23        Do you have any objections, counsel?

24             MR. HAMOUDI:  No objections.  The only request I'd

25   have is to have the latitude on leading this witness, to move

 1   things along.

 2              THE COURT:  It is an adverse party, counsel, in line

 3   with the government, so I don't think that's a problem.

 4              MR. HAMOUDI:  Thank you, Your Honor.

 5         Your Honor, the defense calls Ms. Kathleen Decker to the

 6   stand.

 7              THE COURT:  Please step forward.

 8                        KATHLEEN DECKER,
              having been previously sworn, testified as follows:

 9

10              THE CLERK:  Please state your full name for the

11   record, and spell your last name for the court reporter.

12              THE WITNESS:  Kathleen Decker.  My first name is

13   K-a-t-h-l-e-e-n; my last name is D-e-c-k-e-r.

14              THE COURT:  Is there any objection to the witness

15   removing her mask while she's testifying?

16              MS. BECKER:  No, Your Honor.  I was going to request

17   that she do so.

18              THE COURT:  Is there any objection, counsel?

19              MR. HAMOUDI:  No, Your Honor.

20              THE COURT:  All right.  Please proceed.

21                        DIRECT EXAMINATION

22   BY MR. HAMOUDI:

23   Q.   Good morning.

24   A.   Good morning.

25   Q.   Would you like me to refer to you as "Ms. Decker," "Miss

1    Decker," or "Detective Decker"?

2    A.    I will answer to either of those.  Your choice.

3    Q.    Detective Decker, I want to talk a little bit about your

4    experience.

5          You joined the King County Sheriff's Office as a deputy in

6    1985?

7    A.    Yes.

8    Q.    And after several years, you rose to the rank of detective?

9    A.    Yes.

10   Q.    And you have about 17 years experience with the Major

11   Crimes Unit at the King County Sheriff's Office?

12   A.    Yes.

13   Q.    And you have a bachelor's degree in criminal justice from

14   Washington State University?

15   A.    Yes.

16   Q.    And you've investigated and worked many crimes scenes?

17   A.    Yes.

18   Q.    And those include serious felonies like robbery, assault,

19   homicide?

20   A.    Yes.

21   Q.    And in addition to that, you've provided tracking expertise

22   and examination?

23   A.    Yes.

24   Q.    You've testified as an expert witness in multiple cases?

25   A.    Yes.

1    Q.    I'm sorry.  I didn't hear that.

2    A.    Yes.

3    Q.    Okay.  And, in fact, you're associated with the Joel Hardin

4    tracking program?

5    A.    Yes.

6    Q.    And you've provided training to law enforcement personnel

7    on investigative techniques; is that correct?

8    A.    Yes.

9    Q.    And you've also provided forensic photo analysis and

10   testimony in cases, correct?

11   A.    Yes.

12   Q.    Do you recall the case of a homicide involving Miss Amarah

13   Riley?

14   A.    Yes.

15   Q.    And do you remember being called to a scene of homicide on

16   September 19th, 2018?

17   A.    Yes.

18   Q.    And you were called to the scene by your supervisor,

19   Sergeant Anthony McNabb?

20   A.    Yes.

21   Q.    And you were assigned to be the lead detective on that

22   case?

23   A.    Yes.

24   Q.    And another detective, Detective John Free, was also

25   assigned to be your partner in that case?

1   A.    Yes.

2   Q.    And you arrived at the scene, and you were advised that

3   seven shell casings were recovered from the scene; is that

4   correct?

5   A.    Yes.

6   Q.    And the shell casings were .40 caliber shell casings?

7   A.    Yes.

8   Q.    And coming to investigate a homicide scene, you take notes?

9   A.    Yes.

10  Q.    And you gather information, and you try to do that as soon

11  as possible, correct?

12  A.    Yes.

13  Q.    And the King County Sheriff's Office, they provide you a

14  little memo book to carry with you so you can take notes about

15  what happens right when you learn important facts?

16  A.    Yes.

17  Q.    And you take these notes as soon as possible to enable you

18  to recall important things about what's going on, correct?

19  A.    Yes.

20  Q.    And you write down dates so that if you come to court to

21  testify sometime later, you can refer back to them?

22  A.    Yes.

23  Q.    And you write down important things people say to you?

24  A.    Yes.

25  Q.    On September the 20th, which is about a day after the

1   homicide, did you or one of your colleagues submit casings to be

2   put into a NIBIN computer?

3   A.   Yes.

4   Q.   And on the following day, did you learn that there were no

5   NIBIN hits as a result of those casings being submitted?  And if

6   you don't remember, I can --

7   A.   I don't remember.

8   Q.   Okay.  If you can bring up Discovery Page 8860.  Take a

9   moment to look at this.

10  A.   Yes, that's correct.

11  Q.   Okay.  Thank you.

12       Marked for identification Exhibit 134.  Ms. Decker, there

13  is a binder up there that says "Defense Exhibits."  That binder

14  has unredacted exhibits, and then I will bring up the exhibits

15  also on the screen for ease and convenience.

16       If you can -- I'm going to go through this document on the

17  screen, and you take a moment to read it, and let me know if

18  you -- this is the search warrant application that you submitted

19  to Judge Richardson.

20       Is this your search warrant application?

21  A.   Yes.

22            MR. HAMOUDI:  Move to admit Defense Exhibit 134.

23            MR. OESTERLE:  No objection.

24            THE COURT:  134 is admitted.

25                        (Exhibit 134 admitted.)

1  Q.   (By Mr. Hamoudi)  If we could go back to the third page of

2  the exhibit, please.

3       In this affidavit, you wrote that you believe there is

4  probable cause that the above-identified crimes occurred in King

5  County and that evidence of the crime of murder in the first

6  degree will be located at the address and the vehicle that you

7  listed in this application, correct?

8  A.   Yes.

9  Q.   And going back to page 13, please, and at the bottom --

10 middle way, you say, "I certify, under penalty of perjury, under

11 the laws of the state of Washington, that the foregoing is true

12 and correct," correct?

13 A.   Yes.

14 Q.   And going back to page 5, please, so on this date you told

15 the judge that forensic examination has established that shell

16 casings recovered from the scene matched a gun known to be owned

17 by Gizachew Wondie, correct?

18 A.   Yes.

19 Q.   This statement was not accurate, correct?

20 A.   No.

21 Q.   Okay.  Marked for identification Defense Exhibit 135.

22 A.   Actually --

23 Q.   Would you like to clarify?

24 A.   Yes.  Can you ask the question one more time?

25 Q.   That statement was not accurate, correct?

1   A.    Statement?

2   Q.    Go back to 134.

3         This statement, "Forensic examination has established that

4   shell casings recovered from the scene matched a gun known to be

5   owned by Gizachew Wondie."

6   A.    Yes, that is not correct.

7   Q.    So if we can go to marked for identification Exhibit 135,

8   Detective Decker, do you recognize this email?

9   A.    Yes.

10  Q.    Okay.  Going to the next page, do you recognize this

11  document?

12  A.    Yes.

13  Q.    And what is this document?

14  A.    This is a lead document that I received pertaining to an

15  association between my murder gun and shell casings.

16  Q.    All right.  Go to the next page.

17        This is part of that same document, correct?

18  A.    Yes.

19  Q.    Go to the next page.

20        This is part of the same document, correct?

21  A.    Yes.

22            MR. HAMOUDI:  Move to admit Exhibit 135.

23            THE COURT:  Any objection?

24            MR. OESTERLE:  No objection.

25            THE COURT:  135 is admitted.

1                    (Exhibit 135 admitted.)

2    Q.   (By Mr. Hamoudi)  And back to page 1, the email.

3         So this email, nor the accompanying documents, say that the

4    shell casings recovered from the scene matched the gun known to

5    be owned by Gizachew Wondie, correct?

6    A.   Yes, that's correct.

7    Q.   And this email was in your possession as of September 25th,

8    2018, correct?

9    A.   Yes.

10   Q.   If you go back to the search warrant application at 134-2,

11   you also stated in your affidavit, down at the bottom, that "the

12   test results link conclusively to the shell casings collected

13   from the Amarah Riley murder scene on September 19th, 2018, and

14   the Gizachew Wondie Smith & Wesson .40 caliber firearm described

15   above," correct?

16   A.   Yes.

17   Q.   And neither the NIBIN lead nor the accompanying documents

18   used any such language, correct?

19   A.   That's correct.

20   Q.   If you go back to Exhibit 135-1, please, the email says,

21   "If a microscopic confirmation is required for warrants,

22   arrests, please contact the WSP Crime Lab," correct?

23   A.   Yes.

24   Q.   And that's telling you there is, if you want to use this

25   lead for a search warrant application, the first thing that must

1   happen is the WSP must be communicated with, correct?

2   A.    That's not my understanding, no.

3   Q.    Okay.

4         Did you contact the WSP Crime Lab between September 25th,

5   2018, and when you applied for the search warrant in this case?

6   A.    The initial request for NIBIN work was submitted through

7   the crime lab, so, yes.  If you're asking for additional work to

8   be done, no.

9   Q.    Okay.  Let's go down to the second page of this document.

10        This is the individual who sent you the language about

11  "appears to correspond" and also told you "if a microscopic

12  confirmation is required for warrants, arrests, please contact

13  the WSP Crime Lab," correct?

14  A.    Yes, that's correct.

15  Q.    Okay.  And this individual's name, Sam Gonzalez, correct?

16  A.    Yes.

17  Q.    And he is an industry operation intelligence specialist,

18  correct?

19  A.    Yes.

20  Q.    And he does not work for the WSP Crime Lab, correct?

21  A.    Correct.

22  Q.    And you had actually worked with him in the past, and he

23  had told you that NIBIN is a screening tool and what you need to

24  do is have the lead confirmed by the WSP Crime Lab, correct?

25  A.    I don't recall that.

1   Q.   Okay.  Marked for identification Exhibit 136, and go to

2   page 29.

3        Stephen Herschkowitz, who is Stephen Herschkowitz,

4   Detective Decker?

5   A.   I, actually, don't recall.

6   Q.   Do you know who Aaron Thompson is?

7   A.   Yes.

8   Q.   Who is Aaron Thompson?

9   A.   He was a co-worker within my unit.

10  Q.   And is he a detective?

11  A.   Yes, that's correct.

12  Q.   So in this email -- this is dated in 2017 -- Stephen

13  Herschkowitz is asking your co-worker about a case and a report

14  written by Sam Gonzalez.  Do you see that?

15  A.   Yes.

16  Q.   Okay.  All right.  And let's go up to the -- and

17  Mr. Gonzalez responds and says, "NIBIN is a screening tool.

18  What you need is to have the lead confirmed by the WSP Crime

19  Lab," correct?

20  A.   Yes.

21  Q.   And that email is then forwarded to you.

22  A.   Yes, the 2017 one, that's correct.

23  Q.   Yes.

24       So, here, in this particular instance, Mr. Gonzalez informs

25  you that NIBIN is a screening tool and what you need to do is

1    have the lead confirmed by the WSP Crime Lab, correct?

2    A.    Yes.

3            MR. HAMOUDI:  Move to admit Exhibit 136, page 29.

4            THE COURT:  Any objection?

5            MR. OESTERLE:  No objection.

6            THE COURT:  It's admitted.

7                    (Exhibit 136-9 admitted.)

8    Q.    (By Mr. Hamoudi)  And before you applied for your search

9    warrant, you did not receive any separate information about this

10   lead, did you?

11   A.    Can you clarify what you mean by "separate information"?

12   Q.    It means all of the information you received with respect

13   to that lead was contained in that email and accompanying

14   documents?

15   A.    Yes.

16   Q.    And just so we're clear, after you received the lead you

17   never asked for a microscopic confirmation, correct?

18   A.    Correct.

19   Q.    You testified about your experience in multiple homicide

20   cases, correct, in your past?

21   A.    Yes.

22   Q.    And those cases involve forensic evidence?

23   A.    Yes.

24   Q.    DNA?

25   A.    Yes.

1    Q.    They involve fingerprints?

2    A.    Yes.

3    Q.    Serology?

4    A.    Yes.

5    Q.    And ballistics?

6    A.    Yes.

7    Q.    And you've worked with the Washington State Patrol Crime

8    Lab for a significant period of time, correct?

9    A.    Yes.

10   Q.    And you know how to communicate with the crime lab,

11   correct?

12   A.    Yes.

13   Q.    And you know, when you need the crime lab to conduct

14   forensic testing, what steps to take to have them conduct that

15   forensic testing?

16   A.    That was not always clear, but I knew who to call to

17   confirm something, yes.

18   Q.    Okay.

19         And you received training in NIBIN, correct?

20   A.    I don't know that I received any formal training.  I had a

21   rudimentary, informal understanding of the process.

22   Q.    Okay.

23         All right.  I'm going to cover some correspondences

24   involving yourself and colleagues with respect to NIBIN.

25         Marked for identification is Exhibit 136-1.  Take a moment

1    to read this email, and let me know when you're finished.

2    A.   Okay.

3    Q.   Okay.  And Donald Gallagher works for the ATF; is that

4    correct?

5    A.   I don't know.  I don't recognize the name today.

6    Q.   Okay.  So, here, this individual is sending you an email

7    about the Regional Crime Gun Task Force.  ATF would like to get

8    any cartridge case evidence from your case entered into

9    IBIS/NIBIN as soon as possible, correct?

10   A.   Yes.

11   Q.   And what he told you in this email in 2015 is that

12   IBIS/NIBIN can provide you with linkages to any other

13   shots-fired incidents as soon as they were established, correct?

14   A.   Yes.

15   Q.   And so this was an investigative tool that they were

16   offering homicide investigators, correct?

17   A.   Yes.

18   Q.   So as a homicide investigator, you arrive to a scene, you

19   get the casings, you put them in, and you get investigative

20   leads by using this service, correct?

21   A.   Yes.

22   Q.   Okay.

23        MR. HAMOUDI:  Move to admit page 1.

24        THE COURT:  Any objection?

25        MR. OESTERLE:  No objection.

1          THE COURT:  136-1 is admitted.

2              (Exhibit 136-1 admitted.)

3   Q.   (By Mr. Hamoudi)  Let's move to page 2.  This is an email

4   from another case, and this is from Sam Gonzalez, correct?

5   A.   Yes.

6   Q.   And the email is directed to you.  Do you see this email?

7   A.   Yes.

8   Q.   Okay.

9        And this email has the same language in the email that

10  Mr. Gonzalez sent you with respect to the lead in this case,

11  correct?

12  A.   Yes, that's correct.

13  Q.   Okay.

14          MR. HAMOUDI:  Move to admit page 2.

15          THE COURT:  Any objection?

16          MR. OESTERLE:  No objection.

17          THE COURT:  136-2 is admitted.

18              (Exhibit 136-2 admitted.)

19  Q.   (By Mr. Hamoudi)  Let's go to page 5.

20       Do you know who Jennifer Tardiff is from the WSP Crime Lab?

21  A.   I recognize the name.  I don't recall her specialty.

22  Q.   All right.

23       And she works for the Washington State Patrol Crime Lab,

24  correct?

25  A.   Yes, that's correct.

1    Q.    And this email was sent to you as well?

2    A.    2016, yes, that's correct.

3    Q.    And this email, like the email sent to you in this case,

4    uses the same language with respect to a lead, correct?

5    A.    Yes, that's correct.

6              MR. HAMOUDI:  Move to admit page 5.

7              MR. OESTERLE:  No objection.

8              THE COURT:  Of Exhibit 136?

9              MR. HAMOUDI:  Yes, Your Honor.

10             THE COURT:  Any objection?

11             MR. OESTERLE:  No objection.

12             THE COURT:  It's admitted.

13                   (Exhibit 136-5 admitted.)

14   Q.    (By Mr. Hamoudi)  Let's go to page 8, please.

15         This is another case, 2017, and this is you requesting an

16   DNA examination request, correct?

17   A.    Yes.

18   Q.    Okay.  Let's go to the next page.

19         And any DNA supplemental information, you provide a summary

20   of the case, and here you're informing, in your own words,

21   "shell casing was recovered from the scene, and NIBIN linked

22   that gun to multiple shootings occurring before and after this,"

23   correct?

24   A.    Yes.

25   Q.    Okay.

1          MR. HAMOUDI:  Move to admit page 8.

2          MR. OESTERLE:  No objection.

3          THE COURT:  It's admitted.

4          MR. HAMOUDI:  And 9, Your Honor, 8 and 9.  I

5   apologize.

6          THE COURT:  No objection for 9, either?

7          MR. OESTERLE:  No objection.

8          THE COURT:  It's admitted.

9          (Exhibits 136-8 and 136-9 admitted.)

10  Q.   (By Mr. Hamoudi)  And page 10, do you recognize this email,

11  Ms. Decker?

12  A.   Yes.

13  Q.   In this email as well, you're asking the lab to "verify the

14  results for us on this comparison, which was done between one of

15  the" -- redacted -- "handguns recovered in our investigations

16  and the shell casing recovered at the scene.  The initial NIBIN

17  submittal was done by" -- redacted -- "let me know if you need

18  an official WSPCL request form completed for this request,"

19  correct?

20  A.   I think you just stated this as the gun in this particular

21  case.  This is a 2017 email, so prior to this case.

22  Q.   With that correction, is that accurate?

23  A.   Yes, that's correct.

24  Q.   So this email demonstrates that you're certainly familiar

25  with the fact that you need to submit a NIBIN lead for

1  verification with the lab, correct?

2  A.   Before going to trial, that is correct.

3  Q.   So is your testimony that you do not need to get a NIBIN

4  lead verified for the purposes of a warrant?

5  A.   That was my understanding at the time, correct.

6  Q.   When you say it was your understanding, who provided you

7  with that understanding?

8  A.   The language within the document itself that came to me

9  regarding this particular case.

10 Q.   And when you're talking about the document that was sent to

11 you, are you talking about the document that Mr. Gonzalez sent

12 to you with respect to the NIBIN leads?

13 A.   I don't recall who it came from.  It was the lead document

14 in regards to the linkage on this case, the verbiage contained

15 within that document.

16 Q.   And would this document exist somewhere in your files?

17 A.   Yes.

18 Q.   Okay.  Bringing up Exhibit 135, is this the document you're

19 referring to?

20 A.   Not the one that comes to mind, but this is relevant.

21 Q.   Let's go to the third page.  Is this the document that

22 you're referring to?

23 A.   I believe so.  Is there another page?

24 Q.   Okay.  Yeah.

25 A.   Yes, sir, that's correct.

1    Q.    And what is your understanding about this document?

2    A.    May I read a portion?

3    Q.    Sure.  Take your time.

4    A.    "Evidence may be confirmed by a microscopic comparison when

5    requested.  For a formal report, please submit a completed

6    request for lab exam to the Washington State Patrol Crime

7    Laboratory Firearms Unit requesting IBIS lead confirmation."

8    Q.    And this lead does not make a distinction between trial and

9    warrants, correct?

10   A.    Correct.

11   Q.    And you're not a firearms examiner, correct?

12   A.    That is correct.

13   Q.    But Mr. Gonzalez' email said to you, "If a microscopic

14   confirmation is required for warrants, arrests, et cetera,

15   please contact the WSP Crime Lab," correct?

16   A.    Yes, that's correct.

17   Q.    Okay.  Go to page 17 of Exhibit 136.

18         Here you received, in 2017, in another case, an email from

19   Jennifer Tardiff with the WSP Crime Lab, correct?

20   A.    Yes, that's correct.

21   Q.    This is page 17.

22         MR. HAMOUDI:  Move to admit page 17.

23         THE COURT:  Any objection?

24         MR. OESTERLE:  No objection.

25         THE COURT:  17 is admitted.

1          (Exhibit 136-17 admitted.)

2   Q.    (By Mr. Hamoudi)  And this email also uses the same

3   language Mr. Gonzalez used, correct?

4   A.    Yes.  "If a microscopic confirmation is required for

5   warrants, arrests, et cetera, please let me know," so, yes,

6   that's correct.

7   Q.    Let's go to page 23.

8          This is from another case in 2017, from Jennifer Desrosier,

9   who also is a firearm and toolmark lab technician from the WSP

10  Crime Lab, correct?

11  A.    Yes, that's correct.

12  Q.    And Ms. Desrosier is also using the same language and

13  offering you the opportunity to have the casings confirmed

14  microscopically, correct?

15  A.    Yes, that's correct.

16          MR. HAMOUDI:  Move to admit page 23 of this exhibit.

17          MR. OESTERLE:  No objection.

18          THE COURT:  It's admitted.

19          (Exhibit 136-23 admitted.)

20  Q.    (By Mr. Hamoudi)  And if you'll go to page 24, and she

21  wrote you an earlier email, and she says, "The test fires

22  haven't hit on anything, but I will be requesting the evidence

23  items tomorrow to cross-compare them into NIBIN to see if they

24  correspond with the firearm," correct?

25  A.    Yes, in that 2017 email, that's correct.

1    Q.    That's correct.

2          So at least in 2017, in this email you have an instance

3    where NIBIN does not hit on something, correct, and you've been

4    informed of that fact by Ms. Desrosier, correct?

5    A.    I think she said the test fires haven't hit on anything and

6    she was going to cross-compare them into NIBIN.  So my

7    understanding in this email is they haven't yet been compared in

8    NIBIN.

9    Q.    Okay.

10         MR. HAMOUDI:  Move to admit page 24.

11         MR. OESTERLE:  No objection.

12         THE COURT:  Was this 23, counsel, or 24?

13         MR. HAMOUDI:  Twenty-four, Your Honor.

14         THE COURT:  No objection.  Twenty-four is admitted.

15              (Exhibit 136-24 admitted.)

16   Q.    (By Mr. Hamoudi)  Let's go to page 28.

17         This is an email that you sent in 2017 actually requesting

18   a NIBIN evaluation of casings, correct?

19   A.    Yes, that's correct.

20   Q.    And down at the bottom you say, "We are interested in

21   linking the shell casings from the scene to the pistol and then

22   the pistol to any other unsolved shootings," correct?

23   A.    Yes, that's correct.

24   Q.    And all of these emails we just reviewed that you have

25   received, those were before you applied for your search warrant

1   in this case?

2   A.   Yes, that's correct.

3   Q.   And all these discussions about the difference between

4   leads and confirmation happened before you applied for your

5   warrant in this case?

6   A.   Yes, that's correct.

7   Q.   And you knew all of this information about what you could

8   and could not use a lead for before you applied for the warrant

9   in this case?

10  A.   As it relates to 2017, yes, sir.

11  Q.   I want to talk to you about another subject matter,

12  Detective Decker.

13       You'd never heard about my client, Mr. Wondie, before you

14  received the NIBIN lead, correct?

15  A.   Yes, that's correct.

16  Q.   And that's why you began investigating him?

17  A.   Yes, that's correct.

18  Q.   And you started to look into databases available to you to

19  obtain police reports associated with the NIBIN leads, correct?

20  A.   Yes, that's correct.

21  Q.   And you included information also in your affidavit from

22  other law enforcement officers who had reported to you that they

23  had contact with Mr. Wondie, correct?

24  A.   Yes, that's correct.

25  Q.   And you know when you include information in your affidavit

1    that you have the duty and are responsible for the information

2    accuracy in that affidavit?

3    A.    Yes, that's correct.

4    Q.    And you are responsible if what you represent in the

5    affidavit is incorrect, right?

6    A.    That's correct.

7    Q.    And it's important to verify information provided to you by

8    other officers, correct?

9    A.    Depending on the context, yes.

10   Q.    Depending on the context.

11         Ultimately, if an officer misrepresents a fact to you, that

12   is on you, correct?

13   A.    Correct, if I know that fact has been misrepresented,

14   that's correct.

15   Q.    All right.

16         You also looked into my client's criminal history, correct?

17   A.    Yes, that's correct.

18   Q.    And what you learned is that my client, with the exception

19   of a misdemeanor false statement conviction, had no other

20   convictions, correct?

21   A.    I believe that's correct.

22   Q.    Okay.  Let's go to the affidavit, Exhibit 134, page 11.

23         In the affidavit to search my client's home and residence,

24   you had included information Seattle Police Department Officer

25   Elliott Averett.  Do you recall that?

1    A.    Yes, I do.

2    Q.    And you stated that he said, at the time of that contact,

3    that he advised Gizachew Wondie he was aware that he was armed

4    with a gun, CCW permit -- and CCW permit means that he had a

5    concealed-carry weapons permit, correct?

6    A.    Yes, that's correct.

7    Q.    And to obtain that permit, you have to go to law

8    enforcement, in fact, correct?

9    A.    I don't recall specifically what the rules were at that

10   time, because they changed, but I believe that's correct.

11   Q.    And they conduct a background search?

12   A.    Yes.

13   Q.    Okay.  And that he was aware of his prior arrests and

14   propensity for violence, correct?

15   A.    Yes, that's correct.

16   Q.    All right.

17         Let's go to Discovery Page 14, very briefly.

18         On September 27, 2018 -- and this was before you applied

19   for the search warrant to search my client's home and

20   residence -- you obtain a police report here.  Do you see that?

21   A.    Yes.

22   Q.    Okay.  And marked for identification Exhibit 137, I'm going

23   to present you with an unredacted copy of this police report,

24   and this is the police report that you obtained on September the

25   27th, 2018.  I'm going to go through it slowly and see if you

1    recognize it.  Okay?  If we move too fast, let me know.

2    A.    Yes, I recognize it.

3    Q.    And this is the police report that was linked to the NIBIN

4    lead that allowed you to focus on my client, correct?

5    A.    Yes, the police report that led to the seizure of the gun

6    that connected to the NIBIN lead, yes, that's correct.

7              MR. HAMOUDI:  Move to admit Exhibit No. 137.

8              THE COURT:  Any objection?

9              MR. OESTERLE:  No objection.

10             THE COURT:  It is admitted.

11                  (Exhibit 137 admitted.)

