UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

───────────────────────────────────────────────

UNITED STATES OF AMERICA,            )
                                     ) CASE NO. CR18-315-RAJ
                    Plaintiff,       )
                                     ) Seattle, Washington
v.                                   )
                                     ) June 22, 2021
GIZACHEW WONDIE,                     ) 9:00 a.m.
                                     )
                    Defendant.       ) *FRANKS* HEARING
                                     ) Part 2 of 2
                                     )
                                     )

───────────────────────────────────────────────

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD A. JONES
UNITED STATES DISTRICT JUDGE

───────────────────────────────────────────────

APPEARANCES:


  For the Plaintiff:        ERIN BECKER
                            JAMES OESTERLE
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


  For the Defendant:        MOHAMMAD HAMOUDI
                            SARA BRIN
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 98101


  Reported by:              NANCY L. BAUER, CCR, RPR
                            Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov

EXAMINATION INDEX

EXAMINATION OF                                              PAGE

  MATTHEW NOEDEL     DIRECT EXAMINATION                   197
                     BY MR. HAMOUDI

                     CROSS-EXAMINATION                    202
                     BY MS. BECKER

                     REDIRECT EXAMINATION                 223
                     BY MR. HAMOUDI




  DEFENDANT'S CLOSING ARGUMENT BY MS. BRIN           241

  GOVERNMENT'S CLOSING ARGUMENT BY MS. BECKER        263

  DEFENDANT'S REBUTTAL ARGUMENT BY MS. BRIN          284

  DEFENDANT'S CLOSING ARGUMENT BY MR. HAMOUDI        288

  GOVERNMENT'S CLOSING ARGUMENT BY MR. OESTERLE      314

  DEFENDANT'S REBUTTAL ARGUMENT BY MR. HAMOUDI       330


EXHIBIT INDEX

EXHIBITS ADMITTED                                           PAGE
      79                                                    213
      80                                                    213
      170                                                   199

```
1                        PROCEEDINGS

2        _____

3             THE COURT:  Good morning, please be seated.

4             THE CLERK:  We are here in the matter of the United

5    States versus Gizachew Wondie, Cause No. CR18-315, assigned to

6    this court.

7          Counsel, please make your appearances for the record.

8             MS. BECKER:  Good morning, Your Honor.  Erin Becker

9    for the United States, alongside co-counsel Jim Oesterle.  Also

10   Jordan Clark will be present periodically.  Thank you.

11            THE COURT:  Good morning.

12            MR. HAMOUDI:  Good morning, Your Honor.  Mohammad

13   Hamoudi, along with Sara Brin and Patricia Stordeur from the

14   Federal Defender's Office.  We're joined by our investigator,

15   Michael Stortini, Mr. Gizachew Wondie and his family.

16            THE COURT:  Good morning, all of you.

17         As we closed business yesterday, there was an issue that

18   appeared to have been unresolved.  Did the parties work out

19   their differences?

20            MR. HAMOUDI:  We're going to put on Mr. Noedel's

21   testimony, Your Honor, and if the government has objections as

22   he's testifying, we can address them on an ongoing basis.

23            THE COURT:  All right.  If that's satisfactory, I

24   believe we had him identify himself by name, and we had an

25   objection shortly after that, so I think we can pick up from
```

 1  there, counsel.

 2                      MATTHEW NOEDEL,
        having been previously sworn, testified as follows:
 3

 4                    DIRECT EXAMINATION

 5  BY MR. HAMOUDI:

 6  Q.   Mr. Noedel, good morning.

 7  A.   Good morning.

 8  Q.   Can you tell us a little bit about your background, sir?

 9  A.   Yes.

10       So I've been working in forensic science for over 30 years.

11  I started with a private toxicology company in California, where

12  I worked for three years before coming to the Washington State

13  Patrol Crime Laboratory.

14       In 1990, I went into the crime laboratory working as a

15  chemist and trace evidence and microscopy analyst, and so I was

16  studying small particles and doing drug analysis, as well as

17  responding to crime scenes.

18       In about the first five years of my employment with the

19  State Patrol, I transferred into the Firearm and Toolmark

20  Examination Unit, where I worked for the next 10 years.

21       After a total of 15 years at the Washington State Patrol

22  Crime Laboratory, I started my own consulting business called

23  Noedel Scientific, and I've been working as an independent

24  consultant in forensic analysis for the past 16 years beyond my

25  time with the State Patrol.

1          In support of that career path and profession, I'm a member

2    of a number of professional organizations; one important one is

3    called AFTE, A-F-T-E, which stands for the Association of

4    Firearm and Toolmark Examiners.  I'm a distinguished member of

5    that organization and the former editor of the scientific

6    journal that we produce.

7          That organization is an association of about a thousand

8    practicing firearm examiners, and we study the microscopic

9    features that are connected to comparing and identifying

10   firearms, cartridge cases, projectiles, bullets, and studying

11   the performance of all of those components.  Anything that can

12   be connected to the discharge of firearm may come the way of a

13   firearm and toolmark examiner like myself.

14         I am certified by that organization in firearms, toolmarks,

15   and gunshot-residue analysis.  I'm also, I may have mentioned, a

16   distinguish member of that organization.

17         Beyond that, I'm a member of number of professional

18   organizations.  I participate in standardization committees

19   within the field of forensic science, and continue to work in

20   those capacities annually and throughout my career.

21         And so that's a nutshell of my short, short resumé.

22   Q.   Thank you.

23         Did you prepare a declaration that was, in this particular

24   case -- in Mr. Wondie's case, after reviewing materials that

25   were provided to you?

1  A.   Yes, I did.

2  Q.   Okay.  Do you stand by that declaration?

3  A.   I do.

4  Q.   Okay.

5         MR. HAMOUDI:  At this point, marked for identification

6  Exhibit 170 and move to admit it, Your Honor.

7         THE COURT:  Any objection?

8         MS. BECKER:  No, Your Honor.  Thank you.

9         THE COURT:  It's admitted.

10                  (Exhibit 170 admitted.)

11 Q.   (By Mr. Hamoudi)  I want to focus in this declaration on a

12 couple of topics.  Under the heading, "NIBIN program

13 description," you discuss -- you say the following:  "Because

14 the computer may return false positive associations, any

15 computer suggestion must be evaluated by direct microscopic

16 examination of the actual cartridge cases.  This exam must be

17 conducted by a trained firearm and toolmark examiner."

18      Do you see that?

19 A.   I do.

20 Q.   Can you explain to us what is a false positive?

21 A.   So in terms of the NIBIN program, the computer association

22 program, a false positive would be any time the computer

23 suggests that two items have similarities, but, in fact, we,

24 during direct examination, find that they are not, in fact,

25 associated and not from a common source.

1      So, in general, a false positive is when an examination
2   returns the wrong results, it's the wrong answer, but it says
3   two things are associated.  So it claims a positive association,
4   but in further testing, that turns out to be not true, and
5   that's what a false positive is, in terms of a NIBIN comparison.
6   So when the computer suggests a correlation that is proven to be
7   false in direct exam.
8   Q.   What is the significance of a false-positive association in
9   your training and experience?
10  A.   False positives are a very dangerous condition in any
11  forensic discipline because it indicates that the wrong
12  association has been made, and then, of course, a wrong
13  association can be carried through into legal proceedings and
14  potentially harm someone's life and liberty if falsely
15  associated with a particular event.
16  Q.   In your declaration, you state, "The NIBIN administration
17  placed an emphasis on obtaining fast results."  Do you remember
18  that?
19  A.   Yes, I do.
20  Q.   Can you talk to us about the idea of obtaining fast result
21  in the context of your training and experience with respect to
22  your discipline of firearm examination?
23  A.   In general, firearm and toolmark comparisons and
24  identifications are not something that should be rushed, and so
25  I'm also concerned when the emphasis is put on the speed of

1    analysis rather than the correct analysis or the thoroughness of

2    analysis.

3         When we take shortcuts in forensic evaluations, it tends to

4    create mistakes, and mistakes are not acceptable in the level of

5    work that we are providing to the legal community.

6    Q.   I want to ask you a hypothetical.

7         You reviewed the NIBIN lead in this case, correct?

8    A.   Yes.

9    Q.   The NIBIN lead involved -- we can bring up Exhibit 135.  Do

10   you remember this document, this NIBIN lead?

11   A.   Yes, I do.

12   Q.   And in this document, it describes three exhibits, correct?

13   A.   Yes, it does.

14   Q.   Okay.  And hypothetically speaking, as a hypothetical, if

15   Exhibit 7164651-1TF was discarded shortly after the test-fire,

16   what is the forensic significance of that event?

17   A.   So the significance of having that component discarded

18   means unless a confirmation by a trained microscopist has

19   already been completed, that it can't be completed until a

20   test-fire is generated.

21        The destruction of the test-fires means that we cannot

22   confirm or refute the computer's suggestion that is offered on

23   this lead notification.

24             MR. HAMOUDI:  I have no other questions, Your Honor.

25   Thank you.

1    THE COURT:  Cross-examination?

2    MS. BECKER:  Thank you.

3    CROSS-EXAMINATION

4    BY MS. BECKER:

5    Q.   Mr. Noedel, before we get very far, I want to ask you some

6    questions about terminology, to make sure that we're on the same

7    page.

8    A.   Sure.

9    Q.   And they're specific to NIBIN.

10   First, am I correct that the word "acquisition" is used to

11   describe the process of a technician inputting a casing into an

12   instrument so that it can be thoroughly photographed?

13   A.   Yes.  Acquisition is the process of a technician acquiring

14   the data, inputting the data.

15   Q.   And by "the data," we're talking about high-definition

16   imaging, correct?

17   A.   Yes.  The computer takes images.  The operator also puts

18   the names and the calibers and the qualifying information, and

19   then the computer takes the high-definition photographs

20   connected to that input.

21   Q.   And then the next step for would be for that image and data

22   that's been acquired to put into the database of images; is that

23   correct?

24   A.   Correct.  During the acquisition process, all that

25   information is stored and put into the computer database.

1  Q.    All right.

2        Then there's the word "correlation," and I'm understanding

3  from your report that a correlation is a comparison of two

4  images believed to be -- I guess "belief" is the wrong word if

5  we're talking about a computer -- but images generated by a

6  computer as a potential match.

7  A.    Generally correct.  Correlation is the process the computer

8  uses to compare all of the images in the database that the user

9  has defined.  For example, a computer won't compare 9mm to .40

10 calibers.

11       So the collaboration process is the computer sorting

12 through, and the correlation returns results whether there is

13 actually a lead or a comparison, something worthy of comparison

14 or not.  It simply returns, during correlation, the things the

15 computer thinks are best, and it provides a list of

16 candidates --

17 Q.    A rank list?  I'm sorry.  I didn't mean to cut you off.

18 A.    A list of candidates to consider.

19 Q.    And that's a ranked list?

20 A.    Yes, it's a ranked list.

21 Q.    All right.  And the correlation review is the next step,

22 and it would be technicians looking at the correlation suggested

23 by the computer, looking at the imaging provided by the computer

24 that was acquired to make an initial determination as to whether

25 those correlations were appropriate.

1   A.   Correct.  The correlation review is the first human

2   interaction after the computer has done its comparison.  The

3   correlation review is required because the computer will return

4   more results than what could be declared a lead or an

5   association.

6        So the operator, the technician has to sort through the

7   computer offerings to narrow down what that operator feels might

8   warrant further exams.

9   Q.   And that conclusion, in order to generate a lead, must be

10  confirmed by two technicians; is that correct?

11  A.   Correct.  The first technician reviews the correlation list

12  offered by the computer.  If that technician finds something

13  that he finds interesting, that he feels there is an

14  association, he can then send that to a second human to review

15  the photographs that he's selected, and the second person can

16  then review the correlation selected by the first person.

17  Q.   And then if those two individuals agree with those

18  correlations, they can generate what's called a lead

19  notification, which is sent out to the investigators who are

20  working on the cases that resulted in the input of images that

21  have been correlated, correct?

22  A.   Correct.

23       This is one of the processes that has been expedited.  Once

24  those two individuals agree that the photographs offered by the

25  computer warrant further examination, they issue a lead

1    notification.

2         Because those two analysts do not have to look at the

3    physical evidence directly, they're looking at photographs,

4    they can do that process quickly and provide it to detectives or

5    investigators quickly, before the confirmation process.

6    Q.   And you've referred, just now, to the confirmation process,

7    and that's the process of forensic scientists trained in

8    toolmark and firearm examination, looking at not just the

9    photographs and the images that have been acquired, but by

10   looking at the actual casings under a microscope and comparing

11   them?

12   A.   Correct.  The confirmation step is required, and it is the

13   last step of the process, where a trained examiner can either

14   agree with the association, or refute the association.  And

15   that's the step that is necessary so that we have a scientist

16   who can consider all of the ins and outs of microscopic

17   comparisons.

18   Q.   Confirmation is also called a match?

19   A.   Confirmation is not a match.  If a computer suggestion is

20   confirmed, it would be called, by the laboratory, an

21   "identification."  The crime laboratory and the Association of

22   Firearm and Toolmark Examiners, we have three results:

23   Identified, eliminated, or inconclusive.  And so if an examiner

24   compared the actual exhibits suggested by the computer and found

25   them to be of common source, the word would be "identification."

1    The cartridge cases would be identified to each other.

2    Q.    So you're telling us the word that a scientist would use

3    under the NIBIN framework, "match" would be another word to

4    describe a confirmation?

5    A.    Confirmation can only exist when a firearms examiner has

6    studied the exact specimens.

7    Q.    I understand the definition of "confirmation," Mr. Noedel.

8    What I'm asking you is, under the NIBIN framework and the NIBIN

9    guidelines that the word "match" is commonly used to describe a

10   confirmation as well.

11   A.    In my experience, people use the word "match" to describe

12   the associations pulled by the computer.  So, yes, a technician

13   may use the word "match" during their analysis of the event.

14   Q.    And the word that is also used is "hit"; is that correct?

15   A.    Yes.

16   Q.    Now, I'm understanding you to say that the words "hit" and

17   "match" are more appropriately associated with correlations and

18   not confirmations; is that correct?

19   A.    That's correct.

20   Q.    So I see in your report that's been admitted as Exhibit 170

21   that you refer on page 6 to a document called, "Minimum Required

22   Operating Standards for National Integrated Ballistic

23   Information Network Sites"; is that correct?

24   A.    Yes.

25   Q.    Do you have a copy of that document in front of you?

1   A.   I do not have that document with me.

2          MS. BECKER:  Your Honor, I brought a copy of that

3   document.  May I approach Mr. Noedel and defense counsel to

4   provide a copy?

5          THE COURT:  You may.  Do you have that copy

6   electronically, counsel?

7          MS. BECKER:  Unfortunately, I do not for today.

8          THE COURT:  All right.  Show it to counsel first.

9          MS. BECKER:  I'm going to give them a separate copy.

10          THE COURT:  Okay.

11          THE CLERK:  This will be marked Exhibit 83.

12   Q.   (By Ms. Becker)  Do you have that document in front of you?

13   A.   Yes.

14   Q.   Is this the document that you were referring to on page 6

15   of Exhibit 170?

16   A.   I believe it is.  I'm looking at my reference.  I just have

17   it as "Government File 133576."  The title is correct and

18   matching.

19          So I pulled this from -- this reference from the Internet.

20   So I'm going to assume that this is, in fact, the matching

21   document that I reference in page 6.

22   Q.   All right.  And that is a document created by ATF?

23   A.   Yes, it is.

24   Q.   And it provides a list of definitions of terms?

25   A.   Yes, it does.

1   Q.   On page 3, there is the definition of a "NIBIN hit,"

2   correct?

3   A.   Yes.

4   Q.   And it defines "NIBIN hit" as "a result of two or more

5   firearm ballistic acquisitions that have been confirmed as a

6   match by a firearms examiner.  NIBIN hits are based on

7   correlation review of digital images using MatchPoint Plus and

8   microscopic confirmation by a firearms examiner.  This

9   information and intelligence can be used for investigative

10  purposes, and is suitable for court purposes."

11       Is that ATF's definition of a "hit"?

12  A.   Yes.

13  Q.   And then under ATF's definition, a "hit" and a "match" and

14  a "confirmation" are all the same thing.

15  A.   I disagree.

16  Q.   You disagree that those are the words that are in the ATF's

17  report?

18  A.   I do not disagree with the words in the report.  One of the

19  elements that you read through reads, "and microscopic

20  confirmation by a firearms examiner."  A firearms examiner is

21  someone who studies firearm and toolmark examinations as a

22  profession, as stated in things like the AFTE guidelines.

23       So when you have the computer suggestions confirmed,

24  microscopically confirmed by a firearms examiner, then you have

25  intelligence that can be used for investigative purposes and is

1    suitable for court purposes.

2         So it's my interpretation that a microscopic confirmation

3    by a firearm examiner is the confirmation process, the third

4    element after correlation conducted by an actual scientist

5    looking at the actual exhibits.

6    Q.   And ATF defines that as a "NIBIN hit."

7    A.   Yes; for example, in the same document --

8    Q.   What I asked you was:  They define it as a "NIBIN hit"?

9    A.   Yes.  A microscopic confirmation by a firearms examiner is

10   a NIBIN hit.

11   Q.   And they also call that a "match" in the same definition?

12   A.   Yes, yes, they do call that a "match."

13   Q.   So it seems there is some confusion between the terminology

14   the ATF uses -- "hit," "match," and "confirmation" -- and what

15   you understood is that "hit" and "match" are the same as a

16   correlation?

17   A.   Well, I disagree that there's confusion.  It clearly says

18   "microscopic confirmation."  So, for me, "hit" and "match" are

19   not confusing.  This definition that you're citing specifically

20   mentions a firearm examiner, which is also defined in this

21   document.

22   Q.   Thank you.

23        Mr. Noedel, I want to go back to talking about acquisition,

24   correlation, and correlation review for a moment, if I could.

25   A.   Sure.

1          MS. BECKER:  Victoria, do we already have an Exhibit

2     80 and 81?

3          THE CLERK:  Those numbers are reversed.

4          MS. BECKER:  Thank you.  Your Honor, I have two images

5     that I'd like to mark as 80 and 81.  May I approach?

6          THE CLERK:  79 and 80 are available.

7          MS. BECKER:  I'll take 79 and 80, if I might.

8          THE COURT:  Again, counsel, do you have these

9     documents electronically?

10         MS. BECKER:  I'm sorry, Your Honor, I do not.

11         THE COURT:  Okay.

12    Q.   (By Ms. Becker)  Mr. Nobel, do you have in front of you

13    Exhibits 79 and 80?

14    A.   Yes.

15    Q.   I want to just start by looking at Exhibit 80 for a moment,

16    if I may.

17    A.   Okay.

18    Q.   Does this appear to be a photograph taken of a cartridge

19    case?

20    A.   This is, yes, the head-stamp area of a fired cartridge

21    case.

22    Q.   All right.  And when we're talking about the acquisition of

23    data by NIBIN, we're not talking about anything that looks like

24    this in Exhibit 80, right?

25    A.   Correct.

1   Q.   This appears to be a photograph taken with an ordinary

2   camera?

3   A.   Yes.

4   Q.   Turn to Exhibit 79.  This also appears to be an image of a

5   cartridge case; is that correct?

6   A.   I believe this is two images placed side by side.

7   Q.   Perfect.

8        And we're talking about the same general area that was in

9   Exhibit 80, correct?

10  A.   Yes.  This appears -- well, this appears to be a

11  magnification of the central portion of Item 80.  That portion

12  is called the primer, and this is a close-up image of the

13  microscopic information on a primer.

14  Q.   And Exhibit 79 better demonstrates the kind of precision --

15  precise images that the BrassTRAX, the instrument used to

16  acquire images, produces?

17  A.   Yes.  It appears that the images on Exhibit 79 are images

18  taken directly from the computer, and this is the type of detail

19  and information that the computer returns for the technician to

20  evaluate.

21  Q.   All right.  And you would agree that this photograph is

22  exceptionally detailed, especially in comparison to Exhibit 80?

23  A.   Yes.  It is far more detailed than No. 80 and does contain

24  useful detail.

25  Q.   And you described for us that this, in fact, appears to be

1  two images side by side, and I see, if we're looking just at the

2  photograph in the middle, kind of the white line vertically

3  through the image, towards the left side?

4  A.   Yes, if I could --

5  Q.   Is the portion to the left of that white line one image,

6  and the portion to the right another image?

