HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

   Plaintiff,

   v.

GIZACHEW WONDIE,

   Defendant.

Case No. CR18-315 RAJ

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

## I. INTRODUCTION

THIS MATTER comes before the Court upon Defendant Gizachew Wondie's motion to suppress evidence for warrantless arrest without probable cause. Dkt. # 190. Having considered the government's response, Dkt. # 208, the defendant's reply, Dkt. # 219, the files and pleadings herein, and testimony elicited during the evidentiary hearings conducted on June 7, 8, 21, and 22, 2021, the Court **GRANTS** the motion.

## II. BACKGROUND

In late 2018, ▇▇▇▇▇▇ was shot and killed. Dkt. # 54-1. King County Sherriff's Office ("KCSO") suspected that Defendant Gizachew Wondie possessed the gun that killed her. *Id.* On December 4, 2018, KCSO detective Kathleen Decker obtained a search warrant from King County Judge Kristin Richardson. Dkt. # 54-1. In applying for the warrant, Detective Decker represented to Judge Richardson that she had probable cause to search Mr. Wondie's apartment and car for the murder weapon. *Id.* Two days later, on December 6, 2018, KCSO executed the search warrant. Dkt. ## 190-1, 190-2, 190-5.

ORDER – 1

Officers from Homeland Security Investigations ("HSI") and the Seattle Police Department ("SPD") attended the December 6, 2018 operation. Dkt. # 190-2. Apart from KCSO's murder investigation, the two agencies were "familiar" with Mr. Wondie because they were "working a narcotics case targeting [him]." Dkt. # 54-1 at 11. Specifically, HSI was investigating Mr. Wondie because it suspected that he was building a pill press machine and counterfeiting Xanax pills. Dkt. # 73-1. HSI also suspected, based on a citizen complaint, that Mr. Wondie was dealing drugs out of his car. Dkt. ## 73-6, 73-7. Meanwhile, SPD was investigating Mr. Wondie for "drug dealing around the area of 12th Ave and E Alder St." Dkt. # 73-5. To support KCSO's murder investigation, HSI and SPD shared some information with KCSO about Mr. Wondie's gun possession and activity. Dkt. # 54-1 at 11-12; Dkt. # 219-1 at 3. Detective Decker referred to the other investigations as "ongoing" or "parallel" "drug investigations," "working the dope (pill) angle" against Mr. Wondie. Dkt. # 190-1 at 5; Dkt. # 219-3.

Detective Decker employed KCSO's TAC-30 unit to execute the search warrant. Dkt. # 190-1. The morning of December 6, 2018, KCSO drove to an area near Mr. Wondie's apartment. Dkt. # 190-5. Soon after, officers saw Mr. Wondie arrive and park his car nearby. *Id.* One officer saw a person in the driver's seat, "but [his] hood was up and [the officer] couldn't see [the driver's] face." *Id.* at 2. Another officer saw Mr. Wondie "on his phone." *Id.* at 5. Then, TAC-30 moved in. *Id.* Mr. Wondie was reportedly "oblivious" to the approach, until an officer "banged on the window." *Id.* at 1, 7. At the time, Mr. Wondie was "sitting with his head down counting a large amount of cash money in his lap." *Id.* at 7. An officer later opened the car door and removed him. *Id.* at 1, 7.

KCSO arrested Mr. Wondie. Dkt. # 285-1 ¶ 3. Detective Decker and officers from other agencies then interviewed him. Dkt. # 73-5 at 3-4; Dkt. #73-8 at 3. Based on the evidence recovered from the December 6, 2018 operation, including what the officers learned from their interviews, SPD Detective Amy Branham obtained another search

ORDER – 2

warrant from Judge Richardson, this time for Mr. Wondie's suspected drug possession and distribution crimes. Dkt. # 73-12. The Branham warrant specifically identified the Decker warrant. *Id.* Officers executed the Branham warrant and, relevant to this case, recovered 11,000 Xanax pills, 171 grams of powder cocaine, a pill press, and more. Dkt. # 73-5 at 4; Dkt. # 190-7. The murder gun was not recovered. Dkt. # 190-7.