12   Q.    (By Mr. Hamoudi)  On page 4 of this exhibit, down at the

13   bottom, the law enforcement officer who arrived at the scene

14   spoke to an individual who was with Mr. Wondie, and this

15   individual reported to the officers that Mr. Wondie did not have

16   a firearm while she was with him, correct?

17   A.    That's correct.

18   Q.    And if we go back to go to the search warrant application,

19   and go to page 7, this is a summary of that police report that

20   you provided to Judge Richardson, correct?

21   A.    Yes, that's correct.

22   Q.    Okay.  And did you report that witness's statement in this

23   summary?

24   A.    No, I did not.

25   Q.    And then marked for identification Exhibit 138, and in your

 1  investigation with my client, with respect to that case, you

 2  also learned that the case was dismissed against him with

 3  prejudice, correct?

 4  A.    I believe so, yes.

 5            MR. HAMOUDI:  Okay.  Move to admit Exhibit 138.

 6            THE COURT:  Any objection?

 7            MR. OESTERLE:  No objection.

 8            THE COURT:  It's admitted.

 9                    (Exhibit 138 admitted.)

10  Q.    (By Mr. Hamoudi)  And you did not report that fact to Judge

11  Richardson, either, correct?

12  A.    That is correct.

13  Q.    And you knew these facts prior to when you sought your

14  application for the search warrant for my client's home and

15  residence, correct?

16  A.    Yes, that's correct.

17  Q.    Now, at some point you actually were forwarded some notes

18  that were that were prepared by Seattle Police Department

19  Elliott Averett, correct?

20  A.    Yes, I believe it was an email, yes.

21  Q.    Marked for identification Government's Exhibit 62, this is

22  an email dated November 27th, 2018, forwarded to you by your

23  colleague, Detective John Free?

24  A.    Yes.

25  Q.    Next page.

1   A.   Yes.

2   Q.   Okay.  Next page.

3   A.   Yes.

4   Q.   Next page.

5   A.   Yes.

6   Q.   And you reviewed this email and notes in preparation of

7   drafting that application for a search warrant for Judge

8   Richardson?

9   A.   Yes.

10        MR. HAMOUDI:  Move to admit Government's Exhibit 62.

11        THE COURT:  Any objection?

12        MR. OESTERLE:  No objection.

13        THE COURT:  It's admitted.

14             (Exhibit 62 admitted.)

15   Q.   (By Mr. Hamoudi)  In these notes, at page 3, down at the

16   bottom, it talks about October 6th, 2018, and he says, "During a

17   nightlife patrol, I contacted the owners of Pike Tobacco and

18   asked about Wondie's hot dog stand.  I then had a social contact

19   with Wondie at the Broadway and Pike, and Wondie wanted to know

20   why I had been asking about him.  I advised I was aware he had a

21   gun, aware he had been arrested before, and concerned about the

22   potential for violence.  Wondie was cooperative.  He had a cast

23   on his arm."  Is that accurate?

24   A.   Yes.

25   Q.   Okay.

1           You understand that a "social contact" refers to an

2     interaction between an individual and a police officer that is

3     not based on any criminal activity?

4     A.    Yes, that's correct.

5     Q.    And he also noted that Mr. Wondie wanted to know "why I've

6     been asking about him.  I advised I was aware he had a gun,

7     aware he'd been arrested before, and concerned about the

8     potential for violence," correct?

9     A.    Yes, that's correct.

10    Q.    I want you to focus on a certain phrase here.  What Officer

11    Averett says here is that he was concerned about the potential

12    for violence, correct?

13    A.    Yes, that's correct.

14    Q.    And you understand that "potential" and "propensity" are

15    different words?

16    A.    Yes, that's correct.

17    Q.    They have different meanings?

18    A.    Yes.

19    Q.    Potential for violence is possible any time an individual

20    has a firearm, correct?

21    A.    Yes, that's correct.

22    Q.    Propensity means that a person has the tendency to be

23    violent, correct?

24    A.    Yes.

25    Q.    Mark for identification Defense 139.  Ms. Decker, take a

1    moment to review this document, please.

2    A.    Yes.

3    Q.    Go to the next page, please.

4    A.    Yes.

5    Q.    Next page.

6    A.    Yes.

7    Q.    Is that your digital signature at the bottom of this

8    document?

9    A.    Yes, that's correct.

10            MR. HAMOUDI:  Move to admit Exhibit 139, please.

11            THE COURT:  Any objection?

12            MR. OESTERLE:  No objection.

13            THE COURT:  It's admitted.

14                      (Exhibit 139 admitted.)

15   Q.    (By Mr. Hamoudi)  You prepared and signed this checklist so

16   that you could use a mobile arrest team to take Mr. Wondie into

17   custody, correct?

18   A.    I completed this form as it's required by our unit prior to

19   initiating any type of arrest.

20   Q.    But this particular form is used for a TAC-30 unit,

21   correct?

22   A.    Yes, that is correct.

23   Q.    And one of the synonyms that are used to describe a TAC-30

24   unit is a mobile arrest team, correct, the MAT team?

25   A.    I believe that is a subset of the TAC-30 team, yes.

1   Q.   And that's your SWAT team?

2   A.   Yes, correct.

3   Q.   One of the reasons you prepare this checklist is because

4   the officers who are being asked to go and arrest somebody, you

5   want to make sure they have information in their possession so

6   that they're safe, correct?

7   A.   Yes.

8   Q.   And this arrest took place outside of a university,

9   correct?

10  A.   Yes.

11  Q.   And it occurred early in the morning, correct?

12  A.   Yes.

13  Q.   And so early in the morning on a weekday, lots of people

14  are around, correct?

15  A.   Yes.  It was a normal workday, yes.

16  Q.   And you wanted to make sure that you're very accurate about

17  what you're telling your TAC-30 SWAT team so that they can make

18  sure not only they're safe but also the person they're arresting

19  is safe, but also the community is safe, correct?

20  A.   Yes.

21  Q.   So if you go to page 1 of this document, which you filled

22  out for this TAC team, you were asked whether there's reason to

23  believe the suspect, suspect's associates at the location are

24  likely to have assaultive behavior towards law enforcement.  How

25  did you answer that question?

1    A.    "No."

2    Q.    And down at the bottom, the form asked whether you have

3    reason to believe the suspect to be violent, i.e. past history.

4    How did you answer?

5    A.    "No."

6    Q.    And these two beliefs were withheld from Judge Richardson

7    in your application for the search warrant to search my client's

8    home and his residence, correct?

9    A.    That is correct.

10   Q.    Okay.  And you made these statements prior to when you

11   sought the application for that search warrant, correct?

12   A.    I didn't make the statements.  I filled out the check box

13   corresponding with the statement, but, yes, that's correct.

14   Q.    You adopted these statements, correct?

15   A.    Yes.

16   Q.    And you adopted them to be true and correct?

17   A.    At the time I filled out the form, yes.

18   Q.    Okay.  All right.

19         I want to mark for identification Exhibit 122.

20         Detective Decker, do you recognize this document?

21   A.    Yes, I do.

22   Q.    This is a basic search warrant sample application and

23   warrant, which is issued to all police officers who prepare

24   them, correct?

25   A.    I don't feel comfortable speaking for all police officers,

1    but I'm familiar with the document, and I have used it, yes.

2    Q.   Is this the document that you start with when you start to

3    prepare an application for a search warrant?

4    A.   Yes, I believe it is.

5             MR. HAMOUDI:  Move to admit Exhibit 122.

6             THE COURT:  Any objection?

7             MR. OESTERLE:  No objection.

8             THE COURT:  It is admitted.

9                       (Exhibit 122 admitted.)

10   Q.   (By Mr. Hamoudi)  If we can go to page 3 of this document.

11   Under the heading "investigation," there are some bullet points,

12   and you were given guidance as to what the standards are in this

13   application, and you're told, "Avoid conclusions, rely on

14   facts," correct?

15   A.   Yes, that's correct.

16   Q.   "Every statement of fact should be attributed to a source,"

17   correct?

18   A.   Yes, that's correct.

19   Q.   "If the source is a person, explain how the person learned

20   the facts," correct?

21   A.   Yes, that's correct.

22   Q.   "Any evidence tending to negate probable cause must be

23   included in the application"?

24   A.   Yes, that's correct.

25   Q.   And that is the standard that controlled how you drafted

1  the applications for the search warrant to search my client's

2  home and his residence, correct?

3  A.   Yes, that's correct.

4  Q.   And that is the same standard you applied to other

5  applications for warrants that you filed in this case, correct?

6  A.   Yes, that's correct.

7  Q.   All right.

8       Marked for identification Exhibit 123, this application for

9  search warrant was prepared by you, correct, and signed

10 electronically?

11 A.   I'm not seeing my signature on here, which is confusing me,

12 but I do recognize the content as being from me, yes.

13 Q.   Does that help?

14 A.   Yes.  Thank you.

15 Q.   Okay.  So this application was signed September 25th, 2018,

16 which was shortly after you arrived at the homicide scene,

17 correct?

18 A.   Yes, that's correct.

19            MR. HAMOUDI:  Move to admit Exhibit 123.

20            THE COURT:  Any objection?

21            MR. OESTERLE:  No objection.

22            THE COURT:  It's admitted.

23                       (Exhibit 123 admitted.)

24 Q.   (By Mr. Hamoudi)  And marked for identification Exhibit

25 124, this is the search warrant that was signed by Judge

1    Richardson with respect to that application.

2    A.    Sorry.  Can you go back to the names of the different

3    social networks?

4    Q.    Yes.

5    A.    Okay.  Next page, please.

6          Okay.  Thank you.

7    Q.    Is that the warrant that accompanied that application?

8    A.    I believe so, yes.

9               MR. HAMOUDI:  I move to admit Exhibit 124.

10              THE COURT:  Any objection?

11              MR. OESTERLE:  No objection.

12              THE COURT:  It is admitted.

13                    (Exhibit 124 admitted.)

14   Q.    (By Mr. Hamoudi)  On page 2 of this document, you had

15   requested and you obtained permission to obtain Twitter records

16   for Handle 1, correct?

17   A.    Yes, that's correct.

18   Q.    Social media accounts for Group A, correct?

19   A.    Yes, that's correct.

20   Q.    And you sought to search Ms. Riley's home and vehicle and

21   her social media accounts as well?

22   A.    Yes, that's correct.

23   Q.    And page 8 of this application for warrant, 123-8, you

24   represented that, "It appears likely that the murder of

25   Ms. Riley was part of the ongoing gang war between Group C, a

1  rival gang from Group B, and Group A," correct?

2  A.    Yes, that's correct.

3  Q.    Okay.  And at this point, early on, your theory was that

4  Ms. Riley was romantically involved with a member of Group C and

5  a member of Group B, correct?

6  A.    Yes, that's correct.

7  Q.    And the two individuals you believed Ms. Riley was

8  personally involved with were Individual 4 and Individual 5,

9  correct?

10  A.    Yes, that's correct.

11  Q.    Okay.  And a source told you that Individual 5 is currently

12  leader of Group C, correct?  I can put it in the affidavit.  Go

13  to 123-5 down at the bottom.

14  A.    Yes.  Thank you.  That's correct.

15  Q.    Okay.  And as this affidavit was signed on September the

16  25th, you -- in fact, prior to signing this affidavit, you

17  interview Individual 5, correct?

18  A.    Yes, that's correct.

19  Q.    And Individual 5 denied ever being a part of Group C,

20  correct?

21  A.    Yes, I believe that's correct.

22  Q.    And you never wrote in the application for the search

23  warrant for the social media accounts that you interviewed

24  Individual 5 or that Individual 5 denied being a part of

25  Group C, correct?

1    A.    Yes, that's correct.

2    Q.    Okay.

3          In paragraph 14 of this affidavit, you represented that

4    Individual 4 is also confirmed to be a member of Group C,

5    correct?  And if you need an unredacted copy of this affidavit,

6    a binder is up there for you to look at.

7    A.    That is correct.

8    Q.    And what this paragraph is referring to is that you were

9    receiving information from the Kirkland Police Department, who

10   had an active investigation into Individual 4, correct?

11   A.    I need more for context.  I apologize.

12   Q.    Sure.

13   A.    What is the unredacted version?

14   Q.    If you can, Detective Decker, there is an exhibit binder up

15   there, and if you could go to Defense Exhibit 123, the defense

16   exhibit, and application for the warrant is up there,

17   unredacted.

18   A.    This goes to 121.

19              THE COURT:  There's another binder.

20              THE WITNESS:  A different binder?  Oh, Volume 2.  And

21   it was 123?

22   A.    I believe No. 14 was information pertaining to a federal

23   investigation, not a Kirkland investigation.

24   Q.    (By Mr. Hamoudi)  Could it have been a joint investigation?

25   A.    Yes, yes.

1    Q.    Okay.  Let's bring up, to help refresh Detective Decker's

2    recollection, Discovery 8219.  Is this the document?

3    A.    Yes, that's correct.

4    Q.    Okay.  And this is the document that you looked at to rely

5    on in making representations in the application for the search

6    warrant, correct?

7    A.    Yes, I did.

8    Q.    Okay.  And in this document, it, in fact, says that

9    Individual 5 -- Individual 4 is a known member of Group B, not

10   Group C, correct?

11   A.    Yes, that's correct.

12   Q.    Okay.

13         Early on, it appears you immediately started using social

14   media as an investigative tool to try to identify individuals to

15   develop leads to solve Ms. Riley's homicide, correct?

16   A.    Yes.

17   Q.    One of your sources shared with you Handle 1, correct?

18   A.    Can you re-ask the question?

19   Q.    One of your sources provided you with the social media name

20   for Handle 1, correct?

21   A.    Yes, that's correct.

22   Q.    Okay.  And your source was telling you to focus on

23   Handle 1, correct?

24   A.    Yes.

25   Q.    And marked for identification Exhibit 125, this is an email

1   early on in your investigation that you're forwarding to your

2   colleague, Detective Free.  Do you see it?

3   A.   Yes, I do.

4   Q.   And down below, it appears you're forwarding information

5   provided to you by your source, correct?

6   A.   May I look at the unredacted version?

7   Q.   I don't think we have an unredacted version, but I'll go to

8   the next page and show you the attachment.  Maybe that will

9   help.

10  A.   I believe that's correct, yes.

11  Q.   Okay.

12        MR. HAMOUDI:  So move to admit Exhibit 125.

13        THE COURT:  Any objection?

14        MR. OESTERLE:  Objection as to relevancy.  I don't

15  understand how this relates to the issue before the court.

16        THE COURT:  Well, counsel?

17        MR. HAMOUDI:  I think this goes to the ability of the

18  investigator to use resources available to them to conduct

19  social medial investigation, which will then speak to the aspect

20  of one of the issues before the court.

21        THE COURT:  So it's more to her experience and ability

22  to use this type of investigative tool to advance another

23  investigation --

24        MR. HAMOUDI:  Yes.

25        THE COURT:  -- separate and independent from this

1   information?

2              MR. HAMOUDI:  Yes.

3              THE COURT:  All right.  The objection is overruled.

4         Counsel, the concern I do have is, did the witness

5   affirmatively identify that she recognized Exhibit 125?  She had

6   to look at a different document before she was able to make that

7   identification, so you need to clarify that.

8              MR. HAMOUDI:  Yes, Your Honor.

9   Q.   (By Mr. Hamoudi)  Do you recognize this document?

10  A.   I don't as I sit here today, but I have no reason to

11  disbelieve that this isn't the document that was pertinent,

12  related.

13             THE COURT:  Well, counsel, you've turned to this page,

14  but it was the preceding page that she didn't identify, and you

15  used this document to assist in her recollection of the

16  preceding document.  Does that make sense?

17             MR. HAMOUDI:  That makes sense.

18             THE COURT:  Okay.

19  Q.   (By Mr. Hamoudi)  Ms. Decker, let's go back to page 1.  Do

20  you recognize this document?

21             THE COURT:  So we're clear, counsel, this is

22  Exhibit 125?

23             MR. HAMOUDI:  Exhibit 125, yes, Your Honor.

24  Q.   (By Mr. Hamoudi)  And this document is an email you

25  forwarded to Detective Free, and it has an attachment, correct?

1  A.   The attachment is not showing, but, yes, that's correct.

2  Q.   Okay.  And the attachment that you forwarded to him was

3  sent to you by somebody else?

4  A.   I have no reason to disbelieve that --

5  Q.   Okay.

6  A.   -- yes.

7  Q.   All right.

8       MR. HAMOUDI:  Is that adequate foundation, Your Honor?

9       THE COURT:  Yes.  It's admitted.

10             (Exhibit 125 admitted.)

11  Q.   (By Mr. Hamoudi)  Marked for identification Exhibit 126,

12  this is another email, around the same time, forwarded to

13  Detective John Free with an image attached to it, and whoever is

14  sending you the email, who is redacted, informs you that this

15  individual follows Amarah Instagram, correct?

16  A.   Yes.

17  Q.   And so to put things kind of together, when you initially

18  testified that somebody was telling you to focus on a particular

19  social media account, this is the source, correct?

20  A.   I don't know.

21  Q.   Let's go to the JPEG that follows this.

22  A.   Is there an unredacted copy that I can look at?

23  Q.   Exhibit 126 in Volume 2 is an unredacted copy.  If you

24  could go to page 2.

25  A.   This is redacted.

1    Q.    It's okay.  We can move on.

2          Marked for identification Exhibit 127, you know ATF Agent

3    Austin Wozniak?

4    A.    Yes.

5    Q.    And Agent Wozniak is an ATF agent?

6    A.    Yes.

7    Q.    And you reached out to him early on in this case for his

8    assistance, correct?

9    A.    Yes.

10   Q.    And the reason that you reached out to him is that he, in

11   fact, was investigating Individual 4, correct?

12   A.    Yes.

13   Q.    And he had a warrant for his arrest, correct?

14   A.    Yes.

15   Q.    And so here, early on, after you've learned that, you reach

16   out to Agent Wozniak, who you refer to by the first name

17   "Austin," and you asked for his assistance, correct?

18   A.    Yes.

19   Q.    And you say, "This is from one of my sources who says this

20   is the shooter," correct?

21   A.    Yes, that's correct.

22   Q.    And the information is third-hand from another source in

23   Capitol Hill, correct?

24   A.    Yes, that's correct.

25   Q.    And then, "I also got another lead that we need to look at

1    Instagram account for Handle 1, second attached video is

2    associated to that Instagram account," correct?

3    A.    That's correct.

4    Q.    And then you're asking him whether he can make a connection

5    for you between Handle 1 and Individual 4, who he is

6    investigating, correct?

7    A.    Yes, that's correct.

8    Q.    Okay.

9          And if you go down to the next page, you attached videos to

10   the email that you obtained to aid Agent Wozniak in his task of

11   identifying this individual for you, correct?

12   A.    Yes, I believe those are links for videos, correct.

13              MR. HAMOUDI:  Okay.  Move to admit Exhibit 127.

14              THE COURT:  Any objection?

15              MR. OESTERLE:  No objection.

16              THE COURT:  It is admitted.

17                    (Exhibit 127 admitted.)

18   Q.    (By Mr. Hamoudi)  Marked for identification Exhibit 130,

19   another resource available to you was GETEM, correct?

20   A.    Yes, that's correct.

21   Q.    And without disclosing any sensitive law enforcement

22   information, give us a general understanding of what is GETEM.

23   A.    If I recall correctly, it was a database that was

24   accessible, where names were inputted where individuals had

25   reason to believe that these individuals were associated in some

1   type of a street gang.

2   Q.   Okay.  Let's go to the next page.

3        And here you sought to identify Individual 6, correct, and

4   you used this database as a resource to do that, correct?  And

5   if you need to look at an unredacted --

6   A.   I do.  There's not a name here.

7   Q.   It's Exhibit 130.

8   A.   Yes, that's correct.

9            MR. HAMOUDI:  Move to admit Exhibit 130.

10           THE COURT:  Any objection?

11           MR. OESTERLE:  No objection.

12           THE COURT:  It's admitted.

13                    (Exhibit 130 admitted.)

14  Q.   (By Mr. Hamoudi)  Marked for identification Exhibit 131,

15  this is an email that you sent on September the 23rd, 2018,

16  correct?

17  A.   Yes, that's correct.

18  Q.   Okay.  And the individuals listed on this email are Deputy

19  Prosecuting Attorney Scott O'Toole, your supervising

20  sergeants -- Sergeant Anthony McNabb, Blythe Miniken, and

21  Detective John Free, correct?

22  A.   Yes.  There may be others that are blocked out.  I'm not

23  sure if that's what those blocks mean.  But, yes, who you have

24  named, they are, indeed, listed there, yes.

25  Q.   But here you have sort of used resources to reach the

1  conclusion that, "our shooter, now we just need to ID him and

2  prove it."  What does that mean?

3  A.    I believe at that time I had information that this person

4  may well be our shooter pertaining to the murder and that we

5  needed to move forward to identify him and to prove the case.

6  Q.    And when you're talking about "our shooter," you're talking

7  about Handle 1, whoever is the person who is in control of

8  Handle 1, correct?

9  A.    Yes, that's correct.

10 Q.    Okay.  And Austin, who is Agent Wozniak, informed you that

11 he was going to reach out and try to help you identify this

12 individual, correct?

13 A.    Yes.

14 Q.    Okay.  And the person you had, at this point, identified is

15 Individual 6 to be this Handle 1, correct?

16 A.    Yes, that's correct.

17 Q.    Okay.

18        MR. HAMOUDI:  Move to admit 131.

19        THE COURT:  Any objection?

20        MR. OESTERLE:  Your Honor, I'm going to object to the

21 exhibit and also object to this continuing line of questions.

22 It seems to me as if we're now into establishing the underlying

23 murder case, not the issue before the court, which is whether

24 the affidavit was properly obtained, and I don't see the

25 relevance to this to the issue that's before the court.

1          THE COURT:  Counsel, clarify.

2          MR. HAMOUDI:  Handle 1 is directly relevant to

3    Detective Decker's misidentification of Mr. Wondie in Group A

4    photo, Your Honor.

5          THE COURT:  I'll allow limited latitude.  The exhibit

6    is admitted.

7                    (Exhibit 131 admitted.)

8    Q.   (By Mr. Hamoudi)  Marked for identification Exhibit 132,

9    this is an email you sent to Deputy Prosecuting Attorney O'Toole

10   and Detective John Free, and you wrote, "Scott, this is the

11   YouTube video posted the night Amarah was killed.  It is from

12   Individual 6," and you're asking his assistance as to how to

13   preserve this and how to preserve the Twitter account, "more to

14   come," and identifying the source helping you, correct?

15   A.   Yes, that's correct.

16   Q.   And if you can go to the next page, this picture does not

17   show an individual, but this is what you've attached to the

18   email.  I'm going to go to the next page, and here what you have

19   attached is a social media posting from Group A, correct?

20   A.   I believe that's correct, yes.

21   Q.   If you need to look at an unredacted copy of this exhibit,

22   it's 132-3, right in front of you.

23   A.   Yes.  Thank you.  That's correct.

24   Q.   Okay.  And go to the next page.

25        In the unredacted copy, if you continue to move forward, we

1  have redacted the photos of these individuals.  There are faces

2  of individuals in those pictures.  Can you look at those and let

3  me know when you get to --

4  A.    Yes, I believe I'm on that page now.

5  Q.    Was it your opinion at this time that the individual --

6  what page are you on, on the bottom right-hand?

7  A.    It's USA-008233.

8  Q.    8233?  That's 132-7.

9        Is it your opinion that this individual was Individual 6?

10 A.    I don't know.

11 Q.    Okay.  All right.  That's fine.

12        MR. HAMOUDI:  If I haven't moved Exhibit 132, I move

13 to admit Exhibit 132 at this time.

14        THE COURT:  It has not been admitted.  Any objection?

15        MR. OESTERLE:  No objection.

16        THE COURT:  Exhibit 132 is admitted.

17                    (Exhibit 132 admitted.)

18 Q.    (By Mr. Hamoudi)  Marked for identification Exhibit 133,

19 this is an addendum to application for search warrant that you

20 filed in this case.  I'm going to go through it slowly, and a

21 copy of it is in front of you, under Tab 33, if you need to

22 review it.

23 A.    Yes.

24 Q.    And this addendum -- the reason you prepared this addendum

25 was because the first warrant failed because at least one of the

 1   entities, after it had been served with the original warrant,

 2   told you that the warrant failed to provide sufficiently

 3   specific information about the account and our account holder to

 4   enable the company to locate the requested records, correct?

 5   A.    I believe that's correct, yes.

 6               MR. HAMOUDI:  Okay.  Move to admit Exhibit 133.

 7               THE COURT:  Any objection?

 8               MR. OESTERLE:  No objection.

 9               THE COURT:  It's admitted.

10                         (Exhibit 133 admitted.)

11   Q.    (By Mr. Hamoudi)  And Judge Richardson signed this warrant,

12   correct?

13   A.    Yes, that's correct.

14   Q.    And this warrant also failed because one entity reported to

15   you that overly broad and vague language request as it failed to

16   describe is appropriate and reasonable, the type of information

17   being sought, correct?

18   A.    Yes.

19   Q.    And when you learned that this warrant failed, too, you

20   wrote Deputy Prosecuting Attorney David Seaver, who signed this

21   affidavit, saying, "Can they seriously do this?  It is a signed

22   warrant by a superior court judge."  Correct?

23   A.    Yes.

24   Q.    And you were clearly frustrated when you sent that email,

25   correct?

1    A.    Yes.

2    Q.    Frustrated because you could not get information to solve

3    your homicide, correct?

4    A.    No.

5    Q.    What's that?

6    A.    No.

7    Q.    No?  What was your frustration about?

8    A.    That I was not familiar enough with social media sites to

9    be able to correctly state what needed to be stated to get

10   evidence to, hopefully, solve my homicide.

11   Q.    You had a prosecuting attorney that helped you prepare the

12   affidavit, or was that -- did you prepare the affidavit?

13   A.    I was the primary.  I believe I had it reviewed by the

14   prosecutor, correct.