7  A.   Yes.  So imagine that we're looking at 25 percent of the

8  left image, the dividing line, and about 75 percent of the right

9  image, and the dividing line separate -- they would be overlaid,

10  and the dividing line lets us see both exhibits at the same

11  time.

12  Q.   And someone who is doing a correlation of review can move

13  that white line to the left and to the right to see other parts

14  of the two images side by side to assist in making that

15  correlation review and generating a lead?

16  A.   Yes, they can.

17  Q.   And although not shown in this photograph, in addition, the

18  examiner can manipulate the photograph to exaggerate the

19  striations and grooves to get a better sense of whether they

20  are, in fact, similar?

21  A.   Yes.  The technicians do have limited resources in tools to

22  enhance and diminish contrast and lighting.

23  Q.   And that helps them, more than just the naked eye does,

24  determine whether a correlation and a lead is appropriate?

25  A.   I'm not sure if I'm tracking properly.  Ultimately --

1    Q.    I'm happy to ask it a little bit differently.

2    A.    Okay.  Thank you.

3    Q.    You would agree that this is far more detail than what we

4    see just merely in Exhibit 80?

5    A.    Yes, yes.  This close-up image is much better --

6    Q.    All right --

7    A.    -- at --

8    Q.    We've just been talking about images and photographs --

9              THE COURT:  Counsel, let's slow down and not

10   interrupt --

11             MS. BECKER:  Thank you.

12             THE COURT:  -- the witness --

13             MS. BECKER:  I apologize.

14             THE COURT:  -- so we have a complete record.

15             MS. BECKER:  Thank you.

16             THE COURT:  Start again.

17             MS. BECKER:  Your Honor, I'd like to offer Exhibit 79

18   and 80 for illustrative purposes only.

19             THE COURT:  Any objection?

20             MR. HAMOUDI:  If only for illustrative purposes, Your

21   Honor.

22             THE COURT:  They're admitted for illustrative

23   purposes.

24                  (Exhibits 79 and 80 admitted.)

25             MS. BECKER:  Thank you.

1  Q.    (By Ms. Becker)  I'm going to start with what's been

2  admitted as the second page of Exhibit 136.  Do you have that in

3  front of you?

4  A.    It's not on the computer yet.

5  Q.    Better?

6  A.    Yes, I see "USA page 7492" in the lower right.

7  Q.    Yes, and you also see at the bottom right, "Defendant's

8  Exhibit 136-2"?

9  A.    Yes.

10 Q.    All right.  And at the top, this appears to be a document

11 generated in 2016; is that correct?

12 A.    That's correct.

13 Q.    And it indicates that -- excuse me.

14       On the next page, 136-3, which has also been admitted into

15 evidence, it attaches a NIBIN lead notification?

16 A.    Yes.  That's the title of the document.

17 Q.    And it indicates that it's generated by the Washington

18 State Patrol?

19 A.    Yes, it does.

20 Q.    And going back to the cover page, it indicates, "If a

21 microscopic confirmation is required, please inform the State

22 Patrol Crime Lab?

23 A.    Yes.

24 Q.    And it also indicates that not all leads require

25 confirmation; is that correct?

1    A.    That's correct.

2    Q.    And, finally, on the last page of this document, on 136-4,

3    it reads that "NIBIN leads cannot be utilized for the

4    establishment of probable cause"?

5    A.    Yes, it says that.

6    Q.    And it also asks, "if a hit confirmation is needed"?

7    A.    Yes, that is posed.

8    Q.    All right.  I want to look next at what's been admitted as

9    Exhibit 70.  Can you see that document?

10   A.    Yes, I do.

11   Q.    This also appears to be a document generated in 2016?

12   A.    Yes.

13   Q.    And it includes -- it appears to be an email from somebody

14   named Jennifer Tardiff at the Washington State Patrol Crime Lab?

15   A.    Yes.

16   Q.    And it appears that she's in the firearms section?

17   A.    That's true.

18   Q.    Do you know Ms. Tardiff?

19   A.    I do.

20   Q.    All right.  And she is, actually, a Washington State Patrol

21   Crime Lab employee, correct?

22   A.    Yes.  She's a NIBIN technician.

23   Q.    All right.  And her name is no longer Jennifer Tardiff?

24   A.    That, I don't know.

25   Q.    All right.

1    In her cover memo, she indicated that one of the fired

2    cartridge cases appears to be a match, correct?

3    A.   Yes.

4    Q.   And she also indicates that if she would like the hit

5    confirmed -- correct, she's referring to this as a hit?

6    A.   Yes.

7    Q.   And she also asks -- she also tells the recipients that if

8    they have any questions pertaining to the firearms or forensics

9    of this case, who they should contact; is that right?

10   A.   That's correct.

11   Q.   All right.

12   And then if we look at the next page of this same document,

13   70-002, it's called a "NIBIN hit notification," correct?

14   A.   Yes.

15   Q.   And this is a document that's different from the document

16   we just looked at, even though they were both generated in 2016?

17   A.   I think there was semantics differences in -- well, yes,

18   this is a different document.

19   Q.   All right.  At the top, it also includes "date of report"?

20   A.   Yes.

21   Q.   Implying that it's a report?

22   A.   That's true.

23   Q.   And at the bottom, although it says this is not a report,

24   it's a notification, it does not include that language that

25   "this is not sufficient for the establishment of probable

1    cause"; is that correct?

2    A.    It does not mention probable cause.

3    Q.    All right.  And although it calls itself a hit notification

4    at the top, it also asks whether hit confirmation is needed at

5    the bottom?

6    A.    Correct.

7    Q.    Let's look next at what's been admitted as Exhibit 51.

8    This appears to be -- I want you to ignore the top, because it's

9    just a more recent forwarding of this document, and look at this

10   email, which appears to have been sent in 2018; is that correct?

11   A.    Yes.

12   Q.    And it includes similar language, that if a microscopic

13   confirmation is needed to please contact the crime lab?

14   A.    Yes.  "For warrants or arrests, please, contact the crime

15   lab."

16   Q.    In particular, it says "if" it's needed?

17   A.    Yes, if a detective desires --

18   Q.    I'm asking what it says.

19   A.    Oh, okay.  Yes, it --

20   Q.    "If a microscopic confirmation is required, please contact

21   the crime lab."

22   A.    Well, it says more than that.  It says, "If a microscopic

23   confirmation is required for warrants, arrests, et cetera,

24   please contact the WSP Crime Lab."

25   Q.    Right.  And it also says, "Note:  Not all leads require

1    confirmation," correct?

2    A.    That's correct.

3    Q.    And it further advises that confirmation requests will be

4    addressed as routine casework?

5    A.    Yes.

6    Q.    There is not an explanation in here as to whether or how or

7    why something might be -- a confirmation might be required?

8    A.    No, there is no -- no guidance telling the user, who

9    submitted this information into the computer and had the

10   computer sort it, there's no -- there's no guidance there to say

11   whether or not you need, in your investigation, a confirmation.

12   That's left up to the user agency, whoever collected this

13   information and is doing the investigation.  This is work that's

14   being done in the NIBIN environment.  It's not a field

15   investigation.

16   Q.    Exactly.  Thank you.

17         On page 3, we again have a lead notification; is that

18   correct?

19   A.    Yes.

20   Q.    And that appears to have been sent and generated by the

21   Washington State Patrol?

22   A.    That's on the header, yes.

23   Q.    And it specifically references the laboratory's firearms

24   unit?

25   A.    It does.

1    Q.    And, again, it starts with "date of report," correct?

2    A.    Correct, yes.

3    Q.    And then moving down one page to page 4 of Exhibit 51, it

4    indicates that the images were reviewed by a operator/scientist?

5    A.    Yes, operator, slash, scientist, yes.

6    Q.    And it, in fact, lists two operator/scientists, both

7    Mr. Gonzalez and Mr. Jones; is that correct?

8    A.    That's correct.

9    Q.    Implying -- consistent with the policy of the State Patrol

10   Crime Lab not to push out a report unless it's been peer

11   reviewed; is that right?

12   A.    No, I disagree.

13   Q.    It certainly indicates that two people have done this

14   examination; is that right?

15   A.    Yes.  In this case, it's two operators.

16   Q.    But it indicates that they're operator/scientists?

17   A.    It's an either/or.  My interpretation is that is an

18   either/or choice; an operator, slash, scientist.  Certainly a

19   scientist can do this work.  In this case, it was operators that

20   did the work.

21   Q.    All right.  And, again, it does not include any language

22   suggesting that a confirmation is required for the establishment

23   of probable cause; is that right?

24   A.    The words "probable cause" do not exist in this warning.

25   Q.    All right.

1        So I want to take a slightly closer look at your report.

2   Do you have a copy of that in front of you?

3   A.    I do.

4   Q.    And that's Exhibit 170.  If you can turn to page 5 of your

5   report.  I'm sorry.  We don't have it loaded, so I need you to

6   look at the hard copy, unless counsel wants to bring up a copy

7   for your review.

8   A.    I have a copy of page 5.

9   Q.    Thank you.

10        And it includes your conclusions; is that right?

11  A.    Yes.

12  Q.    And one of your conclusions is that a lead notification is

13  not an official Washington State Patrol Crime Lab forensic

14  scientist report, correct?

15  A.    Yes.

16  Q.    And that's even though some of these documents indicate, at

17  the top, that they are generated by the Washington State Patrol

18  Crime Lab?

19  A.    Yes.

20  Q.    And that's even though, at the top, it indicates that it's

21  a report?

22  A.    Correct.

23  Q.    And that's so even though it indicates at the bottom that

24  it is generated by an operator, slash, scientist?

25  A.    Yes.

1   Q.   All right.

2       You also conclude that identifications made or

3   identifications -- I guess "identification" is the wrong word.

4       The lead notification is not, in fact, a match without a

5   required laboratory scientist examination?

6   A.   Yes.

7   Q.   And that is so, even though a cover memo from the

8   Washington State Patrol Crime Lab describes something as

9   appearing to be a match?

10  A.   Correct, that is included in their description.

11  Q.   All right.

12      And even though in the same document it's referencing

13  whether they have questions about forensics?

14  A.   Yes.

15  Q.   And, finally, it's your conclusion, Mr. Noedel that all of

16  this is confusing?

17  A.   Yes, I believe the NIBIN lead notifications, as they're

18  presented in this case, are confusing.

19  Q.   And, in fact, border on misleading; is that correct?

20  A.   I think they could mislead someone, yes.

21  Q.   And these are documents that are sent out by the Washington

22  State Patrol Crime Lab to the detectives and other

23  investigators?

24  A.   I'm not sure if these are sent by the crime laboratory.

25  The crime laboratory is an accredited body.  That's how we know

1   these are not crime lab reports.  These appear, to me, to be

2   sent out by the ATF NIBIN clearinghouse.

3   Q.   All right.  Well, I've got up in front of you Exhibit 70

4   again, what's been admitted as Exhibit 70.

5   A.   Yes.

6   Q.   Does that appear to be an email from Jennifer Tardiff to

7   some investigators?

8   A.   Yes, it does.

9   Q.   And you just confirmed for us that Ms. Tardiff, whom you

10  know, is an employee at the Washington State Patrol?

11  A.   Correct, at this time was a NIBIN technician, not a

12  forensic scientist.

13  Q.   But she was employed by the Washington State Patrol Crime

14  Lab at that time?

15  A.   Yes, that's true.

16  Q.   All right.  So it's being sent out by the Washington State

17  Patrol Crime Laboratory?

18  A.   Yes, this memo was sent by the crime laboratory.

19  Q.   And your ultimate conclusion in this case is that these

20  documents that are being sent by the crime lab to detectives and

21  investigators are confusing, if not downright misleading?

22  A.   I believe they are confusing and can be misleading.

23  Q.   Thank you.

24       MS. BECKER:  No further questions.

25       THE COURT:  Redirect?

1                         REDIRECT EXAMINATION

2     BY MR. HAMOUDI:

3     Q.    Mr. Noedel, do you know Kathleen Decker?

4     A.    I do.

5     Q.    You worked with the Washington State Patrol Crime Lab and

6     you worked with her on a variety of cases, correct?

7     A.    Yes, I did.

8     Q.    Can you tell us what you think about her competence as a

9     detective?

10          MS. BECKER:  I would object as to being beyond the

11    scope of my cross-examination, and it was not included in the

12    disclosure with respect to this expert.

13          MR. HAMOUDI:  The government just reviewed a series of

14    emails written by officials to Ms. Decker to bolster her

15    confusion as to what is a hit or a match, and I think that this

16    opens up the inquiry as to that, Your Honor.  She had her take

17    testimony as to her particular emails.

18          THE COURT:  I'll allow limited latitude, counsel.

19    A.    So I found Ms. Decker to be a competent and a good --

20    someone I would consider a good detective.  I enjoyed working

21    with her.

22    Q.    (By Mr. Hamoudi)  And I want to talk to you a little bit

23    about the document that ATF -- the ATF document, which you

24    reviewed.

25    A.    Yes.

1   Q.    Can you open it up?

2   A.    Yes.

3   Q.    Okay.  There's a definition of a NIBIN hit, and then a

4   definition of a NIBIN lead.

5   A.    Yes.

6   Q.    Correct?

7         So define a NIBIN lead.

8   A.    So -- so the lead, using these semantics, is the

9   unconfirmed potential association between two or more pieces of

10  ballistic evidence, based on the correlation review of the

11  digital images in the database, and that can be done by an

12  examiner or a technician.

13  Q.    And this document also clearly defines a NIBIN hit,

14  correct?

15  A.    Yes.

16  Q.    And how does it define a NIBIN hit?

17  A.    The hit is the result of two or more pieces of evidence

18  being confirmed as a match by a firearms examiner.  And NIBIN

19  hits are based on the review of images, followed by or/and

20  microscopic confirmation by a firearms examiner, and then the

21  document defines firearms examiner.

22  Q.    And when you testified a little bit about correlation

23  review, the first step of the correlation review has to do with

24  the list of the 30 candidates; is that correct?

25  A.    Thirty or more, yes.  The correlation is submitted -- in

1    other words, the data is captured -- and the operator says go,

2    and the computer churns through its information and it returns a

3    list.

4    Q.    Okay.  And the technician chooses one, but doesn't choose

5    others, correct?

6    A.    The technician chooses which ones to look at or not look

7    at, and chooses any to suggest be followed up for confirmation.

8          It's the technician's choice as to whether or not any of

9    the images are good associations or if none of them are good

10   associations.  It's up to the technician to review the

11   photographs.

12         The computer does not necessarily return good matching or

13   correlated information in the first, second, third, fourth,

14   maybe up to the 30th, suggestion that the computer makes.

15   That's why a human has to sort through the photographs, because

16   the computer can return false positives.

17   Q.    And then after that selection judgment is made by the first

18   technician, those selected comparisons are then sent forward to

19   the next technician, correct?

20   A.    Correct.  The first technician isolates the ones that that

21   technician likes, as agreement, and then that is sent on, and a

22   second technician evaluates, if they agree that there is

23   agreement that's worth confirming.

24   Q.    Okay.

25         And would you agree that that process, which involves two

1  law enforcement officers, could have an environment of

2  confirmation bias?

3  A.    Yes.

4  Q.    And what is confirmation bias?

5  A.    Confirmation bias is skewing the results of an examination

6  in order to confirm or support one another or a preconceived

7  idea about a particular outcome of a test.

8  Q.    And the Washington State Patrol Crime Lab is an independent

9  agency, correct?

10 A.    Yes.

11 Q.    And it is independent from law enforcement, correct?

12 A.    That's not correct.  It's a civilian branch of the

13 Washington State Patrol.

14 Q.    That's what I meant.  I'm sorry.

15 A.    Yeah.  So it is connected to a police department, but the

16 majority of employees, if not all of the employees in the crime

17 lab, are civilian employees.

18 Q.    You looked at Exhibit 79 and 80, those two images and these

19 two-dimensional images.

20       Can you describe to the court what is the difference

21 between actually looking at a casing and looking at a photograph

22 like that, what are the limitations and why manual examination

23 is so important.

24 A.    So the reason for confirmation by a human firearms examiner

25 is required is because these two-dimensional photographs only

1    show this one perspective.

2        In reality, what the firearm examiner is considering is not

3    only the brand of ammunition -- I don't know if these two brands

4    match each other.  Different brands can produce different types

5    of patterns of toolmarks.

6        The most valuable thing that the examiner can do now is

7    manipulate these specimens in three dimensions; that is,

8    changing the rotation and orientation of the stage, along with

9    changing the orientation and position of lighting, and looking

10   at areas beyond the simple center of this cartridge case;

11   looking at areas on the sides and on the rim that may be useful

12   for including or excluding the cartridge cases from each other.

13       That comes with a firearms examiner's training and

14   experience, and so the computer doesn't necessarily know what to

15   look for.  The computer follows the program.  Then the

16   confirmation is important because that's when an actual human

17   being, with knowledge of the limitations of any particular

18   comparison, can use the microscope and use the equipment to

19   either refute or identify, confirm, what the computer has

20   suggested.

21   Q.   And one of the dangers you avoid in having that process

22   take place is maybe having police officers act on a lead when,

23   in fact, the lead is not a match, correct?

24   A.   Yes.  To completely answer that, I would say, historically,

25   every computer's suggestion, lead, had to be confirmed by a

1    firearm examiner.  But there are only about a thousand of us

2    firearms examiners in the United States, and so the number of

3    leads the computer, with all its various technicians, was

4    generating far outpaced the capacity of any crime laboratory.

5    And so results were getting delayed and delayed and delayed, and

6    so the NIBIN administrators at the ATF said, "We need a fast way

7    to get information out."

8         The reason that some of the language says, "This may not

9    need to be confirmed," is that if a case is over or dead,

10   there's no reason to have a confirmation done by an examiner.

11   So the detectives decide whether or not this is a case that's

12   going to go forward, so we better get the confirmation.

13        So the whole purpose of the confirmation -- or the whole

14   purpose of the lead notifications was to rapidly give

15   information to detectives so that they could expedite a

16   confirmation, if their case is active and the information is

17   beneficial to their investigation.

18   Q.   And you talk about expediting a confirmation.  The

19   Washington State Patrol Crime Lab cooperates with law

20   enforcement agencies if they need casings matched immediately

21   following a lead, correct?

22   A.   Yeah, certainly that's a negotiation.  There is -- on the

23   request form, there is, actually, a box to check if you would

24   like a rush examination.  Usually that is triaged by the section

25   supervisor, and he evaluates how much priority to give any given

1    case.  But, absolutely, cases can be expedited if they are of

2    investigative importance.

3    Q.   Say, for example, I'm a homicide detective and I come to

4    you with a homicide case, and I want to act quickly on a lead.

5    Would that be the type of case that would be expedited at the

6    lab?

7    A.   Yes.  The key being a homicide case.  For example, if one

8    were to expedite two no-suspect drive-bys, where there is just

9    cartridge cases laying in the street, it probably wouldn't be

10   expedited.  But when you're talking about homicide, those are

11   the highest profile cases for the State Patrol, whether it be in

12   firearms or DNA, or any of the other disciplines.

13       So, certainly, homicide is the type of case that can be

14   expedited and done on a rush basis.

15   Q.   I want to direct your attention to the NIBIN lead in this

16   case, Government's Exhibit 51.

17       The email written by Mr. Gonzalez to the detective in this

18   case, he writes, "Please see the attached lead notification,"

19   correct?

20   A.   Yes.

21   Q.   So there's not using the language "hit" there, correct?

22   A.   Correct.

23   Q.   And it says, "The fired .40 cal cartridge cases," and then

24   describes the case, "appear to correspond."  The words "appear

25   to correspond," what would that signal to you?

1   A.   That that is an admission of uncertainty and that is -- I

2   think that is the author of this memo's signal that they've not

3   been confirmed, nor can he confirm them, and he can only report

4   that they appeared to correspond.

5   Q.   Okay.  If we can bring up Government's Exhibit 17, and we

6   can go to -- I think it's 134.  Let's move to the next page,

7   please.

8        This is previously admitted Defense Exhibit 134.  Go to the

9   next page, please.  Go to the next page.

10       The highlighted portion, Mr. Noedel, what is -- the

11   language, "Forensic examination has established that shell

12   casings recovered from the scene matched the gun known to be

13   owned by Gizachew Wondie," what is that language signaling to

14   you?