After he was indicted, Mr. Wondie moved for a *Franks* hearing, contending that Detective Decker obtained the Decker warrant by knowingly offering false information to Judge Richardson. Dkt. # 54. After holding an evidentiary hearing, the Court granted the motion. Dkt. # 314. It determined that, in applying for the Decker warrant, Detective Decker recklessly provided false information and misleading omissions to Judge Richardson. *Id.* After excising the falsehoods, the Court found that the warrant failed for lack of probable cause. *Id.*

### III. DISCUSSION

Now, the Court must determine what evidence, if any, must be suppressed. Dkt. # 190. Mr. Wondie argues that all evidence seized following his December 6, 2018 arrest must be excluded. *Id.* This includes the evidence obtained the day of his arrest (such as the evidence seized from his person and vehicle and statements he made to law enforcement officers) and evidence later obtained from both his residences upon execution of the Branham warrant. Dkt. # 190 at 8.

The Court agrees: all evidence obtained following Mr. Wondie's arrest is fruit of the Decker warrant and must be excluded. The Court begins with the exclusionary rule and concludes by addressing the government's collective knowledge and *Terry* stop arguments.

    A.    **Suppression Following *Franks* Hearing**

If a defendant prevails at a *Franks* hearing, "the evidence obtained as a result of the search warrant issued on the affidavit must be excluded." *United States v. Valencia*, 24 F.3d 1106, 1109 (9th Cir. 1994). Well settled, the "exclusionary rule" maintains that

ORDER – 3

"evidence seized during an unlawful search cannot constitute proof against the victim of the search." *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). This rule extends to "direct" and "indirect" products of unlawful searches. *Id.* Evidence qualifies as "fruit of the poisonous tree" if "the illegal activity tends to significantly direct the investigation to the evidence in question." *Frimmel Mgmt., LLC v. United States*, 897 F.3d 1045, 1054 (9th Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017)). The "focus" is on "the causal connection between the illegality and the evidence." *Id.* Even then, the rule "does not require a particularly tight causal chain between the illegal search and the discovery of the evidence sought to be suppressed." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).

Because Mr. Wondie prevailed at the *Franks* hearing, the Court must exclude all evidence obtained as a result of the Decker warrant. For any given piece of evidence, the Court must determine whether the Decker warrant "significantly directed" the investigation to that evidence. Under that rubric, the Court concludes that all evidence obtained from the December 6, 2018 operation must be excluded.

The following is not seriously disputed: On December 6, 2018, KCSO apprehended Mr. Wondie, with Detective Decker at the lead. Dkt. ## 190-1, 190-2, 190-5, 285-1. The purpose of the operation was to execute the Decker warrant. *Id.* In fact, the parties have agreed that the "contact" would not have occurred "at the time, at the place, and in the manner it did but for [KCSO]'s homicide investigation." Dkt. # 285-1 ¶ 2. The government does not argue, nor does the evidence suggest, that KCSO conducted the operation at the behest of HSI or SPD. Dkt. ## 190-5, 219-1. Nor is there any argument or evidence suggesting that KCSO confronted Mr. Wondie for his suspected pill press and drug dealing activity. *Id.* Nor was there any suggestion by HSI and SPD before the operation that they, in fact, had probable cause to arrest Mr. Wondie based on their respective investigations. *See id.* Indeed, the day before the operation,