15   Q.    So the responsibility fell on you?

16   A.    Yes.

17   Q.    Okay.

18         I want to talk about another area of inquiry that an

19   email -- marked for identification Exhibit 140.  This is an

20   email sent at 1:46 p.m. on November the 20th to Detective John

21   Free, correct?

22   A.    Yes.

23   Q.    And you are summarizing for him what you have learned as a

24   result of these two NIBIN leads that have come to your

25   attention, correct?

1    A.   Yes, that's correct.

2    Q.   And your theory at this point is that the gun was either in

3    Wondie's possession, if he lied back in 2017, or the guy from

4    the May 28th shooting, correct?

5    A.   Can you re-ask that question?

6    Q.   Sure.

7         So your theory here is either Mr. Wondie has the gun, or

8    the guy from the May 28 shooting, correct?

9    A.   Yes, that's correct.

10   Q.   Okay.  And if you look at the attachments up top, the

11   attachments have two files attached to them.  Do you see that?

12        Those files, is it fair to say, correspond with the police

13   reports associated with those two incidents?

14   A.   May I see more for context?

15   Q.   Yes.

16             MR. HAMOUDI:  Let's mark for identification

17   Exhibit 141.

18   Q.   (By Mr. Hamoudi)  This is a police report request dated --

19   released to you on September 27, 2018, correct?

20   A.   I don't recall the date, but I do recognize the report,

21   yes.

22   Q.   Okay.  So up top in the top right-hand corner --

23   A.   Yes --

24   Q.   -- that number corresponds with the number that is the

25   attachment reference in the earlier email, correct?

 1   A.    Yes, correct.

 2   Q.    So you attached this report to that email when you sent

 3   your theory to Detective Free, correct?

 4   A.    Yes.

 5              MR. HAMOUDI:  Move to admit Exhibit 141.

 6              THE COURT:  Any objection?

 7              MR. OESTERLE:  No objection.

 8              THE COURT:  It is admitted.

 9                      (Exhibit 141 admitted.)

10   Q.    (By Mr. Hamoudi)  Okay.  The binder in front of you,

11   Exhibit 141 is in there.  Take a moment to read that report that

12   you obtained, to refresh your recollection, and I'll ask you

13   some questions about it.

14              THE COURT:  Counsel, we're close enough to the morning

15   recess, why don't we break now and give the witness the

16   opportunity to review the exhibit so when we return, she's ready

17   to answer questions.

18              MR. HAMOUDI:  Thank you, Your Honor.

19              THE COURT:  We'll take our recess at this time.

20              (Court in recess 10:31 a.m. to 10:49 a.m.)

21              THE COURT:  Counsel, you may continue your examination

22   of the witness.

23              MR. HAMOUDI:  The defense moves to admit Exhibit 140.

24              THE COURT:  Any objection?

25              MR. OESTERLE:  No, Your Honor.

1          THE COURT:  It is admitted.

2                    (Exhibit 140 admitted.)

3   Q.    (By Mr. Hamoudi)  Detective Decker, just a brief recap:

4   This was the email that you sent to Detective Free on November

5   28th at 1:46 p.m. that had attached to it the two reports

6   related to the two NIBIN leads, correct?

7   A.    Yes, that's correct.

8   Q.    Okay.  So we're going to cover Exhibit 141, which is the

9   report associated with the 2018 shooting incident, and you've

10  reviewed that report, correct?

11  A.    Yes, that's correct.

12          MR. HAMOUDI:  I move to admit Exhibit 141.

13          THE COURT:  141 has been admitted, counsel.

14  Q.    (By Mr. Hamoudi)  Page 11 of this exhibit, there's an

15  eyewitness report, and the eyewitness reports that they were

16  standing outside near the house when they observed a black male

17  start shooting at a passing vehicle, correct?

18  A.    Yes, that's correct.

19  Q.    And the eyewitness described the vehicle and reported where

20  the vehicle was traveling to, correct?

21  A.    I think the vehicle reference is that the black male

22  started shooting at a passing vehicle.

23  Q.    Okay.  And as you recall -- well, if you recall, Ms. Riley

24  was shot while driving a moving vehicle, correct?

25  A.    Yes, that's correct.

1    Q.    And on page 6 of this report, Seattle Police Department

2    investigators identified a subject, correct?

3    A.    Yes, that's correct.

4    Q.    And to your knowledge, that person was or was not

5    Mr. Wondie?

6    A.    It looks like it is blocked out here as well.  I don't know

7    the answer to that.

8    Q.    All right.  Let's go to your affidavit, Exhibit 134-8.

9          Down below, you're referring to the May 28th, 2018,

10   incident, correct?

11   A.    Yes, that's correct.

12   Q.    Okay.  And you prepared this narrative after reviewing the

13   report that I just reviewed with you, correct?

14   A.    Yes, that's correct.

15   Q.    Okay.  And in that report, you say nothing about somebody

16   shooting at a passing vehicle, correct?

17   A.    That is correct.

18   Q.    And if the individual identified in the May 28th, 2018,

19   incident was Mr. Wondie, you would have listed his name in this

20   affidavit, correct?

21   A.    I would certainly hope so, yes.

22   Q.    And you received that report prior to, obviously, preparing

23   this application to search my client's home and residence,

24   correct?

25   A.    Yes.

1    Q.   So you did not inform Judge Richardson that somebody, on

2    May 28th, 2018, which was approximately four months before

3    Ms. Riley's death, was involved in a shooting incident involving

4    a passing vehicle, correct?

5    A.   That's correct.

6    Q.   And that incident involved a NIBIN link, which linked the

7    casing recovered from Ms. Riley's death, correct?

8    A.   Yes, that's correct.

9    Q.   Marked for identification Government's Exhibit 58, on

10   November the 20th, 2018, at approximately 2:20 p.m., you sent an

11   email to Detective Free with the subject matter "Wondie,"

12   correct?

13   A.   I don't believe that email was actually was ever sent, but,

14   yes, I did write the email.

15   Q.   But this email you sent, correct?

16   A.   Oh, yes, that is correct.

17   Q.   Okay.

18        And this is on the same day where we just -- where you just

19   shared the police reports with Detective Free, correct?  And if

20   you need your memory refreshed, it's Exhibit 140 --

21   A.   140?

22   Q.   -- at -- so this email with the reports is sent November

23   20th, 2018, at 1:46 p.m., correct?

24   A.   That's correct, yes.

25   Q.   And then -- going to Government's Exhibit -- at 2:19 p.m.,

1    correct?

2    A.    Yes, that's correct.

3    Q.    So less than a half an hour after you sent the reports, you

4    sent this email, correct?

5    A.    Yes.

6    Q.    And the subject is, "Wondie," and you say, "At any rate, I

7    already had him down as someone to locate and interview,"

8    correct?

9    A.    Yes.

10   Q.    Because you wanted to speak to Mr. Wondie?

11   A.    Yes.

12   Q.    And Detective Free responds to you, at 2:32, which is

13   approximately ten minutes or more after, says, "You know the

14   facts that the dates don't match up, I wonder if that would

15   leave enough PC for a search warrant of his place for the gun,"

16   right?

17   A.    Yes, that's correct.

18   Q.    And he's identifying a potential problem here for a

19   probable cause basis is that in order to go for the search

20   warrant for that gun, he has to be in possession of that gun,

21   correct?

22   A.    Can you re-ask that question?

23   Q.    Sure.

24         If you want to go search for a piece of evidence that's

25   related to your homicide, you have to establish that that person

1    is in possession of that piece of evidence, correct?

2    A.    Or that that piece of evidence is potentially at a

3    particular location, not a residence, without being on

4    somebody's person, but, yes.

5    Q.    The item has to be either be there either in a home or a

6    vehicle or on the person, correct?

7    A.    We need probable cause to believe that, that's correct.

8    Q.    That's right.

9          And so your colleague here is identifying a problem with

10   dates not matching up, correct?

11   A.    Not a problem, no.

12   Q.    He's asking you, "I wonder if that would leave enough

13   probable cause for a search warrant of his place for the gun."

14   So there is a probable cause problem that he's potentially

15   identifying, correct?

16   A.    I interpreted that differently.

17   Q.    How did you interpret it?

18   A.    The fact that the dates aren't matching up between when the

19   gun was released back to Mr. Wondie and the date of the burglary

20   being inconsistent, he's asking if that would be enough probable

21   cause for a search warrant, is my understanding.

22   Q.    All right.

23         And then you respond to him, and I think you represented

24   that you drafted but you did not send this email?

25   A.    Correct.

1   Q.   Okay.  So you drafted this email, and you said, "In this

2   state, ha, but we may be able to establish that with some

3   c-r-e-a," correct?

4   A.   Yes.

5   Q.   And c-r-e-a, if you were allowed to complete it, would mean

6   "creativity"?

7   A.   Yes.

8        MR. HAMOUDI:  Move to admit Government's Exhibit 58.

9        MR. OESTERLE:  No objection.

10        THE COURT:  It is admitted.

11                    (Exhibit 58 admitted.)

12   Q.   (By Mr. Hamoudi)  You drafted that statement about

13   creativity after having two of your warrants rejected.

14   A.   Are you referring to the Instagram warrant?  Yes.

15   Q.   After you voiced frustration to Deputy Prosecuting Attorney

16   Seaver about one of those rejections?

17   A.   Yes.

18   Q.   You wrote this because you knew that all you had in your

19   possession was a NIBIN lead, which was insufficient for a

20   warrant for my client's residence and vehicle, correct?

21   A.   No.

22   Q.   You wrote this because you knew that you had other suspects

23   who had the gun, and you wanted to talk to my client to see who

24   he gave the firearm to, correct?

25   A.   No.

1   Q.   Let's go to Discovery Page 5368.  Take a moment to read

2   this email, please.

3            THE COURT:  Is this document embodied in an exhibit,

4   counsel?

5            MR. HAMOUDI:  No, it's not, Your Honor.

6            THE COURT:  All right.

7            MR. OESTERLE:  Counsel, this is Government's

8   Exhibit 68.

9            MR. HAMOUDI:  Oh, excellent.

10  Q.   (By Mr. Hamoudi)  Marked for identification Government's

11  Exhibit 68.

12  A.   And I have reviewed this.

13  Q.   Yeah, there we go.

14       Did you finish reading that first page?

15  A.   Yes.

16  Q.   Okay.  Let's go to the second page.

17  A.   Yes, I've read it.

18  Q.   And go up to the first page, down at the bottom, when

19  Detective Free says, down at the bottom he says, "One thing that

20  Kathy and I discussed last week," correct?

21  A.   Yes.

22  Q.   So last week of December 3rd -- a few days before December

23  3rd, you and Detective Free had a discussion about the strategy

24  with respect to the moment of contact with Mr. Wondie, correct?

25  A.   Yes.

1    MR. HAMOUDI:  Move to admit Government's Exhibit 68.

2    MR. OESTERLE:  No objection.

3    THE COURT:  It is admitted.

4                    (Exhibit 68 admitted.)

5    Q.   (By Mr. Hamoudi)  Here Detective Free, following your

6    discussion the week prior, says he wants, at the moment of

7    contact, to speak to Mr. Wondie and say, "Please tell me that

8    you're, at least, a responsible gun owner and you keep your gun

9    secure and aren't, like, loaning them out or anything," correct?

10   A.   Correct.

11   Q.   And the reason that he is putting that in this email is

12   because you do not have reason to believe that he is currently

13   in possession of a firearm, correct?

14   A.   That's not true.

15   Q.   Or you want to know who he has loaned the firearm to,

16   correct?

17   A.   If he didn't have it on him, we would want to know who he

18   loaned it to, that's correct.

19   Q.   And also this email reveals that the Department of Homeland

20   Security drug case was being used as a basis to contact my

21   client to get information about the firearm, correct?  And if I

22   misunderstand that, please correct me.

23   A.   It references a dope case but it is not specific to which

24   case, so I can't agree to that.

25   Q.   Okay.

1      But you were working with Special Agent Marco Dkane in this

2  case, correct?

3  A.    Yes.

4  Q.    And Special Agent Marco Dkane represented to you that he

5  was investigating my client on a dope case, correct?

6  A.    Yes, that's correct.

7  Q.    And you were sharing information with the Department of

8  Homeland Security in order to prepare your application for a

9  search warrant for my client's home and residence, correct?

10 A.    Yes, that's correct.

11 Q.    Okay.

12     And in this email, Detective Free also says, "That little

13 bit of acknowledgment that he's had rein and control of his guns

14 the entire time might pay dividends down the road," correct?

15 A.    Yes, correct.

16 Q.    Marked for identification Defense Exhibit 142, this goes a

17 little bit earlier, back in October, in your investigation.

18 Down at the bottom, Detective Free identifies Individual 2 and a

19 moniker, correct?

20 A.    Is there an unredacted version?

21 Q.    Yes.  The unredacted version would be in the Volume 2

22 binder, Exhibit 142.

23 A.    Looks like this is redacted as well, so just give me a

24 moment, and I'll try to answer your question.

25     Can you ask the question again?

1    Q.    The moniker "Head" has been identified as Individual 2?

2    A.    Yes, that's correct.

3    Q.    And then up top you respond and you say that, "Our shooter

4    has been identified," correct?

5    A.    That's correct.

6    Q.    And this is the same person that was just identified with

7    the reference with that moniker, correct?

8    A.    Yes, sir, that's correct.

9              MR. HAMOUDI:  Move to admit Exhibit 142.

10             MR. OESTERLE:  No objection.

11             THE COURT:  It's admitted.

12                        (Exhibit 142 admitted.)

13   Q.    (By Mr. Hamoudi)  And marked for identification Exhibit

14   143, and down at the bottom, you, on October 16th, ask your

15   colleague, "Again what is the inmate in the King County Jail

16   that was talking with the guy in L.A. who named our shooter as,"

17   and then you refer to the same moniker, correct?

18   A.    Yes, that's correct.

19   Q.    And so then the source of the identification by your

20   colleague was a King County Jail inmate talking with a guy in

21   Los Angeles, correct?

22   A.    Yes, that's correct.

23   Q.    Okay.

24             MR. HAMOUDI:  Move to admit Exhibit 143.

25             MR. OESTERLE:  No objection.

1    THE COURT:  It's admitted.

2                    (Exhibit 143 admitted.)

3    Q.   (By Mr. Hamoudi)  And marked for identification Exhibit

4    145, this is an email exchange, one is an earlier one from

5    October 31st between you and Agent Wozniak, correct?

6    A.   Yes, that's correct.

7    Q.   And you write him, on October 31st, asking him for

8    assistance with Individual 2, correct?

9    A.   That's correct.

10   Q.   And what does "POI" mean?

11   A.   Person of interest.

12   Q.   What is a person of interest?

13   A.   Somebody who is a potential lead in the identification of a

14   murder suspect.

15   Q.   I'm sorry.  Somebody coughed.  Can you repeat what a person

16   of interest is?

17   A.   A person of interest is someone who is potentially a lead

18   suspect in a murder investigation.

19   Q.   Okay.

20        And then up top, you respond to this and you say, "First

21   batch, looks like Individual 2 to me, part of Group A," correct?

22   A.   Yes.

23   Q.   And it appears you've attached to this email photos of

24   Individual 2, Group A, correct?

25   A.   Yes, correct.

1    Q.   And you're asking -- you're just sharing your thoughts to a

2    colleague about what your impression is, correct?

3    A.   Yes, that's correct.

4         MR. HAMOUDI:  If I haven't moved to admit this, I move

5    to admit this exhibit.

6         MR. OESTERLE:  No objection.

7         THE COURT:  145 is admitted.

8              (Exhibit 145 admitted.)

9    Q.   (By Mr. Hamoudi)  And this is on November the 20th,

10   correct, at 5:28 p.m.?

11   A.   Yes, that's correct.

12   Q.   All right.

13        Marked for identification Exhibit 146, this is an email

14   from December 5th, 2018, sent from your sergeant, Blythe

15   Miniken, correct?

16   A.   Yes.

17   Q.   And December the 5th is the day before the search warrant

18   was executed on December the 6th, correct?

19   A.   Yes.

20   Q.   Okay.

21        So, here, Sergeant Miniken is sharing information, and one

22   of the information that -- there's attachments to this email,

23   "wondie.doc.x"; do you see that?

24   A.   Yes.

25   Q.   If we can move forward so we can show that attachment to

1    the detective.

2          Do you remember this document?

3    A.    Yes.

4    Q.    And this is a document that you prepared?

5    A.    Yes.

6    Q.    Let's go through it slowly so you can see it.

7    A.    Okay.

8          MR. HAMOUDI:  Move to admit Exhibit 146.

9          THE COURT:  Any objection?

10         MR. OESTERLE:  No objection.

11                    (Exhibit 146 admitted.)

12   Q.    (By Mr. Hamoudi)  So in this email and the attachment that

13   you've prepared, you say, "Murder weapon NIBIN link," correct?

14   A.    Yes, that's correct.

15   Q.    And you also say, "May 28th, 2018, recovered shell casings

16   linked to murder weapon," correct?

17   A.    Yes, that's correct.

18   Q.    Okay.

19         And let's move to the next page.

20         You also say, "Individual 2 and Wondie each appear to be

21   photographed as part of the Group A," correct?  Down at the

22   bottom.

23   A.    Yes, that's correct.

24   Q.    Okay.  All right.

25         Marked for identification Exhibit 147.  If you need to look

1   at an unredacted email, it's in Volume 2, Exhibit 147.  I know

2   it's a bit long.  I apologize.  If you could take a moment to

3   read it.

4   A.   Okay.

5           MR. HAMOUDI:  Move to admit Exhibit 147.

6           THE COURT:  Any objection?

7           MR. OESTERLE:  Your Honor, I do have a relevancy

8   objection to this.

9       I'm not sure how this relates to what's before the court

10  again.

11          THE COURT:  Counsel, clarify.

12          MR. HAMOUDI:  What I will establish with this line of

13  questioning is that, as of November 20th, there was another

14  person of interest involved in the homicide, and that person had

15  no connection to any of the groups.

16          THE COURT:  All right.  The objection is overruled.

17  It's admitted.

18                  (Exhibit 147 admitted.)

19  Q.   (By Mr. Hamoudi)  Ms. Decker, this individual -- and we'll

20  call him Individual 3 -- was a working professional here in our

21  community, correct?

22  A.   Yes.

23  Q.   And this individual employed Ms. Riley, correct?

24  A.   Correct.

25  Q.   And this individual and Ms. Riley may have also been

1  personally involved, correct?

2  A.    Correct.

3  Q.    And you had a theory that this individual may have been

4  involved in Ms. Riley's death, correct?

5  A.    Yes.

6  Q.    And you also had been working with Agent Wozniak with

7  respect to this theory, correct?

8  A.    Yes.

9  Q.    And marked for identification Exhibit 148, and this is an

10  email that you sent to your colleague, Detective Free, on

11  November the 20th.  And if you want to look at this, just flip

12  your binder to Exhibit 148.  It's right there.  It's the

13  unredacted copy.

14  A.    Okay.

15  Q.    Okay.

16     So what you did in order to see -- what you did is ruled

17  out Individual 3 as being associated with Group A here, correct?

18  A.    As being an associate of who?  I'm sorry.  I didn't hear

19  you.

20  Q.    You said you looked at Group A social media files here,

21  correct?

22  A.    Yes.

23  Q.    And you went through them to see if there was a photograph

24  of Individual 3 with Group A, correct?

25  A.    That is correct.

1    Q.    And you could not find it?

2    A.    That is correct.

3    Q.    And you write it, "Sounds like he's not affiliated with

4    them but with the other street gang," correct?

5    A.    Correct.

6    Q.    Without saying the other street gang's name, and if you can

7    look at your acronym list, do you remember which street gang you

8    were referring to?

9    A.    I don't.

10   Q.    Okay.

11         I want to talk to you a bit about the photo you included in

12   your search warrant of Group A.  If we can go to previously

13   admitted Exhibit 134 at page 10.  You swore that you located an

14   Instagram photograph associated to Group A, depicting an

15   African-American male holding a gun, who has the same facial

16   features and hair style as Gizachew Wondie.  I attached the

17   current booking photograph of Wondie to be compared against the

18   Instagram photograph.  It should be noted the Instagram

19   photograph was posted on September 27, 2018, eight days after

20   the murder occurred," supposedly, and you specifically swore

21   that you believe the male shown second from the left in the back

22   is Gizachew Wondie, although it is not possible to identify the

23   make and model of a firearm, correct?

24   A.    That is correct.

25   Q.    Can you go to the next page?

1          Prior to when you signed the application for the search

2     warrant to search my client's home and residence, you didn't

3     have any personal interactions with Mr. Wondie, did you?

4     A.    That is correct.

5     Q.    In fact, you didn't know anything about him before the

6     NIBIN lead put him on your investigative radar, correct?

7     A.    That is correct.

8     Q.    But you had done investigation on your own into Group A,

9     correct?

10    A.    To some extent, yes, that's correct.

11    Q.    And you had started looking into Group A before Mr. Wondie

12    was on your radar, correct?

13    A.    I believe so, yes.

14    Q.    Okay.  You prepared a homicide chronology in this case.

15    Would it help refresh your recollection to look at entries from

16    that homicide chronology?

17    A.    Yes, please.

18    Q.    Go to 8692.  During that, September 25th, you're speaking

19    to a witness, and it looks like you're sharing Group A video

20    clips with that witness, correct?

21    A.    Yes, that's correct.

22    Q.    And let's go to 8691.  Here is September 22nd, 2018, you

23    said, "I began review of the names and social media relating to

24    this case in preparation for search warrant," and it says, "I

25    researched Group A on YouTube and noted a posting dated

1  September 19, 2018," correct?

2  A.    Yes, that's correct.

3  Q.    All right.

4        And you had actually put out a theory to Judge Richardson

5  about the conflict between Group A, Group B, and Group C,

6  correct --

7  A.    Yes.

8  Q.    -- as a homicide theory, correct?

9  A.    Yes.

10 Q.    And then you received the NIBIN lead, and your NIBIN lead

11 brought my client's name onto your radar, correct?

12 A.    That's correct.

13 Q.    Okay.  And it was at that point you needed Mr. Wondie to

14 somehow be associated with Group A, correct?

15 A.    No, that's not correct.

16 Q.    Well, you knew Group A was a music group, correct?

17 A.    I learned that during the investigation, yes.

18 Q.    That they had registered their group as a corporate entity

19 with the State of Washington?

20 A.    I don't know that now.  I don't know.

21 Q.    You knew they had a significant following in our community?

22 A.    I don't know.

23 Q.    That articles have been written about them in the

24 mainstream media?

25 A.    I believe I learned that during the investigation, yes.

1    Q.    That they'd given interviews about their music?

2    A.    I'm not familiar with that, no.

3    Q.    That they are -- about their experience as Somali members

4    of our community.

5    A.    I'm sorry.  Re-ask that question, please.

6    Q.    Yes.

7          You researched and learned that they were expressing, in

8    their music, their interests in the Somali experience in our

9    community, correct?

10   A.    I don't know now what my knowledge was at that point.  It's

11   been too long.  It's very possible, yes.

12   Q.    And you also knew that law enforcement suspected they were

13   a gang, correct?

14   A.    Yes.

15   Q.    You learned that from Agent Wozniak, correct?

16   A.    I don't recall.

17   Q.    Well, let's bring up -- this is from our previous

18   hearing -- Defense Exhibit 110-4.  This is an email where people

19   are asking about Group A, and take a moment to read it.

20         It says, "Special Agent Wozniak knows more of the players

21   from this group than I know," correct?

22   A.    Yes, that's correct.

23   Q.    Does that help refresh your recollection that Special Agent

24   Wozniak was a source for you in investigating Group A?

25   A.    It doesn't, no.

 1   Q.   That's fine.

 2        Let's mark for identification 149.

 3        This is dated October 23rd, 2018, and it's an exchange

 4   between you and Agent Wozniak, correct?

 5   A.   Yes.

 6   Q.   And you ask him if he knows my client, correct?

 7   A.   Yes, that's correct.

 8   Q.   And he tells you, "I would definitely remember hearing that

 9   name, 'Gizachew Wondie.'  That sounds like one hell of an ATF

10   NIBIN lead, though.  Some folks will be doing a happy dance if

11   the NIBIN machine leads to a homicide suspect," correct?

12   A.   Yes, that's correct.

13        MR. HAMOUDI:  Move to admit 149.

14        MR. OESTERLE:  No objection.

15        THE COURT:  It's admitted.

16              (Exhibit 149 admitted.)

17   Q.   (By Mr. Hamoudi)  Now, here, AFT Agent Wozniak, who works

18   with the ATF, who manages the NIBIN program, is telling you that

19   this is a NIBIN lead, correct, in this email?

20   A.   I wouldn't call him managing the NIBIN program.

21   Q.   His agency, not him --

22   A.   Oh, his agency.  Okay.

23   Q.   Correct?

24   A.   Can you re-ask the question.

25   Q.   He did not call it a forensic match?

1    A.    Oh, that is correct, yes.

2    Q.    He did not say that this was a conclusive link, correct?

3    A.    That is correct.

4    Q.    And you also identified my client by name to him, and he's

5    clearly telling you he doesn't know my client, correct?

6    A.    Correct.

7    Q.    And you never told the judge that Agent Wozniak never

8    identified my client -- didn't know my client when you asked him

9    if he knew him, correct?

10   A.    That is correct.

11   Q.    Okay.

12         You also received information from the Seattle Police

13   Department about Group A, correct?

14   A.    Yes.

15   Q.    Okay.  Mark for identification Exhibit 150?

16         THE COURT:  Any objection?

17         MR. OESTERLE:  I believe he asked it to be marked.

18         THE COURT:  150 to be marked.

19         MR. OESTERLE:  I have no objection to it being marked.

20   I don't know if he's offering it now.

21         MR. HAMOUDI:  I'll move to admit it now, Your Honor.

22         MR. OESTERLE:  There's no objection.

23         THE COURT:  150 is admitted.

24                    (Exhibit 150 admitted.)