15            MS. BECKER:  Objection, Your Honor.  This is, again,

16   beyond the scope of my cross-examination.

17            THE COURT:  It's overruled.  You may answer the

18   question.

19   A.   To me, when an analysis is described as forensic

20   examination, I expect that that was an examination conducted by

21   a forensic scientist.

22   Q.   (By Mr. Hamoudi)  Down at the bottom, the language here,

23   "The test results linked conclusively to the shell casings

24   collected from the Amarah Riley murder scene on 9/19/2018 and

25   Gizachew Wondie's Smith & Wesson .40 caliber firearm."

1    A.    That statement is deceptive in that "linked conclusively"

2    would, again, imply that a firearms examiner has conducted and

3    issued a report that says identified, identified to be -- that's

4    the only way to link, conclusively, two cartridge cases to each

5    other.  The computer cannot do that.

6    Q.    And last question:  Do you recall testimony you gave about

7    if, hypothetically, a casing is destroyed, that you cannot

8    obtain a confirmation because the casing no longer exists,

9    correct?

10   A.    Correct.  If one or any of the exhibits that are claimed to

11   be associated by the computer are destroyed, then it's,

12   essentially, game over.  You have to have the example test-fires

13   or the example gun to regenerate test-fires to even conduct the

14   confirmation comparison.  If that evidence is destroyed or not

15   available, you cannot even conduct the required confirmation

16   step.

17   Q.    And the destruction of that casing also means that you

18   cannot exonerate that casing, correct?

19   A.    Correct, you cannot include it or eliminate it.  You

20   can't -- it's a no-examination.  No analysis can be conducted

21   because you don't have the elements to compare.

22            MR. HAMOUDI:  No further questions, Your Honor.

23            THE COURT:  Recross?

24            MS. BECKER:  Just a moment, please, Your Honor.

25       No, Your Honor.  Thank you.

```
1            THE COURT:  Thank you, sir.  You may step down.

2            THE WITNESS:  Thank you.

3       Next witness?

4            MR. HAMOUDI:  No more witnesses, Your Honor.  The

5    defense rests.

6            THE COURT:  Counsel for the government?

7            MS. BECKER:  Your Honor, the government doesn't have

8    any witnesses.  Thank you.

9            THE COURT:  No other witnesses?  You're resting as

10   well?

11           MS. BECKER:  Correct.

12           THE COURT:  Counsel, are you prepared to make closing

13   remarks on the motions?

14           MS. BECKER:  The government is, Your Honor.  If you

15   could provide some direction as to which party you'd like to

16   hear from first and on which of the two motions pending before

17   the court.

18           THE COURT:  Well, this is a defense motion.  I'll tell

19   you what, counsel.  Why don't we take a recess now.  That will

20   give you the opportunity to organize whatever materials that you

21   have to assist in your presentation, and we'll resume in, say,

22   ten minutes.

23           MS. BECKER:  Can I ask one question first?

24           THE COURT:  Sure.

25           MS. BECKER:  Are we going to argue the motion to
```

```
 1   suppress the arrest independently, and then, second, take up the
 2   Franks motion, or do you want all argument --
 3                THE COURT:  Let's keep them separate, counsel, so it's
 4   easier for the court to take in the context.  If you need to
 5   overarch or cross-reference, that's acceptable to the court as
 6   well, but I prefer you to keep your remarks confined to the
 7   motion.
 8                MS. BECKER:  Thank you.
 9                THE COURT:  Anything else by way of clarification?
10                MR. HAMOUDI:  Nothing else.  Thank you very much, Your
11   Honor.
12        When should we be back to court?
13                THE COURT:  Oh, let me ask you this?  How much time do
14   you anticipate to argue both motions?
15                MR. HAMOUDI:  Let me ask my colleague.
16        I think that Ms. Brin is going to take the probable cause
17   aspect.  She will be advocating for 20 minutes, and I myself,
18   approximately 20 minutes.
19                THE COURT:  Counsel for the government?
20                MS. BECKER:  Similar.
21                THE COURT:  Okay.  Well, I'm not putting you on a time
22   limit, counsel.  We have dedicated these two days.  I don't want
23   you to treat that as a goal.  You don't have to maximize the two
24   full days with your argument.  I just want you to know you're
25   not in a rush.  Let's start back up at 10:15.
```

```
1          We'll be in recess.

2                 (Court in recess 10:00 a.m. to 10:23 a.m.)

3                 THE COURT:  Counsel, if you're ready, let's get

4      started.

5                 MS. BRIN:  Thank you, Your Honor.  I think I've won

6      the lottery of going first.

7          I do have two housekeeping matters that I do want to

8      address with the court as well.

9          The first is that we submitted a declaration from King

10     County Superior Court Judge McDonald, and we would ask that the

11     court enter that into evidence as an exhibit, and I do believe

12     that that -- we have discussed this with the government, and I

13     do believe that they will be objecting to that exhibit.

14                THE COURT:  Okay.  Have you presented that in hard

15     copy?

16                MS. BRIN:  I apologize, Your Honor.  I do not have a

17     copy of it.  The declaration was filed on, I believe, Friday.

18                THE COURT:  It's a bit of a challenge, counsel, if I

19     haven't read it.

20                MS. BRIN:  Sorry, Your Honor.  It's Defense Exhibit 157.

21     And, Your Honor, Ms. Stordeur has been able to bring it up on

22     the screen as well.

23                THE COURT:  Let me read it.  Just one second, counsel.

24                MS. BRIN:  Thank you, Your Honor.

25                THE COURT:  Okay.  I've reviewed it.
```

1          MS. BRIN:  Thank you, Your Honor.

2      And we would ask that it be entered as an exhibit at this

3  time.

4          THE COURT:  Counsel for the government?

5          MS. BECKER:  Your Honor, the government does object to

6  the admission of the declaration in its entirety.

7      The government had an opportunity to sit down with Judge

8  McDonald to discuss potential testimony.  Mr. Hamoudi indicated

9  back in early 2020 that he expected that Judge McDonald would be

10  called to testify at this hearing, and I sat down with him to

11  review what that testimony might be.

12      In light of that, the government cannot agree that

13  paragraphs 6 and 7 are a complete reflection of what Judge

14  McDonald would testify to; rather, if subjected to

15  cross-examination, the government believes that Judge McDonald

16  would provide additional context that would be relevant for this

17  court's consideration.

18      Because they are not putting Judge McDonald on the stand

19  and subjecting him to cross-examination, the government is

20  unable to bring forward those facts.

21      Moreover, this declaration was presented to us on

22  Wednesday, with Judge McDonald leaving town and becoming

23  unavailable on Friday.  The government was, therefore, unable to

24  secure supplemental declaration to discuss those facts.

25      For those reasons, the government does object.

1     Nonetheless, with respect to paragraphs 1 through 5 and

2  paragraph 8, the government does not object.  Our objection is

3  limited to paragraphs 6 and 7.

4           THE COURT:  Counsel?

5           MS. BRIN:  Your Honor, the government put Judge

6  McDonald at issue in their response in, I think, January of

7  2020.  We have repeatedly told the government that they had put

8  Judge McDonald at issue, and they did so at the hearing here.

9     If Judge McDonald was a witness the government wanted to

10 call, my understanding is that Ms. Becker was in touch with him

11 throughout the last two years.

12    We spoke with Judge McDonald.  He reviewed and edited this

13 declaration and returned it to us.  It is sworn under the

14 penalty of perjury, and we provided it to the government.

15    The government has access to email.  If they wanted to call

16 Judge McDonald and subpoena him, they could have done that.

17    We understood that Judge McDonald was going out of the

18 state and did this in an effort to not bother him, or require a

19 sitting King County Superior Court judge to come and testify at

20 this hearing, as a courtesy.

21    We provided the declaration to the government on Wednesday.

22 Judge McDonald was always on notice and the government was

23 always on notice, since they put him at issue, that he was

24 potentially a witness in this case.

25    If Judge McDonald or the government had intended to elicit

1   other testimony, Judge McDonald either could have refused to

2   sign the declaration, he could have edited it to make sure that

3   those paragraphs were full and complete, or, in between

4   Wednesday and Friday, the government could have provided

5   additional information that it asked to be included in the

6   declaration or informed us that Judge McDonald did not agree

7   with what he had sworn under the penalty of perjury and wanted

8   to add things to it.

9        Throughout this case, you know, we have gone back and forth

10  with the government on declarations, on stipulations.  I will be

11  asking the court to consider a stipulation we entered this

12  morning.  We have attempted to give the government every

13  opportunity to object or oppose or change anything in an attempt

14  to streamline these proceedings.

15       We would note that this is an evidentiary hearing, Your

16  Honor, it is not a trial.  If the government has an objection

17  and says that this is not complete, I think the court can

18  consider that as to the weight, but I believe that -- for the

19  purposes of this hearing, with the evidentiary rules as they

20  are -- for the purposes of this hearing, that this is an

21  appropriate and reliable declaration, and it should be admitted.

22            THE COURT:  Thank you.

23       Counsel for the government?

24            MS. BECKER:  Your Honor, Ms. Brin is correct, this is

25  an evidentiary hearing, and any party who wants to put forward

1    evidence has the opportunity to issue a subpoena and put the

2    witness before court.

3        Counsel is the proponent of the entirety of this

4    declaration, and they could have issued that subpoena.  If Judge

5    McDonald was unavailable, we could have talked about

6    rescheduling.  The scheduling was set here over June 7th and

7    8th, as well as June 21st and 22nd, to accommodate schedules.

8        Again, this document was provided to us on Wednesday.  I

9    reached out to Judge McDonald's chambers, and he was not

10   available to meet or to talk during that period, despite my

11   requests, before he departed.

12       And counsel is not correct that I've been in continuous

13   conversation or communication with Judge McDonald throughout the

14   pendency of these proceedings.  That is not correct.  Our first

15   meeting with him was several weeks ago.

16            THE COURT:  And do you know when Judge McDonald will

17   be available once again?

18            MS. BECKER:  I do not know.  I did not know he was

19   departing.

20            THE COURT:  Do you know?

21            MS. BRIN:  I do not know, Your Honor.

22            THE COURT:  Well, the concern the court has, this

23   hearing has been set for a period of time -- an extended period

24   of time, and the court had a separation specifically between the

25   first hearing and then today's date, and it's a little bit late

1   in the game for an offering of this type.

2        The court is going to sustain the objection by the

3   government as it pertains to paragraphs 6 and 7.  I will allow

4   the admission regarding the other paragraphs.

5        The court notes that either party was free to call any

6   witness.  This court, as you know, did not put any limitations

7   or restrictions on the government or the defense on the number

8   of witnesses that could testify.  Ample time was given to both

9   parties at the last hearing, and today as well.  It's now 10:30.

10  We still have the balance of the day to be able to take witness

11  testimony.  If there is a need to take Judge McDonald out of

12  order, or even by way of special accommodation, that could have

13  been a request made to the court, and that was not done.

14       This is helpful information in terms of paragraphs 6 and 7,

15  but under the circumstances and the manner in which it was

16  presented to the court, the court will sustain the objection by

17  the government, and those paragraphs will not be admitted.

18       Now, I'll let you know that the court is not going to rule

19  today.  I'm going to set this matter over for ruling to July 1

20  at 1:30, and if you believe, between now or before then, that

21  you can get in contact with Judge McDonald -- I'm not going to

22  require Judge McDonald to come to this courthouse and testify;

23  one, I don't think he's any different from any other witness.

24  I've shown up for jury duty down in King County, as a federal

25  judge, and I don't think it's that much of an inconvenience for

1    him to come here.

2         If the parties are willing to agree and stipulate that he

3    can make his appearance by way of a telephone call, that is

4    acceptable to the court.  I know there is the right to confront

5    witnesses and accusers, but if Mr. Wondie's lawyers would agree

6    to allow Judge McDonald to testify by way of a telephone

7    conference, and he's back in town, this court will certainly

8    keep the opportunity for additional testimony, as it relates to

9    those paragraphs, to the parties.

10        I'll leave that there.  This court made its ruling as we

11   speak right now, but you'll have the opportunity to clarify that

12   information, either side.

13        I'm not asking Judge McDonald to come off of vacation.  I

14   don't expect that you would even know how to get in touch with

15   Judge McDonald.  If he has staff like I have, they will not

16   bother him on vacation.

17        So with that, that's the court's ruling.

18        Next issue, counsel?

19             MS. BRIN:  Thank you, Your Honor.

20        At this time we would also withdraw our subpoena, formally,

21   to Detective John Free.  I don't believe that the court has

22   ruled on the motion to quash, and so we wanted to let the court

23   know that we will also notify his sergeant, I believe, that we

24   would withdrew that subpoena.

25        And then, finally, Your Honor, we did file the stipulation

 1   about the casing -- the disposed casing.  We filed that this

 2   morning, so we would also ask the court to consider that.

 3           THE COURT:  Any objection?

 4           MS. BECKER:  No, Your Honor.

 5           THE COURT:  All right.  The court will consider that

 6   document as well.

 7           MS. BRIN:  Thank you, Your Honor.

 8           THE COURT:  Does that take care of your

 9   preliminary issues, counsel?

10           MS. BRIN:  It does.  Thank you, Your Honor.

11           THE COURT:  Please proceed.

12                    DEFENDANT'S CLOSING ARGUMENT

13           MS. BRIN:  Thank you, Your Honor.

14        I'm going to address the government's argument as it

15   relates to the warrantless arrest and alternative probable

16   cause.

17        This argument is meritless on its face.  The government has

18   asked the court to apply the collective knowledge doctrine to a

19   *Franks* case but has not cited to a single case in which the

20   court has done this.

21        The government treats the collective knowledge doctrine as

22   a choose-your-own-adventure for law enforcement, but that is

23   contrary to the policy behind it and to the precedent supporting

24   its application.

25        Collective knowledge is almost always applied when an

 1   officer with probable cause directs another officer without

 2   probable cause to arrest an individual, and this is in the

 3   arrest context.  That's what I will refer to as the

 4   directed-arrest application of this doctrine, and

 5   *United States v. Ramirez*, at 36 F.Supp.3d 970, is an example of

 6   that kind of case.

 7        That is not what the government says happened here, and it

 8   is not what happened here.

 9        The SWAT team was not directed to arrest Mr. Wondie based

10   on the drug investigation.  It did not arrest Mr. Wondie based

11   on the drug investigation or at the direction of anybody with

12   knowledge or who was even involved in that investigation.

13        Instead, Your Honor, the government attempts to wedge the

14   facts of this case into the very narrow secondary application of

15   the collective knowledge doctrine.  In extremely rare and very

16   unique and specific circumstances, probable cause has been found

17   when it was known to some officers involved in an investigation

18   but not to other officers either executing a search warrant or

19   conducting an arrest.  That application depends on two things:

20   Communication and reliance, and neither of those things exist

21   under the facts as presented here.

22        Your Honor, there is a district court case called

23   *United States v. Holmes*, and that's 36 F.Supp.3d 970.  It was a

24   district court in Montana that looked at a number of issues

25   relating to the search and seizure of a firearm in an unrelated

1    search warrant.

2          And the judge in that case noted that, in all cases in

3    which the collective knowledge doctrine is used, to save an

4    arrest or seizure not based on the underlying warrant, the

5    arrest or the seizure must be, quote, based on, end quote, the

6    information that establishes probable cause, and that, quote,

7    the causal chain that leads directly to -- in this case, the

8    arrest of Mr. Wondie -- must begin with that piece of

9    information, end quote.

10         Here, Your Honor, the causal chain that led directly to

11   Mr. Wondie's arrest was the homicide investigation.  It had

12   nothing to do with the drug investigation, and the government

13   has stipulated to that.

14         The drug investigation had no drugs, no drug sales, and no

15   facts that would support probable cause until after Mr. Wondie's

16   arrest.  The agents were hoping that they would get facts that

17   supported their drug investigation through the Decker warrant.

18   The correspondence that is in the record clearly shows that that

19   was the intent of the federal agents.  What they didn't expect

20   was for Officer Alvarez to jump the gun and illegally arrest

21   Mr. Wondie before any other facts had been established.

22         The agents were counting on the search warrant of

23   Mr. Wondie's car and home to provide the probable cause for the

24   drug investigation, and that is not a situation in which the

25   collective knowledge doctrine applies.

1          The SWAT team illegally arrested Mr. Wondie.  They were

2     there on that day at that time to do one thing, which was to

3     execute the Decker warrant, and, as Detective Decker

4     acknowledged and as the government has conceded, there was no

5     probable cause to arrest Mr. Wondie based on that.

6          There is no authority or precedent that the government has

7     cited that it contemplates applying that very narrow secondary

8     application of the collective knowledge doctrine to the facts in

9     this case.

10          But, Your Honor, there was also no probable cause to arrest

11     Mr. Wondie for any drug crime.  The cases that were cited by the

12     government in its briefing on this issue highlight the fact

13     that, on December 6th of 2018, they were not there yet.

14          In *U.S. v. Wesby*, probable cause was found when a citizen

15     complaint was independently witnessed by law enforcement and

16     other witnesses.

17          In *Struckman*, the Ninth Circuit specifically noted that law

18     enforcement officers may not simply rely on the claim of citizen

19     witnesses but actually must independently investigate that

20     knowledge or interview other witnesses.

21          Your Honor, I could go through each case that the

22     government has cited, but I won't.

23          There are monitored phone calls between informants and

24     defendants.  There are weeks and weeks of law enforcement

25     surveillance, confirming tips or intel provided from sources of

1    information.  And in every single case cited by the government

2    where a court found probable cause, independent corroboration by

3    law enforcement of the criminal activity itself existed, or an

4    informant or complainant accurately predicted future behavior,

5    did not just talk about what had happened in the past, or there

6    was physical evidence, controlled buys, or surveillance by law

7    enforcement of detailed and uniquely criminal activity.  In most

8    of the cases cited by the government, there are multiple of

9    those things.

10        Here, the government has not even shown one.  Instead, what

11   it did was pile multiple deadends on top of each other, and then

12   tried to pass it off as a road map to probable cause.  Even if

13   the court credits all the testimony given by Agents Dkane and

14   Spencer, they still did not come close to meeting their burden.

15   But, Your Honor, there is good reason not to credit the

16   testimony of Agent Dkane.

17        On the first day, Agent Dkane testified from memory

18   because, as he told us, he did not take any notes on this

19   investigation, and he produced two reports that were extremely

20   bare-bones, and yet he started his testimony off by talking

21   about an undisclosed interview with the SOI and an executive

22   from Pfizer, a pharmaceutical company, and he claimed, at this

23   meeting, he did not take any notes, and he didn't have any

24   reports.

25        If we can go to page 139, line 2.

1        On direct examination, when Ms. Becker was asking him

2    questions, he said, "When he mentioned the pill press, that's

3    when I asked Mr. Donnelley" -- and that's the Pfizer

4    executive -- "if he could, sort of, talk shop with him; that is,

5    asked him as many technical questions as he could think of to

6    stump him, so to speak.  So in that part of the interview, I was

7    doing more listening than talking while he and Mr. Donnelley

8    threw out bunches of phrases about rotaries and different kinds

9    of punches and a whole variety of, sort of, technical jargon

10   related to pill presses."

11       That was pretty impressive testimony.

12       However, after short voir dire in which defense counsel

13   confronted him about not having any documentation about this

14   meeting, he decided he wanted to clarify that testimony.

15       At page 142, line 17, suddenly Agent Dkane wanted to

16   clarify and said, "The reason I asked Mr. Donnelley into the

17   room was to ask two or three very limited questions,

18   specifically to use jargon I was not familiar with.  It was

19   mostly to actually give me the ability to determine if, when

20   this particular guy said, 'I know about pill presses,' did he

21   actually know about pill presses?"

22       So, initially, he was willing to enlarge that conversation

23   and talk about the fact that they had spent as much time as

24   needed; on voir dire, was asked whether he had notes, and then

25   he wanted to clarify.  And this continued throughout his

1   testimony.

2        He consistently testified about things that were

3   contradicted by documents in evidence.  He spoke very

4   confidently and at length about the information he knew about

5   Mr. Wondie dealing drugs.

6        Specifically, he claimed multiple SPD officers and the SOI

7   told him or gave him information that Mr. Wondie was dealing

8   drugs in the Mud Bay parking lot.  And, Your Honor, that is why

9   reports and notes are so important, because if Agent Dkane had

10  kept some, maybe he would have remembered all of that

11  information a little more clearly.