ORDER – 4

Detective Decker informed her team and the other agencies, "[KCSO] DO[ES] NOT have [probable cause] for Wondie (at least not yet)." Dkt. # 190-2. HSI and SPD did not then represent that they had independent probable cause from their investigations. Though KCSO intended to stop Mr. Wondie on December 6, 2018 merely to execute the Decker warrant, it ultimately arrested him. Dkt. # 285-1. During that arrest, KCSO recovered drugs on his person and, along with other agencies, obtained admissions. *Id.*; Dkt. # 73-8 at 3; Dkt. # 285 ¶ 4. That evidence was primarily the basis of the Branham warrant. Dkt. # 73-12 at 7-8. The Branham warrant specifically referenced the Decker warrant and explained that the purpose of the December 6, 2018 operation was to execute the Decker warrant. *Id.* at 7. In executing the Branham warrant, law enforcement officers discovered the evidence relevant to Mr. Wondie's indictment here: 11,000 Xanax pills, 171 grams of powder cocaine, a pill press, and more. Dkt. # 73-5 at 4; Dkt. # 190-7.

The Court finds that the Decker warrant significantly directed the investigation that followed it. The purpose of the December 6, 2018 operation was to execute the Decker warrant. The evidence obtained at the time was obtained because of the operation and was the basis for the later Branham warrant. The Court finds that the execution of the tainted Decker warrant tended to significantly direct the investigation to the evidence in question. The standard itself does not require a "particularly tight causal chain," and even then the Court finds that the chain here is a tight one. Thus, the Court suppresses all evidence obtained from the December 6, 2018 operation.

**B.   Collective Knowledge Doctrine**

The Decker warrant aside, the government argues that, on December 6, 2018, law enforcement officers had independent probable cause to arrest Mr. Wondie under the collective knowledge doctrine. Dkt. # 208.

Given "the complexity of modern police work, [an] arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is

ORDER – 5

based on facts known only to his superior or associates." *United States v. Jensen*, 425 F.3d 698, 704-05 (9th Cir. 2005) (quoting *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986)). Under the collective knowledge doctrine, courts determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by assessing the "collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (quoting *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986)). The doctrine applies even when all the information known to the "law enforcement officers involved in the investigation" was not communicated to the officer who undertook the challenged action. *Id.*

The doctrine generally applies in two situations. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). The first is when officers "are working together in an investigation but have not explicitly communicated the facts each has independently learned." *Id.* (quoting *Ramirez*, 473 F.3d at 1032). The second is when an officer "with direct personal knowledge of *all* the facts necessary to give rise to . . . probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Ramirez*, 473 F.3d at 1033 (emphasis in original).

The second situation does not apply. Mr. Wondie's arrest on December 6, 2018 was not done at the command of another officer or agency that had direct personal knowledge of all the facts necessary for probable cause. That is not what the government argues. Dkt. # 208 at 14-15. That is not what the evidence reveals. KCSO confronted Mr. Wondie on December 6, 2018 to execute the Decker warrant. Dkt. # 285-1 ¶ 2.

The government suggests that the first situation applies. According to the government, independent of the Decker warrant, HSI and SPD had probable cause to arrest Mr. Wondie based on their respective investigations of his drug manufacturing and drug dealing activities. Dkt. # 208. Under the collective knowledge doctrine, the government says, the Court should first search beyond what KCSO officers and Detective Decker personally knew at the time of the arrest, then identify what HSI and SPD knew

ORDER – 6

from their independent investigations, and then impute HSI's and SPD's knowledge to KCSO and Detective Decker. *Id.* at 7-15. The government argues that, should the Court do so, it would find that when KCSO approached Mr. Wondie's car on December 6, 2018, "the investigative team collectively knew a number of facts, each of which supported a finding of probable cause to arrest for drug violations." *Id.* Thus, the government argues that Mr. Wondie's arrest was valid and that the resulting evidence should not be suppressed. *Id.*

### i.   "Working Together in an Investigation"

In the first collective knowledge situation, often "no single law enforcement officer knows all of the facts necessary to establish reasonable suspicion or probable cause, and thus aggregation of facts is required." *Ramirez*, 473 F.3d at 1032. Courts have been willing to "aggregate the facts known to each of the officers involved," when there has been at least some communication between them. *Id.* The doctrine seeks to "distinguish[ ] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *Id.* (alteration in original) (quoting *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005)).