25   Q.    (By Mr. Hamoudi)  This is an email dated October 11th,

1    2018, between yourself and Scott O'Toole, who is a deputy

2    prosecuting attorney, and your colleague, John Free, correct?

3    A.    Yes, that's correct.

4    Q.    And you say, "Here's what SPD sent our way, not for

5    discovery but very helpful," correct?

6    A.    Yes, that's correct.

7    Q.    If we can move to the next page.  Move to the next page.

8          And it looks like you had received from the Seattle Police

9    Department information about Group A, correct?

10   A.    Yes, that's correct.

11   Q.    And the Seattle Police Department, it was a detective, who

12   investigated gangs, correct?  Is that who you received this

13   document from?

14   A.    I don't recall.

15   Q.    Okay.

16         Well, in this document, Group A is identified, and

17   individuals associated with Group A are also identified,

18   correct?

19   A.    Yes, that's correct.

20   Q.    Identified Individual 1, yes?

21   A.    Yes, correct.

22   Q.    Mr. Wondie is not on this chart?

23   A.    That is correct.

24   Q.    And you had this information prior to when you sought and

25   obtained the search warrant for my client's home and residence,

1    correct?

2    A.    Yes, that's correct.

3    Q.    And you didn't provide this information to the judge,

4    correct?

5    A.    That is correct.

6    Q.    Let's go to previously admitted Government's Exhibit 14.

7          On November 20th, 2018, your partner requested -- sent out

8    a request -- seems like a request to law enforcement agents --

9    looking for gang affiliations and moniker for my client,

10   correct?

11   A.    Yes.

12         Can I review the non-redacted copy?

13   Q.    We don't have a non-redacted copy.  We have the question

14   that he asked and responses to that question by certain

15   officers.

16   A.    Okay.  I was wanting to refresh on the who-it-went-to

17   portion, but, yes, the rest is correct.

18   Q.    Okay.

19         And the reason this request was sent is that you were

20   trying to establish an association between my client and a gang,

21   correct, if one existed?

22   A.    Yes, if one existed, correct.

23   Q.    And the reason that's important is that if there was an

24   association with a gang, you would have presented it to the

25   judge, correct?

1   A.   Correct.

2   Q.   And let's go to Government's Exhibit 13.

3        One of the individuals that responded to this email was

4   Officer Averett, and if you could read what he responded.  Take

5   a moment.

6   A.   Okay.

7   Q.   So you were aware that Mr. Averett did not report any gang

8   associations; is that correct?

9   A.   That is correct.

10  Q.   Okay.  Let's go to Exhibit 14, page 1.

11       And Officer John Chesney also responded, and he wondered

12  the same thing Detective Free wondered, correct?

13  A.   Yes, that's correct.

14  Q.   So he did not report that my client had any gang

15  associations, correct?

16  A.   Yes, that's correct.

17  Q.   Let's go to Exhibit 15.

18       Here is Officer Souriall.  He says, "Don't know gang

19  associations," but provides you information about where my

20  client hangs out.

21  A.   Yes, that's correct.

22  Q.   So three different officers, after an affirmative request

23  to establish gang associations, responded and did not say that

24  Mr. Wondie was associated with any gangs, correct?

25  A.   Yes, that's correct.

1  Q.   And none of this information from the police officers was

2  provided to the judge on December the 4th, 2018, when you sought

3  to search his home and residence, correct?

4  A.   That is correct.

5  Q.   Okay.  So to recap:  Before you sought out your affidavit,

6  you had information about Group A, correct?

7  A.   Yes.

8  Q.   Access to law enforcement who knew about Group A?

9  A.   Yes.

10  Q.   Had reviewed charts of membership of Group A?

11  A.   Yes.

12  Q.   Had discussed the group with fellow law enforcement agents?

13  A.   Yes.

14  Q.   You had access to a database called Accurint, correct?

15  A.   A similar database, but not Accurint.

16  Q.   Okay.  Similar to Accurint.

17       And nobody reported any association between Mr. Wondie and

18  Group A, correct?

19  A.   That is correct.

20  Q.   Okay.  So the only connection between this group and

21  Mr. Wondie is your misidentification of my client.

22  A.   That's not correct.

23  Q.   And misidentification that all started with a NIBIN lead

24  that was not a match or a conclusive link, correct?

25  A.   That is correct.

1   Q.   Okay.

2        So we'd already talked about your investigation into

3   Group A's social media account.  And you received Instagram

4   records from Group A's Instagram account, correct?

5   A.   Yes, that's correct.

6   Q.   And you also received their YouTube records, correct?

7   A.   Yes, that's correct.

8   Q.   And marked for identification Exhibit 155, do you remember

9   this to be the Instagram records you obtained for Group A?

10  A.   Yes, that's correct.

11  Q.   Okay.

12       MR. HAMOUDI:  Move to admit a small portion of Exhibit

13  155, six pages.

14       THE COURT:  When you say "small portion," counsel, can

15  you clarify so the record knows what "small portion" means?

16       MR. HAMOUDI:  Yes, Your Honor.  155-1 to 155-6.

17       THE COURT:  Any objection?

18       MR. OESTERLE:  No objection.

19       THE COURT:  All right.  It is admitted.

20       (Exhibits 155-1 to 155-6 admitted.)

21  Q.   (By Mr. Hamoudi)  This is the photo on page 5 that you

22  included in your affidavit, correct?

23  A.   Yes, that's correct.

24  Q.   And if you turn to page 6, individuals commented on that

25  photo, correct?

1    A.    Yes, that's correct.

2    Q.    And one of the individuals that commented was Handle 1,

3    correct?

4    A.    I'm not seeing that.

5    Q.    Handle 2.  I apologize.

6    A.    Yes.

7    Q.    Handle 1.  Sorry.  It is Handle 1.

8    A.    Oh, Handle 1, yes.

9    Q.    And Handle 2 also commented as well, correct?

10   A.    Yes.

11   Q.    And we've talked a little bit today about Handle 1,

12   correct?

13   A.    Yes, that's correct.

14   Q.    That's the individual that you focused on early on in your

15   investigation and you believed was involved in Ms. Riley's

16   death, correct?

17   A.    Yes, that's correct.

18   Q.    Okay.

19            THE COURT:  Counsel, since the court is not familiar

20   with this document, could you highlight the reference to Handle

21   1 and Handle 2?

22            MR. HAMOUDI:  Yes, Your Honor.

23   Q.    (By Mr. Hamoudi)  So let's go through this slowly.

24        This is comments made to the photo that you included in the

25   search warrant application to search my client's home and

1    vehicle, correct?

2    A.    Yes, that's correct.

3    Q.    And then below that photo and the records that you

4    reviewed, there are comments to that photo, like people comment

5    on social media pictures, correct?

6    A.    Yes, that's correct.

7    Q.    So we have here user Group A and then Handle 2 commenting,

8    and then a text of that comment is, "Monkey business EAP,"

9    correct?

10   A.    Yes, that's correct.

11   Q.    And then Handle 1 also comments, and it's unclear what the

12   text is, but they commented something on the photo, correct?

13   A.    That's correct.

14   Q.    Okay.

15         And you received these Instagram records prior to when you,

16   obviously, signed the search warrant application for my client's

17   home and vehicle, correct?

18   A.    That's correct.

19   Q.    Okay.

20         And Mr. Wondie is not one of the individuals who's

21   commenting on this photo, is he?

22   A.    That is correct.

23   Q.    That's correct.  Okay.

24         And you did not include the fact that Handle 1 and Handle 2

25   commented on the photo, or any of these individuals, in your

1    search warrant application, did you?

2    A.    That is correct.

3    Q.    And you did not tell Judge Richardson that Mr. Wondie did

4    not even comment on this photo, did you?

5    A.    That is correct.

6    Q.    And let's go to your homicide chronology, just to refresh

7    your recollection.

8          This is on October the 23rd, 2018.  This is, it appears,

9    the task -- the investigative task you're conducting -- October

10   24th -- I'm sorry -- 2018, you write, "Interestingly, Wondie is

11   photographed in a Group A photograph posted on September 29th,

12   2018, holding what appears to be a semiautomatic firearm.  The

13   caption of the photograph is, quote, Smoke who?  He's also

14   depicted in several other photographs with the same people, also

15   holding what appears to be a firearm.

16         "I also located a photograph of a man who closely

17   resembles" -- and I'm not going to say the name -- "Individual 2

18   on page 130 titled at Group A," with a thing that falls.  Okay?

19   A.    Yes, correct.

20   Q.    So let's go back to Exhibit 155, and that's page 130,

21   correct?

22   A.    Yes, that's correct.

23   Q.    So this is the individual in the back that you conclude, at

24   least back when we were reading your chronology, was

25   Individual 2, correct?

1    A.    Yes, I believe he resembled Individual 2, correct.

2    Q.    And then if we go to page 2, 3, this is the "smoke who"

3    photograph, correct?

4    A.    Yes, that's correct.

5    Q.    And you never included this photograph alongside the other

6    photograph in your search warrant application to search my

7    client's home and residence, correct?

8    A.    Yes, that's correct.

9    Q.    And it was available to you, correct?

10   A.    Yes.

11   Q.    You referenced it in your chronology, correct?

12   A.    Yes.

13   Q.    Okay.

14         Marked for identification Exhibit 151, this is an email

15   that you forwarded, on September 23rd, 2018, to Deputy

16   Prosecuting Attorney O'Toole and Free, and you say, "Evidence,"

17   correct?

18   A.    Yes.

19   Q.    And let's go to the next page.

20         And here you're sharing what appears to be a YouTube

21   still-shot video of Group A, and Handle 2 is also listed on that

22   YouTube account, correct?  And if you need to look at the

23   unredacted --

24   A.    Yes, please.

25   Q.    151, please.

1    A.    Yes.

2              MR. HAMOUDI:  Move to admit Exhibit 151.

3              MR. OESTERLE:  No objection.

4              THE COURT:  It's admitted.

5                        (Exhibit 151 admitted.)

6    Q.    (By Mr. Hamoudi)  And you testified that you also obtained

7    YouTube videos from Group A after you requested them via search

8    warrant, correct?

9    A.    Yes, correct.

10   Q.    And you had this video in your YouTube returns, correct?

11   A.    Yes.

12   Q.    Let's -- marked for identification Exhibit 153.  Let's make

13   sure it's muted and no music is played.

14         This is the video that you received, after you sent out

15   your search warrant, from YouTube, correct?

16   A.    Yes, that's correct.

17   Q.    And this video corresponds with the still shot that you

18   forwarded to Detective Free and Deputy Prosecuting Attorney

19   O'Toole, correct?

20   A.    I'm not sure about the correspondence, but it's part of the

21   same social media account, yes.

22   Q.    Okay.  Why don't we let this video play for a while, and as

23   it's playing, if you could turn your binder to Defense Exhibit

24   151-2, and tell me if what you see in the photo in 151-2 is

25   reflected in this video, that this is the same video.

1   A.   Yes, I have no reason to believe that it's not the same,

2   yes.

3          MR. HAMOUDI:  Moving to admit Exhibit 153.

4          THE COURT:  Any objection?

5          MR. OESTERLE:  No objection.

6          THE COURT:  It's admitted.

7                     (Exhibit 153 admitted.)

8          MR. HAMOUDI:  Let's go back to the beginning of the

9   video, at about seven seconds in.

10  Q.   (By Mr. Hamoudi)  Do you see a gentleman wearing glasses?

11  A.   Yes, I do.

12  Q.   Did you take any steps to try and identify who this

13  individual is?

14  A.   No.

15  Q.   There is the same person that you identified as Mr. Wondie,

16  correct?

17  A.   No, I do not believe that to be true.

18  Q.   You can see in this photo that he has some fairly

19  distinctive features?

20  A.   Depends upon what you call "distinctive features," but,

21  yes.

22  Q.   It looks like he has a chipped tooth?

23  A.   Too blurred for me to tell if the tooth is chipped.  He has

24  a high forehead, a wide nose, the beard -- or is that a shadow?

25  I think that's a beard.

1   Q.   Has the same square facial-hair pattern as the photo you

2   included in the affidavit?

3   A.   I'd have to compare it to the photo in the affidavit.

4   Q.   Sure.  The photo in the affidavit is 134-11.

5   A.   The forehead looks more round to me.  This person's

6   forehead is more round than the other photo.  I couldn't say

7   that was the same physical trait.

8   Q.   Okay.

9        Marked for identification Exhibit 168, take a moment to

10  look at this.

11       You obtained my client's booking photo, correct?

12  A.   Yes, that's correct.

13  Q.   You obtained a copy of his driver's license, correct?

14  A.   Yes, that's correct.

15  Q.   You worked with Agent Dkane from the Department of Homeland

16  Security, who was monitoring what he told you was my client's

17  social media accounts, correct?

18  A.   One of the accounts, yes.

19  Q.   And with these photos in your possession, why did you

20  attempt to make an identification in the search warrant

21  application by comparing just two photographs?

22  A.   To me at that time, it was immediately recognizable to be

23  Mr. Wondie.

24  Q.   Is a photograph show-up comparing one person or one photo

25  to a suspect the best way to make an identification?

1    A.    It depends on the context of that show-up.

2    Q.    You've created photo montages in the past?

3    A.    Yes, I have.

4    Q.    Your training states that an investigator shall create a

5    photo montage in such a manner that the individual does not

6    unduly stand out?

7    A.    Yes, that's correct.

8    Q.    Your training states that you should provide instruction to

9    the person you're asking to make the identification to ensure

10   that they understand the importance of the identification

11   procedure, to exculpate the innocence as much as to identify the

12   individual, correct?

13   A.    Yes, that's correct.

14   Q.    Your training states that you should avoid saying or doing

15   anything that may influence the selection of the person making

16   the identification, correct?

17   A.    Yes, that's correct.

18   Q.    And you have conducted one-on-one show-ups in the past,

19   correct?

20   A.    Yes, I have.

21   Q.    And your training teaches you that one-on-one show-ups

22   should generally be used shortly after a crime has occurred,

23   correct?

24   A.    That is one purpose of them, yes, that's correct.

25   Q.    They're generally not suggested for use long after a crime

1   has been committed, correct?

2   A.    Am I allowed to offer another situation in which I've used

3   them?

4   Q.    Yes, you may.

5   A.    I have used a single photo to make an identification with a

6   witness when there's been a relationship established between the

7   two, there's a familiarity, and where I've asked that witness to

8   confirm that the photo that I have in my possession is, in fact,

9   who I believe it to be.

10  Q.    Judge Richardson did not know who Mr. Wondie was, correct?

11  A.    I don't know if she was familiar with him or not.  I don't

12  know.

13  Q.    You have no knowledge if she had personal interactions with

14  Mr. Wondie, correct?

15  A.    I have no knowledge of that, that's correct.

16  Q.    Even if you used a show-up, your training teaches you that

17  a show-up shall not be unnecessarily suggestive, correct?

18  A.    That's correct.

19  Q.    And that means you should not influence a person by

20  advising the person in writing of additional facts that suggest

21  a person is the individual sought for identification, correct?

22  A.    I don't know of that writing.

23  Q.    Well, you shouldn't lead the person in making the

24  identification, correct?

25  A.    That's correct.

1    Q.    Okay.

2          Do you think that you may have come to the task of

3    comparing photos, Group A and my client, with preexisting

4    expectations about the guilt of members of Group A?

5    A.    No, I do not.

6    Q.    Are you supposed to come to a task like this with your mind

7    already made up whether someone will be a match or not?

8    A.    If I believe that person to be a match, I believe that my

9    opinion on that is relevant.

10   Q.    Do you think it is possible that you experience

11   confirmation bias?

12   A.    I don't believe at that time I did, no.

13   Q.    Do you think your confidence in your ability to match

14   suspects may be overblown?

15   A.    I don't have a reason to think that, no.

16   Q.    You said in your warrant application that one of the

17   members of Group A had the same facial features and hair style

18   as my client.  Do you remember that?

19   A.    Yes, I stated that there was a similarity there, that's

20   correct.

21   Q.    Do you really believe that?

22   A.    Yes, I do.

23   Q.    What led you to conclude that these two individuals were

24   the same person?

25   A.    They looked to be similar to me, which is what I stated in

1    my warrant.  My opinion based upon those two photos was that

2    that was the same person.

3    Q.    But you know, in fact, they are different people now?

4    A.    I don't know that.

5    Q.    Are they different in terms of their face shape?

6    A.    I believed at the time those were the same people.  I don't

7    have information at this time to say they're different people.

8    Q.    Body type?

9    A.    There's not enough of that person depicted in the photo to

10   speak to the body type, so that was based upon the facial

11   features.

12   Q.    Shape and quantity of facial hair?

13   A.    There was a similarity in their facial hair, yes.

14   Q.    Type of glasses?

15   A.    I can't tell if the glasses are the same or not.  The glare

16   makes it hard for me to make that statement.  They may be

17   different.  I can't tell.

18   Q.    Do you think you should have attempted to find other photos

19   before making the conclusion?

20   A.    I felt at the time they were the same individual.

21   Q.    You had photos available to you and multiple officers

22   conducting a pattern-of-life investigation on my client,

23   correct?

24   A.    Yes, that's correct.

25   Q.    To try to determine his habits?

1    A.    Yes, that's correct.

2    Q.    And those officers were actually photographing my client

3    walking in the streets and getting photos of him, correct?

4    A.    I don't know if they were.  I presume they were.  That's

5    typically what happens, yes.

6    Q.    Are you a different race than the people you were trying to

7    identify as the same person?

8    A.    Yes.

9    Q.    Does this matter when you're trying to make an

10   identification?

11   A.    It depends on the identification.  It may matter and it may

12   not.

13   Q.    What is cross-racial bias?

14   A.    I actually don't know the definition of that.

15   Q.    So you're not familiar with the definition -- the

16   longstanding finding that witnesses are less accurate at

17   identifying people of a different race than their own?

18   A.    Yes, I'm familiar with that.  I just didn't connect the

19   terms.

20   Q.    Do you acknowledge that you may have some limitations in

21   identifying persons of color?

22   A.    It's possible, yes.

23   Q.    Did you consider your own biases when comparing these

24   photos?

25   A.    No.  I was certain at the time that that's who that was.

1    Q.   Did you take any steps to put aside your own expectations

2    about these photos before reaching this identification?

3    A.   Can you ask that again, please?

4    Q.   Yeah.

5         Did you attempt to put aside your own expectations about

6    the conclusions with respect to these photos before making the

7    identification?

8    A.   No.

9    Q.   Okay.

10        Did you attempt to have a person of color try to make the

11   comparison for you?

12   A.   No.

13   Q.   Does hip-hop music equal violence?

14   A.   No.

15   Q.   So you don't know that these are different people?  That

16   fact has not been revealed to you yet?

17   A.   Well, obviously that is what's being presented to me.  At

18   the time I believed that those were the same people.

19   Q.   But now we know they aren't, and knowing that, what should

20   you have done differently?

21   A.   I don't know, at that time, what else would have occurred

22   to me to be done.  I was positive that those were the same

23   people.

24   Q.   Right.  And the certainty with which you offered your

25   opinion is in the affidavit.  My question to is now that we know

1    it's not the same person, what should you have done differently?

2    A.    I guess I'm not entirely sure that they're not the same

3    people.  As we sit here today, I would need to have additional

4    information; however, photographs, additional interviews are

5    something that I would do or have done to help confirm.

6    Q.    Detective Decker, you knew that when you had a SWAT team

7    arrest my client, there was no probable cause to arrest him,

8    correct?

9    A.    I disagree with that.

10   Q.    I think you wrote in an email --

11   A.    Oh, I'm sorry.  Can you re-ask that question?

12   Q.    Of course.

13         You knew that when you had a SWAT team arrest my client,

14   there was no probable cause to arrest him, correct?

15   A.    That is correct.

16   Q.    And you understand there are dangers associated with having

17   a SWAT team arrest an individual who you have informed a SWAT

18   team that he has a conceal-carry permit and is armed?

19   A.    Yes, that's correct.

20   Q.    You understand that that could result in somebody getting

21   seriously injured or getting killed?

22   A.    Yes.

23   Q.    Okay.

24         And you have no regrets about making this identification in

25   this case and asking a SWAT team to arrest my client?

1        MR. OESTERLE:  Objection, Your Honor; relevance.

2        THE COURT:  That's overruled.  You may answer the

3  question.

4  A.    I have no regrets.

5  Q.    (By Mr. Hamoudi)  But you did have in your possession

6  photographs -- lots of photographs of my client that you could

7  have disclosed to Judge Richardson, correct?

8  A.    Correct.

9  Q.    And you didn't do that?

10  A.    Correct.

11  Q.    And Judge Richardson didn't know you were asking a SWAT

12  team to arrest my client, correct?

13  A.    Not as it's stated in the affidavit.  I don't recall if

14  that was shared in a personal conversation or not.

15  Q.    Wouldn't have Judge Richardson benefited from having more

16  information before signing that search warrant?

17  A.    I can't speak for Judge Richardson.

18  Q.    Okay.

19        You could have done more work investigating the social

20  media profile of my client, correct?

21  A.    Based upon my familiarity with social media and skillset, I

22  don't know how much more work I would have been capable of

23  doing.

24  Q.    Well, you were using resources to help you investigate

25  social media accounts, correct?  Sources were sharing with you

 1  social media accounts, correct?

 2  A.   By "resources," you mean?

 3  Q.   Well, you shared social media material with Agent Wozniak?

 4  A.   Oh.  Yes, that's correct.

 5  Q.   You could have tasked him to help you look at these

 6  photographs and do some social media investigation to see

 7  whether, in fact, the individual in the photo is Mr. Wondie,

 8  correct?

 9  A.   Correct, I did not ask him to do that, that's correct.

10  Q.   And you had the database GETEM.  You could have sent out a

11  blast onto that resource to see if this individual was

12  Mr. Wondie, correct?

13  A.   Correct.

14  Q.   And you did not do that?

15  A.   I believe that's correct.

16            THE COURT:  Counsel, we're almost at noon.  Is this a

17  convenient time to recess?

18            MR. HAMOUDI:  Yes.

19       I'm done with my direct examination at this time, Your

20  Honor.

21            THE COURT:  Why don't we recess, counsel, as opposed

22  to starting for 60 seconds, instead of --

23            MR. HAMOUDI:  Yes, Your Honor.  Your Honor, I

24  apologize.  I'm not done with my direct examination.

25            THE COURT:  You gave me two opinions, counsel.  Which

 1   one is it?

 2          MR. HAMOUDI:  It's the second one.  I failed -- no

 3   disrespected to my colleague, but I did not confer with her

 4   before letting the court know that.

 5          THE COURT:  Okay.  We'll take our recess either way,

 6   and we'll operate under the assumption that counsel has not

 7   completed his examination of the witness at this time.

 8       We'll be in recess.  We'll pick up at 1:30.

 9              (Court in recess 12:00 p.m. to 1:36 p.m.)

10          THE COURT:  Counsel, cross-examination continues?

11          MR. HAMOUDI:  Thank you, Your Honor.

12   Q.   (By Mr. Hamoudi)  Marking for identification Defense

13   Exhibit 152.

14       Detective Decker, is this the search warrant return you got

15   for Group A for their YouTube videos?

16   A.   Yes, that's correct.

17   Q.   Okay.  This is dated November 2nd, 2018, correct?

18   A.   Yes, that's correct.

19          MR. HAMOUDI:  Move to admit Defense Exhibit 152.

20          THE COURT:  Any objection?

21          MR. OESTERLE:  No objection.

22          THE COURT:  It's admitted.

23                  (Exhibit 152 admitted.)

24   Q.   (By Mr. Hamoudi)  You testified before the lunch break that

25   when you presented the application for the search warrant to

1  search my client's home and residence, you were confident at the

2  time Mr. Wondie was the individual in Group A's photograph,

3  correct?

4  A.    Yes, that's what I believe, that's correct.

5  Q.    You also testified that you're not confident enough today

6  to say that it is not Mr. Wondie, even though I'm telling you it

7  is not Mr. Wondie, correct?

8  A.    That's correct.

9  Q.    And you're not confident enough to say individual -- can

10 you bring up Exhibit 168, please?

11       There are three photographs up top and three photographs

12 down below this -- we call it a montage.  Let's just call it a

13 montage.

14       You're not confident enough to say that Individual 1, which

15 is the individual in the photos up top, is in the photograph,

16 despite looking at these three photographs today?

17 A.    Yes, sir, that's correct.

18 Q.    And even though the three photographs up top and the three

19 photographs on the bottom have dissimilarities, you still are

20 saying that you're not confident enough to say it is not my

21 client?

22 A.    Yes, sir, that's correct.

23 Q.    Okay.

24       The pictures up top are pictures that you obtained and

25 reviewed when you received the YouTube materials from Group A,

1  correct?

2  A.    Yes, that's correct.

3  Q.    Okay.

4        It clearly shows that the individual up top has a chipped

5  tooth, correct?

6  A.    Yes, that's correct.

7  Q.    And on the bottom left-hand photo, it clearly shows that my

8  client does not have a chipped tooth, correct?

9  A.    Yes, that's correct.

10 Q.    Is it fair to say that the individual up top, his face

11 shape is square, while my client's face shape is round, as

12 depicted in his license, in the booking photo, and the other

13 photo, correct?

14 A.    Can you re-ask that question?  I want to make sure I

15 understand.

16 Q.    Sure.

17       The person, which is my client, in the three photos below

18 has a round shape, correct?

19 A.    In one photo it appears more square, and in another photo

20 it appears more round.

21 Q.    But the person in the top three photos has a face shape

22 that is square, correct?

23 A.    I would characterize the first photo on the left as being

24 more oblong shape; the photo in the center more square shaped.

25 Q.    And the three photos up top, the beards of the gentleman in

1   the three photos up top are different than the two on the bottom

2   right, which are my client, correct?