12       On the second day of his testimony, he was confronted with

13  the receipts, the actual, documented correspondence he had

14  received about Mr. Wondie.

15       So let's start with the SOI, Your Honor.

16       At page 144 at line 10 -- and this is the first day --

17  Agent Dkane talked about the SOI and -- I apologize.  This is a

18  long section -- but on this day he talked about the fact that

19  "G operated in the area around the 1500 block of Broadway," and

20  that's at line 21.

21       "He indicated" -- and this is the SOI -- "that, sort of,

22  his territory, for lack of a better term, was the area around

23  the 1500 block of Broadway in the Capitol Hill area."  And

24  Ms. Becker asked, "What's there?  What's at the 1500 block of

25  Broadway?"  And Agent Dkane answered, "There's a smoke shop and

1    there's a Mud Bay."

2         He also said that this area was well known to some of the

3    East Precinct SPD officers he was working with, and we are going

4    to come back to each one of those officers.

5         Agent Dkane was correct about one thing:  The SOI did

6    specify where he believed G hung out, but it was not the 1500

7    block of Broadway.

8         If we can turn to Exhibit 21 on page 83.

9         Here is what the SOI actually said about G; said, "He hangs

10   out a lot on 12th and Jefferson.  The whole corner is owned by

11   Ethiopian business owners, and they all turn a blind eye to

12   their own people."

13        The SOI never said or provided information about G, who

14   they believed to be Mr. Wondie, selling drugs in the Mud Bay

15   parking lot.

16        The SOI also gave an explanation earlier, and again here,

17   about why G would spend time in that area.  To Agent Spencer in

18   her notes, what he had said is that G had grown up around Yesler

19   Terrace.  One of the SPD officers also acknowledged that.  And

20   here, again, the SOI was saying that this was an area that was

21   primarily owned by Ethiopian business owners, the people in his

22   community.

23        If we can turn to page 182 at line 22.

24        Here, Ms. Becker asked Agent Dkane some clarifying

25   questions, and she said, "Earlier, we talked about the interview

1    of the SOI.  Did you take some of the information you learned

2    from the interview of the SOI and talk with Officer Blackburn

3    about it?"

4         And what Agent Dkane said, "Specifically, the information I

5    mentioned a bit earlier about the Mud Bay parking lot in the

6    1500 block of Broadway."  He immediately recognized that the

7    information the SOI was describing to him about the activities

8    there was already known to him, because they had already

9    observed it, and it was already a problem for officers in that

10   area.

11        So did Officer Blackburn say that?  Well, the government

12   did not call Officer Blackburn, despite it was their burden to

13   show probable cause, but, luckily, we have an email from him.

14        If we could turn to Exhibit 109, page 4.

15        And here is the email from Officer Matthew Blackburn to a

16   number of other law enforcement officers, and I would ask that

17   the court note the date on that, November 29th.  That is long

18   after the SOI was interviewed, that is long after the SOI was in

19   communication with all of the agents at the direction of

20   supervising Agent Dkane, and it was just before Mr. Wondie's

21   arrest.  And what Officer Blackburn is asking is, "We are trying

22   to find out where Wondie deals dope."  That is not a question

23   that an officer, who immediately recognizes and knows an

24   individual is dealing dope in a certain place, would be asking

25   other officers.

1       Agent Dkane also talked about information that he learned

2  from other SPD officers.  On page 184 and to 185, this is when

3  Ms. Becker asked Agent Dkane specifically about Officer Averett,

4  and what he said is that, "Officer Averett indicated that he

5  believed he was selling drugs" -- and this is, again, about Mr.

6  Wondie -- "out of that Mud Bay parking lot, and then he provided

7  information about Mr. Wondie related to him always carrying a

8  gun to a hot dog stand that he had in the area.  He described

9  some problematic encounters he had with him."

10      And Ms. Becker said, "When you say 'problematic encounters'

11 are you talking about one or more than one that he described to

12 you?"

13      And Agent Dkane said, "It sounded to me like he was talking

14 about a habitual-type situation."

15      Again, Your Honor, the government did not bring Officer

16 Averett to testify about his own observations, but, luckily, we

17 have an email.  So we know what Officer Averett actually told --

18 and this is an email that was sent to Detective John Free on

19 November 20th and was forwarded to Agent Dkane.

20      What Officer Averett actually said was that, "Mr. Wondie

21 has a business license to sell hot dogs at 1518 Broadway,"

22 which, Your Honor, is, basically, the Mud Bay parking lot.  He

23 also had a name for that business.

24      And what Officer Averett said is that, "That area is a

25 narcotics hotspot for us."  He goes on to talk about the

1   dismissed case that the court is aware of and is in evidence, he

2   talks about an anonymous tip, which is not in evidence, and he

3   talks about his interactions with Mr. Wondie:  "He has admitted

4   to me that he is carrying his gun during several nightlife

5   patrols over the summer.  I can send you the incidents.

6   Conversely, if you want information, I would love to hear about

7   it."  That was the email from Officer Averett.

8        Officer Averett did not, as the court knows, ever say that

9   he had problematic encounters with Mr. Wondie.  In fact,

10  repeatedly, in evidence that is in the record and in multiple

11  exhibits, he has always said that Mr. Wondie was cooperative,

12  and he used that word repeatedly.

13       Again, in this same email, Officer Averett is specifically

14  saying that they do not have evidence or facts that link

15  Mr. Wondie to drug dealing; what they have is a suspicion.

16       And if we can turn to 185, line 11.  Again, Agent Dkane,

17  testifying from memory, talked about two other officers,

18  Officers Souriall and Chesney, and what he said is that he

19  "received forwarded emails where they were describing very much

20  the same activity we've been talking about, meaning they were

21  familiar with Gizachew Wondie, they were familiar with the area

22  that he sold drugs at that is in and around that 1500 block of

23  the Broadway area.  It was, basically, more of the same."

24  Q.   And the issue here, of course, Your Honor, is what Agent

25  Dkane says is an assumption, the area he sold drugs in.  What

1    the evidence shows is that there were no facts establishing that

2    link.

3          If we can pull up Government's Exhibit 14.

4          Here is that email from Officer Chesney, and, again, Your

5    Honor, Officer Chesney, from the SPD, told John Free, and it was

6    then forwarded to Agent Dkane, that he runs a hot dog stand in

7    the 1500 block of Broadway on Capitol Hill.  He specifies that's

8    the Capitol Hill Tobacco parking lot, which is also shared with

9    the Mud Bay there, on Friday and Saturday nights.  He confirms

10   it is called Chronic Dogs.  He talks about the car he bought,

11   and he says, "We believed he was/is slinging dope on Capitol

12   Hill, not in the parking lot, but have never pinned it on him."

13   He also noted that he has a valid CPL and keeps his handgun in

14   his car at all times.

15         And you will recall, Your Honor, that Agent Dkane testified

16   that he had received information that Mr. Wondie was supposedly

17   bringing his gun to his hot dog stand, and there is no evidence

18   in the record of that, either.

19         This officer also confirmed what the SOI said, which is he

20   frequents this area down by where Yesler Terrace used to be,

21   because that was an area that he was familiar with and, as the

22   SOI had said earlier, that is where he grew up.

23         And I would just note that these are areas that he

24   frequents or has been seen in.  Officer Chesney is not saying

25   that these are areas or specific places where he sells drugs.

1          And here, Your Honor, is that email from Officer Souriall,

2    and Officer Souriall literally says nothing about drug dealing.

3    He says, "Don't know any gang associations, but he hangs out

4    near Cal Anderson Park," which is, again, the area that's down

5    by where Yesler Terrace was, in the specific area, "has been

6    arrested with a gun recently by SPD and is frequently in the Mud

7    Bay parking lot.  He's with a group of people, and I can get

8    more information.  If I can, I will."  That was it.

9          Your Honor, at worst, Agent Dkane was lying on the stand to

10   bolster probable cause, and, at best, he was misremembering the

11   information that he had in his possession two years ago because

12   he had not documented that.  Luckily for us, that evidence was

13   documented in multiple emails sent by the very SPD officers that

14   he was testifying about.

15         Your Honor, what Agent Dkane did on the stand was a master

16   class in watering down probable cause.  He had three pieces of

17   information about Mr. Wondie.  He knew that Mr. Wondie was

18   associated with two different places, the 1500 block of Broadway

19   and the area where Yesler Terrace used to be.  He also knew that

20   Mr. Wondie had a legitimate reason to be in the Mud Bay parking

21   lot, and he knew that Mr. Wondie had community and family and

22   had grown up in the second area in which he was identified as

23   spending time.

24         The final piece of information he had was that SPD

25   considered both of these places, places where there was drug

1    activity.

2        What Agent Dkane did on the stand is, he connected that

3    first piece of information -- "This is where Mr. Wondie hangs

4    out" -- to that third piece of information -- "This is where SPD

5    believes there is drug activity" -- and in doing so, he ignored

6    the legitimate reasons Mr. Wondie had to be at both of those

7    places.  And what he did was, he turned assumptions and

8    speculation about Mr. Wondie's activity in those places and

9    testified as if they were fact.  They were not fact.

10       And, Your Honor, this is exactly why individuals who live

11   in communities that police identify as high-drug-trafficking

12   areas are consistently and wrongfully arrested without probable

13   cause.

14       Luckily, Your Honor, in this case, SPD had not done what

15   Agent Dkane tried to do here.  In each and every one of their

16   emails, they acknowledge that they did not have facts, they did

17   not have enough of a link to prove their speculation or to

18   establish probable cause.

19       The government bears the burden of showing there was

20   probable cause for an arrest, and this was not it.  If the

21   government believed that the SPD had gotten enough facts to get

22   them to probable cause, they certainly would have called those

23   officers here to testify firsthand, because, as the evidence

24   shows, those were the officers who were familiar with

25   Mr. Wondie; the ones who said he was cooperative, who

1  acknowledged and confirmed that he had a legitimate reason to be

2  in both of those areas, and who, yes, said they had suspicions

3  and hunches but nothing more than that.

4       Your Honor, I would ask the court not to give any weight to

5  Agent Dkane's testimony about the SPD investigations.  Whether

6  he was being intentionally untruthful, or if he was just unable

7  to accurately remember the facts from back in 2018, none of what

8  he testified to is supported by the record.

9       The other thing that Agent Dkane discussed at length were

10 his secret personas, Lala and Mike Davis.  The actual

11 conversations on these texts speak for themselves, and they are

12 both in evidence.  Neither amounted to anything.  But even when

13 the exhibit was right in front of him, Agent Dkane was still

14 willing to exaggerate what was on the paper.

15      On page 154, starting at line 12, Agent Dkane said, "As the

16 conversation developed" -- as if that was natural -- "he brought

17 up drugs in a variety of ways, and then on two occasions he sent

18 me pictures of those drugs, and asked me on a number of

19 occasions to get together and indicated I would be able to get

20 those drugs or find out more about them when we meet."

21      If we can pull up Exhibit 26, page 9.

22      The first mention of drugs in these text messages came from

23 Lala, or Agent Dkane, when he said, "I skipped class today to

24 get high."  Mr. Wondie's response is, "Dam (sic), no drugs for

25 me."  And she says, "Are you a good boy?"  And he says,

1   "Depends," with a smiling emoji.

2        Mr. Wondie did not discuss drugs or drug use until Agent

3   Dkane continued to push this issue and insinuate that the

4   female, Lala, was not interested in good boys, or said that

5   Mr. Wondie was, quote, no fun, end quote, because he said he

6   didn't use drugs.

7        Agent Dkane also testified that Mr. Wondie was going to

8   meet up with Lala to sell -- and he implied -- to sell or to

9   give her drugs, and that is laughable.  Starting on page 5 of

10  this exhibit, Mr. Wondie is certainly trying to meet up with

11  Lala, but it does not have anything to do with drugs.

12       The conversation started with a sexual tone, and that

13  continued throughout.  Quite frankly, Your Honor, Mr. Wondie

14  wanted to meet up with Lala because he wanted to have sex with

15  her, and that is apparent through this entire conversation, and

16  it is also clear that Mr. Wondie's motivation does not change.

17  His motivation was always about meeting up with a cute girl who

18  suddenly started talking about how she was into getting high and

19  was into, quote, having fun, meaning using drugs.

20       The photos that he had sent could have been smashed-up

21  aspirin that Mr. Wondie wanted to look like cocaine, because

22  Lala, the girl he was trying to hook up with, had said that

23  that's what she was into.  Mr. Wondie never said he had drugs to

24  sell or even that that was something he wanted to do.  The Lala

25  texts did nothing to move the drug investigation forward, and

1    Agent Dkane knew that.

2         His other persona was Mike Davis.  In the entire

3    conversation between Mike Davis and the phone number that Agent

4    Dkane believed was Mr. Wondie, was Agent Dkane randomly reaching

5    out to this person and asking for a drug hookup and burning the

6    SOI without telling any of his partners that he was doing so.

7         During that conversation, again, that person, who he

8    believed to be Mr. Wondie, never said he had drugs to sell.  He

9    never said he could or would sell the Mike Davis persona or any

10   of Mike Davis's friends drugs.  And when Agent Dkane realized it

11   wasn't going anywhere, as he said on the stand, he had to cover,

12   and so what he did is pretend that he had gotten Mr. Wondie, or

13   the person he believed was Mr. Wondie, confused with a

14   well-known drug dealer, and both of them laughed it off and

15   asked each other for a more recent number for that person.

16        Supposedly, the link there is that Mr. Wondie then went

17   back to the SOI and was upset that the SOI had given his phone

18   number out to people to try to get drugs.

19        If we can look at page 103, line 6 through 25.

20        When Agent Spencer was asked about the SOI getting upset

21   about that, she confirmed what I think we all know, which is, if

22   one of your friends or colleagues or just somebody that you know

23   gives your phone number out to some stranger and says to hit you

24   up for drugs, whether or not you are selling drugs, Your Honor,

25   that would be upsetting, and you would confront the person who

1    had given your phone number out.

2         Nothing about that phone conversation or Mr. Wondie's

3    alleged response to that phone conversation moves the ball

4    forward on probable cause.

5         Turning now, Your Honor, to Agent Spencer's testimony.  Her

6    testimony really confirmed what the court has already seen in

7    the pleadings.

8         She spoke mostly about the SOI.  She confirmed that what

9    she knew is that the SOI was a, quote, B.S. artist willing to do

10   what it took to get out of the 20 years he was facing.  He was

11   not credible and he was not reliable.

12        Agent Spencer's testimony, when asked by Ms. Becker, that

13   she had no reason to doubt him was inconsistent with the facts

14   even as Agent Spencer knew them at the time of his arrest.  The

15   first thing the SOI did was lie to them, and he continued to lie

16   to them throughout the entire time he was in touch with the

17   agents.

18        Agent Spencer's testimony confirmed that the SOI had

19   provided no corroborated intel on G.  First -- if we can turn to

20   page 95, lines 7 through 10.

21        First, one of the things that the SOI had told the agent

22   about G was that he was buying raw materials from China to make

23   counterfeit pills, and that was included in Agent Spencer's own

24   notes.

25        At this part of the transcript, the court can see that she

1    confirmed they had no confirmation connecting him to any kind of

2    unusual packages at his address.  And that is not because they

3    didn't try, Your Honor.  As the court will recall, they sent an

4    email to the Postal Service specifically asking for confirmation

5    of suspicious packages at that address and did not receive it.

6         The SOI also said that G was, quote, active on the dark

7    web.  We talked with Agent Spencer a little bit about the fact

8    that there are specialized agents who are familiar with the dark

9    web and who investigate the dark web and cryptocurrency, and she

10   confirmed that she did ask those agents whether they knew of G,

11   or Mr. Wondie, and they confirmed that they did not.

12        Next, there was the storage unit and the pill press.  The

13   SOI told the agents that he was working on a pill press with G

14   and that they had stopped working on it only eight or nine

15   months before, when a part was seized by Customs.

16        What we learned is it was actually more than a year and a

17   half before his arrest that this had stopped, and we also

18   learned that he never told his Louisiana handlers that he was

19   building this new press, even though he was testifying in

20   federal court that same month.

21        Agent Spencer said that she was shown a picture -- and we

22   saw the picture -- of a pill press by the SOI, and she also

23   confirmed that there was nothing in that photo that connected

24   that pill press to Mr. Wondie.

25        Further down in that same section, Agent Spencer admitted

1   that she was not able to corroborate any of the information

2   about Mr. Wondie, the pill press, the pill press part, or the

3   storage unit.

4       To be clear, Your Honor, to this day the government does

5   not have evidence that the SOI was not building that pill press

6   all by himself and trying to set Mr. Wondie up for it.

7       Agent Spencer also confirmed that the SOI never made any

8   connection between the agents and G that resulted in any

9   evidence that would have been helpful for them to establish

10  probable cause for drug dealing.

11      From about pages 80 to 83 of the transcript, Your Honor,

12  she discussed this on cross-examination.  At page 82, lines 3

13  through 12, she admits that despite them asking, the SOI never

14  introduced G to anybody, not through text message, not in

15  person, nothing else.  And then, as we know, he was picked up

16  and brought back to answer to his parole violation.

17      Finally, Your Honor, at page 105, from lines 114, Agent

18  Spencer discusses the fact that she was also surveilling

19  Mr. Wondie for the drug investigation.  She confirms that she

20  never saw Mr. Wondie in possession of drugs during that

21  surveillance, she never saw him exchange anything that looked

22  like drugs, and she never saw patterns that were consistent with

23  drug dealing while she was surveilling him.

24      On direct examination, they discussed the person that they

25  saw getting in and out of Mr. Wondie's car.  She also confirmed

1    that that was the same individual twice, that that person was

2    not in the car for just a minute, and that individual was also

3    dropped off at another location, which is not consistent with

4    drug dealing.

5         Your Honor, later in this testimony, Agent Spencer

6    specifically said that she was surveilling him to get -- and

7    this is at lines 4 through 7 -- she was specifically surveilling

8    him to get additional facts to establish probable cause for her

9    own investigation.  They did not get any additional facts from

10   this, either.

11        Finally, Your Honor, the citizen complaint.  The original

12   complaint and Agent Spencer's follow-up report are both in

13   evidence, Your Honor.

14        And if we could turn to Exhibit 7.

15        I would also note for the record, Your Honor, SPD had this

16   complaint, and, in fact, SPD was the organization that provided

17   this to the federal agents, and they certainly didn't think that

18   this was enough of a fact to get them to probable cause.

19        And the original complaint, on its face, should have given

20   both Agent Dkane and Agent Spencer some pause.  The complainant

21   is clearly frustrated that SPD had not responded to what she

22   believes are issues in her neighborhood.  Neither Agent Dkane

23   nor Agent Spencer did any follow-up outside of interviewing this

24   individual on the telephone, and there are inconsistencies and

25   omissions between the first complaint and what she said to Agent

1    Spencer in the telephone conversation.

2         This is not an anonymous complaint, Your Honor, but it does

3    not have the same indicia of reliability that the Supreme Court

4    has discussed in *Illinois v. Gates*.  The agents did no inquiry

5    into this person's motive.  There is no explicit description of

6    the activity.  There is no detailed description of the alleged

7    drug dealer.  There is no track record of this complainant

8    providing accurate information, or future predictions that are,

9    sort of, born through.  And, Your Honor, the activity that is

10   described in this complaint ended months and months before

11   Mr. Wondie's arrest.

12        Agent Dkane acknowledged, on the stand, that the

13   reliability and motive of citizen complainants has recently been

14   cast into question, both in the media and by law enforcement, as

15   it should be.  Put plainly, Your Honor, citizens with no

16   criminal history are willing to weaponize the police against

17   certain communities and certain people.  This has always

18   happened, but it now has been cataloged and studied and

19   documented.  Law enforcement can no longer consider a citizen

20   complainants like this as presumed reliable, and the Ninth

21   Circuit has alluded to that fact in cases like *U.S. v. Struckman*.

22        The citizen complaint and the follow-up interview of this

23   individual did not move the ball forward on probable cause to

24   arrest Mr. Wondie for any drug investigation.

25        Your Honor, there was no probable cause to arrest

1   Mr. Wondie on December 6 either from Detective Decker's warrant

2   or from any other drug investigation.

3        Even if there was, this case does not fall into the

4   collective knowledge doctrine.  His arrest was not directed by

5   an officer for the purpose of arresting him for a drug crime,

6   and his arrest was not based on or made in reliance upon any

7   information that establishes probable cause.