For example, in *United States v. Bernard*, 623 F.2d 551, 561 (9th Cir. 1979), the court aggregated the knowledge of three DEA agents at the scene of the same arrest. At the time, the agents were investigating defendants suspected of manufacturing methamphetamine. *Id.* at 553-54. Officers were monitoring a mobile home; they suspected it was being used as drug laboratory. *Id.* One officer saw a defendant "rush" out of the mobile home "gasping, breathing deep" and "shaking his head," apparently trying to get fresh air. *Id.* The officer relayed that information to a second officer, and they concluded that the suspects were using the mobile home to manufacture methamphetamine. *Id.* The second officer relayed that conclusion—but not the first officer's actual observations—to a third officer, who then authorized the arrest. *Id.* Though it found that no agent alone, "considered in isolation," had knowledge of facts

ORDER – 7

sufficient to constitute probable cause to arrest the defendants, the court aggregated the knowledge between them to find probable cause. *Id.* at 560-61. The agents were "working in close concert," and "[i]n effect all of them participated in the decision to make the arrests." *Id.*

The Ninth Circuit has applied the doctrine in similar situations: aggregating the knowledge of law enforcement officers working on the same investigation (often in the same department). *See, e.g.*, *United States v. Del Vizo*, 918 F.2d 821, 827 (9th Cir. 1990) (aggregating the knowledge of different Torrance Police Department officers conducting the same investigation of defendants' "narcotics transaction"); *United States v. Jensen*, 425 F.3d 698, 705 (9th Cir. 2005) (aggregating the knowledge of two members of the Northwest Drug Task Force and one former member because they had "extensive and specific knowledge" of defendant's "drug-related activities"); *United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105-06 (9th Cir. 2002) (aggregating the knowledge of two detectives, each "standing at [the other's] elbow," pursuing and arresting the same fleeing bank robber); *cf. Terry*, 400 F.3d at 578, 581 (aggregating the knowledge of three Oglala Sioux Tribe Department of Public Safety officers "proceeding as a team" "to investigate a domestic violence complaint").

The Court rejects the government application of the collective knowledge doctrine. The doctrine applies to officers working on the same investigation. Here, the agencies were working on three different investigations.

The collective knowledge doctrine applies to officers working together "in an investigation." *Villasenor*, 608 F.3d at 475. Precedent provides examples: two officers pursuing the same bank robber, three officers responding to the same domestic violence complaint, three officers observing different facts at the scene of the same drug arrest. When officers are working together on an investigation, courts have been willing to aggregate the knowledge of officers for that investigation.

Here, there were three distinct "investigations," conducted by three different

ORDER – 8

agencies, each of which "happen to be investigating the same subject"—Mr. Wondie. *Ramirez*, 473 F.3d at 1032 (quoting *Terry*, 400 F.3d at 581); *cf.* Dkt. # 73-5 at 3. First, KCSO was investigating Mr. Wondie for a murder. Dkt. # 54-1. Second, HSI was investigating Mr. Wondie for importing a pill press and manufacturing counterfeit Xanax. Dkt. ## 73-6, 73-7. Third, SPD was investigating Mr. Wondie for drug dealing in the East Precinct. Dkt. # 73-5.

The "investigation" that resulted in Mr. Wondie's arrest was, undisputedly, KCSO's murder investigation. When officers confronted Mr. Wondie on December 6, 2018, they did so to execute the Decker warrant. Dkt. # 73-12 at 7; Dkt. # 190-1; Dkt. # 219-1 at 3 ("Our goal is to serve a search warrant on his current residence for firearm evidence to include the murder gun."). Surely, the other agencies helped KCSO in that investigation. To the extent that those agencies had knowledge about Mr. Wondie's gun activity, the Court has no trouble applying the doctrine to impute that knowledge to KCSO. For example, before the arrest, HSI agent Marco Dkane told KCSO that, while undercover in HSI's investigation, he discussed guns with Mr. Wondie who suggested that he indeed had guns. Dkt. # 219-1 at 3. To that extent, KCSO, HSI, and SPD were "functioning as a team"—for the *murder* investigation. Under the collective knowledge doctrine, the officers' knowledge may be aggregated for the *murder* investigation.