3   A.   The beard appears to be most consistent with the beard of

4   your client in the middle photograph down below.

5   Q.   And how are they consistent, the two photos that you just

6   described?  Which one?  The middle up top?  The second from up

7   top?

8   A.   No.  Looking at the photo of the man brandishing the

9   firearm, and comparing that to the middle photo down below, to

10  me there is a similarity with that facial hair.

11  Q.   All right.  Let's bring up previously admitted --

12       MR. HAMOUDI:  Madam Clerk, if you could hand the

13  witness Exhibit 155-3 so we can do a side-by-side comparison.

14       Your Honor, this is previously admitted Exhibit 155-3, and

15  it is just the color rendition of that exhibit in the event the

16  black-and-white has not been contained in the binders.

17       THE COURT:  Thank you.

18  Q.   (By Mr. Hamoudi)  Looking at Exhibit 155-3, you can clearly

19  tell in this photograph that the beard of this gentleman who is

20  brandishing the firearm is not the same as the beard of my

21  client in the booking photo or in the driver's license, correct?

22  A.   Actually, I'm having a hard time stating that.  The

23  shadowing of this photo makes it difficult for me to tell where

24  the facial hair is and then what is shadow.

25  Q.   And this was the photograph you were looking at at the time

1    you were looking at Group A's social media files, correct?

2    A.   You're referring to this photograph marked Exhibit 155?

3    Q.   Dash three, correct, the "smoke who" photograph.

4    A.   Yes.

5    Q.   Okay.

6         I want to talk to you about why you're so confident more,

7    at the time, that this was Mr. Wondie.

8         Before the break, I asked you whether Mr. Wondie and the

9    individual in Group A had the same body type, and you said you

10   could not tell from the photos you chose, correct?

11   A.    It's not depicted in the photos presented in the affidavit,

12   that's correct.

13   Q.   But you had multiple officers following my client and

14   developing pattern-of-life evidence for your search warrant,

15   correct?

16   A.   Yes, not under my direction, but, yes, that is correct,

17   that was happening.

18   Q.   But they were reporting their findings to you, correct?

19   A.   I believe the reporting findings were going to my sergeant,

20   and then that was being summarized and shared with me later,

21   yes.

22   Q.   Just before the break, I asked you whether they had the

23   same glasses.  Do you recall that?

24   A.   Yes, I do.

25   Q.   And you said you could not tell from the photos you chose,

1    correct?

2    A.    That's correct.

3    Q.    And looking at the same exhibit that Madam Clerk handed

4    you, Exhibit 155-3, you can see the glasses here, correct?

5    A.    Yes.  To some extent, yes, you can.

6    Q.    And, again, this is a photo you did not include in your

7    affidavit, correct?

8    A.    That's correct.

9    Q.    And these are not the same glasses as Mr. Wondie is wearing

10   in his booking photo, correct?

11   A.    That is correct.  That's correct.

12   Q.    And you also noted in your affidavit -- and we'll bring up

13   134, previously admitted, at page 11.  And down where what

14   Officer Averett told you.  Do you recall that?

15   A.    Yes.

16   Q.    And he said he had a cast on his arm when he had an

17   interaction with him.

18   A.    Yes.

19   Q.    And that was the last interaction on October 6th, 2018?

20   A.    Yes, that's correct.

21   Q.    Looking at 155-3, which is in your possession -- you're

22   holding it in your hand -- that individual does not look like he

23   has a cast on his arm, correct?

24   A.    I can't tell.  He's wearing a leather jacket, so I don't

25   know if there's something underneath the jacket.  It's not

1  obvious, correct.

2  Q.   Going back to Exhibit 168, looking at the bottom photo of

3  Mr. Wondie, he has close-cut hair in that photo, correct?

4  A.   Are you referencing one photo in particular, or in general?

5  Q.   The driver's license photo in your possession and the

6  booking photo.

7  A.   Yes, the driver's license photo more so than the booking

8  photo, correct.

9  Q.   I want to replay previously admitted Defense Exhibit 153,

10  and without any noise, please.  This is the video, Detective

11  Decker, that you had in your possession.  Now, I want you to

12  watch this video, and keep in front of you 155-3, which is what

13  I've handed you.

14      Do you see the similarities between the hair with this

15  individual and the individual in 155-3?

16  A.   Yes, there are similarities, that's correct.

17  Q.   Okay.  And the facial hair, do you see the similarities?

18  A.   Again, the shadowing with 1553 makes it difficult for me to

19  say with certainty.  It's the angle in which the photograph is

20  taken and the shadowing makes that difficult.

21  Q.   And you're familiar with the hair styles worn by black men,

22  correct?  Braids or buzz cut of that kind of nature, are you

23  familiar with that?

24  A.   Yes.

25  Q.   And can you can tell this individual has braids, correct?

1    A.   Not in this photo, no.

2    Q.   Let's keep playing the video.

3         Do you see the braids there?

4    A.   In this depiction, yes, I do.

5    Q.   Okay.  In 155-3, the individual has braids, correct?

6    A.   I do not see braids.

7    Q.   Okay.  All right.  Let's go back to previously marked

8    Defense Exhibit 113, which has not been admitted.  Detective

9    Decker, go to page 2.

10        This is an email that was sent to you by supervisory

11   Special Agent Marco Dkane.  If you can take a moment to read it.

12   A.   Yes, I've read it.

13   Q.   So in this email, Agent Dkane is instructing you to retain

14   email and text communication regarding charged cases, correct?

15   A.   That was not my interpretation, no.

16   Q.   Well, he says, "I know on the State side."

17   A.   Uh-huh.

18   Q.   And you're an agent of the State, correct?

19   A.   Correct.

20   Q.   And he said, "You have pretty aggressive PDR rules, too,"

21   correct?

22   A.   Yes.

23   Q.   And PDR is "public disclosure request," correct?

24   A.   Yes.

25   Q.   And he's saying this isn't really earth shattering that

1    you're supposed to keep these things, correct?

2    A.    Again, that was not my understanding of that paragraph.

3    Q.    Well, when you exchange text messages on a phone provided

4    to you by the county, you understand that's the county's

5    property, correct?

6    A.    Yes.

7    Q.    And, in turn, it's the public's property, correct?

8    A.    Yes.

9    Q.    So a public disclosure request is so the public can obtain,

10   if they want, text messages that you have sent in your cases,

11   correct?

12   A.    I don't know how to answer that.  That was not our internal

13   policy to keep text messages.

14   Q.    Okay.  But in any event, you received this email?

15   A.    Yes, sir.

16   Q.    And you went ahead and destroyed your text messages in this

17   case?

18   A.    Yes.

19   Q.    And is it fair to say that you were communicating with your

20   colleagues on your text messages?

21   A.    Yes.

22   Q.    Detective Free?

23   A.    Yes.

24   Q.    You were communicating with Sergeant Blythe Miniken?

25   A.    Yes.

1    Q.    Matthew Olmstead?

2    A.    Yes.

3    Q.    Anthony McNabb?

4    A.    Yes.

5    Q.    Austin Wozniak?

6    A.    Yes.

7    Q.    Marco Dkane?

8    A.    Yes.

9              MR. HAMOUDI:  Move to admit Exhibit 113.

10             THE COURT:  Any objection?

11             MR. OESTERLE:  No objection.

12             THE COURT:  113 is admitted.

13                       (Exhibit 113 admitted.)

14   Q.    (By Mr. Hamoudi)  Moving forward to after Mr. Wondie's

15   arrest, marking for identification Exhibit 158, Ms. Decker, you

16   and Detective Free took Mr. Wondie into custody, and you took

17   him back where?

18   A.    To an interview room at our office at the King County

19   Administration Building.

20   Q.    And you interviewed him first, correct?  You were the first

21   two detectives to interview him?

22   A.    Yes, that's correct.

23   Q.    And this is an excerpt of your interview, and I'll refer to

24   it to refresh your recollection, but I want to ask a question

25   first.

1       It was at this interview that you learned that Denny Way

2   was not Mr. Wondie's current residence, correct?

3   A.   Yes, that's correct.

4   Q.   And it was during this interview that he disclosed for the

5   first time that his residence was 1311-12th Avenue, correct?

6   A.   Yes, that's correct.

7   Q.   And he disclosed this information to you in the context of

8   you and Detective Free telling him that you needed his help to

9   find which you believed was the murder weapon, correct?

10  A.   Yes, that is correct.

11  Q.   Okay.  And then what happened is that once he disclosed his

12  new address, you communicated with Deputy Prosecuting Attorney

13  Brian McDonald, Marco Dkane, Agent Wozniak, and Detective Amy

14  Branham that there's a different address, correct?

15  A.   Correct.

16  Q.   And after that disclosure was made, you and them

17  coordinated preparing new search warrant affidavits to go search

18  that residence, correct?

19  A.   Yes, that's correct.

20  Q.   And you helped Detective Branham in preparation of her

21  search warrant affidavit?

22  A.   No, I don't recall that.

23  Q.   Okay.  Marked for identification Exhibit 159, this is an

24  email from Detective Branham, and she was asking for your

25  assistance for the proper language of the firearm.  Does that

1  refresh your recollection?

2  A.   Yes, she did ask me that question, that's correct.

3  Q.   So you were providing input for her affidavit in the

4  warrant, correct?

5  A.   I believe I referred her to the prosecutor.  But, yes, she

6  did ask me the question.  I don't recall what my response was.

7  Q.   Okay.

8       MR. HAMOUDI:  Move to admit this one page, Exhibit

9  159, page 1.

10      THE COURT:  Any objection, counsel?

11      MR. OESTERLE:  Your Honor, again, I object as to

12 relevancy.

13      The time is after the preparation and, importantly, the

14 execution of the warrant that's actually before the court.  I

15 don't know what this has to do with her state of mind at the

16 time the affidavit was prepared.

17      THE COURT:  Let's make the connection, counsel.

18      MR. HAMOUDI:  Okay.

19 Q.   (By Mr. Hamoudi)  You, essentially, executed the search

20 warrant at Mr. Wondie's residence at 12th Avenue with the

21 assistance of federal and state agencies, correct?

22 A.   It was at the same time as federal and state agencies,

23 that's correct.

24 Q.   Okay.

25      MR. HAMOUDI:  I don't need to move in this exhibit,

1    Your Honor, so that answers my question.

2         Thank you, Your Honor.  I'm finished with my direct

3    examination.

4              THE COURT:  Examination by the government?

5              MR. OESTERLE:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. OESTERLE:

8    Q.   Good afternoon, Detective Decker.

9    A.   Good afternoon.

10   Q.   Just a couple of questions to complete your background

11   information that was asked this morning.

12        Are you currently involved in law enforcement duties?  Do

13   you have current employment in that area?

14   A.   I volunteer to do co-case work, and so, yes, I'm not in

15   paid status, no.

16   Q.   During your time at the King County Sheriff's Office, did

17   you receive any special commendations?

18   A.   Yes.

19   Q.   If you could just identify maybe the top four.

20   A.   In 2004, I was awarded the King County Detective of the

21   Year as it pertained to the Major Crimes Unit.  In 2018, I

22   received the Commander's Award.  In 2020, I received the

23   Detective of the Year Award as it pertained to the department.

24   Q.   Let's turn to the Riley homicide investigation.

25        If we could turn to Exhibit 16, Government's Exhibit 16.

1    This document has already been admitted.

2        What was the purpose of seeking this affidavit?

3    A.    To request the court's permission to conduct a search of a

4    residence and a vehicle to look for a firearm that I believed

5    was the firearm used in the commission of a homicide.

6    Q.    Was the purpose to seek the arrest of Mr. Wondie?

7    A.    No.

8    Q.    Did you believe that you had probable cause to arrest

9    Mr. Wondie in November and early December of 2018?

10   A.    No, I did not.

11   Q.    Did you authorize the SWAT team on December 6th, 2018, to

12   arrest Mr. Wondie?

13   A.    No, I did not.

14   Q.    With respect to preparing search warrants in your position

15   as a detective, you testified about some of that this morning.

16       Was it your practice to put every fact you had learned in

17   an investigation into a warrant?

18   A.    No, it was not.

19   Q.    How did you decide which facts to include in a warrant?

20   A.    I base that on my training and experience and the best

21   ability I have at the time to identify those facts that I felt

22   would be most relevant to what my request was from the court.

23   Q.    And in this case, I think you testified that the request

24   here was to search for a gun and evidence of the gun; is that

25   right?

1   A.   Yes, and firearm evidence, that's correct.

2   Q.   I want to ask you some questions about NIBIN.  We discussed

3   that this morning.

4        How would you describe your knowledge of NIBIN in December

5   of 2018?

6   A.   I understood that it was a forensic examination, in part,

7   the first level of a two-level exam that was possible, and that

8   that first level identified, forensically, grooves and

9   striations that could be found within a shell casing as it

10  related specifically to the barrel of a firearm.

11  Q.   Prior to December of 2018, had you had prior experience

12  working with NIBIN information or evidence that had been

13  reported back to you?

14  A.   Yes.  I believe I have received emails from the crime lab

15  in regards to NIBIN results.

16  Q.   I'm going to ask you to look at what's been marked as

17  Government's Exhibit 70.  Can you see that?

18  A.   Yes, I can.  Thank you.

19  Q.   This appears to be an email.  Do you see your name as one

20  of the recipients of the email?

21  A.   Yes, I do.

22  Q.   And what's the year in which it was sent?

23  A.   2016.

24  Q.   And is that consistent with your belief that you had some

25  knowledge of NIBIN in 2016?

1    A.    Yes.

2    Q.    And what was that knowledge informed by?

3    A.    Can you re-ask that question?

4    Q.    Sure.  It wasn't a good one.

5          What was the basis of your knowledge of NIBIN in 2016?

6    What resources had you consulted with, or who had you spoken

7    with?

8    A.    I had just recently came back to the Major Crimes Unit.  My

9    knowledge was based primarily on informal conversations with my

10   co-workers.

11   Q.    In reading here the substance of the email, can you read

12   that first sentence?

13   A.    Yes.

14         "One of the fired cartridge casings from case appeared to

15   be a match to the fired cartridge cases from case."

16   Q.    And then the rest of that first short paragraph.

17   A.    "If you would like the hit confirmed, please let me know."

18   Q.    With regard to the word "match" that's used in the first

19   sentence, what was your understanding in 2016 as to what that

20   meant?

21   A.    That the case was consistent to have been fired from the

22   barrel of -- oh, I'm sorry.  Let me reread this.

23         That there were shell casings or a shell case that was

24   consistent with another shell case that had been fired from a

25   specific weapon.

1    Q.    I'm going to ask you to turn to page 2 of this exhibit.

2          MR. OESTERLE:  Let me first move to admit Exhibit 70.

3          THE COURT:  Any objection?

4          MR. HAMOUDI:  No objection.

5          THE COURT:  Exhibit 70 is admitted.

6                     (Exhibit 70 admitted.)

7    Q.    (By Mr. Oesterle)  On page 2 of the document, Detective

8    Decker, do you see at the top of the page?  What is this page

9    entitled?

10   A.    "NIBIN hit notification."

11   Q.    And do you see other references on the page to a NIBIN hit?

12   A.    Yes.

13   Q.    And there's a box at the bottom, a rectangular box.  Do you

14   see that box on the document?

15   A.    Yes, I do.

16   Q.    And does the text in that box also reference a hit

17   confirmation?

18   A.    Yes, it does.

19   Q.    What was your understanding at the time, in 2016, of what a

20   NIBIN hit was?

21         MR. HAMOUDI:  Objection, Your Honor.  I don't think

22   this document says "hit confirmation."  It says "hit

23   confirmation needed."

24         THE COURT:  Let's enlarge it, counsel.

25   Q.    (By Mr. Oesterle)  My question was:  What was your

1  understanding of the use of the word "hit" in the context of a

2  NIBIN test?

3  A.   I understood "hit" to mean that there was evidence that

4  established that one came from another.

5  Q.   And in 2016, did you believe the word "hit" and "match" to

6  mean the same thing in the context of a NIBIN test?

7  A.   Yes.

8       MR. OESTERLE:  If we could have Exhibit 71.

9  Q.   (By Ms. Oesterle)  Just look at the header information,

10  Detective Decker, did you receive a copy of this email in 2016?

11  A.   Yes.

12  Q.   And who is the email from?

13  A.   Jennifer Tardiff, and in parentheses it says "WSP," which

14  stands for "Washington State Patrol."

15  Q.   Can you read the whole paragraph of the email?  It's

16  relatively short.

17  A.   "Please see the attached hit notification adding another

18  case to hit series.  The fired cartridge cases appear to be a

19  hit to case as well as case."

20  Q.   And do you have a belief today as to what "hit" was

21  referring to when it was used here?

22  A.   I understood "hit" to be synonymous with "match."

23  Q.   Let's turn to page 2 of this exhibit, please.

24       MR. OESTERLE:  First let me move to admit Exhibit 71.

25       MR. HAMOUDI:  No objection.

1          THE COURT:  It's admitted.

2                (Exhibit 71 admitted.)

3     Q.    (By Ms. Oesterle)  Page 2 of the document, Detective

4     Decker, what's this document entitled at the top?

5     A.    "NIBIN hit notification."

6     Q.    And now referring, again, to that rectangular text box at

7     the bottom, does that include the same language that you saw in

8     the previous exhibit?

9     A.    Yes, it does.

10    Q.    Does that language include the phrase "hit confirmation"?

11    A.    Yes.

12    Q.    Exhibit 72, Detective Decker, do you recognize this

13    document?

14    A.    Yes.

15    Q.    And are you a recipient of the email?

16    A.    Yes.

17    Q.    If you can, again, just please read that short paragraph.

18    A.    "Please see the attached hit for the caliber test-fired

19    cartridge casings submitted by case to fired cartridge cases in

20    case.  If you would like the hit confirmed, please let me know."

21    Q.    And is this consistent with the language we've seen in the

22    prior exhibit?

23    A.    Yes.

24          MR. OESTERLE:  Government moves for the admission of

25    Exhibit 72.

1    MR. HAMOUDI:  No objection.

2    THE COURT:  72 is admitted.

3                   (Exhibit 72 admitted.)

4    Q.   (By Ms. Oesterle)  And the second page, if we could,

5    please.

6         And is this the language that you see on page 2 of Exhibit

7    72, is that identical to the language we see in the prior two

8    exhibits?

9    A.   Yes, it is.

10   Q.   And the reference being to the hit -- hit confirmed; is

11   that correct?

12   A.   Yes.

13   Q.   If we could have Exhibit 73, please.

14        And is this an email from you to an individual by the name

15   of Jeff Baird?

16   A.   Yes.

17   Q.   Who is Jeff Baird?

18   A.   He was the chair of the King County Prosecutor's Office

19   MDOT team.

20   Q.   Can you read the only sentence that appears there in the

21   exhibit?

22   A.   Yes.

23        "I will take time later today to carefully examine all of

24   the NIBIN hits to get a better feel of how and where the --

25   and -- are linked."

1   Q.   Did your use of the words "hits" and "link," does that

2   reflect your understanding of NIBIN at the time this email was

3   prepared?

4   A.   Yes.

5   Q.   If we could have Exhibit 74, please --

6        MR. OESTERLE:  Let me first move for admission of this

7   exhibit.

8        THE COURT:  Any objection?

9        MR. HAMOUDI:  No objections.

10       THE COURT:  It is admitted.

11                    (Exhibit 74 admitted.)

12  Q.   (By Ms. Oesterle)  Before you, Detective Decker, is an

13  exhibit that's been marked as Government's Exhibit 74.  Do you

14  recognize this exhibit?

15  A.   Yes.

16  Q.   And was it sent to you in 2015?  Is that what it indicates?

17  A.   Yes.

18  Q.   And it's from an individual by the name of Tobin Corlis.

19  Who is Tobin Corlis?

20  A.   At that time he was part of what they called the gun

21  compliance unit.  He was officed at the property management unit

22  for the sheriff's office, and his responsible at that time was

23  to submit firearm evidence for NIBIN testing.

24  Q.   Did you consider him to be somewhat knowledgeable about the

25  NIBIN process?

1    A.    Somewhat, yes.

2    Q.    Could you read the sentence of his email?

3    A.    "Good morning.  The IBIS request that you submitted for

4    items under case has been entered into NIBIN, slash, IBIS.  The

5    Washington State Patrol Crime Lab examines the correlations,

6    will notify you directly of any "hits."  "Hits" is in quotation

7    marks.

8    Q.    And, again, is his use of the word "hits" consistent with

9    your understanding of the NIBIN testing process at the initial

10   stage?

11   A.    Yes.

12   Q.    And you would equate that with "match"?

13   A.    Yes.

14          MR. OESTERLE:  I would move to admit Exhibit 74.

15          MR. HAMOUDI:  No objection.

16          THE COURT:  Exhibit 74 is admitted.

17                 (Exhibit 74 admitted.)

18   Q.    (By Ms. Oesterle)  Exhibit 51, I believe, you've seen an

19   exhibit similar to this one.  Do you recognize this exhibit?

20   A.    Yes.

21   Q.    Is this the email transmittal that was forwarding to you

22   the NIBIN investigative lead associated with the Riley homicide

23   investigation?

24   A.    Yes, I believe so.

25   Q.    You testified this morning about the language that is in

1    the message from Mr. Gonzalez to you in the second half of this

2    page.  Do you see that?

3    A.    Yes.

4    Q.    And you were asked about, particularly -- the second

5    paragraph of that sentence.  Can you read that sentence, please?

6    A.    "If a microscopic confirmation is required for warrants,

7    arrests, et cetera, please contact the WSP Crime Lab."

8    Q.    At the time you received this, did the King County

9    Sheriff's Office have a practice of requesting microscopic

10   confirmations for all warrants?

11   A.    I can share with you what my practice of that understanding

12   was, yes.

13   Q.    What was that?

14   A.    That we were not to submit for an actual secondary forensic

15   exam unless the case was due to go to trial.  This was due to

16   backlog concerns, which would allow the lab to prioritize and

17   get the work done for the higher priority requests.

18   Q.    And did you follow that practice yourself?

19   A.    Yes.

20   Q.    Can you read the next sentence?

21   A.    "Note:  Not all leads require confirmation.  Please be

22   advised, due to backlog and time constraints, lead confirmations

23   will be addressed as routine case work for the forensic

24   scientists."

25             MR. OESTERLE:  Your Honor, I move to admit

1     Government's Exhibit 51.

2              MR. HAMOUDI:  I think it's duplicate, Your Honor.

3     It's already been admitted.

4              THE COURT:  Which exhibit, counsel?

5              MR. HAMOUDI:  At Exhibit 135, Your Honor.

6              MR. OESTERLE:  Your Honor, I'm in a minute, I'm going

7     to -- I'll go into why, but I believe this is a different

8     exhibit.  I believe there's information on ours that is not

9     included on the defense exhibit.

10             THE COURT:  All right.  I'll overrule the objection at

11    this time.  Counsel is permitted to admit Exhibit 51.  You'll

12    need to clarify if they are not duplicates at the appropriate

13    time, but it is admitted for now.

14                      (Exhibit 51 admitted.)

15             MR. OESTERLE:  Thank you.

16    Q.   (By Ms. Oesterle)  If we could go, please, to page 3 of

17    this exhibit, please.

18         Detective Decker, in the couple prior exhibits this

19    document had been entitled "NIBIN hit notification."  Do you

20    recall that testimony?

21    A.   Yes.

22    Q.   And how is it identified here?

23    A.   Here it is identified as "NIBIN lead notification."

24    Q.   At the bottom of the page, there is another rectangular

25    box.  Do you see that?

1    A.    Yes.

2    Q.    And does this text in the box reflect that it is a revised

3    document from a prior NIBIN document?

4             MR. HAMOUDI:  Objection; lack of foundation.  This

5    witness is not a Washington State Patrol Crime Lab employee to

6    give us testimony regarding the origins of this document or

7    edits or modifications to its policies.

8             THE COURT:  Let's ask more questions, counsel, on the

9    foundation basis.

10   Q.    (By Ms. Oesterle)  Detective Decker, do you recall

11   receiving this document?

12   A.    Yes.

13   Q.    And do you recall reviewing it when you received it?

14   A.    Yes.

15   Q.    And do you recall reading the document to include the

16   bottom of the document, which includes when the document may

17   have been generated or created?

18   A.    I don't recall if I read that portion at the time, so I

19   don't know if I did or not.

20   Q.    Do you have any reason to believe when this document may

21   have been created?  And when I say "this document," I mean the

22   NIBIN lead notification that you received.

23            MR. HAMOUDI:  Objection, Your Honor.  The witness

24   answered "I don't recall" when asked.

25            THE COURT:  You may answer the question.

1   A.    Yes.

2   Q.    (By Mr. Oesterle)  When was it prepared, if you know?

3   A.    Revised January 17th, 2018.

4   Q.    Next page -- we're on the same exhibit, but page 4.  I want

5   to direct your attention to the information that's in red at the

6   top of the document.  Can you read that, please?

7   A.    "This is not a report.  This is a notification of a

8   presumptive investigative lead or leads from entry into the

9   NIBIN system.  Evidence may be confirmed by microscopic

10  comparison when requested.  For a formal report, please submit a

11  completed request for laboratory examination to the Washington

12  State Patrol Crime Laboratory firearms unit requesting IBIS lead

13  confirmation."

14  Q.    Did you request a microscopic confirmation at the time you

15  received this report?

16  A.    I did not.

17  Q.    Did you request one prior to presenting the warrant

18  affidavit to Judge Richardson?

19  A.    I did not.

20  Q.    Why not?

21  A.    My understanding was that we were not to do that unless the

22  case was actually set for trial and the prosecutor on that case

23  made the request to have that work done for trial purposes.

24  Q.    Exhibit 51, I'd like to ask you a question.

25        Is there any reference in the exhibit to limiting the use

1    of NIBIN lead notifications when you're trying to establish

2    probable cause for a search warrant?