8        The government has conceded that there was no probable

9   cause based on the Decker warrant, and so Mr. Wondie's arrest

10  was unlawful under any factual situation that we put it in.

11  What that means is that the illegal arrest is cause to suppress

12  anything that flowed from it, and that includes all of

13  Mr. Wondie's statements and any secondary warrants that flowed

14  from those statements or information that was provided in those

15  statements.

16       We would ask that the court find that Mr. Wondie's arrest

17  was illegal, an illegal, warrantless arrest, and suppress any

18  evidence that flowed from it.

19            THE COURT:  Thank you, counsel.

20       Counsel for the government?

21                 GOVERNMENT'S CLOSING ARGUMENT

22            MS. BECKER:  Thank you, Your Honor, and good morning.

23       Well before December 6th of 2018, and certainly no later

24  than December 6th of 2018, before the contact with Mr. Wondie,

25  agents from HSI, detectives from the Seattle Police Department,

1  and investigators at the King County Sheriff's Office knew,

2  collectively among them, that there was, in fact, probable cause

3  to arrest Mr. Wondie on that date.

4        The question was not whether they acted motivated by the

5  information that they had with respect to the drug

6  investigation, but it is a simple question of whether there was,

7  in fact, probable cause on that date to support the arrest on

8  probable cause.

9        Your Honor, the standard that this court applies is one of

10  probable cause, and it is a well-known standard.  It is

11  articulated probably most frequently in the case law and with

12  respect to searches, but it is the same standard that applies to

13  arrests.  And it is, as articulated in so many cases, that,

14  under the totality of the facts and circumstances known, whether

15  a prudent person would have concluded that there was a fair

16  probability that the suspect had committed a crime.

17        It is an objective standard.  It is not up to the

18  individuals making the arrest and involved in the investigation,

19  ultimately, to determine whether there is or is not probable

20  cause.

21        Counsel has referred to the fellow-officer rule, and the

22  government does rely on it.  This is set forth in Ninth Circuit

23  case law in *Ramirez* and *Garcia*, both of which are cited in the

24  government's brief.  And it indicates that when officers are

25  working in concert, the knowledge of one is imputed to all of

1    them.

2         And although HSI was working on a drug investigation and

3    the King County Sheriff's Office was working on a homicide

4    investigation, they met together, they exchanged information,

5    and they collaborated, including on the morning of the arrest

6    when all of these agencies, including the Seattle Police

7    Department, met and exchanged information in advance of the

8    planned execution of the Decker warrant, and, indeed, HSI agents

9    stood by and went to the scene immediately upon Mr. Wondie's

10   contact and arrest.

11        If the collective knowledge supports probable cause, then

12   the arrest can be made by anyone, even a person who does not

13   himself have knowledge of all the facts, as long as that person

14   is in communication with or is acting at the direction of the

15   team that does have knowledge.

16        While the same standard applies, Your Honor, with respect

17   to the meaning of probable cause in both the arrest and the

18   search context, there are some significant differences.

19        As this court is well aware, with respect to a search

20   without a warrant, such a warrant is presumed to be

21   unconstitutional absent evidence that it fits into one of the

22   closely guarded exceptions to the rule for warrants.  This is

23   not true with respect to arrests.

24        An arrest is constitutional, whether there is a warrant or

25   not, if it is supported by probable cause, and a warrantless

1    arrest satisfies the constitution so long as the officer had

2    probable cause to believe the suspect had committed a crime.  No

3    warrant is required.

4         Separately, staleness is a well-known concern of search

5    warrants.  Because there is probable cause to locate an item in

6    a particular place at a particular time does not mean that, a

7    day or a week or month or a year later, there is still probable

8    cause to search that location for an item of evidence.  For that

9    reason, anytime an officer applies for a search warrant, they

10   must provide specific facts that indicate that the warrant is

11   not stale.  And search warrants, under the rule, are for a

12   particular and short period of time.  They are not indefinite

13   authorizations to search the location.  This is just simply not

14   true with respect to arrests, and it is for a very good reason.

15        Once an individual commits a crime and there is probable

16   cause to believe that individual has committed a crime, that

17   crime has been committed.  There is no change that occurs as to

18   whether the crime has been committed.  It is looking at a past,

19   completed act.

20        Certainly, new information can come to light that indicates

21   that the probable cause has become insufficient, but it does not

22   erase the facts that have happened before that supported whether

23   the crime was committed and by a particular individual, and it

24   is for this reason that arrest warrants are not limited in time

25   in a way that search warrants are.  In fact, arrest warrants can

1   remain in a system and active for not just days or weeks, like a

2   search warrant might, but for years on end.

3        I want to turn to the probable cause here and some guiding

4   principles that were alluded to and sometimes directly addressed

5   by the defense.

6        The cases are clear, starting with *Gates*, that in

7   evaluating informants, information provided by non-police

8   officers, the evaluation of that information provided is based

9   on the totality of the circumstances.  It looks at an

10  informant's credibility to the extent it can be evaluated, the

11  basis of the informant's knowledge, the detail that the

12  informant is able to provide, and any corroboration that the

13  investigators are able to conduct with respect to the

14  information provided.

15       Case law also gives us additional guidance with respect to

16  citizen informants, as opposed to informants who are already

17  engaged in criminal activity.  And it tell us, in *Navarette v.*

18  *California,* a case out of Supreme Court from only seven years

19  ago, that an anonymous call can establish probable cause if the

20  information is detailed and implies firsthand knowledge, and it

21  is so even if that call is anonymous, because even though the

22  identity of the caller is not known, it is likely knowable and

23  the caller likely knows that it is knowable because of the 9-1-1

24  system that can be traced back.

25       And the point of this is that individuals know -- both

1   informants who are criminal in nature and citizen informants

2   know that if they provide false information, that there may well

3   be a consequence, criminal or otherwise, to themselves.

4        The Ninth Circuit has also told us, again, in *Villaseñor*,

5   that reliability is further established by an individual's

6   willingness to meet face to face with the police and to admit to

7   more significant criminal activity on their own part than the

8   police knew independently, and criminal conduct that invited

9   more severe penalties.

10       Here, Your Honor, we have both a citizen informant for

11  whom, when they are able to provide detailed information, a

12  presumption is afforded them that it is credible, and we

13  separately have information from a criminal informant who

14  provided detailed information not only about Mr. Wondie but,

15  first and primarily, about himself.

16       So let's start with the source of information.

17       The source of information met with Agents Dkane and

18  Spencer, as well as other individuals, immediately after his

19  arrest.  He knew that he was already in trouble, and the first

20  things that he did were to acknowledge his own role in setting

21  up the deal that ultimately led to his arrest, and he admitted

22  to additional misconduct, which was that he intended to rob the

23  person with whom he had set up the deal, who happens to have

24  been Lala, Agent Dkane's well-known and well-used undercover

25  persona.

1        In addition, the SOI admitted that he was himself

2   participating in the building of a pill press that was intended

3   to be used to manufacture counterfeit pills, and later he

4   provided photographs of that press.

5        He admitted to the investigators that material in his car

6   would show that he was so involved in criminal activity.  On his

7   own, he provided information, including location information

8   and, later, a tracking number.  He provided information

9   indicating that the pill press part that he had ordered had been

10  seized by CBP, and he told that to HSI before HSI knew it, or,

11  at least, before these particular agents knew it.  He also

12  admitted that he was a drug addict and told them that he was on

13  probation.

14       Later, after he was released, some of his first

15  communications with HSI was to point out that they had left

16  evidence in his car and sent a photo of it to them.

17       The HSI agents involved in his arrest on that day performed

18  some further investigation to vet the information that he was

19  providing.  They had an industry analyst present to ask

20  questions that the agents did not feel confident to ask

21  themselves, to confirm that the SOI actually had information,

22  reliable, accurate information about a pill press.

23       They called HSI agents in Louisiana to vet him, and

24  received no derogatory information back, and they contacted HSI

25  agents here who had previously met with the SOI on a previous

1    occasion.

2         The one piece of derogatory information was rather

3    colorfully expressed as "B.S. artist" in Agent Winger's note.

4    That notation was explained in considerably more detail by

5    documents submitted by counsel and by Agent Spencer, who

6    indicated that those HSI agents, who work in a entirely

7    different field, felt that the information that was within the

8    SOI's personal knowledge was not helpful and not useful because

9    it was not as detailed or as informative or even provided as

10   much information as the HSI officers themselves already knew.

11        Later, the HSI officers also confirmed what the SOI had

12   told them with respect to the pill press being shipped to a

13   location at a storage locker in Kent, and confirmed that that is

14   exactly what had happened; that it was the kind of part that

15   they were interested in and that the SOI had talked about and

16   that it had been seized.

17        It was against this backdrop of information providing

18   extensive information exposing him to substantially greater

19   criminal liability, but the SOI also provided information about

20   others, including Mr. Wondie, and that information was that

21   Mr. Wondie was participating with the SOI in the building of the

22   pill press; specifically, that he was financing it and paying

23   for the SOI's know-how to order and build the pill press.

24        The SOI provided a nickname that he knew Mr. Wondie by, he

25   provided a description of his car, and a phone number, as well

1    as information that I'll discuss in a few moments with respect

2    to Mr. Wondie's additional activities.

3         He did not purport to claim that he knew where exactly the

4    pill press was or even Mr. Wondie's current address.  He did not

5    stretch.

6         And based on the interview initially with the SOI that was

7    conducted on October 2nd, as well as follow-up interactions with

8    the SOI over a period of time, until he was no longer available

9    to him because he was arrested and returned to Louisiana for

10   probation violations, based on that entire set of interactions,

11   Agent Spencer believed, personally, that the SOI was credible.

12        It is clear, of course, that a SOI is not an upstanding

13   citizen.  He has numerous criminal convictions, he was on

14   probation, and he had a significant motive to cooperate.  But,

15   as Agent Dkane expressed, that does not make him not credible.

16   In fact, the fact he was known already in drug trafficking,

17   indicating he does have the requisite knowledge, and more often,

18   because he was providing information about his own misconduct,

19   he had a lot at stake.  So he was motivated to provide truthful

20   information that would advance an HSI investigation, with

21   knowledge that if he provided false information, he could be in

22   even bigger trouble than he already was.

23        And it is for these reasons that the case law is clear that

24   when an informant, who is already under arrest or is providing

25   significant criminal information about their own activities, is

1    meeting with the police and providing detailed information about

2    themselves and others, that this court can and should find that

3    information to be credible.

4         That is not, however, the only piece of information in the

5    possession of HSI, SPD, and the King County Sheriff's Office.

6    HSI and SPD both knew that a citizen complainant, an individual

7    who is presumed by the law to be credible if they provide

8    detailed and specific information from firsthand knowledge, is

9    credible.

10        That complainant initially made a report to the Seattle

11   Police Department, I believe, in August, although that's

12   reflected more accurately in the document, and then was

13   interviewed by HSI Agents Spencer and Dkane later.  Although

14   that person has not been identified here, it's clear that that

15   was a known person.  They were able to call her at the phone

16   number that was included in the documentation that they had, and

17   they were able to run that individual's criminal history and

18   determine that she had none.

19        In that interview, which is documented, I believe, at

20   Exhibit 9, the complainant described what she personally saw

21   from her apartment.  She described personal knowledge.  She

22   indicated that she had made repeated complaints, which was

23   consistent with her earlier report.  She described, in detail, a

24   car coming into the alley behind her residence and having

25   numerous hand-to-hand contacts with other individuals, as well

1    as people posting up along the alley to further engage in

2    similar activity.  And although she described it as drug

3    dealing, in addition to her initial description, Agent Spencer

4    and Agent Dkane, from their knowledge, also recognized that

5    conduct is consistent with drug dealing.

6        She did not know the individual's name or residence, so she

7    could not have been involved in the swatting or doxing that

8    defense counsel has referred to, the inviting the police to

9    harass a known individual for hidden motives.

10       Agent Spencer then went out to the area to look at the

11   alley that day that the complainant described, and found that it

12   met the description that she provided.

13       The agents found no reason for this individual to

14   fabricate, particularly because the conduct that she had been

15   complaining about and had said that it lasted for a number of

16   months, beginning in 2018 and continuing until she left town in

17   approximately August of 2018, had ended and she was no longer

18   asking for any police intervention but was still standing on the

19   statements that she had previously made.

20       And, finally, the location that she described, and that

21   Agent Spencer went out to and looked at, is consistent with

22   information provided by the SOI.  The same text messages that

23   counsel, helpfully, brought up for this court earlier in which

24   the SOI provided, after his release, when he was being asked

25   information about Mr. Wondie so that they could plan to buy for

1    him, said that he was dealing from his car, exactly as described

2    by the complainant, and in the area of 12th and Jefferson, which

3    is just a block and a half from where this complainant was

4    complaining.

5         In addition to the information provided by the SOI and the

6    complainant, Agents Dkane and Spencer had additional

7    information.  They went to a meeting -- or, rather, Agent Dkane

8    went to a meeting.  Not only did he review the emails that

9    counsel has reviewed with this court, but he met, in person,

10   with, at least, Officer Elliott Averett about the investigation

11   he was conducting, and particularly noted that Officer Averett

12   was concerned about Mr. Wondie openly selling drugs and being

13   armed at the same time, and that Officer Averett was, in fact,

14   pursuing an ERPO, an extreme risk protection order, because of

15   his concern about the combination of those events.

16        MS. BRIN:  Objection, Your Honor; misstates the

17   evidence in the email.

18        THE COURT:  It's overruled.

19        MS. BECKER:  The information from Officers Averett,

20   Souriall, and Chesney also indicated that the defendant was, in

21   fact, repeatedly in an area that was identified as a hotspot by

22   the Seattle Police Department for drug trafficking.  Although he

23   had a lawful reason to be at his business, it was always set up

24   in the Mud Bay parking lot, which is a particular hotspot, and

25   it is also reinforced by information from the SOI, where he

1  said, according to Agent Dkane, information that he provided in

2  the interview was that he was selling drugs from the Mud Bay

3  parking lot.

4      Finally, we have the undercover texts between Agent Dkane

5  and Mr. Wondie in two separate personas.  The court has all of

6  these text messages before it and can review them.  I won't

7  cover them in great detail.  I will just point out a few

8  important details.

9      First, with respect to the undercover communications

10 between Agent Dkane and the defendant, in his persona as Lala,

11 the same persona that successfully lured the SOI to a location

12 to provide Xanax for $200, during those communications Agent

13 Dkane was able to confirm that the name on the Facebook account

14 matched the data provided during a background check -- or a

15 records check, rather, that was associated with the phone number

16 initially provided with the SOI, and, in fact, the defendant

17 himself provided that phone number in the text messages.

18     The defendant said during those exchanges that he went to

19 school and was studying computer science, something that was

20 independently confirmed by Detective Decker and is in evidence

21 at Exhibit 68, which is a snapshot of the defendant's course

22 schedule.

23     During the course of their conversations, Lala -- Agent

24 Dkane as Lala -- initially raised the question of her interest

25 in drugs, and then nine days later, the defendant, on his own,

1   raised the question of drugs again, and that's on page 17 of

2   Exhibit 26, when he began the conversation with, "What are you

3   doing?"  She said, "Slangin and bangin."  And he responded,

4   "Sounds gangsta.  Tryna blow."  And Agent Dkane told you, based

5   on his experience, and, frankly, based on popular culture, it's

6   fairly clear that references to "blow," as well as his other

7   references to "snow" and "fire," are references to drugs, and,

8   in particular, with "snow" and "blow," to cocaine.

9       He told Lala that he had decent shit and invited her to

10   slide through, implying that she should come over because he had

11   it available at that time.

12       Additionally, he twice sent photos of apparent cocaine to

13   Lala.  These are documented at Exhibits 26, 27, and 28, and, in

14   particular, I would draw the court's attention to pages 18 and

15   19 of Exhibit 26, when the defendant texted to Lala that he had

16   a little that she could try, told her to call when she was ready

17   to stop playing, provided his phone number, and provided a

18   photograph of apparent cocaine.

19       Of course, counsel is correct that Mr. Wondie could have

20   been lying, but the standard is not proof beyond a reasonable

21   doubt that he possessed cocaine or was willing to give it to

22   Lala.  It is not even clear and convincing evidence or a

23   preponderance of the evidence.  It's the low standard of

24   probable cause.  And through his communications with Lala,

25   Mr. Wondie independently gave Agent Dkane probable cause that he

1    possessed and was willing to distribute cocaine.

2         With respect to the communications between Agent Dkane and

3    the defendant in the agent's persona as Mike Davis, these,

4    obviously, on their face, as well as through the testimony of

5    Agent Dkane, reinforced the belief, based on all the information

6    gathered to date, that the defendant was, in fact, engaged in

7    drug dealing.

8         When contacted by an individual unknown to him seeking

9    drugs, the defendant did not do what you would expect any of the

10   things you would expect an innocent person not involved in drug

11   dealing would do, which is to shut that person down and say, "I

12   don't know what you're talking about.  I'm not interested."

13        Rather, he began a cautious questioning of who the

14   contactor, Mike Davis, was and how he knew him, because he was,

15   obviously, concerned that he was being contacted, as drug

16   dealers ought to, frankly, be cautious about who they're being

17   contacted by when that person is a stranger to them, because of

18   the risk of informants and undercover contacts, exactly as this

19   was.  He did not shut the conversation down, but rather went on

20   to repeatedly feel out Agent DKane, in his persona as Mike

21   Davis, as to who he was and what he wanted.

22        In fact, the defendant asked Mike Davis directly what it

23   was that he wanted.  "He" referencing Mike Davis's purported

24   friend that was interested in buying drugs.  And when he said

25   that he had percs or bars, he did not respond with, you know,

1    "you have the wrong number" or in any other way that you might

2    imagine but indicated that if he knew these people better, he

3    might be willing to help and indicated he was willing to refer

4    them to someone else.

5         When Mike Davis asked about Gutu, that was exactly who --

6    the defendant knew who that person was and indicated that that's

7    who he would have referred Mike Davis to.  And as Agent Dkane

8    told us, Gutu is not a made-up name but an individual that Agent

9    Dkane has personally interviewed himself.

10        Finally, we have not only the direct interactions between

11   Agent Dkane in the persona of Mike Davis and the defendant

12   themselves but the follow-up that came from that when the SOI

13   independently reached out, on his own, to Agent Spencer to ask

14   whether someone in the persona of Mike Davis was contacting the

15   defendant, because the defendant had come to him and told him

16   about it.

17        The SOI indicated that the defendant was scared and spooked

18   that someone was on to him, and he was able to provide a

19   detailed description, and accurate description of the

20   conversation, indicating that, in fact, the SOI and the

21   defendant were in contact and were talking about drug-related

22   things.

23        All of the portions of these investigations together, which

24   is the test that this court must apply, the totality of the

25   circumstances point in a single direction, and that is that the

1    defendant was engaged in dealing drugs, and that he had, in

2    fact, delivered drugs and had possessed drugs and was willing to

3    provide them.

4        Defense counsel both, in their briefing, suggest that this

5    is an inevitable discovery argument, Your Honor, and the

6    government has repeatedly disclaimed that, and I want to speak

7    briefly to it.

8        The question before the court is not would a different

9    investigation have led to this same information, nor is it would

10   the police have arrested -- would HSI and the Seattle Police

11   Department have arrested the defendant on December 6th, 2018,

12   but for the Decker warrant.  That is not the question before the

13   court.

14       And it is not a question for a couple of reasons.  One,

15   Agent Dkane told you, I think quite frankly and quite

16   accurately, that even though they might have had probable cause

17   to arrest, it was not strategically sound --

18           MS. BRIN:  Objection, Your Honor, as to this line of

19   argument.  This is testimony we objected to during the eliciting

20   of it, and I believe the court sustained our objection.

21           THE COURT:  The court will note that, but please

22   continue.

23           MS. BECKER:  Thank you, Your Honor.

24       Although that objection was sustained at that time, he

25   testified further on that topic, permitted by the court in

1    redirect.

2         He indicated that it was not strategically sound that,

3    although there might have been probable cause to arrest him,

4    that is not proof beyond a reasonable doubt, and more

5    importantly, from Agent Dkane's perspective, that was not

6    sufficient evidence that our office would have accepted the case

7    for prosecution at that time because they did not, in fact,

8    recover drugs from the defendant.

9         Again, the question is not whether they would have arrested

10   the defendant on that date.  The question before this court is

11   was there probable cause to do so.