Yet the government asks the collective knowledge doctrine to do much, much more. As the government would have it, the term "an investigation" should be construed broadly. It should include all three investigations here (murder, drug manufacturing, and drug dealing), each conducted by three different agencies (KCSO, HSI, and SPD). Dkt. # 208 at 7-15. According to the government, the Court should then impute any probable-cause-sufficient knowledge from those three investigations to KCSO. *Id.* Should the Court do so, the government submits, it would find that at least one agency had sufficient probable cause to arrest Mr. Wondie on December 6, 2018 and that the evidence that followed was legitimately gathered apart from the Decker warrant. *Id.*

ORDER – 9

The Court is unpersuaded for three reasons. First, the government simply offers no support for its application of the collective knowledge doctrine. It cites no authority suggesting that the doctrine applies to officers in different agencies working on different investigations. The Court has similarly found none. On the other hand, the case law clearly contemplates a single investigation. Explaining the doctrine, the Ninth Circuit stated that it applies to officers working together in "an investigation." *Villasenor*, 608 F.3d at 475 (quoting *Ramirez*, 473 F.3d at 1032). It referenced a singular investigation; it did not reference "many" or "several." *See id.* Further, the case law provides illustrative examples: a single bank robbery, a single domestic violence complaint, a single narcotics investigation. The collective knowledge doctrine may apply to the murder investigation, but there is no authority suggesting that the Court should aggregate knowledge across all three unrelated investigations.

Second, precedent clearly warns against aggregating the knowledge "independent actors who merely happen to be investigating the same subject." *Ramirez*, 473 F.3d at 1032 (quoting *Terry*, 400 F.3d at 581). The government represents that KCSO, HSI, and SPD should be treated as the same "investigative team." Dkt. # 208 at 7. It says that, sometime before Mr. Wondie's arrest, the agencies' "three investigative threads came together." Dkt. # 73 at 4. The implication is that all three investigations were, really, one. The evidence suggests otherwise. Though KCSO, HSI, and SPD were investigating the same subject (Mr. Wondie), the investigating officers appeared to view and treat the three investigations as independent. *See, e.g.*, Dkt. # 73-5 at 3 (SPD officer explaining that KCSO was investigating Mr. Wondie "for a homicide" while HSI was investigating him for "possess[ion] [of] a pill press machine" and SPD was investigating him "for drug dealing around the area of 12th Ave and E Alder St"); Dkt. # 73-12 at 8 (SPD Detective Amy Branham explaining that KCSO was "conducting a murder investigation in which they believed WONDIE was in possession of the murder weapon" while "HSI was investigating WONDIE for drug trafficking, specifically counterfeit Xanax pills"); Dkt. #

ORDER – 10

219-1 at 3 (Detective Decker explaining that there was an "ongoing drug investigation" against Mr. Wondie in which other agents were "working the dope (pill) angle"). These examples suggest that, despite some collaboration, KCSO, HSI, and SPD, conducted independent investigations and merely happened to be investigating the same subject.

Third, even if the Court applied the doctrine across different investigations, the government has offered scant evidence showing why KCSO should be considered part of HSI's and SPD's respective investigative teams. HSI and SPD may well have shared their knowledge with KCSO about Mr. Wondie's gun activity, thereby becoming members of the murder investigation. Dkt. # 219-1 at 3. But there is little evidence demonstrating that the information flowed the other way—that KCSO helped HSI with its pill press investigation or SPD with its drug dealing investigation, thereby becoming part of their investigations. If KCSO was not part of HSI's and SPD's teams, the Court need not impute their pill press and drug dealing knowledge to KCSO.