3    A.    No, there's not.

4    Q.    Detective Decker, did you ask any of the prosecutors in the

5    King County Prosecutor's Office to review your draft affidavit

6    in this case?

7    A.    Yes.

8    Q.    And who did you ask to review it?

9    A.    Initially, it was Senior Deputy Prosecutor Scott O'Toole.

10   When Scott O'Toole took vacation, it was Senior Deputy

11   Prosecutor -- now Superior Court judge -- Brian McDonald.

12   Q.    Exhibit 17, please.  Detective Decker, do you recognize

13   this document?

14   A.    Yes.

15   Q.    What is it?

16   A.    It is an email from me to Brian McDonald, and Scott O'Toole

17   is cc'd on the email.

18   Q.    And what is the purpose of this email?

19   A.    The subject is "Search warrant affidavit, review

20   attachment, gun warrant, Wondie draft," and the date November

21   29th, 2018.

22   Q.    And the pages that follow it, is this a draft of the

23   document -- the affidavit that was ultimately signed by Judge

24   Richardson?

25   A.    Yes.

1    MR. OESTERLE:  Government moves to admit Exhibit 17.

2    MR. HAMOUDI:  No objection.

3    THE COURT:  Seventeen is admitted.

4    (Exhibit 17 admitted.)

5    Q.   (By Mr. Oesterle)  Did Brian McDonald review your document?

6    A.   Yes.

7    Q.   Did he provide edits or suggested changes to you?

8    A.   Yes.

9    Q.   Was it your normal practice to have a King County

10   prosecutor review your affidavits?

11   A.   Yes.

12   Q.   Was that a policy of the office, or simply your practice,

13   or both?

14   A.   A policy of our office.

15   Q.   And that's one that you followed?

16   A.   Yes.

17   Q.   What was the purpose for having the prosecutor review the

18   affidavit?

19   A.   My understanding for the purpose is, as search-warrant

20   writing became more complex and technical, it was advised to

21   have an attorney, the prosecutor, review the warrant language to

22   make sure that the vernacular was correct, as well as

23   punctuation, and that the document was not overstating or

24   understating evidence.

25   Q.   And did Brian McDonald subsequently provide you with

1   comments?

2   A.   Yes.

3   Q.   Exhibit 18, do you recognize this document?

4   A.   Yes.

5   Q.   And what is it?

6   A.   An email to me from Brian McDonald, dated Saturday,

7   December 1st.  The subject:  "Gun warrant."

8   Q.   And attached to this email, did he submit to you a

9   marked-up copy of your draft affidavit?

10  A.   Yes, he did.

11  Q.   Did you ultimately accept his changes?

12  A.   Yes, I did.

13  Q.   Do you recall any conversations with Mr. McDonald about his

14  edits?

15         MR. HAMOUDI:  Objection; hearsay.

16         THE COURT:  That's sustained.

17  Q.   (By Mr. Oesterle)  Let's look at the edited version that

18  follows.  If we could go to -- I believe it's page 3 of the

19  affidavit.

20      Is it your understanding, Detective Decker, that the

21  suggestions or the edits offered by Brian McDonald appear red in

22  this document?

23  A.   Yes.

24  Q.   Is that because he entered the changes with a track-change

25  function?

1    A.    Yes.

2    Q.    So has the red language here entirely been offered to you

3    by Mr. McDonald?

4    A.    Yes.

5    Q.    I'll ask you some questions about the language.

6          The second sentence starts with the phrase "forensic

7    examination."  Do you see that?

8    A.    Yes.

9    Q.    What was your understanding of that term at the time -- and

10   I'm talking about early December of 2018.  What did that term

11   mean to you?

12   A.    A forensic examination, to me, meant a detailed examination

13   of evidence.  It can be in the form of latent evidence, that

14   which is not always readily visible to the eye and may need to

15   be supplemented with microscopic exam.

16   Q.    Did you believe at the time that this would have included

17   the first step of the NIBIN lead process?

18   A.    Yes.

19   Q.    Did you believe use of the term was appropriate in this

20   situation?

21   A.    Yes.

22   Q.    Was the use of that term offered in any way to the court as

23   an intent on your part to mislead the court?

24   A.    No.

25   Q.    Was it made with the high degree of awareness on your part

 1   that it was probably false?

 2   A.   No.

 3   Q.   Let me ask you some questions about the balance of that

 4   sentence.

 5        It's written here that the examination established that

 6   shell casings recovered from the scene matched a gun known to be

 7   owned by Gizachew Wondie.  Did you agree with that language?

 8   A.   Yes.

 9   Q.   At the time?

10   A.   Yes.

11   Q.   And, particularly, you agreed with the use of the word

12   "matched"?

13   A.   Yes.

14   Q.   Is that consistent with your prior understanding, based on

15   the communications we've reviewed this afternoon, that that was

16   consistent use of the word "match"?

17   A.   Yes.

18   Q.   Did you believe that statement to be accurate?  And when I

19   say "that statement," meaning that the casings recovered match a

20   gun.

21   A.   Yes.

22   Q.   At the time did you entertain any doubts as to the truth of

23   that statement?

24   A.   No.

25   Q.   Was it offered in any way with the intent to mislead Judge

1    Richardson?

2    A.    No.

3    Q.    Was it included in any way to attempt to prevent Judge

4    Richardson from appreciating the magnitude of NIBIN testing

5    capabilities?

6    A.    No.

7    Q.    Detective Decker, the NIBIN lead notification that we've

8    just reviewed previously used the word "presumptively."  Do you

9    recall that?

10   A.    If you could call that back up, please.

11   Q.    Now do you see that language?  And I may have confused you

12   because I didn't use the full term.  It says "presumptive

13   investigative leads."

14   A.    Yes.

15   Q.    Do you see that now?

16   A.    Yes.

17   Q.    Why didn't you use that language in that paragraph that

18   we're talking about?  And when I say "that paragraph," can we go

19   back to...

20   A.    I have consistently and regularly used the term "match"

21   synonymous with "hit," and my understanding was that that was

22   correct here, as recommended to me by the prosecutor.

23   Q.    Do you believe it was a mistake not to use the language

24   from the lead notification itself?

25   A.    Today?  Yes.

1   Q.   Let's talk about a couple other references in the affidavit

2   to NIBIN.  If you could go to page 4 of the affidavit.

3   Paragraph 5, that sentence in the rectangle, can you read that,

4   please?

5   A.   "Testing," is in red and has a hash mark through it.  Then

6   in black font, it says, "Detectives learned through NIBIN

7   testing the firearm used to shoot and kill Amarah Riley was the

8   same firearm linked to two Seattle Police cases.  These cases,

9   as well as several others, will be outlined below."

10      In red font, underlined in red font, "I have reviewed the

11  police reports associated with these cases."

12  Q.   And what's your basis for offering this statement in the

13  affidavit?

14  A.   It is part of the chronology that I felt was important and

15  relevant to the court, as it associated shell casings from

16  Seattle incidents to a firearm seized from a particular

17  individual, linked, again, to my shell casings from the murder

18  scene.

19  Q.   Your use of the sentence here, is that based -- referring

20  again to the NIBIN lead notification you received from the

21  Washington State Patrol Crime Lab?

22  A.   Can you ask that one more time?

23  Q.   Sure.

24      In particular, the phrase, "same firearm linked," is that

25  in reference to the NIBIN lead notification you had received

1    previously?

2    A.    Yes.

3    Q.    Was your choice of words here, namely, "same firearm

4    linked," was that offered with an intent to mislead Judge

5    Richardson?

6    A.    No.

7    Q.    Did you have any serious doubts as to whether this was an

8    accurate statement?

9    A.    No.

10   Q.    Was your failure to use the term "presumptive lead,

11   investigative lead" made consciously with an intent to mislead

12   Judge Richardson?

13   A.    No.

14         MR. OESTERLE:  Your Honor, before I switch documents,

15   I'd like to move to admit Government's Exhibit 18.

16         THE COURT:  Any objection?

17         MR. HAMOUDI:  No objection.

18         THE COURT:  Exhibit 18 is admitted.

19         MR. OESTERLE:  If I may switch to Government's Exhibit

20   16.

21         THE COURT:  You may.

22         MR. OESTERLE:  This document has been admitted.

23         THE COURT:  It has?

24         MR. OESTERLE:  And I would like -- it's going to be

25   easier to navigate this document without the track changes.  If

1    I could go, again, to page 5 of the affidavit.

2    Q.    (By Mr. Oesterle)  Do you see in the expanded text, there's

3    some additional references here to the IBIS-NIBINs ballistic

4    testing?

5    A.    Yes.

6    Q.    Particularly the sentence that starts with "those test

7    results."  Do you see that?

8    A.    Yes.

9    Q.    Can you read just that sentence?

10   A.    "Those test results linked to the IBIS-NIBINs test results

11   from the shell casings recovered at the Amarah Riley murder

12   scene on September 19th, 2018."

13   Q.    Same questions as I just asked about the prior passage.

14   The phrase, "those test results linked," was that consistent

15   with your understanding of what you believe the NIBIN lead

16   notification was telling you?

17   A.    Yes.

18   Q.    Is that based on your prior experience working with NIBIN

19   test results?

20   A.    Yes.

21   Q.    And was your use of the word "linked" here intended in any

22   way to mislead Judge Richardson?

23   A.    No.

24   Q.    Did you have any serious doubts at the time you used it

25   that it was a false statement?

1    A.    No.

2    Q.    Let's go to -- or excuse me -- the same exhibit, page 6,

3    lines 24, 25, and this is the last reference I'm going to ask

4    you about with respect to NIBIN.

5          Do you see those references at the bottom of this expanded

6    text, especially the line that starts, "The test results," and

7    if you could read that, please.

8    A.    "The test results linked conclusively to the shell casings

9    collected from the Amarah Riley murder scene on September 19th,

10   2018, and Gizachew Wondie's Smith & Wesson .40 caliber firearm

11   described above."

12   Q.    And are you referring here again to the information you

13   obtained from the NIBIN lead notification previously?

14   A.    Yes.

15   Q.    And can you -- as you sit here today, do you recall why you

16   used the words "link conclusively"?

17   A.    I can speculate.  I can't say with definitive knowledge.

18   Q.    Was it consistent with the information you believed to be

19   communicated through a NIBIN lead notification?

20   A.    Yes.

21   Q.    You used the word "conclusively."  Do you believe that to

22   be an overstatement?

23   A.    Today, yes.

24   Q.    Did you use that word in December of 2018 to mislead Judge

25   Richardson?

1   A.    No.

2   Q.    Did you have any serious doubts as to whether the use of

3   that word "conclusively" was an attempt to mislead the judge?

4   A.    No.

5   Q.    But as you sit here today, you believe that is an

6   overstatement?

7   A.    Yes.

8   Q.    Was your failure to use the term "presumptive investigative

9   lead" a purposeful omission?

10  A.    No.

11  Q.    Was it done in an attempt to mislead the court at all?

12  A.    No.

13  Q.    If I could, I'm going to pull up Exhibit 136, page 29.

14  This was previously admitted and discussed this morning with

15  Mr. Wondie's counsel.

16        In particular, you were asked about the phrase -- the

17  sentence in the middle of the page, the sentence that starts

18  with "NIBIN is a screening tool."  Do you remember that?

19  A.    Yes.

20  Q.    I'm going to ask you to look at the bottom email.  Do you

21  see where it says, "I had this case for trial"?

22  A.    Yes.

23  Q.    What was your understanding of the status of the case at

24  the point in which more NIBIN work was being requested?

25  A.    The case was set for trial, and the request from the

1    prosecutor was to have that additional work done.

2    Q.   Is that then consistent with your understanding of what the

3    policy and practice at the County was when you were there?

4    A.   Yes.

5    Q.   And that, again, was -- at what point were detectives to

6    ask for a confirmation?

7    A.   When the case was set for trial and actually going to

8    trial, and it was from a request of the prosecutor's office.

9    Q.   Okay.  I want to change topics now.  We'll talk about some

10   of the photographs that you've been asked to testify to.

11        If we could turn to page 8 of the affidavit, Exhibit 16.

12        Do you recall some of that testimony this morning and early

13   afternoon?

14   A.   Yes.

15   Q.   What was the purpose for including these photos in the

16   affidavit?

17   A.   So the court could make their own decision and apply the

18   proper weight to what I was saying here in the affidavit.

19   Q.   I think you've testified at length -- I'm not going to ask

20   you any more questions about why you believed the person in the

21   first booking photo is the person in the second photo.

22        I just want to confirm, at the time you presented the

23   affidavit to Judge Richardson, did you, in fact, believe, that

24   they were the same person?

25   A.   Yes.

1  Q.    Was there any doubt in your mind regarding that belief?

2  A.    No.

3  Q.    Was that an honestly held belief at the time?

4  A.    Yes.

5  Q.    Did you have any serious doubts as to whether that was a

6  false association?

7  A.    No.

8  Q.    Was it made with the intent to deceive or mislead Judge

9  Richardson?

10 A.    No.

11 Q.    The second photo, you included a photo with the individual

12 second from the left holding a gun.  Was that a conscious

13 decision to include a photo with an individual that you believed

14 was Mr. Wondie with a gun?

15 A.    Yes.

16 Q.    Why?

17 A.    I thought it would be important for the court to understand

18 the association of Mr. Wondie with firearm evidence.

19 Q.    And why is that?

20 A.    The warrant itself was to seek permission to search a

21 residence associated to Mr. Wondie, as well as a vehicle

22 associated to Mr. Wondie, so those seemed relevant to me and

23 something that should be within the affidavit.

24 Q.    At the time you prepared the affidavit, did you have a

25 belief as to whether Mr. Wondie participated in the homicide of

1   Ms. Riley?

2   A.   I did not believe that he did.

3   Q.   Was it your intent by including this photo to draw that

4   association or suggest an inference on the part of Judge

5   Richardson?

6   A.   No.

7           MR. HAMOUDI:  Your Honor, I would like to raise an

8   objection at this point.

9       Government counsel is asking a lot of questions about

10  Detective Decker's intention to mislead the judge, and *Franks*

11  inquiry is an objective analysis.  Detective Decker's subjective

12  intent is not relevant.  But I just want that objection noted

13  for the record because we keep going into her subjective intent.

14          THE COURT:  I understand, counsel.  I'll still permit

15  it, but your objection will be a continuing one, and the court

16  will except it in that fashion.

17          MR. HAMOUDI:  Thank you, Your Honor.

18  Q.   (By Mr. Oesterle)  Detective Decker, did you undertake

19  efforts to try to gather opinions from other law enforcement

20  officers regarding the similarity of the photos that you

21  presented in the affidavit?

22  A.   Yes.

23  Q.   And did one of those people that you contacted include

24  Special Agent Wozniak?

25  A.   Yes.

1   Q.   Can you identify this document?

2   A.   Yes.  This is an email string between myself and ATF Agent

3   Wozniak.

4   Q.   And what's the purpose for the exchange?

5          THE COURT:  Excuse me, counsel.  What's the exhibit

6   number?

7          MR. OESTERLE:  I'm sorry.  Exhibit 56.

8          THE COURT:  Thank you.

9   A.   I'm asking Agent Wozniak his opinion on the photograph.

10          MR. OESTERLE:  Government moves for the admission of

11   Exhibit 56.

12          MR. HAMOUDI:  No objection.

13          THE COURT:  Exhibit 56 is admitted.

14                  (Exhibit 56 admitted.)

15   Q.   (By Mr. Oesterle)  Why did you choose to ask Special Agent

16   Wozniak for his opinion?

17   A.   I don't know now what made me choose him as my source.  We

18   had been communicating fairly often and regularly on this case,

19   so at that time it must have made sense to me to reach back out

20   to him.

21   Q.   And did he offer you an opinion --

22   A.   Yes.

23   Q.   -- based on what you had provided?

24   A.   Yes.

25   Q.   And what you provided to him was what again?

1    A.    I don't remember the court-related number, but it's the

2    photograph in question that is in the affidavit that shows an

3    African-American male or a dark-skinned male brandishing a

4    firearm.

5    Q.    Detective Decker, did you have, essentially, a meeting with

6    other law enforcement officers prior to execution of the

7    warrant, and I'm talking now at least a week, a week and a half

8    beforehand, at which you discussed the other investigations?

9    A.    Yes.

10   Q.    Do you recall who was in attendance?  And if you don't

11   remember the individuals, if you could identify the agencies

12   were represented.

13   A.    Yes, I'll do my best to identify the agencies.

14         King County Major Crimes, Homeland Security, ATF, and

15   Seattle Police Department representatives.

16   Q.    And, again, what was the purpose of that meeting?

17   A.    To gather everyone who had some part in this investigation

18   together in one room to share information, view photographs, and

19   share documents as it relates to the cases.

20   Q.    And did those photographs include the one that ended up in

21   your affidavit, namely the one with the individuals -- the

22   collective group?

23   A.    Yes.

24   Q.    And when you displayed the photograph at that meeting, did

25   anyone voice concern that that was not Mr. Wondie?

1   A.    No.

2              MR. HAMOUDI:  Objection.

3              THE COURT:  That's sustained, counsel.

4              MR. OESTERLE:  Your Honor, can I be heard?

5              THE COURT:  You may.

6              MR. OESTERLE:  The question, although I understand

7   counsel's concern that this is an objective inquiry, the

8   government disagrees.  And to the extent it's subjective, then

9   it is important what information Detective Decker had or what

10  she did in order to inform her decision to include that

11  photograph, and the effort she took, the due diligence, if you

12  might, to assess whether that -- to get other's opinion and

13  whether that's proper exercise of her decision to make that

14  inclusion in the affidavit.

15             THE COURT:  But, counsel, "Did anyone voice an

16  objection," was your question.  That's seeking a response based

17  on an out-of-court statement being offered for the truth of the

18  matter asserted therein.  That's a sustainable objection,

19  counsel.

20             MR. OESTERLE:  Thank you.

21             THE COURT:  Counsel, we're at the 2:45 mark.  We'll

22  take our afternoon recess at this time.

23                 (Court in recess 2:47 p.m. to 3:05 p.m.)

24             THE COURT:  Mr. Oesterle, please continue your direct

25  examination.

1    MR. OESTERLE:  Thank you, Your Honor.

2    Q.  (By Mr. Oesterle)  Detective Decker, before the break I was

3    asking you questions about a meeting you had prior to obtaining

4    the warrant with the other law enforcement agencies.  Do you

5    recall those questions?

6    A.    Yes.

7    Q.    You testified that you had shared the photograph from the

8    affidavit, the group photo, with others at the meeting; is that

9    correct?

10   A.    Yes.

11   Q.    Did anything occur at that meeting that would have caused

12   you to rethink your association?

13   MR. HAMOUDI:  I'm going to object, again, on the same

14   grounds.  It's calling for an out-of-court --

15   THE COURT:  He's not asking for the statements,

16   counsel.  The objection is overruled.

17   You may ask the question.

18   Q.  (By Mr. Oesterle)  Did anything happen at the meeting --

19   occur at the meeting that would cause you to rethink the

20   association you had made?

21   A.    No.

22   Q.    I want to clarify an answer you gave previously, much

23   earlier when I was asking you questions about whether you were

24   seeking -- whether you believe there was probable cause to

25   arrest Mr. Wondie on December 6th.  Do you recall that?

1    A.    Yes.

2    Q.    And your answer was?

3    A.    I did not have probable cause.

4    Q.    And was that for the homicide investigation?

5    A.    Yes.

6    Q.    I want to ask you a question about -- and hopefully you

7    still have it.  It's Exhibit 155-3.

8    A.    Yes, I have it here.

9    Q.    Why did you not include this photograph in your affidavit?

10   A.    This was a side view.  I felt the other photograph was more

11   representative of the full facial features.

12   Q.    Was that decision based, in any way, on intent on your part

13   to mislead Judge Richardson?

14   A.    No.

15   Q.    Let's go to Exhibit 16, page 5.

16         Earlier today, you testified about some of the information

17   conveyed in paragraph A on page 7 of Exhibit 16.  Do you recall

18   that testimony?

19   A.    Yes.

20   Q.    And the four paragraphs here, do they describe the events

21   that surrounded the April 17, 2017, incident that was one of the

22   NIBIN lead investigative associations?

23   A.    A synopsis of those events, yes.

24   Q.    And I believe you were asked whether you had knowledge that

25   the offense was subsequently was not -- excuse me -- that

1  Mr. Wondie was not convicted of the offense for which he was

2  arrested.  Do you recall that?

3  A.    Yes.

4  Q.    Do you believe that was essential to your presentation to

5  Judge Richardson, to make that clarification or to include that

6  information?

7  A.    No.

8  Q.    Why not?

9  A.    It did not have relevance to me.  The relevant fact of that

10  contact was pertaining to the firearm seizure.

11  Q.    To the best of your knowledge, are the representations in

12  paragraph A, and, in particularly, let me ask about the fact

13  that he was arrested.  Is that a true statement?

14  A.    Can you re-ask that question, please?

15  Q.    Sure.

16        The representation in the paragraph, that an individual

17  later identified as Mr. Wondie had been arrested for a weapons

18  violation, is that a true statement?

19  A.    As it was extracted from the report, yes.

20  Q.    Did you obtain any information outside of the reports that

21  was used to draft this language in paragraph A?

22  A.    No.

23  Q.    Why was the possession of the gun relevant information for

24  the purposes of you obtaining this affidavit?

25  A.    I wanted to show a linkage between the firearm and the

1   seizure of the firearm as it related to the other cases and to

2   my homicide case.

3   Q.    The bottom of the page, referring here to page 7 of

4   Exhibit 16, includes information about the concealed weapons

5   permit that Mr. Wondie had.  Do you see that?

6   A.    Yes.

7   Q.    What was your purpose for including that language?

8   A.    I thought it necessary for the court to know that

9   Mr. Wondie did, in fact, have a concealed weapons permit to

10  carry a firearm.

11  Q.    Why was that important to inform the judge of that?

12  A.    So the judge would not presume that he was illegally

13  possessing a firearm.

14  Q.    I want to go to Subsection C, which I believe is on the

15  next page.  I'm going to skip over Subsection B, but we'll go

16  back to it.

17        What are the events being described in Subparagraph C here?

18  A.    This is a Seattle Police incident, dated from May 28th,

19  2018, of a reported shooting that occurred in Downtown Seattle,

20  and it was a Metro bus shelter that had been struck by bullets,

21  and those shell casings were recovered by law enforcement and

22  subsequently tested for NIBINs and were linked, then, to the

23  firearm that had been seized from Mr. Wondie.

24  Q.    Did you have any reason to believe that Mr. Wondie was

25  identified in those reports as being someone who was a suspect

1  for that incident?

2  A.    No.

3  Q.    Did you make any reference in that paragraph to Mr. Wondie

4  being associated with that incident?

5  A.    No, I did not.

6  Q.    At the time you prepared your affidavit and submitted it in

7  December of 2018, did you believe that the information in

8  paragraph C was truthful?

9  A.    Yes.

10  Q.    I just want to be mindful, though.  We've already talked

11  about the language about NIBIN and this being a conclusive link.

12        Is it your testimony -- I just wanted to make sure it's

13  clear -- it's not inconsistent -- you testified earlier that

14  that was an overstatement.  Do you recall that?

15  A.    Today now, based on my knowledge, I agree it is an

16  overstatement.  At the time I wrote the warrant, I did not

17  believe it was an overstatement.

18  Q.    Going back to page 7, Subsection B here, what are you

19  describing in that paragraph?

20  A.    This is a Seattle Police case incident, dated July 18th,

21  2017, where the firearm in question, the .40 caliber Smith &

22  Wesson, is returned back to Mr. Wondie.

23  Q.    And why is that significant for purposes of your objective

24  of obtaining this warrant?

25  A.    It was part of a date and time timeline to show the

1  movement of this particular firearm as it originated from

2  Mr. Wondie throughout the various incidents in which it was

3  connected.

4  Q.   Paragraph 6, do you see that on top of the page, page 9 of

5  Exhibit 16?

6  A.   Yes.

7  Q.   What are you describing there?

8  A.   This is a burglary that was reported on July 6th, 2017,

9  that Tukwila Police responded to and investigated.

10 Q.   What was the purpose for you including this information in

11 the affidavit?

12 A.   In this report, there was a .40 caliber Smith & Wesson

13 firearm that had been reported by Mr. Wondie as having been

14 stolen from his residence.

15 Q.   And the date of the report?

16 A.   July 6th, 2017.

17 Q.   And that would have been prior to the July 18th incident

18 reported in the other paragraph; is that right?

19 A.   Correct, prior to the return of the Smith & Wesson firearm

20 that was in Seattle's custody back to Mr. Wondie.

21 Q.   And at the time, what was your theory, then, as to whether

22 the weapon reported stolen on July 6th could have been the same

23 gun that had been -- I'll use your word -- linked to the April

24 2017 incident?

25        MR. HAMOUDI:  Objection as to the form of the

1    question.

2              THE COURT:  Do you understand the question?

3              THE WITNESS:  I think so.

4              THE COURT:  Okay.  Give it your best shot.

5         The objection is overruled.

6         You may answer the question, if you understand.

7    A.    The weapon reported stolen in the Tukwila burglary could

8    not be the same firearm of my interest, since that was still in

9    custody of the Seattle Police Department.

10   Q.    (By Mr. Oesterle)  And did you believe that to be a

11   significant event for purposes of trying to establish probable

12   cause?

13   A.    Yes.

14   Q.    Why is that?

15   A.    There was still a possibility that Mr. Wondie had that

16   firearm in question on his person or at the residence that I was

17   asking to search.

18   Q.    You were asked some questions earlier today about the

19   information provided in paragraph 8.  Do you see that in front

20   of you now?

21   A.    Yes, I do.

22   Q.    In particular, you asked the question about -- let me first

23   ask:  Remind us all, where was this information sourced from?

24   A.    This was information obtained from -- I incorrectly

25   referred to him as Officer Elliott, but it's Officer Averett,

1    Seattle Police Department.

2    Q.    And what was your intent in including this language in the

3    affidavit?