12        The cases on this are clear and replete.  I cited some in

13   my brief, and I'll review them briefly, Your Honor.

14        In *Lopez*, which I'm not confident I included in my brief,

15   which is at 482 F.3d 1067, the court was looking at whether

16   there was probable cause to arrest an individual on the stated

17   grounds that the officer had, in fact, arrested, and they

18   concluded that there was not.  But they went on to say that,

19   "Our conclusion that the police did not have probable cause to

20   regard Lopez," the defendant, "as the attempted shooter in their

21   particular investigation, does not end the inquiry, because they

22   can affirm, they can uphold the arrest on any basis evident in

23   the record."

24        *Devenpeck v. Alford* also supports this.  The cases make

25   clear that an arresting officer's state of mind, except, of

1    course, the facts supporting the state of mind, the facts known

2    to the investigating team, is irrelevant to the existence of

3    probable cause.

4        A subjective reason for making an arrest need not be the

5    criminal offense as to which the known facts provide probable

6    cause.

7        So the fact that the defendant was arrested by Officer

8    Alvarez on facts that are not before this court, whether it was

9    appropriate or not, for the facts stated, does not end the

10   inquiry. As these cases make clear, the inquiry is was there

11   probable cause known to the investigating team that would

12   support that arrest?

13       The doctrine of inevitable discovery comes into play only

14   when an arrest is illegal, and, here, the arrest was legal

15   because, although not supported by the probable cause but

16   developed by a homicide investigation, it was supported by the

17   investigation into the defendant's drug trafficking.

18       I would also direct the court to *Whren v. United States*,

19   which is a pretext case, which emphasizes this same principle.

20   The question of whether the police would have made the stop is

21   not the question before the court, and it is, in fact,

22   irrelevant.

23       I want to address one comment made during the arguments

24   made by Ms. Brin about HSI did not have probable cause because

25   they were waiting, and, in fact, they were waiting on the

1   execution of the Decker search warrant to provide that probable

2   cause, that is not the evidence that is before this court.

3          Agent Dkane indicated that he was continually having to put

4   off the defendant in his communications as Lala because the

5   homicide investigation slowed down their investigation, and it,

6   as being involved in a homicide, took priority over their

7   investigation.  It was not because he needed probable cause to

8   arise from the execution of that warrant.

9          A couple of concluding remarks, Your Honor.

10         Again, as this court well knows, the standard that is to be

11  applied is not what would stand up to a reasonable doubt

12  standard.  It would not.  The question is, under the totality of

13  the circumstances, was there probable cause to arrest the

14  defendant for the offense of which the investigating team

15  collectively had knowledge for?  The answer is yes.

16         The government generally agrees with the defense; if this

17  court finds that the arrest was unlawful, it must suppress the

18  defendant's statements, and it must suppress the search of the

19  defendant's -- the second search -- the search of the

20  defendant's second apartment, the later search warrants that

21  were obtained.  Whether other evidence should also be suppressed

22  relies more on whether the Decker warrant is upheld or not.

23         However, if this court finds that the arrest is lawful; in

24  other words, if it was supported by probable cause developed

25  during the drug investigation, and known, even if only in

1    pieces, to the investigating team, this court's inquiry should

2    come to an end.

3         If the search was lawful, everything else that the

4    government would use at trial flows, appropriately, from such an

5    arrest.  If the arrest was lawful, search of the defendant's

6    person incident to that arrest was also lawful.  If the arrest

7    of the defendant was lawful, any search of the vehicle

8    thereafter within a reasonable time was also lawful, even

9    without a warrant at the side of the road where Mr. Wondie was

10   stopped and ultimately arrested.

11        It also supports the warrant for the vehicle that was later

12   obtained by Detective Branham of the Seattle Police Department.

13   It does not rest on anything that was obtained by Detective

14   Decker's warrant.  It rests, instead, on the observations that

15   were made during the arrest and in the search immediately

16   post-arrest of the defendant's person and of the car, which,

17   although done under the auspices of the warrant, was lawful

18   anyway as a search of a vehicle incident to arrest for which

19   there was probable cause within the vehicle.

20        The interview of the defendant, again, would not,

21   therefore, be suppressed, and nor would the warrant for the

22   defendant's apartment.

23        And, accordingly, if so, if the arrest was lawful, this

24   court need not reach the question that my co-counsel and

25   Mr. Hamoudi are about to address with respect to the Decker

1   warrant.  It is, frankly, irrelevant if the arrest was lawful.

2        Thank you.

3             THE COURT:  Thank you, counsel.  Rebuttal?  We're

4   going to break at noon.

5                    DEFENDANT'S REBUTTAL ARGUMENT

6             MS. BRIN:  Thank you, Your Honor.  Briefly.

7        Ms. Becker talked about the fact that an arrest warrant

8   need not be limited in time.

9        What I have noted that the government has not done in its

10  briefing, nor did it do today, is explained to the court what

11  crime there was probable cause for, what drug was it that

12  the officers had probable cause to arrest Mr. Wondie for

13  allegedly dealing, and what transaction was it that they were

14  going to base that arrest on?

15       Your Honor, Ms. Becker went through the probable cause

16  cases, and she talked about informants, totality of

17  circumstances, their basis of knowledge, and the detail that

18  they have provided.  But Ms. Becker has also cited to cases that

19  cite to Supreme Court precedent, such as *Ibarra*, that talks

20  about the fact that those things are all helpful.

21       And the totality of the circumstances requires independent

22  corroboration of more than just a description, of more than just

23  an identification of an individual and, in fact, Your Honor,

24  discuss the fact that simply being near or close to a crime,

25  such as the SOI described with great specificity, would not be

1    sufficient for probable cause.

2        Ms. Becker talked about the SOI and the fact that

3    everything he said was detailed and he showed that he had a

4    significant amount of knowledge about the building of pill

5    presses and that they were able to corroborate all of the

6    information that he told them about himself, about what he had

7    done and his own criminal activity.

8        What Ms. Becker fails to acknowledge is that they were

9    unable to corroborate a single link between the SOI's criminal

10   activity as it related to the building of a second pill press

11   and Mr. Wondie, or G.  That is not sufficient under any

12   precedent.

13       Your Honor, Ms. Becker also talks about *Navarette*, and this

14   brings me to something we raised in our briefing, which is that

15   most of the cases cited by the government about the credibility

16   of complainants and about the credibility of SOIs are addressed

17   in the reasonable-suspicion context, and the government has

18   waived that argument here.

19       The government is no longer claiming that the SWAT team

20   could have done a stop of Mr. Wondie based upon reasonable

21   suspicion that he was or had been dealing drugs.  They are now

22   required to meet the probable-cause standard.

23       The cases, such as *Navarette*, which discuss a 9-1-1 phone

24   call made by an anonymous complainant about somebody who almost

25   drove her off of the road, are reasonable-suspicion cases, they

1    are not probable cause.

2         As to the SOI, Ms. Becker also discussed the fact that he

3    was extremely forthcoming with information.  But what was

4    established on cross-examination is he wasn't actually that

5    forthcoming.  He told them some of what was in his car, but not

6    everything.  He told them he was a drug user, but he did not

7    tell them he was a drug dealer and that they would find 26 grams

8    of heroin in his car, along with methamphetamine and scales and

9    baggies.  They did find that eventually, after he had supposedly

10   confessed.

11        And then, as Ms. Becker noted, he wrote them the text

12   message about how they had left the heroin in his car and he was

13   going to immediately throw it away.  But what he did, clearly,

14   is he used the heroin, and that was the basis of one of his

15   probation violations.

16        As to Agent Dkane's testimony, again, about the

17   conversation and saying that the SOI identified the Mud Bay

18   parking lot in his initial interview, although Agent Dkane did

19   not take notes, Agent Spencer did, and there is no Mud Bay

20   mentioned in those notes.  Agent Spencer did not testify to that

21   identification, and there is no evidence in the record that the

22   SOI identified Mud Bay, except for Agent Dkane's own testimony

23   by memory, which has been repeatedly shown to be poor.

24        Finally, Your Honor, Ms. Becker drew the court's attention

25   to page 17 of Exhibit 26, and she said that that is an area in

1    which Mr. Wondie or the individual believed to be Mr. Wondie

2    raised drugs on his own, and that was the discussion of the

3    phrase, "tryna blow."  And Ms. Becker admitted that, actually,

4    what happened was, Mr. Wondie began that conversation with

5    "WYD," which is "what you doin'?"  And Lala's response was,

6    "Slangin and bangin."  That, in and of itself, is also a

7    reference to drugs inasmuch as "Tryna blow" is.  So, again,

8    Lala, or Agent Dkane, was injecting the same types of

9    conversations about drugs, using those same kinds of slang about

10   drugs.

11        This photo that Mr. Wondie sent when he said, "come

12   through" or "slide through," that was the photo that had

13   something that looked like cocaine on the naked backside of a

14   female.  This was all still in the context of trying to develop

15   a sexual relationship; it was not in the context of trying to

16   deal drugs.

17        Finally, Your Honor, Ms. Becker talks about the fact that

18   Agent Dkane testified about how he needed to put off meeting

19   with Mr. Wondie so that the homicide investigation could move

20   forward.

21        If Agent DKane had met with Mr. Wondie, and Mr. Wondie had

22   showed up with drugs or to deal drugs to Agent Dkane and then

23   the Decker warrant had been executed, we might be in a different

24   situation, but that is not what happened here.

25        Agent Dkane, HSI, SPD, King County, all of them together,

1    all of the different leads that they had that had led to no

2    facts to help them establish probable cause, all of that

3    together does not make any of those leads a fact that could do

4    it.  There is no corroboration between those different things,

5    despite Agent Dkane and Agent Spencer trying to make them.  And

6    on December 6th, when Mr. Wondie was actually arrested, there

7    was no probable cause for the drug investigation.

8         Unless the court has any further questions, we would

9    submit.

10            THE COURT:  I have no additional questions, counsel.

11        It's 11 minutes before noon.  We'll recess at this time.

12    We'll resume back at 1:30, and we'll take up the second

13    argument.  We'll be in recess.

14            (Court in recess 11:51 a.m. to 1:34 p.m.)

15            THE COURT:  Good afternoon, again.

16        Counsel for the defense?

17                  DEFENDANT'S REBUTTAL ARGUMENT

18            MR. HAMOUDI:  Thank you, Your Honor, and thank you,

19    Mr. Wondie.

20        Here we are now, two and a half years has passed since this

21    case's inception.  Here we are, following one of the most

22    difficult summers in our history, a summer that involved

23    battling the pandemic.  It involved the cries of community

24    demanding justice and equal treatment under the law.  And that

25    community was sparked after a video captured a police officer's

 1  behavior on video.  And as Justice Brandeis wrote many years

 2  ago, sunlight is the best disinfectant.

 3       But there was no video in this case.  There was the court.

 4  Had it not been for this court's intervention, granting

 5  Mr. Wondie's emergency discovery relief, it is unclear whether

 6  we would have learned about a lot of the police behavior in this

 7  case.

 8       Detective Decker is a seasoned detective and has received

 9  numerous commendations.  To be clear, this is not personal.

10  This is about her actions as a detective, occupying a position

11  of public trust.

12       She violated the standards.  She applied to prepare an

13  application for a search warrant to search my client's home and

14  his vehicle.  The standards are avoid conclusions; rely on

15  facts.  Every fact should be attributed to a source.  If the

16  source is a person, explain how the person learned the facts.

17  Any evidence tending to negate probable cause must be included.

18       The defense bears the burden to establish Detective

19  Decker's intent or reckless regard for the truth by a

20  preponderance of the evidence.  This standard is well known.

21       In *Kansas v. Glover,* 140 Supreme Court cite 1183 at 1187,

22  the court there places in context where that standard sits in

23  light of other Fourth Amendment standards.

24       Quote, Although the word 'hunch' does not create reasonable

25  suspicion, the level of suspicion the standard requires is

1    considerably less than proof of wrongdoing by a preponderance of

2    the evidence and obviously less than is necessary for probable

3    cause.

4        Our standard sits in the middle of reasonable suspicion and

5    probable cause.

6        Detective Decker intentionally or recklessly made

7    representations about firearm forensics in this case.  The

8    detective testified that she believed "hits" and "matches" mean

9    the same thing.  We do not believe that this is credible in

10   light of the evidence that this court has seen, and we will

11   explain why.  But before we do, even crediting that testimony

12   entitles Mr. Wondie to relief.

13       Under that scenario, Mr. Wondie is entitled to relief under

14   *United States v. Jacobs,* which is cited, approvingly, in *United*

15   *States v. Perkins*.  In *Jacobs*, the affiant acted, at least,

16   recklessly when he correctly stated that the drug dog showed a

17   forensic interest in the defendant's package, but omitted the

18   fact that the drug dog failed to make an official alert.

19       On September the 21st, two days after the homicide, casings

20   were submitted to a NIBIN computer, and no NIBIN hits returned.

21   This earlier no-hit tended to negate probable cause as to the

22   NIBIN claims she made, something that was never included in the

23   affidavit.

24       What's worse, under *Jacobs*, for the government, is that at

25   least Jacobs correctly stated that the dog showed an interest in

1   a defendant's package.  Here, as we will explain next, the

2   detective went a step further, incorrectly declaring that the

3   casings were a match and that the casings were linked

4   conclusively to Mr. Wondie's firearm, leaving the judge to

5   conclude that it was his firearm, to the exclusion of all other

6   firearms.

7        In the lead email in this case and the attached lead

8   documents, nowhere is the term "hit," "linked conclusively," or

9   "matched" used.  She admitted, directly on the stand, that her

10  statement in the affidavit was not true.

11       Irrespective of the fact that the detective sought

12  confirmations for trial, the detective knew that NIBIN is a

13  screening tool.  The detective knew what a confirmation process

14  required, and the detective knew that this lead written by

15  Analyst Gonzalez on this date had written on it, "If you want to

16  use it for an arrest or warrant, contact the Washington State

17  Patrol Crime Lab."

18       The detective, who acknowledged that she had a rudimentary,

19  informal understanding of the NIBIN process, had a duty to

20  provide, in good faith, all relevant NIBIN information to the

21  magistrate, and that is in *United States v. Perkins*, 850 F.3d

22  1109 at 1116.

23       This was important because of her professed rudimentary

24  knowledge, because the magistrate, in order to discharge their

25  duty, has to make an independent evaluation of the matter.  She

1    deprived the magistrate the ability to do that.

2         It is worth observing that she had filled out a request

3    form for the TAC-30 SWAT mobile arrest team, which triggered the

4    use of its team to arrest my client.  I asked her directly, Your

5    Honor, "You knew that when you had a SWAT team arrest my client,

6    there was no probable cause to arrest him, correct?"  And she

7    admitted, "That is correct."

8         The detective's own email from 2017 shows she understands

9    what NIBIN's capabilities are.  This is at Defense Exhibit

10   136-28.

11        She explicitly wrote in that email request that she was

12   interested in linking the shell casings from the scene to the

13   pistol, and then the pistol to any other unsolved shootings.

14   That's the language she uses with NIBIN personnel.  The

15   terminology she uses with her colleagues is irrelevant.

16        She also knew that to use in court proceedings, she had to

17   get the lead verified.  Writing an email in 2017 -- this is at

18   Exhibit 136-10 -- and the subject matter of this email, "Request

19   for firearm testing validation."  Nowhere in that document does

20   she express any confusion.

21        Even -- even -- if her personal practice was not to seek

22   confirmation for warrants or arrests, she certainly had no right

23   to usurp the judge's independent duty to make that

24   determination; to let the judge know what Analyst Gonzalez had

25   written in the lead; that these casings appear to correspond.

1    If a microscopic confirmation is required for warrants, arrests,

2    please contact the WSP Crime Lab, and let the judge decide

3    whether she wanted to have the lead confirmed before signing off

4    on the warrant.

5         This is not a case where the detective stated in her

6    affidavit that a confirmation is not being sought, because, in

7    her training and experience, all previous leads have led to

8    confirmations.  That would be a conditional warrant.  That is a

9    condition that is yet to be confirmed, and let the judge decide,

10   "I will let you proceed with this warrant because when I look at

11   the warrant as a whole, I'm going to allow you to execute this

12   search warrant."

13        We now know -- and this is today, entered at Docket

14   308-1 -- in another 11th-hour, 12th-hour revelation, that had

15   she reached out for a confirmation, if that's what Judge

16   Richardson wanted, the lab would have done what she knows the

17   lab would have done; would have requested the actual casing,

18   which she would have learned that a confirmation was impossible

19   because the casing had been destroyed in 2017.  No warrant would

20   have issued because it would have been impossible for a match to

21   have ever been declared or a conclusive link to have been

22   declared.

23        This is what makes this use of this unequivocal language

24   with respect to the forensic firearm so problematic in this

25   case.

1          There has been testimony in this court that police

2     officers, judges, prosecutors act on information provided to

3     them by officers.  The match and conclusive-link language was

4     not only falsely presented to Judge Richardson, but it became

5     the central part of the government's advocacy in this case

6     against my client, until Judge Peterson put a stop to it, and it

7     created a specter in front of my client's family and his friends

8     that he provided an instrument that was used in the death of an

9     individual, when that fact was not true, nor could that fact be

10    proven, because the casing had been destroyed.

11         The detective's testimony that her understanding was that

12    she did not need NIBIN leads verified for the purposes of a

13    warrant was simply not credible with respect to the analyst in

14    this case, Analyst Gonzalez.

15         In Exhibit 136, in all the correspondences involving

16    Analyst Gonzalez, he repeatedly states, "If a microscopic

17    confirmation is required for warrants/arrests, please inform the

18    WSP Crime Lab."  This is the same language used in the lead

19    here.  The detective was clearly aware that Gonzalez, as opposed

20    to others, stated, "If a microscopic confirmation is required

21    for warrants or arrests, contact the Washington State Patrol

22    Crime Lab."  We now know why that is important, because, as

23    Mr. Noedel testified today, the computer can generate false

24    positives.

25         The NIBIN program operates in an environment of speed.

1   None of this was put before the judge so that the judge could
2   make an independent determination to sign off on a homicide
3   warrant to search my client's home, to search my client's
4   vehicle, utilizing a SWAT team in broad daylight in front of a
5   college.  False positives result in consequences for the
6   innocent.
7        And what's particularly problematic in this case is that
8   the casing has been destroyed, meaning the accusation that has
9   been leveled in open court is still out there.  The complaint is
10  filed and is a public document.  But what we cannot do is now
11  have the casing compared by a firearms examiner to exonerate my
12  client, and this is inimical to our motions of justice and
13  fairness.
14       But the government defended Detective Decker; on one hand,
15  trumpeting her training and expertise, while, on the other hand,
16  suggesting that she made a mistake.  And they cited to Exhibits
17  70 through 72 in support of that confusion between "hits" and
18  "matches."
19       These are correspondences in the past that she had as to
20  NIBIN, and they involve Ms. Tardiff, an employee of the
21  Washington State Patrol Crime Lab.  In all of her emails, she
22  uses the same "appear" language in quotes.  I'm quoting her.
23  Nowhere does she use the word "match" or "conclusively linked."
24  It is important that the particular examiner that she was
25  speaking to, the NIBIN technician, Gonzalez, made a statement to

1    her consistent with all his other previous statements to her.

2    "If a microscopic confirmation is required for warrants,

3    arrests, please contact the WSP Crime Lab."  And this is at

4    136-2, 136-11, and 136-25.

5         And the other two exhibits cited by the government involved

6    Jeff Baird, a King County prosecutor, it's Exhibit 73, and Tobin

7    Corlis, Property Management Unit for the King County Sheriff's

8    Office, Exhibit 74.  These are not NIBIN technicians or firearms

9    examiners.

10        She testified on cross-examination, "I have consistently

11   and regularly used the term 'match' synonymous with 'hit,' and

12   my understanding was that that was correct here, as recommended

13   to me by the prosecutor."

14        But she also said that she is not blaming Judge McDonald.

15   She also said that she is responsible, ultimately, for what is

16   written in her affidavits, and no other affidavit has been

17   produced by the government to corroborate that assertion, that

18   she has used the same type of synonymous language in other NIBIN

19   cases.

20        And we have some evidence before the court that directly

21   contradicts her understanding of NIBIN.  We have her email, at

22   Exhibit 136-28, asking for a NIBIN lead to be conducted.  And

23   she's not asking them to provide her with a hit or a match.