To be sure, the Court is not inquiring into precisely what information was communicated among KCSO, HSI, and SPD. *Ramirez*, 473 F.3d at 1032. The doctrine applies even if the information giving rise to probable cause was not actually communicated to the arresting officer. *Id.* at 1032-33. The Court only determines that, based on the evidence, there were three distinct investigations here and that, for purposes of the collective knowledge doctrine, the Court may only aggregate knowledge for the murder investigation.

In sum, the Court rejects the government's collective knowledge argument and ignores whether the other agencies may have had sufficient probable cause for their investigations. The Court reaffirms its above conclusion: the evidence obtained from the Decker warrant and, later, the Branham warrant are fruits of the poisonous tree and must be excluded.

C.   *Terry* Stop

The Fourth Amendment to the United States Constitution protects individuals

ORDER – 11

against "unreasonable searches and seizures." U.S. Const. amend. IV. There are two types of police seizures under the Fourth Amendment: "*Terry* stops" and "full-scale arrests." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020). *Terry* stops permit officers to conduct "a brief, investigative stop of an individual when they have reasonable suspicion that the 'person apprehended is committing or has committed a criminal offense.'" *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)). "[The] officer must have reasonable suspicion to believe 'criminal activity may be afoot.'" *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

Even if the law enforcement officers lacked probable cause on December 6, 2018 for Mr. Wondie's arrest, the government argues that the operation should alternatively be considered a valid *Terry* stop, providing yet another independent reason the evidence should not be suppressed. Dkt. # 208 at 15-16. The Court rejects that argument: the December 6, 2018 operation was not a *Terry* stop.[1]

Setting aside the Decker warrant and the other agencies' investigations, on December 6, 2018, KCSO had no reasonable suspicion to stop Mr. Wondie. Again, the KCSO confronted Mr. Wondie to execute the Decker warrant. Dkt. # 73-12 at 7; Dkt. # 190-1; Dkt. # 219-1 at 3. There is simply no evidence that, apart from the Decker

---

[1] Initially, the government argued that when KCSO confronted Mr. Wondie, an officer noticed a "baggie of cocaine protruding from his pocket" "in plain view." Dkt. # 208 at 15-16. The government said that the stop was a *Terry* stop and that, upon recognizing the cocaine, the officer gained sufficient probable cause. *Id.* The government has since withdrawn the officer's observations from the record. Dkt. # 285 at 1 ("[The parties] will not call [the officer who observed the cocaine] as a witness for any purpose. Because [the officer] was the only witness who would have testified to observing cocaine in the defendant's possession prior to his arrest, *the government will not cite this alleged possession as an independent basis for its argument that the defendant was lawfully arrested*." (emphasis added)). Whether the government intended to withdraw its entire *Terry* stop argument or just the officer's observations is unclear. In any event, per the parties' stipulation, the Court has not considered that officer's statement. Dkt. # 73-10; Dkt. # 190-5 at 4-5; Dkt. # 285.

ORDER – 12

warrant, KCSO had reasonable suspicion that criminal activity was afoot.  *See* Dkt. # 190-5 (KCSO officer witness statement reports recounting the December 6, 2018 operation).  Based on the KCSO arresting officers' own statements, when they confronted Mr. Wondie, they did so to "arrest" him as a homicide suspect.  *Id*.  Before they ordered him out of his car, the arresting officers reportedly observed Mr. Wondie sitting in his parked car, with his hood up, "on his phone," and "sitting with his head down counting a large amount of cash money in his lap."  *Id*.  This behavior does not rise to the level of reasonable suspicion to initiate a *Terry* stop in the first place.  Mr. Wondie's behavior did not give rise to a reasonable suspicion that criminal activity was afoot.

## IV.  CONCLUSION

For the reasons stated above, Mr. Wondie's motion to suppress evidence for warrantless arrest without probable cause (Dkt. # 190) is **GRANTED**.

DATED this 9th day of August, 2021.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 13