4    A.    To show firsthand information from a law enforcement

5    officer who had had contact with Mr. Wondie at a date and time

6    that was relative to the date and time of my murder.

7    Q.    So are you recounting information that was communicated to

8    you, or is this information you had firsthand knowledge of?

9    A.    I'm recounting information, as I had understood it, that

10   was shared to me by Officer Averett.

11   Q.    And earlier you provided testimony about the use of the

12   term "propensity for violence."  Do you recall that?  That's

13   towards the bottom of that paragraph.

14   A.    Yes.

15   Q.    And you were shown Government's Exhibit 62.  Do you recall

16   the testimony this morning about that phrase, "potential for

17   violence," now before you in Government's Exhibit 62?

18   A.    Yes, that's correct.

19   Q.    Do you have an explanation as to why the language -- the

20   term that you used in the affidavit was "propensity for

21   violence," and the language we see here is "potential for

22   violence"?

23   A.    As we sit here today, I do not.

24   Q.    Do you have a recollection as to whether you made a

25   conscious decision to use "propensity" as opposed to

1    "potential"?

2    A.    I do not.

3    Q.    Did you have any discussions with Officer Averett to

4    discuss this?

5    A.    Yes.

6    Q.    Detective Decker, did you have communications with Special

7    Agent Dkane in late November regarding his contacts with

8    Mr. Wondie?

9    A.    Yes, I did.

10   Q.    And what was your understanding of those and the nature of

11   those contacts?

12   A.    That Agent Dkane had been in an undercover capacity and had

13   established communications with Mr. Wondie, referencing a

14   firearm.

15   Q.    And were those undercover operations conducted as part of

16   the homicide investigation?

17   A.    I don't know.

18   Q.    Or were they part of the drug investigation?

19   A.    I don't know.

20   Q.    Was Officer Dkane part of your investigative team for the

21   homicide?

22   A.    That's hard to answer.  We were working parallel

23   investigations and supporting each other as best we could, but

24   two separate investigations that were going on at the same time.

25   Q.    Was he conducting any of the undercover operations at your

1   direction?

2   A.    No.

3   Q.    Did Agent Dkane provide you any information regarding

4   communications he had received from Mr. Wondie regarding

5   ownership or possession of a gun?

6   A.    Yes.

7   Q.    Do you recall what those were?

8   A.    He shared snippets of text messages that had gone back and

9   forth between he and Mr. Wondie.

10  Q.    And do you recall what the substance of those

11  communications were?

12  A.    May I refresh on that?

13  Q.    Sure.

14        Do you see the expanded text now before you?

15  A.    Yes.

16  Q.    Does that refresh your recollection as to what the

17  representations were?

18  A.    Yes.

19  Q.    Feel free to read off the text.

20        What were the representations that Mr. Wondie was making in

21  the course of those undercover communications?

22  A.    Agent Dkane states, "I asked him if he had one of his own

23  and he answered, quote, Something like that, unquote.  He also

24  offered to show me how to use a gun.  Specifically, he said he

25  could give me a crash course, in parentheses, on the way to a

1   firearms range.  If these comments are helpful in securing your

2   warrant, I can write a statement for you."

3   Q.   Are these the communications that you're referencing at the

4   bottom of page 11 to Exhibit 16?

5   A.   Yes.

6   Q.   And to the best of your knowledge, were these accurate

7   representations of the communications?

8   A.   Yes.

9   Q.   Did you have any reason to doubt the truthfulness of those

10  representations?

11  A.   No.

12          MR. OESTERLE:  Your Honor, may I have one minute,

13  please?

14          THE COURT:  Certainly.

15  Q.   (By Mr. Oesterle)  Just a couple questions to conclude.

16  We're going to Exhibit 58, previously admitted.

17      You were asked some questions about this this morning.  The

18  top line, which is an entry by you, right?

19  A.   Yes.

20  Q.   You wrote that?

21  A.   Yes.

22  Q.   And you were asked, and I think you agreed with counsel's

23  request, that we would assume that the letters c-r-e-a were

24  intended to eventually be "creative," or something to that

25  effect?

1   A.    Yes.

2   Q.    How were you intending to use "creative" in that context?

3   A.    Well, I am creative and resourceful in my investigations;

4   to try to locate as much information and evidence as I can

5   within the rules, policies, guidelines, law.  That's the way I

6   describe myself and how I operate.

7   Q.    You were also asked, I just want to clarify.  Was the SWAT

8   team deployed to arrest Mr. Wondie on December 6th?

9         MR. HAMOUDI:  Objection.  There is a stipulation

10  already entered into the record that addresses this issue, Your

11  Honor.

12        THE COURT:  Is that the one that was entered today,

13  counsel?

14        MR. HAMOUDI:  No.  It was previously, when we agreed

15  not to call Agent Alvarez to the stand, a joint statement and

16  stipulation that Mr. Wondie was, in fact, arrested at or near

17  the time of contact.

18        MR. OESTERLE:  I don't believe that's my question,

19  Your Honor.

20        THE COURT:  All right.  Restate the question.

21  Q.    (By Mr. Oesterle)  Detective Decker, did you direct the

22  SWAT team to effect an arrest of Mr. Wondie on December 6th?

23  A.    I did not.

24  Q.    Did you believe you had probable cause to effect an arrest

25  based on your homicide investigation on December 6th?

1    A.    I did not.

2    Q.    And, finally, you were asked questions about deleted

3    emails.  You told counsel that you had deleted emails in

4    connection with this case.  Do you recall that?

5    A.    Yes.

6    Q.    I'm sorry.  Text messages.  Do you recall that?

7    A.    Yes, text messages, not emails.

8    Q.    We were going too quick.

9          Was that unique to the Riley investigation?

10   A.    No.

11   Q.    Did you delete all of your text messages during a given

12   time period?

13   A.    Yes.  I was working multiple homicides within a short time

14   period and was getting confused with the contacts and sending

15   the wrong text messages to the wrong people who had the same

16   acronyms or names, and so I made the decision to delete

17   everything and start over.

18   Q.    Was it done at all with the intent to destroy evidence that

19   may be relevant to your ongoing homicide investigation?

20   A.    Not at all.  In fact, I had understood that the feds were

21   going to be retaining that evidence.

22   Q.    When you say "the feds were going to be retaining that

23   evidence," retaining it from who at that point?

24   A.    Retaining any text messages that I had between myself and

25   them.

1  Q.  When you say "retaining," the recipient in those instances

2  would be retaining those communications; was that your

3  understanding?

4  A.  Yes.

5          MR. OESTERLE:  No further questions.

6          THE COURT:  Reexamination by the defense?

7          MR. HAMOUDI:  Yes.

8                      REDIRECT EXAMINATION

9  BY MR. HAMOUDI:

10 Q.  Counsel asked you some questions about Government's Exhibit

11 62-004, these were the notes that were forwarded to you from

12 Officer Averett.  Can you see those up there?

13 A.  No.

14 Q.  Can you see them now?

15 A.  Can I see the prior one, just for context?

16 Q.  Yes, absolutely.

17 A.  Can you go back?  I'm sorry.

18 Q.  Sure.

19 A.  Okay.

20 Q.  The next page, there is a list of possible associates, but

21 that's been redacted, correct?

22 A.  Yes.

23 Q.  Okay.

24          MR. HAMOUDI:  Can you bring up Discovery Page 5622, an

25 unredacted copy of this?

1    Q.    (By Mr. Hamoudi)  Going back to previously admitted Defense

2    Exhibit 134-9, you talked about the Tukwila Police

3    investigation.  Do you recall that testimony in paragraph 6?

4    A.    Yes.

5    Q.    And the highlights on the actual warrant, you highlighted

6    that, correct?

7    A.    I believe that's correct.

8    Q.    So what you were trying to do by highlighting was focus the

9    judge's attention on when the firearm was being released and

10   when the firearm was being reported stolen, et cetera, correct?

11   A.    Yes.

12   Q.    And with respect to what the Tukwila Police reported, did

13   you look at any police reports?

14   A.    Yes, the Tukwila Police report, I believe.

15   Q.    Okay.  Marking for identification Government's Exhibit 52,

16   this is an email that you sent to Agent Wozniak, dated December

17   9th, correct?

18   A.    Yes.

19   Q.    Okay.  And you say, "I have attached the reports I have

20   related to Wondie.  Attached is the SPD case where the .40 was

21   seized as evidence, the release paperwork, another SPD shooting

22   case where the casings matched, and the Tukwila burglary

23   report," correct?

24   A.    Yes.

25   Q.    And the next page, is this the Tukwila burglary report?

1   A.    I don't recall if the information I obtained was through

2   LInX or if I actually requested a copy of the report from their

3   records unit.

4   Q.    If you had obtained a copy of the report itself, it would

5   be in your files?

6   A.    It should be, yes.

7   Q.    Okay.  And you know that you can't rely on a LInX report,

8   correct, in an affidavit for probable cause, correct?

9   A.    No.

10  Q.    Okay.  If you could blow up the bottom fine print, and when

11  you can, just read this out loud.

12  A.    "LInX printing agreement:  Any documents that are printed

13  or electronically saved from LInX are to be used for law

14  enforcement purpose only and are subject to the following rules

15  of use:

16        "Photographs may not be used for any photo lineups.  The

17  accuracy of information must be confirmed with the originating

18  agency before any legal action may be undertaken, such as making

19  an arrest or preparing an arrest search warrant affidavit."

20  Q.    That's fine.

21        So what the report is telling you is that you must confirm

22  the contents of this report before you represent what is

23  reported in this report in an affidavit for a probable cause,

24  correct?

25  A.    Yes.

1    Q.   And if you had done that, it would be in your files,

2    correct?

3    A.   It should be, yes.

4    Q.   It would be a police report confirmation?

5    A.   It should be, yes.

6    Q.   Okay.  Thank you.

7         I wanted to go back to what the government covered with you

8    with respect to Agent Wozniak and, as best as I can, try to set

9    up a timeline here.

10        So this is Government's Exhibit 55.

11              MR. HAMOUDI:  Move to admit Government's Exhibit 55.

12              THE COURT:  Any objection, counsel?

13              MR. OESTERLE:  No objection.

14              THE COURT:  Exhibit 55 is admitted.

15                        (Exhibit 55 admitted.)

16   Q.   (By Mr. Hamoudi)  Ms. Decker, this email is October 25th,

17   at 12:44 p.m., correct?

18   A.   Yes.

19   Q.   And you ask Agent Wozniak, "Is that not him in this pic of

20   Instagram, second to the left in the background?"  Correct?

21   A.   Yes.

22   Q.   And the photo was the one in the affidavit, correct?

23   A.   Yes.

24   Q.   And then at 12:47 p.m., up top, he responds, "Looks like

25   it?  Do you have a DOL or a booking photo handy I can compare it

1    against?"  Correct?

2    A.    Yes.

3    Q.    So he's asking for another photograph, correct?

4    A.    Yes.

5    Q.    Okay.  Let's move to, I believe, previously admitted

6    Government's Exhibit 56.

7          And in the middle, at 12:49 p.m., it appears he sends

8    another response, if these emails are sent chronologically.  He

9    says, "I would feel very comfortable making that ID on Gizachew

10   being in that photo.  Hard to say it's the same gun but very

11   good resemblance."  Correct?

12   A.    Yes, that's correct.

13   Q.    And then up top, at 12:50, you respond, "Wouldn't be the

14   first time someone filed false burglary report to try and limit

15   their association to a particular item," correct?

16   A.    Yes.

17   Q.    Okay.  And what you're saying here is that your thesis is

18   Mr. Wondie filed a false burglary report -- right? -- that his

19   firearm was stolen when, in fact, it was still in his

20   possession, correct?

21   A.    Before I knew that Seattle had retained it, yes.

22   Q.    Yes, because if Seattle had the firearm, he would not

23   report to another police officer that his firearm's been stolen,

24   correct?

25   A.    Unless he was confused.

1    Q.    Or unless there was a second firearm?

2    A.    Correct.

3    Q.    Okay.

4          Let's move to marked for identification Government 57, and

5    this is in the chronology of our conversation on email with

6    Agent Wozniak.

7          At 12:51 p.m. Agent Wozniak responds, "I just overlooked

8    the second attachment.  I think that's definitely him."

9    Correct?

10   A.    Yes.

11   Q.    And then go earlier to the next page.

12         But before he said that, at 12:49 p.m., up top, you write,

13   "I have a photo of an old DOL photo, but the one I sent is the

14   best resemblance of."  Correct?

15   A.    Yes.

16   Q.    So you're using your discretion judgment to use a booking

17   photo instead of a driver's license photo to ask Agent Wozniak

18   to make a comparison against the Instagram photo, correct?

19   A.    Yes.

20   Q.    And all of this occurs over a matter of five minutes,

21   correct?

22   A.    I didn't note the time, but it's within a relatively short

23   period of time, yes, that's correct.

24   Q.    Is that about right?

25   A.    Yes.

1    Q.    Okay.

2          So this identification that you relied upon to represent in

3    an affidavit that my client was the individual in the Instagram

4    photo was based on Agent Wozniak's identification over five

5    minutes, correct?

6    A.    Yes.

7    Q.    When you did not provide him with a driver's license photo

8    when he asked you for one, correct?

9    A.    Correct.

10   Q.    And Agent Wozniak did not know my client, correct?

11   A.    That is correct.

12   Q.    Okay.

13         You testified about some of the NIBIN language during your

14   examination by government counsel.  I want to go back to Exhibit

15   122, previously admitted, dash 3.  And, in particular, the

16   standards of drafting the application for a search warrant says,

17   "Every statement of fact should be attributed to a source."

18   A.    Yes.

19   Q.    And what that means is that if somebody other than yourself

20   is providing a statement of fact, you need to identify that

21   individual, correct?

22   A.    Correct.

23   Q.    And it also says, "Avoid conclusions.  Rely on facts,"

24   correct?

25   A.    Correct.

1    Q.    Okay.  Going back to Exhibit 135-1, here, in this case, as

2    opposed to the cases that were covered by government counsel

3    with you, Mr. Gonzalez is saying, "Please see the attached lead

4    notification," correct?

5    A.    Yes.

6    Q.    He says, "The fired .40 cal cartridge cases from KCSO Case

7    C18-041245 appear to correspond to the .40 cal test fire.  Smith

8    & Wesson MMP with the serial number case from Seattle PD Cases

9    17-121743 and Seattle PD 18-1922263 as established by the NIBIN

10   database," correct?

11   A.    Yes.

12   Q.    Okay.

13         And the statement that you wrote in the actual affidavit

14   spoke about a firearm, correct?

15   A.    Yes.

16   Q.    That's on 134-5, and let's zoom up the center.

17         And what you're saying here, that the shell casings

18   recovered from the scene matched the gun, correct?

19   A.    Correct.

20   Q.    Now, the email said nothing about a gun; it only talked

21   about casings, correct?

22   A.    That email, correct.

23   Q.    That's right.

24         MR. HAMOUDI:  Now, let's go to the next page, please,

25   and pull up the highlighted part.

1  Q.    (By Mr. Hamoudi)  Again, here you're telling the judge that

2  it was the same firearm, when, in fact, the email does not say

3  anything about a firearm, but only speaks to casings, correct?

4  A.    That email, correct.

5  Q.    Okay.  Go to the next page.  And the same with this

6  language.  You're speaking to a firearm, and the email does not

7  say anything about a firearm but speaks to casings, correct?

8  A.    That email, that's correct.

9  Q.    And going back to the email, 135-3, you've been a homicide

10 detective for many, many years, correct?

11 A.    Yes.

12 Q.    You understand how to prepare evidence inventory forms,

13 correct?

14 A.    We have a form that we use to guide us in that, yes.

15 Q.    So, here, the exhibit numbers are identified on this sheet,

16 correct?

17 A.    I'm not sure I understand what you mean by "exhibit

18 numbers."

19 Q.    Well, if you read this document -- and we just -- read the

20 document, and it says, up top, "WSP case number," and it says

21 "Case Number" and it says "Exhibit number," correct?

22 A.    Yes, that's correct.

23 Q.    It is not referring to multiple exhibits, correct?

24 A.    Correct.

25 Q.    So single exhibit?

1    A.    Correct.

2    Q.    And then the second part, it is also referring to a single

3    exhibit, correct?

4    A.    Yes, that's correct.

5    Q.    And then in the third event, it's also referring to a

6    single exhibit, correct?

7    A.    Yes.

8    Q.    And so the third event, and that's the homicide event, it

9    says "Exhibit No. 10," that's the casing, correct?  That's the

10   casing that was used to put into NIBIN, correct?

11   A.    I don't know.

12   Q.    If it was more than one exhibit, it would say there,

13   wouldn't it?

14   A.    I don't know.

15   Q.    Okay.

16         You arrived at the homicide scene, correct?

17   A.    Yes.

18   Q.    And casings were recovered at the scene, right?

19   A.    Yes.

20   Q.    And when casings are seen at a homicide scene, people put

21   signs where the casings are, correct?

22   A.    Yes, a numeric designator, I believe, is what we use.

23   Q.    Is it fair to say that Exhibit No. 10 may refer to one of

24   the casings that were recovered at the scene?

25   A.    I believe we only recovered seven, so I don't understand

1    that designator.

2    Q.    Did you ever go and look at the casings in

3    Case No. 2017121-743, up top?

4    A.    Where are you looking?

5    Q.    Up top.  Did you ever go and look at that casing?

6    A.    Look at that case?

7    Q.    Casing --

8    A.    Oh.  No --

9    Q.    -- go ask to view a piece of evidence?

10   A.    Not that I recall.

11   Q.    Did you have any knowledge that that casing was destroyed?

12   A.    No.

13   Q.    Okay.

14        I just want to be clear that you're not blaming Judge

15   McDonald about the contents of the affidavit, are you?

16   A.    Of course not, no.

17   Q.    And you take full responsibility with respect to what

18   you've written in the affidavit?

19   A.    Yes, absolutely.

20   Q.    Okay.

21        Previously partially admitted Defense Exhibit 136-2, the

22   government covered some previous NIBIN emails in cases.  This

23   one has already been admitted.  I covered it with you on direct

24   examination.  Do you recall it?

25   A.    Yes.

1   Q.   Okay.  Let's review the NIBIN lead that is attached to this

2   email.

3          MR. HAMOUDI:  And I move to admit it at this time.

4          THE COURT:  Any objection, counsel?  136?

5          MR. HAMOUDI:  Three.

6          THE COURT:  Any objection to three, counsel?

7          MR. HAMOUDI:  Three and four, Your Honor.

8          MR. OESTERLE:  Can I ask for clarification?  I'm lost.

9   You're asking for admission of?

10          MR. HAMOUDI:  The attached NIBIN lead to previously

11   admitted email 136-2, so it would be three and four.

12          MR. OESTERLE:  No objections.

13          THE COURT:  136-3 and 136-4 are admitted.

14          (Exhibits 136-3 and 136-4 admitted.)

15   Q.   (By Mr. Hamoudi)  And focusing you on the last page of this

16   particular lead, there is language in this NIBIN lead, and here

17   it says, "NIBIN leads cannot be used for the establishment of

18   probable cause for warrants or for any court-related purposes

19   until evidence has been confirmed by microscopic comparison,"

20   correct?

21   A.   Yes, that's correct.

22   Q.   Okay.  And marked for identification 136-11, this is an

23   email that you forwarded to an individual named John Pavlovich

24   after you received an email from Mr. Gonzalez.  Do you see it?

25   A.   For context, can you go back to what was there?

1    Q.    Yes.

2    A.    Yes.

3    Q.    Okay.  And there was a lead attached to this.

4              MR. HAMOUDI:  Move to admit Exhibit 136 with the lead.

5              THE COURT:  Is that 136-11?

6              MR. HAMOUDI:  11 to 16, Your Honor.

7              THE COURT:  Any objection, counsel?

8              MR. OESTERLE:  No objection.

9              THE COURT:  136-11 to 136-16 are admitted.

10             (Exhibits 136-11 to 136-16 admitted.)

11   Q.    (By Mr. Hamoudi)  And if you go forward to the last page,

12   in this lead notification, again you're told, "NIBIN leads

13   cannot be for the establishment of probable cause for warrants

14   or for any court-related purposes until evidence has been

15   confirmed by microscopic comparison," correct?

16   A.    Yes.

17   Q.    Move to 136-17.  This is an email to you from Jennifer

18   Tardiff.

19   A.    Yes.

20             MR. HAMOUDI:  Move to admit 136-17 with the lead,

21   which goes all the way through to 21.

22             MR. OESTERLE:  No objection.

23             THE COURT:  They're admitted.

24             (Exhibits 136-17 to 136-21 admitted.)

25             MR. HAMOUDI:  I'm sorry, Your Honor?

1          THE COURT:  Counsel said he had no objection, and I

2     was making the formality for the exhibit to be admitted.

3     Q.   (By Mr. Hamoudi)  And this email was dated 2017, and at the

4     bottom of this lead, again you're told, "NIBIN leads cannot be

5     used for the establishment of probable cause for warrants or for

6     any court-related purposes until evidence has been confirmed by

7     microscopic confirmation," correct?

8     A.   Yes.

9     Q.   And one last exhibit, which is 136-25, this is again from

10    Sam Gonzalez in 2017, and you recognize this email?

11    A.   Yes.

12         MR. HAMOUDI:  Move to admit this email, along with the

13    lead.

14         THE COURT:  And the number for this one, counsel?

15         MR. HAMOUDI:  136-25 to 27, Your Honor.

16         THE COURT:  Any objection, counsel?

17         MR. OESTERLE:  No objection.

18         THE COURT:  They're admitted.

19              (Exhibits 136-25 to 136-27 admitted.)

20    Q.   (By Mr. Hamoudi)  And going to the last page, again, you're

21    being told here, "NIBIN leads cannot be utilized for the

22    establishment of probable cause for warrants or for any

23    court-related purposes," correct?

24    A.   Yes.

25    Q.   And going back to the lead in this case, which is 135-1,

1    the language that I just read to you does not appear on this

2    lead.  Go back to the last page of it.  Correct?  This cannot be

3    used for probable cause, which we saw on the other leads,

4    correct?

5    A.    Yes.

6    Q.    Okay.  Go to the email now, 135-1.

7          Mr. Gonzalez, who is the source to which this fact is

8    attributed to says, "If a microscopic confirmation is required

9    for warrants or arrests, please contact the WSP Crime Lab,"

10   correct?

11   A.    Yes.

12   Q.    So whatever your understanding was of NIBIN at the time,

13   what you knew was, you'd received leads or you were told,

14   blanket, that they cannot be used for warrants, correct, in the

15   leads?

16   A.    There was mixed understanding on that, so yes and no.

17   Q.    Okay.  So yes and no.  There was a mixed understanding.

18   But you have a duty to inform the judge, who has to make a

19   judgment call on an affidavit, about the facts as you accurately

20   understand them, correct?

21   A.    Yes.

22   Q.    And so if what you just described, there was confusion or

23   something to that effect -- I don't want to put words in your

24   mouth -- you should have just attached the lead email, along

25   with the lead notification, to the warrant, and then Judge

1    Richardson could have said, "Hey, you know what?  I want you to

2    go contact the WSP Crime Lab."  Don't you think that that's

3    something the judge should have had the opportunity to do?

4    A.   Yes, that is something I could have done.  I did not do

5    that.

6    Q.   Because Judge Richardson is not trained in firearms

7    ballistics?

8    A.   That, I don't know.

9    Q.   She is not a firearm technician, right?

10   A.   No, she's not.

11   Q.   She's not conducting the investigation on your behalf,

12   correct?

13   A.   That's correct.

14   Q.   There is a lot of moving parts?

15   A.   Yes.

16   Q.   You're asking for a search warrant for someone's residence

17   and vehicle, correct?

18   A.   Yes, correct.

19   Q.   And you're utilizing a mobile arrest team to go and

20   effectuate this search warrant, correct?

21   A.   Yes.

22   Q.   So it would be best served to have Judge Richardson have

23   all the salient facts about all the forensics in this case to

24   make a judgment call, correct?

25   A.   Correct.

1           MR. HAMOUDI:  No further questions, Your Honor.

2           THE COURT:  Any further examination by the government?

3           MR. OESTERLE:  No, Your Honor.

4           THE COURT:  Any objection to this witness stepping

5      down at this time, counsel?

6           MR. HAMOUDI:  No.

7           THE COURT:  Counsel for the government?

8           MR. OESTERLE:  No.

9           THE COURT:  Thank you.  You may step down.

10     Next witness?

11          MS. BRIN:  At this time, the defense calls Michael

12     Stortini.

13                         MICHAEL STORTINI,
              having been previously sworn, testified as follows:
14

15          THE CLERK:  Please state your full name for the

16     record, and spell your first and last names for the court

17     reporter.

18          THE WITNESS:  Michael Stortini, S-t-o-r-t-i-n-i.

19          THE COURT:  You may inquire.

20                        DIRECT EXAMINATION

21     BY MS. BRIN:

22     Q.   Good afternoon.  Where are you currently employed?

23     A.   The Federal Public Defender's Tacoma office.

24     Q.   And how long have you been working for the Federal Defender?

25     A.   Next week, it will be 22 years.

1    Q.    And what did you do before that?

2    A.    I was at Pierce County Department of Assigned Counsel, the

3    public defender's office for Piece County, for 11 years.  Eight

4    of those years I was the chief investigator, then left there --

5    hired by Tom Hillier out of the Seattle Federal Defender's

6    Office, but assigned to the Tacoma office for the past 22 years.

7    Q.    Can you generally describe some of your job duties as a

8    Federal Defender investigator?

9    A.    Yeah.  General investigative duties:  Tracking down,

10   locating, interviewing witnesses; serving subpoenas when

11   necessary; crime scene photography; those sorts of things.

12   Basic trial preparation for you folks.

13   Q.    And have you attended any trainings or seminars or

14   conferences to help you do your job?