24   She's talking about link language, because she understands that

25   this is an investigative tool.  She understands the purpose of

1    this program.

2        And I would just add, Your Honor, that no testimony has

3    been received by any of her fellow officers that support the use

4    of this language.  No one from the ATF testified.  Neither

5    Analyst Gonzalez or Detective Jones has testified in these

6    hearings.  The court allowed the government, in the *Franks*

7    order, if they wanted to, to call Analyst Gonzalez.

8        The policy that has been submitted today through

9    Mr. Noedel, by the ATF, makes it very clear the distinctions

10   between NIBIN leads and NIBIN hits.

11       The policy that has been produced and admitted and

12   testified to by Detective Decker are the standards that she

13   applies to write search warrant applications, standards she

14   violated because she falsely attributed facts to a source, she

15   provided false conclusions, and she withheld information tending

16   to negate probable cause as to NIBIN.

17       There is some direct evidence in this record as to her

18   motivations.

19       We know that she was frustrated because two of her warrants

20   were rejected for being overly broad and vague.  It is

21   reasonable to infer that, in response to two warrants being

22   rejected because they were vague, she started to write her

23   warrants providing specificity that did not exist, for fear that

24   her warrants would get rejected for the same reasons.

25       The court can also look to Detectives Decker's intent and

1    recklessness with respect to how she drafted other aspects of

2    this affidavit.

3         There is direct evidence of her intent and reckless

4    disregard for the truth with respect to her use of, quote,

5    propensity for violence, closed quote, in describing my client

6    to the judge.  That evidence can also be used by the court to

7    consider her other misstatements.

8         The detective acknowledged she falsely represented that

9    Mr. Wondie had a propensity for violence, when, in fact, Officer

10   Averett reported a potential for violence.  She knew the

11   difference between the two, testifying the two differences that

12   potential for violence is possible anytime an individual has a

13   firearm, while "propensity" means that a person has a tendency

14   to be violent.  She misled Judge Richardson into the belief that

15   an officer, who had most recently had contact with my client,

16   believed that my client had a tendency to be violent.

17        Now, the government did not call Officer Averett to the

18   stand to suggest that he told her anything different.  And when

19   asked for an explanation, she said, "As we sit here today, I do

20   not."  She didn't know why she wrote that.

21        She admitted that she made a false statement in the

22   affidavit, Your Honor, but it was worse than that.  She also

23   withheld her belief that she did not believe that Mr. Wondie

24   would be assaultive towards law enforcement or that she did not

25   believe he would be violent out of past history.

1          This was significant, because in the application for the

2     search warrant -- if we go to 134-9 -- she incorporated Search

3     Warrant No. 18-S-1161A.  And that search warrant refers to

4     Exhibit 133, which is the addendum to the search warrant, and

5     that search warrant addendum was also signed by Judge

6     Richardson, and this is 133-3.

7          And the narrative that she had provided Judge Richardson

8     previous to this was, "I had been told by confidential sources

9     that Group A has, for an extended period of time, used its

10    accounts on Twitter, YouTube, and Instagram to publish its

11    position in its dispute with Group C and with individual members

12    of that gang, and to rally Group A members to its cause of

13    eliminating its rival."

14         She's telling a story here, Your Honor, to the judge about

15    a particular firearm, the history of that firearm, against the

16    backdrop of narratives that have been provided to the court

17    about these groups.  And within the context of that story, she's

18    telling the judge, falsely, my client has a propensity for

19    violence, and this is a warrant that says murder in the first

20    degree has been committed with premeditation and deliberation.

21         *United States v. Davis* 714 F.2d 896, 897 is persuasive on

22    this particular issue.  In that case, the police officer just

23    told an outright falsehood, and this is what the court said:

24    "Thompson," the police officer, "could have relied on the facts

25    learned from his subordinates to prepare a truthful affidavit.

1  This entire problem could have been avoided if Thompson had

2  simply rewritten the affidavit to indicate that he was relying

3  on his officers who had personally interviewed the informants."

4      Similarly, the affiant in *Franks* could have stated that his

5  fellow officer interviewed the informants in question.  By

6  failing properly to identify their sources of information, the

7  affiant in each case made it impossible for the magistrate to

8  evaluate the existence of probable cause.

9      *Franks* teaches that, as in this case, that failure is

10  intentional, the warrant must be invalidated.  The fact that

11  probable cause did exist and could have been established by a

12  truthful affidavit does not cure the error.

13      The *Davis* court invalidated the warrant because it was a

14  false statement provided under oath to the judge.  That was very

15  problematic to the Ninth Circuit.  But it continues.

16      The detective's pattern of recklessness with respect to

17  identifying men, young men, and, unfortunately, men of color, to

18  be associated with gangs was not just this one instance with

19  Mr. Wondie, but it was others.

20      She withheld the fact that she interviewed Individual 5 and

21  withheld the fact that he denied being a member of a gang.  She

22  didn't even tell the judge that she interviewed him.

23      She did the same thing with Individual 4, falsely

24  connecting him with Group C when, in fact, law enforcement had

25  affirmatively informed her that he was a member of Group B.

1        She falsely associated my client with Group A under this

2    theory that they had a conflict with Group B and A, and

3    Ms. Riley ended up getting murdered over it.  It's not even

4    clear if that theory holds water.  She did this even though

5    Agent Wozniak, who was investigating these gangs, did not know

6    who my client was.

7        SPD provided her a chart of Group A.  It clearly showed my

8    client was not a member of Group A.  And the chart identified

9    Individual 1, who she misidentified as Mr. Wondie.  At least

10   three Seattle Police Department officers respond to a request

11   about whether my client was associated with gangs.  No one

12   responded if he was associated with any of these gangs.

13       All of this was -- an affirmative statement was withheld

14   when an affirmative statement was made to the judge about my

15   client's association with Group A and putting a firearm similar

16   to the murder weapon in his hand in this photo.  This is clear

17   evidence of intent or recklessness, falsely or misleadingly

18   associating my client with particular gangs and other men.

19       Mr. Wondie had nothing to do with Group A.  She had this

20   information in her possession.  She had an obligation to tell

21   Judge Richardson, who had signed two separate warrants for Group

22   A, B, and C, that other than the photo she had in her possession

23   connecting Mr. Wondie to these groups and some officers

24   indicating that he had no gang associations, she had an

25   affirmative obligation to tell the judge that.

1          This is the type of information a judge who has signed

2     these warrants in their collective would want to know.  A

3     reasonable judge would say, "Wait.  It's just a photo?  Officers

4     are telling you that they're not associated with him?  Well,

5     what else do you have?"  "Well, I have this NIBIN."  Maybe the

6     judge would have inquired further about NIBIN.  "So all you have

7     is this NIBIN?  Let's talk about that."

8          This is what happens when you skew information, with

9     respect to a judge, and withheld facts.

10         Now, this is not as if she didn't have resources available

11    to her.  We know she was focused on Handle 1, which she was

12    being told was Individual 6, who she purported was involved in

13    Ms. Riley's death.  And as he demonstrated, to our

14    investigator's testimony and Ms. Whittler's report, Handle 1

15    would have readily identified Individual 1, even if she ignored

16    all the resources available to her.  But she had these

17    resources.  She had a source that was directly providing her

18    with social media intelligence.  She had Agent Wozniak assisting

19    her.  She had access to a gang database called GETEM.  All she

20    needed to do was send a picture of Group A and ask every law

21    enforcement agent who had access to that database, "Who are

22    these people?  Do we know their names?  I have a hunch.  A

23    source is telling me that this group is involved in this

24    person's death, and I want to find out who they are, and I'd

25    like to interview them."

1    This pattern establishes that she's been reckless with this

2    affidavit on multiple fronts, multiple instances, and the court

3    can be persuaded, taking her behavior, with other aspects of the

4    affidavit, to the extent there is doubt as to other aspects of

5    the affidavit.

6    She testified that she will use a one-on-one photo show-up

7    when the person making the identification has a familiarity with

8    the person in the photo, and where she has asked that witness to

9    confirm the photo that she has in her possession is that person.

10   This is her standards of using one-on-one photos.

11   She violated those standards.  Applying those standards,

12   she was reckless.  She testified that she had no personal

13   interactions with Mr. Wondie before his arrest.  Agent Wozniak

14   did not know Mr. Wondie.  And there's no evidence in this record

15   that Judge Richardson knew Mr. Wondie.  So here you have an

16   individual who has no personal interactions with Mr. Wondie,

17   making an assertion that they believe the individual is, in

18   fact, Mr. Wondie.  That's recklessly based on her own standard.

19   And what's worse is that she included this photo of this

20   individual looking up, with his tongue stuck out, and a booking

21   photo, and he's sitting in the back and his gun is in the air,

22   and it's a small photo.

23   But there's more.  In Exhibit 146 -- go to the second page.

24   Go to the next page.  This was a document her sergeant sent to

25   her colleagues and her, and there was testimony by Detective

1    Decker that she prepared this document.  She prepared this

2    document, and this document is attached to this email on

3    December the 5th, which is the day before the warrant was

4    executed -- hours.

5         Here, in this document that she prepared, she says,

6    "Individual 2 and Wondie each appear to be photographed as part

7    of the Group A."  She did not represent to them that Mr. Wondie

8    is the individual in the photograph.  Here, a day before the

9    warrant is executed, she's contradicting herself.  That's

10   evidence of recklessness and intent.

11        She was actively looking at social media, either herself or

12   with the assistance of others.  She did it with Individual 3.

13   She spoke with witnesses who identified persons for her on

14   social media.

15        Let's bring up 155-3.

16        This was the particular photograph she testified and she

17   admitted she was looking at it, and she withheld this photograph

18   from the judge, when an objective assessment, from the defense's

19   perspective, clearly shows that this is not Mr. Wondie.

20        There's more evidence of her intent and reckless disregard

21   for the truth.

22        On November 20th, 2018, she had two potential suspects she

23   believed had the firearm.  One was my client, and another one,

24   an individual who was involved in shooting at a moving vehicle

25   on May 28, 2018.  The individual who was a suspect at shooting

1   at the moving vehicle had multiple law enforcement contacts with

2   firearms, including one incident involving a .40 caliber Smith &

3   Wesson firearm.  This individual, the court learned, was not

4   Mr. Wondie.  The detective withheld the fact that the shooting

5   in that case involved shooting at a moving vehicle, similar to

6   Ms. Riley's homicide, had a suspect, and that the suspect was

7   not Mr. Wondie.

8        Had she included those facts, a reasonable judge would have

9   asked a logical question:  How can you assert that Mr. Wondie

10  has the gun if someone other than him was suspected of having

11  the firearm in their possession after the firearm was last

12  placed in Mr. Wondie's position?  What this means is that even

13  if the court credits the detective's understanding of NIBIN,

14  which we don't believe should be credible, you still have a

15  serious nexus problem, because you have to establish probable

16  cause to believe that the firearm was in Mr. Wondie's possession

17  on December the 6th, 2018, to search his home and vehicle.

18       Now, that's not logically possible, because if someone else

19  had the firearm after it was last placed in his possession, then

20  you have to establish what?  You have to establish a connection

21  between that person and Mr. Wondie.  And there was no evidence

22  in the record or in the affidavit that Mr. Wondie loaned out

23  firearms to people.

24       Crediting her NIBIN testimony, which we don't think the

25  court should, there still would have been no nexus had this

1    information been included.  That means even if the court says

2    she made a mistake about hits and matches, the warrant still

3    fails because she withheld material information, with respect to

4    nexus, as to who had the gun in their possession on December 6th

5    of 2018.

6         And we know, on November 20th, 2018, as we went through the

7    timeline chronology of the email when this individual was

8    discussed, and approximately 30 minutes after this, there was

9    that email about Mr. Wondie, and she admitted that she had to

10   get creative with the warrant.  She did not list a suspect for

11   the May 2018 incident or describe the fact that he, too, was

12   involved in shooting at a motor vehicle.  That was the

13   creativity.  Withhold those facts, don't let the judge know,

14   because if I do, what the judge is immediately going to be

15   asking, "Wait, wait, wait, wait, wait.  Why are we going to go

16   search his home and vehicle?  Why aren't we going to talk to

17   this individual if your logic is he is the one who is in

18   possession of the firearm?"

19        And we know that they had nexus problems, even though she

20   denied it on the stand.  And I asked her -- I ask the court not

21   to credit that testimony and to look at the December 3rd, 2018,

22   email, which I covered with her.  And this was the email which

23   is much earlier in time and closer to this event than her

24   testimony here today.

25        And where she talks about the moment of contact with

1    Mr. Wondie, and Detective Free writes, you know, "Kathy and I

2    were discussing last week," and December 3rd, last week, puts us

3    in late November.  And in this email, it's telling.  It shows

4    that they had doubts whether he was presently in possession of

5    the firearm.  Using terms like "loaning out the firearm," and as

6    to whether he had control over the firearm the whole time,

7    Detective Free writes, "It might pay dividends down the road."

8         They had no evidence that he had loaned out his firearm.

9    They wanted to see who he gave his firearm to at some point in

10   the past, and that would lead them to the next step in their

11   investigation:  Identifying the shooter.  That was the purpose

12   of arresting my client.  They admitted they didn't have probable

13   cause to believe he was involved in Ms. Riley's death.  Why else

14   would you go to see him?

15        When she writes in her emails to Agent Wozniak, "I believe

16   I need to chat with him," that's her state of mind.  That's her

17   investigative intent, "I want to talk with him.  I want to see

18   where this firearm is."

19        It is hard to imagine that when I asked the detective, "Now

20   we know that they aren't the same person, and knowing that, what

21   would you do differently?"  Offer an opportunity to acknowledge

22   wrongdoing, a mistake or whatever, and the answer I got was, "I

23   don't know at that time what else would have occurred to me to

24   be done.  I was positive that those were the same people."

25        Her testimony about these photos, Your Honor, was just not

1   credible.

2       And it's hard to go over it in detail, but the transcript

3   sometimes doesn't speak for itself, but the court was present

4   and the court observed the questioning and the photos when we

5   were asking the questions.

6       And we're taking about a detective with years and years of

7   experience.  She testified that she had experience in forensic

8   photo analysis.  And just basic hallmark features and

9   dissimilarities, was not even willing acknowledging those,

10  because acknowledging that -- and this is just an inference,

11  Your Honor -- would suggest something terrible for a person on

12  the stand, to make a mistake of such a devastating order.

13      But we know it's not Mr. Wondie.  We know that there was

14  multiple resources available to the detective to easily

15  establish that it wasn't Mr. Wondie.  Now, had the judge known,

16  the judge would have immediately become concerned as to why --

17  what is the connection?  What's going on here?  What is it with

18  this affidavit, with this narrative?  Would have started to

19  question the connection between the firearm, the association,

20  and would have probably started questioning other aspects of the

21  affidavit.

22      But when the judge is reading the affidavit, the judge

23  reads your affiant has over 17 years' experience in major

24  crimes, investigating homicide, robbery, felony assault, and

25  missing persons cases.  Your affiant has been employed as a

1   fully commission deputy detective with the King County Sheriff's

2   Office for 33 years.  Your affiant has attended numerous

3   trainings over the years, to include basic and homicide

4   investigation, blood spatter interpretation, crime scene

5   photography, interview and interrogation techniques, evidence

6   search theory, as well as training in incident command from the

7   100-level through the 800-level courses.  "I am investigating

8   the homicide referenced in this affidavit.  In the course of the

9   investigation, I have learned the following."  And it is against

10  that backdrop of experience where she says, "I believe the male

11  shown second from the left in the back is Gizachew Wondie."

12      It is that experience that is being brought to bear that

13  leads the judge to think, "Well, if this detective is telling me

14  that, they've done their homework, they've done their diligence,

15  and I can trust what they're saying to me."

16      And what we learned through the evidence -- Mr. Stortini's

17  testimony, his report, Ms. Whittler's report, and the evidence

18  that came in -- rudimentary investigation into this photo was

19  not accomplished.  None of it was done.  That, as well, is

20  evidence of her intent and recklessness.

21      If individually we have not established intent or

22  recklessness, Your Honor, we submit that we have when taking all

23  of these matters into consideration in their totality; that this

24  affidavit, had the truth been revealed, would never been signed,

25  this warrant would have never been signed, and no search would

1    have occurred.  A SWAT team would not have showed up outside a

2    university on December 6th, 2018, with assault rifles and

3    wearing military gear and taking my client into custody.  They

4    just wouldn't have done that.

5         And we wouldn't be here today.  We wouldn't be here today.

6    Mr. Wondie wouldn't have had to grapple with these court

7    proceedings for two and a half years, endured what he's endured.

8    The discovery issues would not have occurred.  None of it.

9         I want to talk about the exclusionary rule a little bit.

10   Ever since its inception, the rule excluding evidence seized in

11   violation of the Fourth Amendment has been recognized as a

12   principle mode of discouraging lawless police conduct.

13        Sounds cliché, but this is from *Terry v. Ohio*, and I was

14   reading it, and it has particular force here.  Its major thrust

15   is a deterrent one, and experience has taught that it is the

16   only effective deterrent to police misconduct in the criminal

17   context, and that without it, the constitutional guarantee

18   against unreasonable searches and seizures would be a mere form

19   of words.

20        But the rule also has another vital function:  The

21   imperative of judicial integrity.  Courts that sit under our

22   constitution cannot and will not be made party to lawless

23   invasions of the constitutional rights of citizens by permitting

24   unhindered governmental use of the fruits of such invasion.

25        I want to go over, briefly, some of the values that would

1    be served by excluding all of the evidence in this case.

2         One of the issues is falsely associating individuals with

3    gangs, which is a dangerous thing to do, especially when someone

4    has been killed as a result of a gang dispute, and associating

5    my client with that homicide through false evidence in open

6    proceedings.

7         Conducting a background investigation into individuals

8    before making claims about their propensities.  Making sure not

9    to skew facts when seeking a warrant.  Destroying your text

10   messages, text messages that were used and exchanged in pursuit

11   of a warrant, which make it difficult for parties, two and a

12   half years later, to understand context, intent, and meaning

13   with respect to the affiant's state of mind.

14        Misrepresenting forensic evidence in a homicide affidavit.

15   Withholding your own subjective beliefs, which directly

16   contradict the beliefs of other officers, which you have also

17   falsely represented.

18        Asking to use a SWAT team when you do not have probable

19   cause for an arrest outside a public university on a weekday in

20   broad daylight, exposing many to risk.  And we know the risks

21   associated with the use of force and SWAT teams.  Just recently,

22   we had Breonna Taylor killed in her home because of these types

23   of activities.  Had Mr. Wondie made an inappropriate gesture or

24   movement, he could have been killed.

25        Because Detectives Decker is a seasoned detective,

1   accountability always starts from the top with respect to our

2   leaders.  Laughing about the warrant process, using words like

3   "creativity" as to the process undermines confidence in the

4   system.

5        Holding this detective accountable empowers officers who do

6   not take shortcuts, who follow the rules, and, more important,

7   officers who want to be public servants in an environment that

8   is currently hostile to them.

9        Judicial integrity, a little bit.  That stands on the

10  process that no warrant shall issue but upon probable cause

11  supported by oath or affirmation.  That's from the Fourth

12  Amendment.  From our finding, oath and affirmation has been a

13  hallmark of the process.  This is an ex parte process, which

14  appears inconsistent with our adversarial system.  Oath and

15  affirmation represents honesty, transparency, and reliability,

16  which are crucial to this system.

17       The public doesn't have access to this system on a

18  day-to-day basis.  Neither do defense lawyers.  An exclusionary

19  rule occupies a special space here.  It protects the judiciary

20  from being party to a deception.  It protects prosecutors, who

21  have to draft affidavits.  And most important, it protects a

22  core Fourth Amendment protection, which is the warrant clause.

23       The last thing is, exclusion is necessary, Your Honor, to

24  inject the government's collective knowledge doctrine based on

25  alternative probable cause, which knows no basis in law.  That

1   theory is a means towards an end, an end which asks this court

2   to ignore the deceptions, the misconduct, and, most important,

3   the risk created not only towards my client's life by use of a

4   SWAT team, but students and the public who were going about

5   their business on the morning of December 6th, 2018.

6        Federal and state agents work towards a common end in this

7   case.  The evidence was clear.

8        We ask that this court exclude all evidence as a

9   consequence of this warrant in the vehicle, on my client's

10  person, all statements made by him, and the search of both

11  residences.