15   A.    Yes, both during my time with the Department of Assigned

16   Counsel, and then several -- actually, more with this office.

17   Q.    At some point were you assigned to work on Mr. Wondie's

18   case?

19   A.    Yes, I was.

20   Q.    And when was that?

21   A.    I'm going to say summer of 2020.  I think it was June of

22   2020; about a year ago.

23   Q.    Was there a reason you were assigned to work on

24   Mr. Wondie's case so late in the case?

25   A.    Yes.  So there was an investigator in our Seattle office

1  named Chelsea Whittler, who resigned just prior to my getting

2  involved.

3  Q.   And was there any specific issue that you were asked to

4  look into about Mr. Wondie's case, initially?

5  A.   Yes.

6  Q.   And what was that?

7  A.   To determine who an individual was in a photograph, the

8  photograph that's been discussed here today, in Detective

9  Decker's search warrant affidavit.

10 Q.   And I'm going to show you what's previously been admitted

11 as Defense Exhibit 134 at page 11.  Is this the photograph you

12 were talking about?

13 A.   Yes, it is.

14 Q.   And can you identify the individual that Detective Decker

15 believed was Mr. Wondie in that photograph?

16 A.   Not by the acronym, just by...

17 Q.   Oh, okay.

18 A.   Make sure I understand the question.

19 Q.   No, and just so that you know, Mr. Stortini, there should

20 be a copy of unredacted documents, but everything on the screen

21 will, hopefully, will be redacted appropriately.

22 A.   Thanks.

23 Q.   When you came onto the case, Ms. Whittler had already

24 worked on the case for some time, correct?

25 A.   Yes.

1    Q.    And had she memorialized her work?

2    A.    Yes.

3    Q.    Did you review her reports?

4    A.    Yes, I did.

5    Q.    Okay.  I'm showing you what's been marked for

6    identification as Defense Exhibit 160, and are you familiar with

7    this document?

8    A.    Yes.  That's the memo that Ms. Whittler produced that I

9    reviewed.

10   Q.    Okay.  Is this a true and accurate copy?

11   A.    Yes, it is.

12            MS. BRIN:  We move to admit Defense Exhibit 160.

13            MS. BECKER:  Your Honor, the government does not

14   object to the admission of this exhibit for the purposes of

15   establishing that the photograph does not depict Mr. Wondie.

16       We do object to the extent the photograph is being offered

17   on the topic of how easy it was to determine that it was him,

18   and, in particular, the suggestion that Decker should have done

19   this.  The standard is not an objective standard; it's a

20   subjective standard.

21       So we don't object for that limited purpose, but for the

22   additional purpose, we do.

23            THE COURT:  Do you have an objection to that limited

24   offering, counsel?

25            MS. BRIN:  I do object to the limited offering, Your

1   Honor.

2       Mr. Oesterle previously asked Detective Decker about some

3   of the things that she did, because he said that he wanted to

4   talk to her about due diligence.

5       As the court knows, intentional behavior is not the only

6   standard for *Franks*.  It can also be reckless disregard of the

7   facts as they were known at the time.

8       I do want to discuss with Mr. Stortini what he reviewed in

9   his own memo and a bit about what Ms. Whittler had put into her

10  memo.

11      I think the ease with which both of our investigators were

12  able to determine through public documents, as well as all of

13  the evidence provided to us that was available to Detective

14  Decker, is directly relevant to her failure to do any diligence

15  on whether that photograph was Mr. Wondie, and I think that this

16  testimony is relevant as to that issue.

17          THE COURT:  The objection is overruled on relevance.

18  The ease goes to the weight, not admissibility.  The objection

19  is overruled.

20      You may answer the question, if you recall the question, or

21  you can have it repeated.

22          THE WITNESS:  I think we need to repeat it, yes.

23          MS. BRIN:  Your Honor, I believe I was just moving to

24  admit the exhibit, and I believe Ms. Becker was just making her

25  objection about the exhibit.

1      THE COURT:  Exhibit 160 is admitted.

2      MS. BRIN:  Thank you, Your Honor.

3                (Exhibit 160 admitted.)

4  Q.   (By Ms. Brin)  And if we could turn to page 3 of 160, and I

5  won't ask you very much about this exhibit, Mr. Stortini, but

6  are you familiar with the photographs that are depicted here?

7  A.   Yes.

8  Q.   And can you tell me what those are?

9  A.   Those are, basically, snapshots from YouTube videos

10 depicting Group A.

11 Q.   Are those snapshots from the same video as was identified

12 by Detective Decker in her affidavit -- those photographs in her

13 affidavit?

14 A.   Yes.

15 Q.   And if we could also move to page 5.  And on this page,

16 there is a redaction for Group A.  There is also a handle on

17 this page.  Are you familiar with that handle in that photo?

18 A.   Yes.

19 Q.   Okay.  And is that Handle 1?

20 A.   That's correct.

21 Q.   If we could move to the next page.

22      And same question as to these photographs, Mr. Stortini,

23 and if you need them to be blown up.

24 A.   Handle 1, yes.

25 Q.   Okay.  And the second photograph?

```
 1   A.    Also Handle 1.

 2   Q.    Okay.

 3         And, Mr. Stortini, from your review of the discovery in

 4   this case, was Handle 1's Instagram account one that Detective

 5   Decker looked at?

 6   A.    Yes.

 7   Q.    I'm going to show you what's been marked as Defense Exhibit

 8   161 for identification purposes.

 9         And are you familiar with this document?

10   A.    Yes.  I produced it.

11   Q.    And is this a true and correct copy?

12   A.    Yes, it is.

13         MS. BRIN:  We would ask that Defense Exhibit 161 be

14   admitted as well.

15         MS. BECKER:  Subject to the same objection previously

16   made.

17         THE COURT:  Same ruling from the court.  It's

18   overruled.  Exhibit 161 is admitted.

19                   (Exhibit 161 admitted.)

20         MS. BRIN:  Thank you, Your Honor.

21   Q.    (By Ms. Brin)  Mr. Stortini, can you talk, generally, about

22   the steps you took to determine whether this was Mr. Wondie in

23   this photograph?

24   A.    Yes.

25         So I did review the discovery, I did review Detective
```

1   Decker's reports and emails, Ms. Whittler's memo, so I did have

2   the advantage of knowing who Ms. Whittler identified.  But be

3   that as it may, I wanted to start off with a clear slate and not

4   use any database that our office has access to, which is not as

5   great as law enforcement access, but we do have things, like

6   Accurint, that have been discussed at this hearing.

7        And so I did set out and just did nothing but simply Google

8   searches and social media searches and was able to determine,

9   rather quickly, who that individual was.

10  Q.   And, Mr. Stortini, do you consider yourself an expert on

11  social media or the Internet searches?

12  A.   According to my wife, I'm horrible, so...

13  Q.   And if we could turn to page 4 of this report.

14       Through your investigation, and, specifically, sort of,

15  your searching on Google, were you able to identify any

16  individuals who are associated with Group A?

17  A.   Yes.

18  Q.   Okay.  And can you tell me a little bit how you did that

19  and who they were?

20  A.   So just a simple Google search of Group A brought up a

21  number of media publications, YouTube videos, even a Secretary

22  of State document showing who -- well, in the Secretary of State

23  document, it showed who the governoring persons were.  There

24  were two of them.  And those two individuals, who are

25  Individual 7 and Individual 1, were listed as the governoring

1   persons.  But also in the media, the publications that I read

2   online via Google searches, those same two individuals were

3   listed in articles as the founders and the leaders of Group A.

4   Q.   And if we could turn to page 5, did you also find some

5   photographs of the individuals in Group A, or who you've

6   identified?

7   A.   Yes.  So in this particular photo, those are the two

8   gentleman, Individual 1 and 7.  That article is from -- I

9   believe it was from the *City Arts* magazine.

10  Q.   And you -- again, I apologize if I missed this -- but this

11  was a publicly available photograph?

12  A.   Yes.  It also listed their true identities as Individual 1

13  and Individual 7 in the article.

14  Q.   Thank you, Mr. Stortini.

15       You also you mentioned you used what Detective Decker had

16  available to her, correct?

17  A.   Correct.

18       MS. BRIN:  If I could have just one moment, Your

19  Honor.

20  Q.   (By Ms. Brin)  Mr. Stortini, you're aware that Detective

21  Decker had received Instagram returns?

22  A.   Yes.

23  Q.   And did you review those as well?

24  A.   Yes, I did.

25  Q.   Did those Instagram returns identify information about who

1    followed the Group A Instagram account?

2    A.    Yes.

3    Q.    And did you review that?

4    A.    I did.

5    Q.    Were you able to find Mr. Wondie as a follower?

6    A.    Not at all.

7    Q.    Okay.

8          And do those Instagram identify other, sort of,

9    social-media-type activities like tagging or comments, things

10   like that?

11   A.    Yes.

12   Q.    And were you able to find any link between Mr. Wondie and

13   Group A's Instagram account through any of those?

14   A.    Not at all.

15   Q.    And we talked a little bit about Handle 1 as an account

16   that you had identified that Ms. Whittler had identified.

17   That's also an account that Detective Decker identified,

18   correct?

19   A.    Correct.

20   Q.    And if we could turn back to 6, the next page, this is a

21   photo that both you and Ms. Whittler were able to identify?

22   A.    Yes.

23   Q.    And can you talk to me about this photo and what you

24   learned from it?

25   A.    Okay.  That's Handle 1's Instagram.  And I think the

 1    date on it -- if you can pull that up just a little bit, the
 2    picture?  Yeah, it's small, real small.
 3         Okay.  So the date -- this is, like, just, literally, a
 4    couple weeks, a few weeks before the homicide of Ms. Riley.
 5         Handle 1 is saying, "SO," which I believe to mean "shout
 6    out," "to my brother at EnvyDaHussle."
 7    Q.   Use the acronym.
 8    A.   Excuse me.  Oh, sorry.  "Shout out to Handle 3."  I
 9    apologize.
10    Q.   And did anything about this photograph stand out to you?
11    A.   Yes.
12    Q.   And what was that?
13    A.   It appeared to be Individual 1.
14    Q.   Did this photo appear -- had you seen this individual in
15    any other photos already?
16    A.   Yes.
17    Q.   And what photos were those?
18    A.   Other Instagram photos, YouTube -- various YouTube videos
19    and snapshots of YouTube videos.
20    Q.   And did you eventually identify this as Individual 1's
21    Instagram handle?
22    A.   Yes.
23    Q.   Can you explain to me how you were able to -- just a
24    summary -- connect Group A, this Instagram handle, and
25    Individual 1?

1   A.    Repeat that.  I got a little --

2   Q.    If you can just summarize the way that you walked through

3   connecting Group A, Handle 1 and Handle 3 and Individual 1.

4   A.    Okay.  So it started with, as mentioned earlier, the Google

5   searches of Group A that identified, in numerous sources, both

6   by name and picture of the two front men, who are Individual 1

7   and Individual 7 and also the founders of the group.

8         Also, as Detective Decker mentioned, a person with Handle 1

9   also was connected to -- within Group A, I mean -- excuse me --

10  within Handle 1's Instagram page, there was more mention of

11  Group A and this particular individual, Individual 1.

12  Q.    Did you notice any unique characteristics of Individual 1?

13  A.    Yes, I did.

14  Q.    And can you tell me, from this photo, or if it would be

15  helpful to look at your entire report, what were some of those

16  unique characteristics?

17  A.    Well, not so much in this photo but in others, he

18  definitely had -- I don't know if it was a chipped tooth or a

19  mostly missing tooth, but he did not have nice upper teeth at

20  all, from, at least, two or three different photographs that

21  Detective Decker had, and both YouTube and Instagram, and

22  compared with Mr. Wondie's, who seems to have fairly nice teeth.

23        He also had a distinct freckle on the middle of his nose.

24  He had braided hair, pulled back hair and a high forehead, and

25  his beard went up a little bit higher than Mr. Wondie's.

1   Q.   If we could pull up what's been marked for identification

2   as Defense Exhibit 163, do you recognize this photo?

3   A.   Yes.

4   Q.   And where have you seen this photo?

5   A.   That is the Instagram page for Group A.

6   Q.   Was this part of the records you reviewed that were in

7   Detective Decker's possession?

8   A.   Yes, it was.

9   Q.   Have you also reviewed the video that's associated with

10  this Instagram post?

11  A.   Yeah.  That's a snapshot from a YouTube video.

12  Q.   Okay.

13       This video has been previously admitted as Defense Exhibit

14  155.  I would just note that.

15       I'm going to now show you what has been marked for

16  identification as Defense Exhibit 164.  Do you recognize this?

17  A.   Yes.

18  Q.   And can you tell me what this is?

19  A.   This is Individual 1 from Group A's Instagram page.

20  Q.   And is this screenshot of the video that has been

21  previously admitted?

22  A.   Yes.

23            MS. BRIN:  We would move to admit Defense Exhibit 164.

24            MS. BECKER:  No objection.

25            THE COURT:  It's admitted.

1             (Exhibit 164 admitted.)

2    Q.    (By Ms. Brin)  And, Mr. Stortini, do you recognize this

3    person?

4    A.    Yes.  That's Individual 1.

5    Q.    How do you recognize him?

6    A.    From all the other ways I was able to identify him, in

7    social media and news publications.

8    Q.    I'm going to move on to what's been marked as Defense

9    Exhibit 165.

10          So you have an unredacted copy of this, I hope, in your

11   witness binder, but it also may be possible that you recognize

12   it from the text at the bottom.

13          Do you know what this is?

14   A.    I recognize the Bates stamp numbers as a YouTube video.

15   Q.    And was this a YouTube video that was available to

16   Detective Decker as well?

17   A.    Yes.

18   Q.    Moving to Exhibit 166 for identification, do you recognize

19   this?

20   A.    That's the photograph -- that's a still photo from that

21   YouTube video.

22   Q.    Okay.  And same questions, Mr. Stortini:  Do you recognize

23   that person?

24   A.    Yes.  That's Individual 1.

25   Q.    And how do you recognize him?

1    A.    Again, from seeing his photo in various publications where

2    he has been named, and also through Instagram.

3    Q.    And, Mr. Stortini, is that Mr. Wondie?

4    A.    No, it's not.

5    Q.    And, again, Mr. Stortini, the YouTube video that you

6    watched, all of the YouTube videos that we've discussed, as well

7    as the still shots, those were all available to Detective Decker

8    prior to her search warrant, correct?

9    A.    Yes.

10   Q.    And I am going to show you what's been marked for

11   identification as Defense Exhibit 167.

12         MS. BRIN:  Actually, Your Honor, before I do this, I

13   want to just lay the foundation.

14   Previously admitted Government's Exhibit -- I believe it is

15   53.

16         THE COURT:  Fifty-three, according to my records, has

17   note been admitted.

18         MS. BRIN:  I apologize, Your Honor.  It is

19   Government's Exhibit 26, previously admitted.

20   Q.    (By Ms. Brin)  And do you recognize this as the -- on the

21   upper left, a photo of Mr. Wondie that's allegedly taken from

22   Facebook?

23   A.    Yes.

24   Q.    Okay.  And now if we could go back to what's been marked

25   for identification as Defense Exhibit 167.

1        Do you recognize that photo?

2    A.    Yes, I do.

3    Q.    And is that the same photograph?

4    A.    Yes.

5             MS. BRIN:  I move to admit Defense Exhibit 167.

6             THE COURT:  Any objection?

7             MS. BECKER:  No, Your Honor.

8             THE COURT:  It's admitted.

9                      (Exhibit 167 admitted.)

10   Q.    (By Ms. Brin)  I'm going to have you look at one final set

11   of photos, Mr. Stortini, and this has been marked for

12   identification only, I believe, Defense Exhibit 168.

13            MS. BRIN:  And, Your Honor, at this time we would move

14   to admit this, if it has not been previously admitted, as a

15   demonstrative.

16            THE COURT:  It think it's already been admitted.

17            MS. BECKER:  Either way, the government has no

18   objection.

19            THE COURT:  All right.  I'll grant the admission.

20                      (Exhibit 168 admitted.)

21            MS. BRIN:  Thank you, Your Honor.

22   Q.    (By Ms. Brin)  Mr. Stortini, could you walk me through some

23   of the things that, as an investigator, would help you identify

24   these individuals either as each other or not each other?

25   A.    Yes.

1      So I what I would look for is -- well, in the case of --

2  the obvious one, the teeth that you see is a big difference.  I

3  already mentioned the freckle on the center of the nose that's

4  very pronounced.  Mr. Wondie has a small mark on his left cheek,

5  and the other gentleman does not.  Their face is shaped much

6  differently.  The hairline for Individual 1 is higher on the

7  forehead, and his hair appears to be, to me, braided.

8  Q.    And in the photos of the individual on the bottom, who is

9  Mr. Wondie, does it appear that Mr. Wondie's facial hair grows

10  up onto his cheeks?

11  A.    It appears to sit just to this part of his jaw, and go no

12  higher.

13  Q.    Mr. Stortini, I'm going to just draw your attention to the

14  photograph on the upper right.

15      As an investigator, if you believed that that wasn't a

16  particularly clear shot of an individual, would you use that as

17  an identification tool?

18  A.    No.

19  Q.    Mr. Stortini, in total, how long did it take you to confirm

20  that the individual in the Group A photo used by Detective

21  Decker was not Mr. Wondie?

22  A.    I mean, I think I put in my memo "90 minutes," but it took

23  me to get to 90 minutes to be absolutely, completely certain.  I

24  mean, I was fairly certain early on, within 15 minutes, but

25  within 90 minutes I felt completely comfortable saying that it

1   was 100 percent not Mr. Wondie and 100 percent Individual 1.

2   Q.   And you said after about 15 minutes you were pretty sure.

3   Why did you continue to do whatever it was you did to try to

4   confirm that?

5   A.   Well, I wanted to be able to go through everything that --

6   not just what was in social media but what Detective Decker had.

7   I wanted to see -- I just wanted to make sure I wasn't missing

8   anything.

9   Q.   I'm going to move to a totally different topic with you

10  now, Mr. Stortini, and I will be very brief.

11       At some point did we ask you to investigate another issue

12  about this case?

13  A.   Yes.

14  Q.   I'm showing you what's been previously marked as

15  Exhibit 135, and if we could go to page 3.

16       Are you familiar with this document?

17  A.   Yes.

18  Q.   And at some point were you asked to investigate one of the

19  incidents referenced in this document?

20  A.   Yes.

21  Q.   And which incident was that?

22  A.   The second paragraph, the 2018 incident.

23  Q.   And now if we could go to Exhibit 141.

24       Mr. Stortini, what did you learn about that 2018 incident?

25  A.   That it was a shots-fired incident involving a black male

1   suspect, I believe, in a Cadillac, if I recall.

2   Q.   I'm showing you what's been previously admitted as Defense

3   Exhibit 141.

4        Did you have the opportunity to review this police report?

5   A.   Yes, I did.

6   Q.   Okay.

7        And at some point did you do additional investigation on

8   this specific police report?

9   A.   Yes.

10  Q.   Did you learn the name of the individual -- without saying

11  it -- who is associated with this incident?

12  A.   Yes.

13  Q.   Did you do any further investigation on that individual?

14  A.   Yes, I did.

15  Q.   And can you tell us what you learned?

16  A.   Sure.

17        I served a subpoena on the Seattle Police Department

18  Records Unit for any police reports, I think, spanning back to

19  2005 through December of 2018.  I didn't worry about anything

20  that occurred after 2018.

21            MS. BECKER:  Your Honor, I'm going to object to this

22  line of questioning.  There's no evidence that the documents or

23  the investigation that he's going to be talking about was ever

24  in the possession of Detective Decker or that she was made aware

25  of it.

1          MS. BRIN:  Your Honor, that's exactly the point of

2    this cross-examination.  The investigation Mr. Stortini did

3    actually revealed that another individual, who had prior gun

4    charges, including for a Smith & Wesson .40 caliber, was

5    implicated in this.

6          And so this is, as Mr. Oesterle and Detective Decker were

7    going through the timeline of her affidavit, the 2017 incident

8    is associated with Mr. Wondie.

9          The 2018 incident, she did not associate with anybody in

10   her affidavit, and then her next entry was to associate

11   Mr. Wondie with Group A via her misidentification.

12         The point of this inquiry is to show that had she,

13   basically, accessed any of what was available to her, the

14   individual, who was a subject, also had a prior history that

15   would have indicated that he may have been in possession of this

16   weapon as well, which was not included in her affidavit.

17         THE COURT:  The nature of the hearing that we have

18   before this court, regardless of which standard the court were

19   to apply, would be a basis for the court overruling the

20   objection, and I'll allow counsel limited latitude to continue

21   this line of examination.

22         MS. BRIN:  Thank you, Your Honor.  I'll be very brief.

23   Q.   (By Ms. Brin)  Mr. Stortini, did you come to learn that the

24   individual who was a subject in that 2018 incident had prior

25   incidences of firearm issues with SPD?

1    A.    Yes.

2    Q.    And can you tell us what kinds of firearms those were, if

3    you remember?

4    A.    The types of firearms?

5    Q.    Uh-huh.

6    A.    In each of the three cases where a gun was taken off of his

7    person, he had a 9mm in one case, a semiautomatic Smith & Wesson

8    .40 caliber semiautomatic and a Glock 20 10mm semiautomatic, and

9    then in 2011, a Glock 19 9mm semiautomatic.

10   Q.    And, again, Mr. Wondie was not mentioned in any of the

11   documents that you received?

12   A.    No.

13   Q.    And as you said, you subpoenaed only information that would

14   have been available to Detective Decker, correct, before her

15   affidavit?

16   A.    Correct.

17             MS. BRIN:  Your Honor, I have no further questions.

18             THE COURT:  Cross-examination?

19             MS. BECKER:  Your Honor, the government has no

20   questions for this witness.

21             THE COURT:  Thank you, sir.  You may step down.

22             MR. HAMOUDI:  So, Your Honor, we do have one more

23   witness, with brief testimony, Mr. Noedel.

24             THE COURT:  Let's get him started, counsel.  We'll

25   stop at our normal hour, unless you can give me an honest and

```
 1   reasonable projection of how long this witness's testimony will

 2   take.

 3          MR. HAMOUDI:  Your Honor, I promise, 20 minutes.

 4          THE COURT:  We're going to stop at 4:30.

 5      And the witness's name, counsel?

 6          MR. HAMOUDI:  Matthew Noedel.

 7          THE COURT:  Please step forward.

 8                         MATTHEW NOEDEL,
          having been first duly sworn, testified as follows:
 9

10          THE CLERK:  Please state your name for the record, and

11   spell your first and last names for the court reporter.

12          THE WITNESS:  Matthew Noedel, N-o-e-d-e-l.

13          THE COURT:  You may inquire.

14          MS. BECKER:  Your Honor, before this inquiry begins,

15   the government has an objection to this testimony.

16      Mr. Hamoudi and Ms. Brin contacted us and asked us to

17   stipulate to Mr. Noedel's report and indicated that they

18   wouldn't call him as a witness if we did so.  We agreed to do

19   so.  We also entered a written stipulation that I expect to be

20   filed later today.

21      So everything that I'm expecting him to testify about, we

22   have stipulated to, as they have requested.  If he is going to

23   testify beyond that, then we have not been provided with expert

24   notice as required by the rule.

25          THE COURT:  Counsel?
```

1        MR. HAMOUDI:  Yes, Your Honor.  We were notified, just

2   a few weeks ago, that the casing from 2017 has been discarded

3   and destroyed.  And this was a recent revelation, after two

4   years of discovery disputes, asking the government to disclose

5   all NIBIN-related materials to us.  And what that revealed is

6   that the government did not inquire with the Seattle Police

7   Department whether this casing ever existed.

8        I think it's important for the court to hear about the

9   significance of the destruction of this piece of evidence, in

10  light of the record before the court.  And that's why I said to

11  Your Honor that I would only ask approximately 20 minutes, and

12  I'd be done with this witness.

13       THE COURT:  Was the summary of this witness's

14  testimony beyond the stipulation provided to counsel from the

15  government?

16       MR. HAMOUDI:  It is -- with respect to the destruction

17  of the casing, yes.  He can't -- he's got to be asked the

18  question about what is the significance of the casing being

19  destroyed for the purposes of this case, and there's no

20  stipulation as to that.  But if they want to reach a stipulation

21  as to that, I'll agree to one.

22       THE COURT:  Counsel, I'm not going to get in the

23  middle of negotiations between you and government's counsel over

24  what the stipulation may or may not provide.  I haven't seen the

25  stipulation as of yet.

1           So we're close enough to 4:30.  I'll give the parties the

2   chance to meet and confer, see if you can resolve your

3   differences, and even avoid the necessity of this witness

4   testifying.  If not, we'll resolve it first thing tomorrow

5   morning at 9:00 a.m.

6           MS. BECKER:  I just want to clarify, if I might, Your

7   Honor?

8       To the extent that he's going to testify beyond his report,

9   we have not received the notification as required by Rule 16.

10          MR. HAMOUDI:  The report was prepared, Your Honor,

11  just so we're clear, January 6, 2021.  We were notified in May

12  2021 that the casing had been discarded, late May.  And so he

13  could not opine about something he did not -- it's after his

14  report.

15          THE COURT:  All right.  Well, counsel, I'll give you a

16  chance to exchange whatever documentation the parties believe

17  that you have or don't have or what was disclosed or what wasn't

18  disclosed, and then we'll address this first thing tomorrow

19  morning.  But I don't want to spend court time with you or with

20  the parties with differences of opinion about what this witness

21  may or may not be able to testify.

22      If you can reach a stipulation, fine; if not, we'll deal

23  with it first thing tomorrow.

24          Have a good evening.  We'll be in recess.

                    (Proceedings adjourned at 4:30 p.m.)

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


        Dated this 8th day of July 2021.


        /S/  Nancy L. Bauer

        Nancy L. Bauer, CCR, RPR
        Official Court Reporter