12       Thank you.

13            THE COURT:  Let's take a stretch break, counsel.

14            MS. BRIN:  Your Honor, if I may just use the restroom

15  as well?

16            THE COURT:  Okay.

17                      (Off the record.)

18            THE COURT:  Please be seated.

19       We're going to take our recess at 2:45.  I'm not asking you

20  to stop.  You can complete your argument, but I want to try and

21  stay on track, to the extent that we can.

22            MR. OESTERLE:  Thank you, Your Honor.  I'm going to

23  wait for Ms. Brin to return to the courtroom.

24            THE COURT:  That's fine.  We'll give her a little more

25  time for a convenience break.

1        GOVERNMENT'S CLOSING ARGUMENT

2           MR. OESTERLE:  Thank you, Your Honor.

3           Counsel, as he was closing his argument, raised a totality

4    of circumstances in a way that goes beyond this case, really.

5    Defense is arguing not just for the instances in the affidavit

6    that have been put forth as being reckless or deliberately

7    false, but other aspects of the affidavit, painting it with the

8    broadest brush possible.

9           Into that totality of the argument, the defense also puts

10   other actions in this case, including discovery issues.  Into

11   that totality argument, counsel also puts the conduct of

12   Detective Decker and her fellow investigators and other aspects

13   of the homicide investigation.

14          But that simply can't be the law for this issue.  And while

15   I respect and admire counsel's passion and zealous advocacy,

16   and, in fact, agree with many of his final policy statements,

17   that's not the issue before this court and should not color the

18   court's analysis under the *Franks* doctrine.

19          The government would urge the court to return to the *Franks*

20   doctrine and what's actually required, and focus on the

21   affidavit that we've been discussing for the past two days.

22          The standard is very clear, and defense readily embraces

23   their burden.  That burden is a heavy one, and to prevail, the

24   defense must prove, by clear evidence, that either Detective

25   Decker either made deliberatively false statements, knowing and

1   intentionally, or made statements in reckless disregard for the

2   truth, which has also been defined by the courts as, in fact,

3   showing that Detective Decker entertained serious doubts as to

4   the truth of her allegations.

5        The *Franks* doctrine, now in the Ninth Circuit, also applies

6   to omissions, as the court is well aware, and has been briefed

7   by the parties.  And in that context, when we deal with

8   omissions, under the *Franks* doctrine, suppression is available

9   if Detective Decker intentionally or recklessly omitted facts

10  found to be material to the finding of probable cause and did so

11  with an intent to mislead.

12       Stripping away all the other claims of government

13  misconduct, overreach noted by the defense, and focusing solely

14  on the affidavit that was submitted by Detective Decker, the

15  government submits this standard cannot be met in this case.

16       First, with respect to NIBIN, Detective Decker made a

17  candid admission before this court.  She acknowledged making a

18  mistake.  She overstated the evidentiary weight to be given to

19  the NIBIN presumptive lead notification.  Instead of quoting

20  directly from the source document, she used language that she

21  had used in the past, and she testified that others, in fact, in

22  her department had used as well.

23       It was a mistake, an overstatement.  It was not made with

24  the intent to deceive.  She was simply using language that she

25  had been comfortable with and had not been challenged for in the

1   past.

2       Defense suggests that the government could have called

3   other people to bolster Detective Decker.  That would have been

4   improper.  The inquiry before this court is what Detective

5   Decker believed.  It is a subjective analysis, not objective.

6   It doesn't matter what Sam Gonzalez thought.  It mattered what

7   Detective Decker had in her mind, and she was here to testify

8   for this court.

9       As I said, she was candid about her understanding of NIBIN,

10  and she was presented documents that included -- documents that

11  she was recipient of, either directly or a copy was sent to her,

12  explaining the NIBIN process.  Many of those documents were

13  reviewed earlier today with Mr. Noedel.

14      And I was going to go through each of those documents, but

15  I really don't think it's necessary, given Mr. Noedel's

16  testimony this morning.

17      What he confirmed, by his own testimony, was that

18  professionals like Detective Decker do use the words "hit" and

19  "match" interchangeably when describing the association that's

20  set forth in a NIBIN lead notification.  He acknowledged what

21  Detective Decker's practice was, and then went a step further

22  and admitted that NIBIN lead notification nomenclature is

23  confusing.

24      Piecing together the evolution of the language found in the

25  NIBIN lead notification, as the government did, and it was

1   reviewed again this morning, from 2015 to 2018 there was a

2   transformation.  It went from "hit," "lead," to "association."

3   It was not unreasonable for Detective Decker to rely on that

4   past experience with NIBIN lead notifications.

5        Yes, the language changed, but it also changed in a way

6   that informed Ms. Decker that the confirmation process, the

7   second step, was not necessary for a probable cause

8   determination because language that had required that was

9   removed from the NIBIN lead notification, as the exhibits

10  presented.

11       The 2018 version, which was the version that communicated

12  the NIBIN lead confirmation to Detective Decker, had removed the

13  requirement that confirmation is required for showing of

14  probable cause.

15       The language remained something of a standard language

16  format in the cover memo, the cover email in this case from Sam

17  Gonzalez, "If microscopic confirmation is needed," and Detective

18  Decker testified that it was her understanding, and it was a

19  reasonable understanding.  She interpreted that as if, "if

20  required," and her understanding was for trial, then she would

21  seek the microscopic confirmation by contacting the lab.  The

22  language does not read, as counsel suggested, that if you have

23  to prove probable cause, you have to get microscopic

24  confirmation.  That's not what the language says.  It's not

25  unreasonable.

1        And, more importantly, she did not use the language she did

2    in the affidavit with an intent to deceive.  It was a mistake.

3    It was an overstatement.  She owned it on the stand, and I think

4    that goes to her credibility.

5        Again, we don't even need to necessarily give a hundred

6    percent credence to that statement.  We just need to recall

7    Mr. Noedel's testimony this morning.

8        The self-described distinguished member of the leading

9    professional organization for firearms and toolmark examiners

10   acknowledged there's confusion.  It's not unreasonable to then

11   allow Detective Decker to share in some of that confusion.

12       So to summarize with respect to NIBIN, again, Detective

13   acknowledged a mistake.  There is no evidence or certainly clear

14   proof that that was a deliberate falsehood intended to deceive

15   Judge Richardson.  There is no evidence of reckless disregard on

16   her part to use the language she did with the intent to deceive

17   Judge Richardson.

18       Courts have interpreted the reckless disregard standard to

19   also mean, as I said earlier, that the affiant, in fact,

20   entertained serious doubts as to the truth of the allegations.

21   There was no evidence elicited that Detective Decker had any

22   doubts as to how she characterized NIBIN, much less serious

23   doubts.

24       And, again, suggesting that the government should have

25   called Sam Gonzalez or others in her department to bolster or

1   verify the legitimacy or the genuineness of her belief flips the

2   standard on its head.  It's not the government's burden to do

3   that.  The government presented the affiant or made the affiant

4   available.  The affiant testified.  That's what matters, what

5   she believed and what her intent was.

6       With respect to the photo, much of defense's presentation

7   with respect to the photo focused on how easily it would have

8   been for Detective Decker to access other social media accounts

9   and information to locate additional images that could have

10  challenged her belief that the individual depicted in the group

11  photo was Mr. Wondie.

12      But that's not the appropriate inquiry for this proceeding.

13  The appropriate inquiry is whether she made an intentional false

14  assertion that the person in the booking photo, Mr. Wondie, was

15  the person depicted second to the left in the group photo.

16      The question is, did Detective Decker entertain serious

17  doubts as to the truth of her belief?  She testified that she

18  did not.  The defense has challenged that, but there is still no

19  evidence in the record that, in fact, she had any doubts.

20      She sought out the advice of others.  She also displayed

21  the photograph -- she testified she displayed the photograph to

22  other law enforcement.  Defense may strongly disagree that that

23  was adequate, but there is no standard set forth in the cases

24  for what is considered to be adequate diligence.

25      The Ninth Circuit has found that a failure to investigate

1    fully is not evidence of an affiant's reckless disregard for the

2    truth.  As stated in the Ninth Circuit decision *U.S. v. Gourde,*

3    440 F.3d 1065, the benchmark is not what the FBI could have

4    done.  An affidavit may support probable cause even if the

5    government fails to obtain potentially dispositive information.

6        Suggesting or putting on evidence that a more thorough

7    investigation would have been appropriate, which was done in

8    this case, is not a substitute for establishing intentional or

9    reckless conduct on the part of the affiant.

10       The Ninth Circuit has repeatedly affirmed the denial of a

11   *Franks* motion in circumstances analogous to those presented here

12   in which the defendant claims that a more thorough investigation

13   was warranted, particularly with respect to the photo.

14       And I would cite, for the court's benefit, two cases:

15   *United States v. Huggins*, 299 F.3d 1039, where the court said,

16   quote, Even assuming without deciding that such a duty of

17   further inquiry may exist in some cases, and, as the defendant

18   argues, a more thorough surveillance would have uncovered

19   information that would have undermined a finding of probable

20   cause, we think that the agent's decision not to conduct

21   prolonged surveillance certainly was not made with the degree of

22   recklessly necessary to warrant suppression.

23       The second case is *United States v. Burns*, at 816 F.2d

24   1354, where the court stated, quote, While further investigation

25   by the officers might have revealed that the chemical bottle

1    obtained by the woman at Chem Lab is not unique to ephedrine,

2    the most that could be said of the officer's failure to further

3    investigate is that they were negligent.

4         The same applies in this case.

5         Absent evidence, clear proof that Detective Decker

6    entertained serious doubts as to the truth of her representation

7    that the photos were of the same person, the most that can be

8    said is that she was negligent.

9         Finally, with respect to the propensity for violence claim,

10   or the inclusion of the "propensity for violence" term in the

11   affidavit, instead of the term apparently used by Officer

12   Averett, which is the "potential for violence," the same could

13   be said.

14        What Detective Decker represented in her affidavit was that

15   this was a communication given to her by Officer Averett.  She

16   does not recall why the word "propensity" appears and not the

17   word "potential," as is in Officer Averett's email.

18        But, again, the mere fact it's different language does not

19   satisfy the burden that that substitution was made with the

20   intent to deceive or with reckless disregard for the truth of

21   the matter.

22        And the court doesn't have to rely solely on the

23   government's representation of that.  With respect to the

24   "propensity" language, I would invite the court to look at the

25   paragraph immediately following that; language that has not, to

 1    the best of my recollection, been challenged by the defense in

 2    this case.

 3        If it's important to a finding of probable cause in this

 4    case, the government submits that this language, even if the

 5    court chooses to excise the "propensity for violence" term

 6    because the court believes it was either recklessly or

 7    deliberately included with an intent to deceive, this language,

 8    which, again, the government believes was not challenged, should

 9    stand as a sufficient basis for supporting Detective Decker's

10    request for a warrant in this case.

11        Again, as representations made in very, very close

12    proximity to the date that this affidavit was submitted in

13    connection with the application for the warrant, showing that,

14    in fact, Mr. Wondie, through his representations to a UC, had

15    represented that he -- and you have to drop a pretty reasonable

16    inference that he had a gun, based on what he was communicating

17    to the UC.

18        That addresses the three principle claims.  Again, focusing

19    solely on the affidavit, which is the task before the court, it

20    is not to apply the broad brush of allegations regarding both

21    the homicide investigation, the federal prosecution, and other

22    external events to somehow color what Detective Decker's intent

23    was.

24        The government would urge the court to remain focused on

25    that question and that question alone in determining whether

1    there was sufficient probable cause to uphold the warrant, and,

2    in fact, that Detective Decker did not make deliberate false

3    statements, she did not make statements in reckless disregard

4    for the truth.  None of that was done with an intent to deceive

5    the court.

6         What's important is what she had in her mind.

7         Two weeks ago, in response to questions asked of Special

8    Agent Dkane about whether he would agree that the photos

9    matched, defense raised an objection, and the court sustained

10   it.  And in the objection, counsel said, "It doesn't matter what

11   Special Agent Dkane thinks.  What matters is what Detective

12   Decker thinks."  And that is exactly what the government asks

13   the court to do in this case, and deny the motion.

14        Thank you.

15           THE COURT:  We'll take our afternoon recess at this

16   time.  We'll resume in 15 minutes.

17              (Court in recess 2:44 p.m. to 3:03 p.m.)

18           THE COURT:  Counsel for the government has completed

19   their argument.  Counsel for the defense?

20                    DEFENSE'S REBUTTAL ARGUMENT

21           MR. HAMOUDI:  Thank you, Your Honor.

22        The government observed that our request for relief

23   encompassed a large -- requested relief outside the scope of

24   what's at issue in the *Franks* motion.  That's not the case.

25        The exclusionary rule here meets two purposes:  One, if the

1    court finds that there is a warrantless arrest and exclusion

2    needs to be used, then the purpose of the exclusionary rule

3    should meet the purposes of what happened with respect to the

4    arrest, which was use of a SWAT team without probable cause.  So

5    a lot of the comments that I made about placing my client's life

6    in danger and the public in danger is with respect to that

7    issue.

8         With respect to the *Franks* motion, the court cannot ignore

9    that the officers' actions, for the exclusionary rule purpose,

10   has downstream effects.  It would treat the behavior as though

11   it existed in a vacuum.

12        Now, that's a separate part of the analysis, which is --

13   and, obviously, the court is going to conduct the analysis

14   however it pleases.  The court may conduct an analysis where

15   it's thinking about the exclusionary rule and the values that it

16   would serve in this case, and then address the affidavit and

17   look at the four corners of the affidavit and focus on the

18   misrepresentations, or vice versa, but we ask that the court do

19   consider what purpose the exclusionary rule would serve in the

20   context of the case if relief is granted, and that's what we're

21   speaking to.

22        We also would add, Your Honor, that the government seems to

23   indicate that Detective Decker's language used with respect to

24   the NIBIN was reasonable for her to rely on this old language of

25   "hit."  And this is not about relying on the language of "hit"

1    in emails exchanged and received.  This is about the language

2    used in an affidavit, a sworn affidavit under penalty of perjury

3    to a judge, who is not your fellow law enforcement colleague,

4    who is not just emails being exchanged over the computer.  This

5    is about filling out an affidavit.  And so when we asked or

6    posed we did not receive any affidavits from Detective Decker in

7    the past, from 2016, when this old language was being used,

8    indicating that that was her understanding of NIBIN.

9         And I would particularly like to focus the court's

10   attention to Exhibit 136-6, 136-16, 136-21, 136-27, and even the

11   government's 75-2, and these are all NIBIN leads from 2017, and

12   consistently, in all of these leads, the language included is,

13   "NIBIN leads cannot be utilized for the establishment of

14   probable cause for warrants or for any court-related purposes

15   until evidence has been confirmed by microscopic examination."

16   And that language in 2018 is included in Gonzalez' email saying,

17   "If a microscopic confirmation is required for arrests,

18   warrants, et cetera, please contact WSP Crime Lab."

19        Now, if you want to even ignore this language, the problem

20   here is -- bringing up the first page of 135, the email --

21   Gonzalez is saying, "The cartridge casings from KCSO appear to

22   correspond, as established by the NIBIN database."  It's the

23   "appear to correspond."  There is no use of the one -- that this

24   is connected to the firearm.  They're talking about the casings.

25   That's the most problematic aspect of what happened in the

1   affidavit.

2       The issue "if a microscopic confirmation is required" is

3   simply flavor to add to that as an indication, an alert, "be

4   careful about how this is prepared or included in an affidavit

5   or a warrant."  That's what that means.

6       To accept the government's position that the detective was

7   reasonably mistaken would be as though a police officer who

8   works at a police department is applying a standard in 2016, and

9   then the police department changes that standard in 2017, and

10  then in 2018 the police officer makes a decision, and that

11  decision is of consequence because it's contrary to the 2017

12  policy, and the police officer proclaims, "I was applying 2016,"

13  that's not reasonable.  That's simply not reasonable in the

14  context of just being a police officer.  Now we're talking in

15  the context of an affidavit that is being prepared and signed by

16  a police officer with 30 years of experience to a judge.

17      On the issue of Mr. Noedel testifying about their being

18  confusion, he was referring to this old language.  And if the

19  government does not want other subjective beliefs of individuals

20  to be associated with Detective Decker, then the same rule

21  should then apply, and what Mr. Noedel's testimony is about

22  someone being confused should equally not be applied to

23  Detective Decker.

24      Detective Decker is responsible for her affidavits, and she

25  has a lot of experience, and if she was confused, she should

1    have just sourced it and attached the NIBIN lead to the

2    affidavit -- and she said she could have.  There was nothing

3    preventing her from doing that -- so that the judge could have

4    the information in her hand.

5         And we are not, with respect to the photo, demanding that

6    some new and burdensome duty to inquire be placed on police

7    officers.  What we're talking about there is what she had in her

8    possession the whole time.  The documents, the emails, the

9    videos that we covered with her in her testimony, she had those

10   in her files; she just decided not to look at them when she made

11   her assertion.  That allows the court to infer a reckless

12   disregard for the truth.

13        The government spoke briefly about this meeting, and no

14   testimony was offered by any of these individuals about what was

15   said in this meeting, but I would just add what the government

16   elicited was that the affidavit was presented in this meeting,

17   and the picture and the booking photo in the affidavit,

18   including her statement that "I believe this is Mr. Wondie."  So

19   she's already asserted her belief.  It's not as if she came into

20   this meeting and was like, "Officers, let's get together and

21   figure out who this person is."  There's no testimony to that

22   effect.

23        Ultimately, Your Honor, the four corners of the affidavit

24   are going to control what happens here, and what I believe

25   Mr. Oesterle is suggesting is that I think if we excise the

1   falsehoods in this affidavit, if we just look at this affidavit

2   without the falsehoods and ask ourselves whether probable cause

3   existed to search my client's home and residence, I don't think

4   we satisfy that.

5          And if we go through and we excise, on 134-5, under the

6   summary, "Forensic examination has established that shell

7   casings recovered from the scene match the gun known to be owned

8   by Gizachew Wondie."  If we go to 134-6, paragraph 5, we write,

9   "Detectives learned, through NIBIN testing, a casing was linked

10  to two Seattle Police cases," rather than, "Detectives learned

11  through NIBIN testing the firearm used to shoot and kill Amarah

12  Riley was the same firearm linked to two Seattle Police cases."

13         If we then go to 134-8, the bottom, and we excise "the test

14  results link conclusively," we remove "conclusively," "to the

15  shell casings collected from the Amarah Riley murder scene on

16  9/19/2018," and we excise "the Gizachew Wondie Smith & Wesson

17  .40 caliber firearm described above," we excise that last

18  sentence, and we move forward to page 134-10, and we -- at the

19  bottom, we excise, "I believe the male shown second from the

20  left in the back is Gizachew Wondie," we excise that, and then

21  we move forward to the next page, we excise, "propensity for

22  violence," and put in "potential for violence," and then if we

23  go to -- I apologize -- 134-8, under the heading, "The May 28th,

24  2018, incident," we include that "there was a suspect that was

25  not Mr. Wondie, who was viewed by witness to be shooting at a

1  moving vehicle," and we put in the appropriate context with

2  respect to suspect's history, if we do all that, Your Honor,

3  probable cause does not exist to search my client's home and his

4  vehicle for the Smith & Wesson firearm.

5      Thank you, Your Honor.

6          THE COURT:  All right.  Thank you, counsel.

7      Counsel, we've come to the conclusion of the evidentiary

8  portion of this case, as well as argument of counsel.  The

9  matters have all been submitted to the court for consideration.

10 I've given you the date of July 1 at 1:30.  If I can get a

11 written order done, counsel, before that date, I'll certainly

12 enter the written order, and you will not have to be here, but I

13 think you should plan to be here otherwise.

14     Counsel for the government, do you know of any reason why

15 you cannot be here for the date and time given by the court?

16         MS. BECKER:  Not at this time.

17         THE COURT:  Counsel for the defense?

18         MR. HAMOUDI:  Not at this time, Your Honor.

19         THE COURT:  All right.  Then if there is nothing

20 further, thank you.  We'll be in recess.

21

22             (Proceedings concluded at 3:16 p.m.)

23

24

25

June 22, 2021

C E R T I F I C A T E

   I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

   I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

   Dated this 12th day of July 2021.

     /S/  Nancy L. Bauer

     Nancy L. Bauer, CCR, RPR
     Official Court Reporter